# EXHIBIT 1



RECHTSANWÄLTE

# BUB, GAUWEILER & PARTNER
Partnerschaftsgesellschaft mit beschränkter Berufshaftung

RAe Bub, Gauweiler & Partner  PartGmbB  Promenadeplatz 9   80333 München

Landgericht Frankfurt am Main
- Zivilkammer -
60265 Frankfurt am Main



**PROF. DR. WOLF-RÜDIGER BUB**
Honorarprofessor an der Universität Potsdam
**DR. PETER GAUWEILER**
Bayerischer Staatsminister a. D.
**FRANZ ENDERLE**
**WOLFGANG BUB**
**DR. HENNING KRAUSS, LL.M. (Duke)**
**DR. ANDREAS STRENKERT, M.Jur. (Oxford)**
**VOLKER EMMINGER**
**SELIHA TEMUCIN**
**DR. STEFANIE RABENAU**
**DR. DÖRTHE KORN**
**THOMAS MEYER\***
**ISABEL BALLAUF**
**DR. STEFANIE GRUHN**
**DR. MICHAEL KNOTT**
**NIKOLAY PRAMATAROFF**

PROMENADEPLATZ 9
80333 MÜNCHEN

TELEFON 089 / 210 32 - 6
TELEFAX  089 / 210 34 - 800

info@bubgauweilerpartner.de
www.bubgauweilerpartner.de

München, den 31.10.2016
485034 - HK/tp

00327-15

## KLAGE

der **Frau Isabella Hranov**

Goldhaldenstrasse 37, CH - 8702 Zollikon-Zürich, Schweiz

- Klägerin -

Prozessbevollmächtigte:      Rechtsanwälte Bub, Gauweiler & Partner

Promenadeplatz 9, 80333 München



gegen

1.      **Deutsche Bank AG**

Taunusanlage 12, 60325 Frankfurt am Main,

gesetzlich vertreten durch den Vorstand, dieser vertreten durch die Vorstände John

Cryan, Stuart Lewis, Sylvie Matherat, Garth Ritchie, Karl von Rohr, Dr. Marcus

Schenck, Christian Sewing und Jeffrey Urwin

- Beklagte zu 1) -

Partnerschaftsgesellschaft PR München Nr. 46
Partner: RAe Prof. Dr. Bub, Dr. Gauweiler, Bub, Enderle
Die Rechtsanwälte in München sind bei der Rechtsanwaltskammer für den Oberlandesgerichtsbezirk München,
Die Rechtsanwälte Dr. Meyer, Dr. Gruhn und Pramataroff sind bei der Rechtsanwaltskammer Berlin
zur Rechtsanwaltschaft zugelassen.

\*Büro Berlin: Koenigsallee 26   14193 Berlin   Tel. 030 / 8973540 – 0   Fax: 030 / 8973540 – 20

**105**

2.  **Simon Biner**

Weiherweg 2, 8803 Rüschlikon, Schweiz

- Beklagter zu 2) -

wegen:        Forderung

Streitwert:   EUR 293.592.000,00

Namens und im Auftrag der Klägerin erheben wir

## KLAGE.

Den Gerichtskostenvorschuss in Höhe von EUR 329.208,00 werden wir umgehend durch Überweisung zur Einzahlung bringen, sobald uns das Aktenzeichen bekannt ist.

Ferner bitten wir um Anberaumung eines zeitnahen Termins zur mündlichen Verhandlung und stellen folgende

## Anträge:

I.      Die Beklagten werden als Gesamtschuldner verurteilt, an die Klägerin CHF 318.177.048,15 nebst Zinsen in Höhen von fünf Prozentpunkten über dem Basiszinssatz ab Rechtshängigkeit zu bezahlen.

II.     Die Beklagten tragen die Kosten des Rechtsstreits.

III.    Das Urteil ist vorläufig vollstreckbar.

Für der Fall der Anordnung des schriftlichen Vorverfahrens **b e a n t r a g e n** wir, gemäß § 331 Abs. 3 Satz 1 ZPO gegen die Beklagten Versäumnisurteil zu erlassen, sollten die Beklagten ihre Verteidigungsabsicht nicht rechtzeitig anzeigen.

**INHALTSVERZEICHNIS**

Vorbemerkung

1. Einleitung

1.1 Zur Klägerin

1.2 Zu Herrn Rumen Hranov

1.3 Zur Beklagten zu 1)

1.4 Zum Beklagten zu 2)

2. Sachverhalt

2.1 Aktien Options-Transaktionen mit der Beklagten zu 1)

2.1.1 Vertragsbeziehungen und ihr „Dokumentation"

    a) Agreement on Direct Orders

    b) Trading Authorization for Direct Orders zwischen Bank Julius Bär und Herrn Hranov

    c) Trading Authorization for Direct Orders zwischen Bank Julius Bär und der Beklagten zu 1)

    d) „Besonderheiten" der Dokumentation

2.1.1 Die Transaktionen im Einzelnen

2.1.2 Courtagen und Börsengebühren

2.1.3 Wertpapierprospekte

2.1.4 Ursachen der eingetretenen Verluste

2.2 Verluste durch Overpricing

2.2.1 Ermittlung des fairen Preises der Optionen

    a) Bewertungsmethode

    b) Vergleich des fairen Preises mit dem von der zu Beklagten zu 1) in Rechnung gestellten Preis

2.2.2 „Marktübliche" Leistungsentgelte für Emittenten von Warrants

2.3 Auf Totalverlust ausgerichtete Anlagestrategie

2.3.1 Verlustrisiken der empfohlenen Anlagestrategie

    a) Verlustrisiko einer Aktienoption im Vergleich zum fremdfinanzierten Erwerb einer Aktie

    b) Auswirkung des Hebeleffekts auf das Verlustrisiko

2.3.2 Anlagestrategie bezweckte den Totalverlust

2.3.3 Keine Diversifikation

2.3.4 Anlageempfehlungen zielten darauf ab, die Gewinnrealisierung zu verhindern

    a) Neutralisierung von Verkäufen mit Gewinn durch zeitgleiche Abschlüsse neuer Transaktionen

    b) Interesse der Beklagten zu 1), eine Risikoabsicherung bezüglich der streitgegenständlichen Geschäfte zu vermeiden

    aa) Absicherung durch den Erwerb gegenläufiger Optionen an der EUREX

    bb) Absicherung durch den Erwerb von OC Oerlikon Aktien

2.4 Unterlassene Aufklärung über Funktionsweise und Risiken der Warrants

2.5     Anlageberatung durch den Beklagten zu 2)

2.5.1   Persönliche Treffen

2.5.2   Telefonische Beratung

2.5.3   Portfolioverwaltung durch den Beklagten zu 2)

          a)     Kauf- und Verkaufsorder durch den Beklagten zu 2) im Namen von Herrn Hranov, Frau
                 Hranova und Frau Schulz

          b)     Verwaltung der Portfolien von Herrn Hranov, Frau Hranova und Frau Schulz

          c)     Bewusste Ausnutzung der Portfolioverwaltung zum Vorteil der Beklagten zu 1)

2.6     Zeitpunkt der Kenntniserlangung durch Herrn Hranov, Frau Hranova und die Erben von Frau
          Schulz von den Ansprüchen gegen die Beklagten

3.        Rechtliche Würdigung

3.1      Zulässigkeit der Klage

3.1.1   Internationale Zuständigkeit für die Klage gegen die Beklagte zu 1)

          a)     Internationale Zuständigkeit gemäß Art. 4 Abs. 1 EuGVVO

          b)     Internationale Zuständigkeit gemäß Art. 2 Abs. 1 LugÜ-II

          c)     Gerichtsstand gemäß Ziffer 5 (Seite I-15) des Offering Circular

3.1.2   Internationale Zuständigkeit für die Klage gegen den Beklagten zu 2)

3.1.3   Örtliche Zuständigkeit

3.2      Begründetheit der Klage

3.2.1   Aktivlegitimation der Klägerin

3.2.2   Haftung des Beklagten zu 1)

          a)     Haftung gemäß § 826 BGB

                 aa)     Sittenwidrige Schadenszufügung

                            (1)     Unterlassene Aufklärung

                            (2)     Overpricing

                            (3)     Anlagestrategie

                            (4)     Transaktionen vom 16.10.2007

                 bb)     Vorsatz

          b)     Haftung gemäß § 823 Abs. 2 S. 1 BGB i.V.m. § 263 Abs. 1 StGB

          c)     Haftung gemäß §§ 280 Abs. 1, 311 Abs. 2 BGB

3.2.3   Haftung des Beklagten zu 2)

          a)     Haftung gemäß § 823 Abs. 2 BGB i.V.m. § 263 Abs. 1 StGB

          b)     Haftung gemäß § 830 Abs. 1, 826 BGB

3.3      Schadensberechnung

## ANLAGENVERZEICHNIS

**K 1**      Abtretungsvereinbarung vom 12.10.2016 zwischen der Klägerin und Herr Rumen Hranov

**K 2**      Abtretungserklärung/Zession zwischen Herrn Rumen Hranov und Frau Maria Hranova vom
15.09.2014

**K 3**      Abtretungserklärung/Zession zwischen Herrn Rumen Hranov und Frau Elissaveta Schulz
vom 15.09.2014

**K 4**      Abtretungsvereinbarung zwischen Frau Maria Hranova und der Klägerin vom 29.07.2016

**K 5**      Abtretungsvereinbarung zwischen Herrn Martin Schulz und Frau Rumiana Engel mit der
Klägerin vom 29.07.2016

**K 6**      Sterbeurkunde vom 12.03.2015, ausgestellt vom Standesamts- und Staatsbürgerschafts-
verband Mödling, Niederösterreich, Österreich

**K 7**      Einantwortungsbeschluss des Bezirksgerichts Döbling, Abteilung 1, Wien, Österreich, vom
24.06.2015

**K 8**      Auszug aus dem Handelsregister des Kantons Zürich, Firmennummer CHE-105.690.694

**K 9**      Handelsblattartikel vom 28.06.2004

**K 9 a**    Schreiben der Beklagten zu 1) vom 19.10.2006

**K 9 b**    Agreement on Direct Orders

**K 9 c**    Settlement Instructions

**k 9 d**    Trading Authorization for Direct Orders zwischen Bank Julius Bär und Beklagte zu 1)

**K 9 e**    Trading Authorization for Direct Orders zwischen Bank Julius Bär und Rumen Hranov

**K 10**     Transaktionsliste

**K 11**     Einzeltransaktionen OERDA

**K 12**     Einzeltransaktionen OERDC

**K 13**     Einzeltransaktionen OERDD

**K 14**     Einzeltransaktionen OERDE

**K 15**     Einzeltransaktionen OERDF

**K 16**     Einzeltransaktionen OERDG

**K 17**     Einzeltransaktionen OERDI

**K 18**     Einzeltransaktionen OERDK

**K 19**     Einzeltransaktionen OERDL

**K 20**     Einzeltransaktionen OERDS

**K 21**     Einzeltransaktionen OERDT

**K 22**     Einzeltransaktionen OERDY

**K 23**     Einzeltransaktionen OERDZ

**K 24**     Einzeltransaktionen OERHA

**K 25**     Einzeltransaktionen OERIA

**K 26**    Einzeltransaktionen OERIB 2007

**K 27**    Einzeltransaktionen OERIB 2008

**K 28**    Einzeltransaktionen OERIQ

**K 29**    Einzeltransaktionen OERIR

**K 30**    Einzeltransaktionen OERIS

**K 31**    Einzeltransaktionen OERIZ

**K 32**    Einzeltransaktionen OERLU

**K 33**    Einzeltransaktionen Spread Wts. 525/575

**K 34**    Einzeltransaktionen Spread Wts. 625/675

**K 35**    Einzeltransaktionen Eurex Call March 560

**K 36**    Einzeltransaktionen Eurex Put March 560

**K 37**    Aufstellung bezahlte Courtagen und Börsengebühren

**K 38**    Offering Circular ISIN CH00286565902865659, CH00286566162865661, CH00286566242865662 und CH00286566322865663

**K 39**    Tabelle Transaktionen

**K 40**    Liste wissenschaftliche Darstellungen

**K 41**    Tabelle Hebel

**K 42**    Gutachten von Herrn Prof. Kaserer vom 12.05.2016

**K 43**    Offenlegungsmeldung der OC Oerlikon AG vom 18.01.2007

**K 44**    Darstellung Betafaktor

**K 45**    Diagramm

**K 46**    Diagramm Kursverlauf und zeitlich Abfolge von Käufen und Verkäufen

**K 47**    Tabelle bewegte Optionen

**K 48**    Tabelle ALM

**K 49**    Erklärung von Herrn Ronny Pecik vom 09. 04.2013

**Begründung:**

**Vorbemerkung:**

I.      Gegenstand dieser Klage und des Verfahrens ist ein besonderes Lehrstück über den Umgang der Beklagten mit ihrem Kunden und (grob missbrauchtes) Vertrauen. Die Bank, die einstmals den Satz

*„Vertrauen ist der Anfang von Allem"*

als Werbeslogan auf ihre Fahnen geschrieben hatte, hat – durch ihren Herrn Simon Biner, Head of Global Markets Equities Switzerland, den Beklagten zu 2) – den Ehemann der Klägerin in krimineller Weise belogen und sein „blindes Vertrauen" – wie jener Herr Biner gegenüber Dritten unumwunden einräumte – schamlos missbraucht. So erklärte er auf Nachfrage nach den für eine andere Transaktion notwendigen Mitteln, die hole er sich vom Ehemann der Klägerin, der ihm „blind vertraue". Er werde – und das hat er dann auch gerade einmal vier Tage später in die Tat umgesetzt – Herrn Hranov Kaufoptionen auf OC-Oerlikon-Aktien mit kurzer Laufzeit verkaufen, die „deep in the money" seien (und deshalb einen hohen Preis haben). Danach werde er mit seinen eigenen Positionen einen Kurssturz der Aktie verursachen, damit die Optionen wertlos verfielen. Der Gesprächspartner von Herrn Biner erklärte empört, dass er (Herr Simon Biner)

*„das doch nicht machen könne."*

Seine (d. h. Herrn Biners) Antwort spricht für sich:

*„Was kümmert dich das? Es ist nicht dein Geld, es ist Hranovs Geld."*

Nicht überraschend: am 16. Oktober 2007 setzte der Beklagte zu 2) seinen Plan in die Tat um, veranlasste den Austausch von 6 Optionen gegen 3 Optionen. Kurze Zeit später stürzte der Aktienkurs – von CHF 524 am 16.10.2007 auf CHF 268,25 am 15.08.2008 - ab und die dem Ehemann der Klägerin am 16. Oktober 2007 in die Wertpapierdepots geschobenen Optionen verfielen wertlos. Am An-fang war der Ehemann der Klägerin ein äußerst wohlhabender Schweizer Staatsbürger, der seit vielen Jahren in der Nähe von Zürich wohnt. Der Beklagte

zu 2), der die Züricher Kantonalbank AG zum führenden Derivatehändler der Schweiz mit einem Marktanteil von 23 % gemacht hatte, gewann den Ehemann der Klägerin im Jahr 2005 als Kunden (und hat ihn vermutlich sofort für seine Zwecke missbraucht). Als er im Jahr 2006 zur Beklagten zu 1) wechselte, nahm er den Ehemann der Klägerin „als Kunden mit". Er empfahl dem in solchen Geschäften völlig unerfahrenen Ehemann der Klägerin großvolumige Aktienoptionsgeschäfte, ohne ihn über die besonderen Gefahren von Geschäften mit Aktienoptionen, insbesondere die Wirkungen der zeitlichen Grenzen und des damit verbundenen Totalverlustrisikos aufzuklären. Nun sind waghalsige Anlagestrategien mit dem fremden Geld der Kunden kein wirklich neues und ungewöhnliches Thema für die Rechtsprechung. Besonders und auch für die Unterzeichner neu ist an der streitgegenständlichen Konstellation, dass der Beklagte zu 2) im Namen der Beklagten zu 1) den Ehemann der Klägerin nicht nur beriet, sondern – ohne dass dies dem Ehemann der Klägerin gegenüber offengelegt worden wäre – die Beklagte zu 1) seine Gegenpartei war. Jeder CHF Gewinn des Ehemannes der Klägerin, seiner Mutter und seiner Schwester war ein CHF Verlust für die Beklagte zu 1) und – vor allem – jeder CHF Verlust, den der Ehemann der Klägerin, seine Mutter und seine Schwester erlitten, war ein CHF Gewinn für die Beklagte zu 1) (und damit Grundlage für die ergebnisabhängige Vergütung des Beklagten zu 2). CHF 316.011.961,00 Verlust – die der Ehemann der Klägerin, seine Mutter und seine Schwester mit den „Empfehlungen" des Beklagten zu 2) verloren haben – stehen damit CHF 316.011.961,00 Gewinn der Beklagten zu 1) – in gerade einmal 2 Jahren – gegenüber, die dem Beklagten zu 2) in diesen beiden Jahren zu einer sieben - wenn nicht achtstelligen variablen Vergütung verholfen haben.

II.    Die Klägerin macht aus abgetretenem Recht Ansprüche ihres Ehemanns, Herrn Rumen Hranov, dessen Mutter, Frau Maria Hranova und seiner verstorbenen Schwester, Frau Elissaveta Schulz, geltend. Herr Rumen Hranov hat von November 2006 bis Oktober 2008 auf Empfehlung der Beklagten für sich selbst, seine Mutter und seine Schwester von der Beklagten zu 1) emittierte Kauf- und Verkaufsoptionen auf Aktien des schweizerischen Unternehmens OC Oerlikon AG erworben. Herrn Hranov, seiner Mutter und seiner Schwester sind aus die-

sen Optionen Verluste in Höhe von insgesamt CHF 316.011.961,00 entstan-
den. Außerdem haben sie Courtagen an ihre Depotbanken in Höhe von insge-
samt CHF 2.073.843,55 und Börsengebühren in Höhe von insgesamt CHF
91.243,60 bezahlt. Der Gesamtschaden beläuft sich damit auf CHF
318.177.048,15.

III.     Die Beklagte zu 1) hat die Emission der Aktienoptionen und die Anlageberatung
        von Herrn Hranov, Frau Hranova und Frau Schulz über ihre Zweigniederlas-
        sung in Zürich durchgeführt. Die Anlageempfehlungen erteilte der Beklagte zu
        2), der bei der Beklagten zu 1) die Position Head of Global Markets Equity
        Switzerland hatte.

        Der Beklagte zu 2) war, bevor er zur Beklagten zu 1) wechselte, der führende
        Derivatehändler der Zürcher Kantonalbank, wo er den Derivatehandel so erfolg-
        reich aufbaute, dass die Zürcher Kantonalbank zum führenden Derivatehändler
        in der Schweiz mit einem Marktanteil von 23 Prozent aufstieg. Der Beklagte zu
        2) trat im Jahr 2005 an Herrn Hranov heran, der in der Schweiz als sehr vermö-
        gend bekannt ist – er hat sein Vermögen im Ölhandel erworben - und gewann
        ihn als Kunden. Im Rahmen seiner Anlageberatung empfahl er dem diesbezüg-
        lich vollkommen unerfahrenen Herrn Hranov großvolumige Aktienoptionsge-
        schäfte auf die Aktie der OC Oerlikon AG. Herr Hranov wurde weder von dem
        Beklagten zu 2) noch von einem anderen Mitarbeiter der Zürcher Kantonalbank
        über die Funktionsweise und die Risiken von Aktienoptionen aufgeklärt. Herr
        Hranov folgte immer den Anlageempfehlungen des Beklagten zu 2). Die Optio-
        nen entwickelten sich positiv, sodass Herr Hranov Gewinne erzielte. Dadurch
        gelang es dem Beklagten zu 2) das uneingeschränkte Vertrauen von Herrn Hra-
        nov zu gewinnen.

        Im Jahr 2006 wechselte der Beklagte zu 2) mit seinem Händlerteam von der
        Zürcher Kantonalbank zur Beklagten zu 1). Bei der Beklagten zu 1) leitete er
        eigenverantwortlich die Derivateabteilung für die Schweiz und trat auch nach
        außen als deren Leiter auf. Nach dem Wechsel des Beklagten zu 2) zur Beklag-
        ten zu 1), folgte ihm Herr Hranov dorthin als Kunde. Der Beklagte zu 2) empfahl
        Herrn Hranov, weiterhin in großem Umfang Aktienoptionen auf die Aktien von

OC Oerlikon zu erwerben. Diesen Empfehlungen folgte Herr Hranov jeweils für sich selbst sowie als deren Vertreter für Frau Hranova und Frau Schulz. Der Beklagte zu 2) verschwieg Herrn Hranov, dass Emittentin der empfohlenen Aktienoptionen die Beklagte zu 1) selbst war, diese deshalb an den empfohlenen Optionsgeschäften verdiente und somit ein massiver Interessenkonflikt zwischen der Beklagten zu 1) und Herrn Hranov, Frau Hranova und Frau Schulz bestand. Herrn Hranov, Frau Hranova und Frau Schulz war deshalb nicht bewusst, dass die von ihnen zum Erwerb der Aktienoptionen eingesetzten Mittel an die Beklagte zu 1) flossen. Der Beklagte zu 2) wies auch nicht darauf hin, dass die von ihm festgesetzten Preise für die Aktienoptionen im Durchschnitt 18 % über dem fairen Marktpreis für diese Optionen lagen. Er erklärte Herrn Hranov im Gegenteil stets, dass er eine gute Investitionsmöglichkeit für ihn hätte, wobei es sich um eine Option handele, die noch nicht am Markt sei, so dass er den ersten Zugriff vor allen anderen möglichen Interessenten habe. Der Beklagte zu 2) verschwieg des Weiteren, dass bei Aktienoptionen immer ein Totalverlustrisiko besteht. Ebenso täuschte er Herrn Hranov darüber, dass die von ihm empfohlene Anlagestrategie auf den Totalverlust ausgerichtet war, um den Gewinn der Beklagten zu 1) zu maximieren.

Das starke Vertrauensverhältnis zum Beklagten zu 2) wurde Herrn Hranov – und mit ihm Frau Hranova und Frau Schulz - zum Verhängnis, weil die Beklagten dieses Vertrauen schamlos auf das Gröbste missbrauchte. In dem Zeitraum von November 2006 bis Oktober 2008 nahmen die Beklagten Herrn Hranov, Frau Hranova und Frau Schulz durch die Empfehlung 80 von der Beklagten zu 1) emittierte Aktienoptionen zu kaufen, solange förmlich aus, bis sich die Verluste auf rund CHF 316 Mio. summierten.

IV.     Die Beklagten zu 1) hat für die Herrn Hranov, Frau Hranova und Frau Schulz von dem Beklagten zu 2) empfohlenen Optionen sittenwidrig überhöhte Leistungsentgelte abgerechnet, die im Durchschnitt rund 600 % über dem marktüblichen Entgelt lagen. Die Beklagte zu 1), die im Allgemeinen als Entgelt für Strukturierung, Emission, Marketing, Vertrieb und Administration von OC Oerlikon Optionen auf den fairen Marktpreis von OC Oerlikon Optionen 2 – 3 % auf-

geschlagen hat, schlug bei den Geschäften, die sie Herrn Hranov, Frau Hranova und Frau Schulz empfahl zwischen 9 und 20 % auf. Der gewichtete Durchschnitt des Preisaufschlags aus allen Optionsgeschäften betrug 18 %. Herrn Hranov, Frau Hranova und Frau Schulz ist alleine durch die überhöhten Leistungsentgelte ein Schaden von CHF 109.742.440,00 entstanden. Die auffällige Überhöhung des Leistungsentgelts betrug zwischen 300 und 666 %, im gewichteten Durchschnitt 594 % und hat damit die Grenze des Wuchers weit überschritten. Der Beklagte zu 2) hat Herrn Hranov darüber getäuscht, dass er ihm Aktienoptionen zu weit überhöhten Preisen empfahl, die von ihm empfohlene Anlagestrategie nicht im Sinne und zum Wohl von Herrn Hranov, Frau Hranova und Frau Schulz, sondern zum Wohl der Beklagten zu 1) und wegen seines eigenen wirtschaftlichen Interesses im Hinblick auf seine erfolgsbezogene Vergütung durch die Beklagte zu 1) auch zu seinem eigenen Wohl war und der Totalverlust von Anfang an beabsichtigt war.

V.   Die Beklagten haben Herrn Hranov, Frau Hranova und Frau Schulz darüber hinaus dadurch in sittenwidriger Weise vorsätzlich geschädigt, dass sie  eine Anlagestrategie empfahlen, die planmäßig darauf gerichtet war, dass das für die Options-Transaktionen eingesetzte Kapital verloren geht und von der Beklagten zu 1) als Gewinn vereinnahmt wird. Der Beklagte zu 2) hat Herrn Hranov bewusst so beraten, dass der größte Teil der Optionen wertlos verfallen ist. Der wertlose Verfall einer Aktienoption tritt zum Beispiel im Fall einer Call Option (Kaufoption) ein, wenn der Ausübungspreis der Option im Zeitpunkt des vereinbarten Ausübungszeitpunktes höher ist als der Kurs der Aktie, die Gegenstand der Option ist, weil bei Ausübung der Option für die Aktie ein höherer Preis zu bezahlen wäre als bei einem Erwerb über die Börse. Herr Hranov, Frau Hranova und Frau Schulz waren bezüglich der von ihnen erworbenen Optionen chancenlos, weil die Optionen aufgrund der Anlagestrategie des Beklagten zu 2) nur Verlust machen konnten. Wegen der aufgrund der überhöhten Leistungsentgelte überhöhten Optionsprämien hätten die Optionen außerdem auf dem Zweitmarkt oder auf sonstige Weise nicht oder nur mit Verlust verkauft werden können.

VI.   Die Beklagte zu 1) hat Herrn Hranov, Frau Hranova und Frau Schulz über die

Funktionsweise von Aktienoptionen und den damit verbundenen Risiken nicht aufgeklärt. Ein zentrales Element der Anlageberatung durch den Beklagten zu 2) war die Ersetzung von Call Optionen vor deren Ausübungszeitpunkt durch neue Call Optionen mit einer längeren Laufzeit und einem niedrigeren Ausübungspreis (so genanntes „Rollen"). Aufgrund dieses Rollens konnten Herr Hranov, Frau Hranova und Frau Schulz das katastrophale Ergebnis der von dem Beklagten zu 2) empfohlenen Anlagestrategie und das Ausmaß der Verluste überhaupt erst nach Ablauf der am längsten laufenden Optionen im Oktober 2008 erkennen. Infolge der hohen Komplexität von Aktien-Optionen an sich, aber auch wegen der empfohlenen Anlagestrategie waren die Geschädigten, die keine Kenntnisse über die Funktionsweise und die Risiken von Aktienoptionen hatten, nicht in der Lage, den vom den Beklagten verfolgten Plan zu durchschauen. Erst ein auf Anregung der Prozessbevollmächtigten der Klägerin von Herrn Prof. Dr. Christoph Kaserer, Inhaber des Lehrstuhls für Finanzmanagement und Kapitalmärkte an der Technischen Universität München, erstelltes Gutachten, das im Oktober 2016 erstattet wurde, offenbarte die planmäßige und systematische Schädigung von Herrn Hranov, seiner Mutter und seiner Schwester durch die Beklagten.

Das Gutachten hat nicht nur die sittenwidrige Überhöhung des Leistungsentgelts der Beklagten zu 1) ans Licht gebracht, sondern auch die Tatsache, dass die Anlagestrategie des Beklagten zu 2) unter anderem dazu geführt hat, dass Herr Hranov, Frau Hranova und Frau Schmidt an zahlreichen Handelstagen ein größere Zahl von OC Oerlikon Optionen erworben und oder verkauft hat, als insgesamt an der Börse gehandelt wurden und die Stückzahl der den Optionen zugrunde liegenden Aktien größer war, als am Markt verfügbar waren. Ferner hat Herr Prof. Kaserer dargelegt, dass die Beklagte zu 1) gar nicht in der Lage gewesen wäre, bei Ausübung der Optionen die erforderliche Stückzahl von Aktien zu liefern, weil sie nicht über eine ausreichende Anzahl von Aktien verfügt hätte. Schon daraus ergab sich für die Beklagten der Zwang, über die empfohlene Anlagestrategie dafür zu sorgen, dass die Optionen wertlos verfallen und nicht ausgeübt werden.

Dass der Beklagte zu 2) einen entsprechenden Plan gefasst hatte, offenbarte

er bereits am 12.10.2007 Herrn Ronny Pecik, dem er von seiner Absicht berichtete, Herrn Hranov den Erwerb großer Volumina von Optionen mit einem niedrigen Ausübungspreis und deshalb einem hohen Kaufpreis zu empfehlen, um danach durch den gezielten Verkauf großer Positionen von OC Oerlikon Aktien der Beklagten zu 1) einen Kurseinbruch der OC Oerlikon Aktie herbeizuführen, um damit zu erreichen, dass die Herrn Hranov empfohlenen Optionen wertlos verfallen. Diesen Plan haben die Beklagten dann auch erfolgreich ausgeführt.

## 1.    Einleitung

### 1.1    Zur Klägerin

Die Klägerin klagt aus abgetretenem Recht. Die streitgegenständlichen Ansprüche wurden ihr von ihrem Ehemann Herrn Rumen Hranov, Frau Maria Hranova, der Mutter von Herrn Rumen Hranov und den Erben von Frau Elissaveta Schulz, der Schwester von Herrn Rumen Hranov, die am 09.03.2015 verstorben ist, abgetreten.

1.1.1   Mit Abtretungsvereinbarung vom 12. Oktober 2016 hat Herr Rumen Hranov die ihm gegen die Beklagte zu 1) und den Beklagten zu 2) zustehenden Ansprüche an die Klägerin abgetreten. Ferner hat er die Ansprüche von Frau Maria Hranova und Frau Elissaveta Schulz gegen die Beklagte zu 1) abgetreten, deren Inhaber er war.

**Beweis:**    Abtretungsvereinbarung zwischen der Klägerin und Herrn Hranov vom 12.10.2016 in Fotokopie **– Anlage K 1**

Mit Abtretungserklärungen/Zessionen jeweils vom 15.09.2014 hatten Frau Hranova und Frau Schulz ihre jeweiligen Ansprüche und Forderungen gegen die Beklagte zu 1) aus den Aktienoptionsgeschäften über OC Oerlikon Aktien in den Jahren 2006 bis 2009, namentlich auf ihren Konten und Depots bei der Bank Julius Bär und der Thurgauer Kantonalbank,  an Herrn Rumen Hranov abgetreten. Herr Hranov war daher Inhaber dieser Forderungen, als er sie an die Klägerin abtrat.

**Beweis:**  Abtretungserklärung/Zession vom 15.09.2014 zwischen Herrn Ru-
men Hranov und Frau Maria Hranova in Fotokopie – **Anlage K 2**

Abtretungserklärung/Zession vom 15.09.2014 zwischen Herrn Ru-
men Hranov und Frau Elissaveta Schulz in Fotokopie – **Anlage K 3**

1.1.2   Mit Abtretungsvereinbarung vom 29.07.2016 hat Frau Maria Hranova sämtliche
Schadensersatzansprüche gegen den Beklagten zu 2), die ihr im Zusammen-
hang mit Aktienoptionsgeschäften mit der Beklagten zu 1), die sie aufgrund der
Beratung und der Anlageempfehlung des Beklagten zu 2) abgeschlossen hatte,
entstanden sind, an die Klägerin abgetreten.

**Beweis:**  Abtretungsvereinbarung vom 29.07.2016 zwischen Frau Maria Hra-
nova und der Klägerin in Fotokopie – **Anlage K 4**

1.1.3   Mit Abtretungsvereinbarung vom 29.07.2016 haben die Erben von Frau Elissa-
veta Schulz sämtliche Schadensersatzansprüche von Frau Elissaveta Schulz
gegen den Beklagten zu 2), die ihr im Zusammenhang mit Aktienoptionsge-
schäften mit der Beklagten zu 1), die sie aufgrund der Beratung und der Anla-
geempfehlung des Beklagten zu 2) abgeschlossen hatte, entstanden sind, an
die Klägerin abgetreten.

**Beweis:**  Abtretungsvereinbarung vom 29.07.2016 zwischen Herrn Martin
Schulz und Frau Rumiana Engel mit der Klägerin in Fotokopie
**– Anlage K 5**

Frau Schulz ist am 09.03.2015 in Wien verstorben.

**Beweis:**  Sterbeurkunde vom 12.03.2015, ausgestellt vom Standesamts-
und Staatsbürgerschaftsverband Mödling, Niederösterreich, Ös-
terreich, in Fotokopie – **Anlage K 6**

Sie wurde von ihren beiden Kindern, Frau Rumiana Engel und Herrn Martin

Schulz beerbt.

**Beweis:**     Einantwortungsbeschluss des Bezirksgerichts Döbling, Abteilung
1, Wien, Österreich, vom 24.06.2015 **– Anlage K 7**

## 1.2   Zu Herrn Rumen Hranov

Herr Hranov ist Schweizer Staatsbürger und hat seinen Wohnsitz in Zollikon im
Kanton Zürich. Er hat für sich selbst sowie im Namen von Frau Maria Hranova
und Frau Elissaveta Schulz von November 2006 bis Oktober 2008 im Zuge von
insgesamt 80 Transaktionen von der Beklagten zu 1) emittierte Optionen auf Ak-
tien des schweizerischen Unternehmens OC Oerlikon AG über seine Depotban-
ken erworben. Sämtliche Optionsgeschäfte kamen aufgrund der Beratung durch
den Beklagten zu 2) zustande, der damals bei der Beklagten zu 1) angestellt war.

**Beweis:**     Rumen Hranov, Goldhaldenstr. 37, 8702 Zollikon-Zürich,
Schweiz, als Zeuge

Der Beklagte zu 2) erklärte Herrn Hranov stets, dass er eine gute Investitions-
möglichkeit für ihn habe und es sich um eine Option handele, die nicht am Markt
sei.

Beweis:     wie vor.

Er nannte dann die Grunddaten der Option, wie Strike Price, Ausübungszeitraum,
Volumen und Optionsprämie, und sagte Herrn Hranov, er solle seine Depotbank
instruieren, bei ihm anzurufen, um das Geschäft abzuschließen.

Beweis:     wie vor.

Alle streitgegenständlichen Optionsgeschäfte liefen nach diesem Muster ab.

Beweis:     wie vor.



Herrn Hranov, Frau Hranova und Frau Schulz ist aus diesen Transaktionen ein Verlust von insgesamt CHF 316.011.961,00 entstanden.

**Beweis:**      Rumen Hranov, b. b., **als Zeuge**

Die Verluste beruhen hauptsächlich auf folgenden Gründen:

- Die Beklagten haben Herrn Hranov, Frau Hranova und Frau Schulz, die in Optionsgeschäften vollkommen unerfahren waren, über die wirtschaftlichen Zusammenhänge, die Funktionsweise und die Risiken von Aktionsoptionen nicht aufgeklärt. Sie haben verheimlicht, dass die Beklagte zu 1) Emittentin der empfohlenen Aktienoptionen war und deshalb sowohl die Beklagte zu 1) als auch der Beklagte zu 2) einen massiven Interessenskonflikt hatten. Herrn Hranov war deshalb nicht bewusst, dass die Beklagten an ihm verdienten. Auch über das bei Aktienoptionen bestehende Totalverlustrisiko wurde er nicht aufgeklärt. Ferner dachte Herr Hranov, dass er für die empfohlenen Optionen den Marktpreis bezahlte, tatsächlich bezahlte er Preise, die im Durchschnitt 18 % über dem fairen Marktpreis lagen.

     **Beweis:**      Rumen Hranov, b. b., **als Zeuge**

     Wäre Herr Hranov gehörig aufgeklärt worden, hätte er die streitgegenständlichen Optionsgeschäfte nicht abgeschlossen.

- Die Beklagte zu 1) hat Herrn Hranov, Frau Hranova und Frau Schulz weit überhöhte Leistungsentgelte berechnet, die zwischen 9 % und 20 % der Optionsprämie betrugen. Marktübliche Leistungsentgelte von Emittenten einfach gestalteter Aktienoptionen (so genannte Plain Vanilla Optionen) für ihre Leistungen im Zusammenhang mit der Strukturierung, Emission, Marketing, Vertrieb, Administration während der Laufzeit der Option etc. betragen 2 bis 3 % der Optionsprämie.

     **Beweis:**      Einholung eines Sachverständigengutachtens.

Herr Hranov, der in Bezug auf Aktien-Optionsgeschäfte vollkommen uner-
fahren war und dem Beklagten zu 2) blind vertraute, hat dies nicht erkannt
und konnte dies aufgrund der Komplexität der Preisbildung für Aktienoptio-
nen nicht erkennen.

**Beweis:**      Rumen Hranov, b. b., **als Zeuge**

- Die Beklagte zu 1) hat Herrn Hranov, Frau Hranova und Frau Schulz durch
  den Beklagten zu 2) eine Anlagestrategie empfohlen, die darauf ausgerich-
  tet war und dazu geführt hat, dass sie chancenlos waren und mit den Opti-
  onen nur Verlust machen konnten. Diese Anlagestrategie wurde von dem
  Beklagten zu 2) zum größten Teil persönlich durch die direkte Erteilung von
  Kauf- und Verkaufsorder per Telefon gegenüber den Depotbanken von
  Herrn Hranov, Frau Hranova und Frau Schulz umgesetzt.

  **Beweis:**      Rumen Hranov, b. b., **als Zeuge**

  Claudio Studer, Sonnenbergstr. 5, 5621 Zufikon, Schweiz,
  **als Zeuge**

  Vivian Brunner, Burgstr. 32c, 8570 Weinfelden, Schweiz, **als
  Zeugin**

  Da für die Warrants aufgrund der überhöhten Leistungsentgelte, die in den
  Optionsprämien versteckt waren, ein Einstandspreis gezahlt wurde, der 18
  % über dem fairen Marktpreis lag, hätten Herr Hranov, Frau Hranova und
  Frau Schulz die Warrants am Zweitmarkt nicht oder nur mit Verlust verkau-
  fen können.

  **Beweis:**   Einholung eines Sachverständigengutachtens

- Der Beklagte zu 2) hat, wie unten unter Ziffer 2.5.3 lit. c) am Ende im Ein-
  zelnen dargestellt, durch den Verkauf großer Positionen von OC Oerlikon



Aktien aus dem Bestand der Beklagten zu 1) Anfang 2008 bewusst einen Kurseinbruch der Aktie herbeigeführt, damit die Herrn Hranov, Frau Hranova und Frau Schulz empfohlenen Optionen wertlos verfallen.

## 1.3    Zur Beklagten zu 1)

Die Beklagte zu 1) unterhält eine Zweigniederlassung in Zürich, in der Uraniastrasse 9, die als „Deutsche Bank Aktiengesellschaft, Frankfurt a. M., Zweigniederlassung Zürich" firmiert und im Handelsregister des Kantons Zürich unter der Firmennummer CHE-105.690.694 eingetragen ist.

**Beweis:**     Auszug aus dem Handelsregister des Kantons Zürich,

Firmennummer CHE-105.690.694,

in Fotokopie - **Anlage K 8**

Über diese Zweigniederlassung hat die Beklagte zu 1) die streitgegenständlichen Aktien-Optionsgeschäfte abgewickelt.

**Beweis:**     Rumen Hranov, b. b., **als Zeuge**

## 1.4    Zum Beklagten zu 2)

Der Beklagte zu 2) war, bevor er im Jahr 2006 zur Deutschen Bank wechselte, bei der Zürcher Kantonalbank beschäftigt. Dort gehörte er zu den führenden Derivatehändlern und spielte eine zentrale Rolle bei den Übernahmeangriffen der österreichischen Beteiligungsgesellschaft VICTORY Industrie-Beteiligungen AG auf die schweizerische börsennotierte Unaxis AG, die im September 2006 in OC Oerlikon AG umfirmiert wurde. Der Beklagte zu 2) beriet die VICTORY und deren Gesellschafter und half ihnen in den Jahren 2004 und 2005, in erster Linie über Aktien-Optionsgeschäfte eine Beteiligung an der Unaxis AG von 42 % aufzubauen. Am 28. Juni 2005 berichtete das Handelsblatt, dass die Vertreter der VICTORY nach einem monatelangen Übernahmekampf in der außerordentlichen Hauptversammlung der Unaxis AG die Kontrolle des Unternehmens übernommen haben.

**Beweis:**     Handelsblattartikel vom 28.06.2005 in Fotokopie **– Anlage K 9**

Der Beklagte zu 2) hatte aufgrund dessen ein erhebliches Insiderwissen über das Unternehmen Unaxis / OC Oerlikon und dessen Aktien. Er handelte im ersten Halbjahr 2005 für die Zürcher Kantonalbank so große Stückzahlen an Aktien und Optionen, dass er Market Maker war. Die Kursentwicklung der Aktie konnte er nicht nur mit großer Wahrscheinlichkeit voraussehen, er konnte sie beeinflussen.

**Beweis:**     Einholung eines Sachverständigengutachtens

Im Dezember 2005 trat der Beklagte zu 2) an Herrn Hranov heran, von dem er wusste, dass er sehr vermögend war und schlug ihm vor, in Optionen auf Aktien der Unaxis AG zu investieren.

**Beweis:**     Rumen Hranov, b. b., als Zeuge

Der Beklagte zu 2) erwartete, dass der öffentlich bekannte Übernahmekampf zwischen der Beteiligungsgesellschaft VICTORY und den Altaktionären der Unaxis AG den Aktienkurs beflügeln würde. Der Beklagte zu 2) gab Herrn Hranov bis ins letzte Detail ausgearbeitete Anlageempfehlungen, in denen er vorgab, welche Optionen auf OC Oerlikon Aktien, mit welchen Ausübungspreisen, welcher Laufzeit etc. er erwerben sollte. Herr Hranov folgte den Empfehlungen des Beklagten zu 2) und machte mit den von dem Beklagten zu 2) empfohlenen Optionen auf Unaxis Aktien in 2005 ausschließlich Gewinne.

**Beweis:**     Rumen Hranov, b. b., als Zeuge

Dies führte dazu, dass Herr Hranov ein starkes Vertrauensverhältnis zu dem Beklagten zu 2) entwickelte und ihm in der Folgezeit uneingeschränkt vertraute.

**Beweis:**     Rumen Hranov, b. b., als Zeuge

Dies sollte ihm ebenso wie Frau Hranova und Frau Schulz zum Verhängnis wer-
den, weil der Beklagte zu 2) das Vertrauen von Herrn Hranov auf das gröbste
missbrauchte und ihm in dem Zeitraum von November 2006 bis Oktober 2008
den Erwerb von 80 Aktienoptionenempfahl, die von der Beklagten zu 1) emittiert
wurden, bis sich die Verluste von Herrn Hranov, Frau Hranova und Frau Schulz
auf rund CHF 316 Mio. summierten.

Mitte des Jahres 2006 wechselte der Beklagte zu 2) mit seinem Derivative-Team
von der Zürcher Kantonalbank zur Zweigniederlassung Zürich der Beklagten zu
1). Die Beklagte zu 1), die bis dahin das schweizerische Derivategeschäft in
Frankfurt bzw. London abwickelte, richtete für den Beklagten zu 2) in Zürich eine
neue Abteilung für Derivate ein und verlieh ihm den Titel „Head of Global Markets
Equity Switzerland, Deutsche Bank AG, Zweigniederlassung Zürich". Der Be-
klagte zu 2) berichtete an die damaligen Leiter des Investmentbankings der Be-
klagten zu 1), Herrn Anshu Jain und Herrn Nino Kjellmann. Die so neu eingerich-
tete Derivate-Abteilung der Beklagten zu 1) für die Schweiz leitete der Beklagte
zu 2) eigenverantwortlich. Nach außen trat er als deren Leiter auf und verwendete
dabei den Titel „Head of Global Markets Equity Switzerland".

Der Beklagte zu 2) warb Herrn Hranov bei der Zürcher Kantonalbank ab und
nahm ihn als Kunden mit zur Beklagten zu 1).

**Beweis:**       Rumen Hranov, b. b., **als Zeuge**

In der Folge kam es aufgrund der Beratung des Beklagten zu 2) zum Erwerb von
80 Aktienoptionen auf OC Oerlikon Aktien durch  Herrn Hranov, Frau Hranova
sowie Frau Schulz und der Beklagte zu 1), durch die sie CHF 316 Mio. Verlust
und die Beklagte zu 1) CHF 316 Mio. Gewinn machten. Außerdem mussten Herr
Hranov, Frau Hranova und Frau Schulz für die Transaktionen an ihre beiden De-
potbanken CHF 2.073.843,55 Courtage und CHF 91.243,60 Börsenspesen be-
zahlen.

**Beweis:**       Rumen Hranov, b. b., **als Zeuge**

Der Beklagte zu 2) äußerte im Jahr 2008 gegenüber Herrn Hranov, dass die Beklagte zu 1) ihm für die von Herrn Hranov, Frau Hranova und Frau Schulz aufgrund seiner Anlageempfehlungen erworbenen Optionen Bonusse von rund CHF 50.000.000,00 gezahlt habe.

**Beweis:**      Rumen Hranov, b. b., **als Zeuge**

## 2.    Sachverhalt

### 2.1   Aktienoptions-Transaktionen mit der Beklagten zu 1)

Herr Hranov, Frau Hranova und Frau Schulz haben auf Veranlassung des Beklagten zu 2) – und nur seinem Rat „in blindem Vertrauen" folgend in der Zeit von November 2006 bis Oktober 2008 über ihre Depotbanken Bank Julius Bär und Thurgauer Kantonalbank in gewaltigem Umfang von der Beklagten zu 1) emittierte Optionen auf die Aktie der OC Oerlikon (OERL, Valor: 81682, ISIN: CH0000816824), gekauft, die als „Warrants" bezeichnet wurden. Der englische Begriff Warrant bezeichnet einen Optionsschein, also eine verbriefte Aktienoption.

**Beweis:**      Einholung eines Sachverständigengutachtens

Ein Warrant oder Optionsschein verbrieft das Recht,

- nach einem bestimmten Bezugsverhältnis,
- einen bestimmten Basiswert (hier: die Aktie der OC Oerlikon AG),
- zu einem vorher festgelegten Ausübungspreis,
- innerhalb einer festgelegten Bezugsfrist (so genannte Amerikanischen Option) oder zum Ende einer Bezugsfrist (so genannte Europäischen Option),
- zu kaufen (Call-Option) oder
- zu verkaufen (Put-Option).

**Beweis:**      Einholung eines Sachverständigengutachtens

Die Beklagte zu 1) hat diese Optionen, was für Herrn Hranov, Frau Hranova und Frau Schulz weder erkennbar war noch von ihnen erkannt wurde,

**Beweis:**    Herr Hrumen Hranov, b. b. , als Zeuge

speziell für diese strukturiert und emittiert. Der Beklagte zu 2) hat Herrn Hranov, der seine Mutter und seine Schwester durchgängig vertrat, die Konditionen der jeweiligen Optionen, wie Ausübungspreis, Laufzeit, Optionsprämie mündlich durchgegeben und ihn veranlasst, diese Daten an eine seine Depotbanken zu übermitteln, die dann mit der Beklagten zu 1) in Kontakt traten und die jeweilige Option kauften. Nachdem die Depotbank auf diesem Weg die entsprechende Option bei der Beklagten zu 1) „bestellt" hatte, hat die Beklagte zu 1) die Option emittiert und als so genanntes OTC-Produkt an die Depotbank verkauft. Die Beklagte zu 1) war damit auf beiden Seiten „beteiligt". Sie „beriet" durch den Beklagten zu 2) den Käufer, der ihr „blind vertraute". Zugleich war sie – für den Käufer nicht erkennbar – die Verkäuferin mit entgegensetzten Interessen. Durch eine geschickte Handelsstrategie gelang es ihr, die auflaufenden Verluste für fast zwei Jahre zu verschleiern. Ausschließlich durch diese „OTC"-Strategie hat sie die streitgegenständlichen Verluste verursacht.

**Beweis:**    Rumen Hranov als Zeuge

Die Abkürzung OTC steht für den englischen Begriff „Over The Counter", was „über die Theke" bedeutet. Der OTC-Handel bezeichnet finanzielle Transaktionen zwischen Marktteilnehmern, die nicht über die Börse abgewickelt werden. Früher stand OTC-Handel für Telefonhandel, heute wird er auf elektronischem Weg abgewickelt. Eine der Haupterscheinungsformen des OTC-Handels ist der außerbörsliche Handel mit Finanzderivaten ohne standardisierte Spezifikationen wie im Fall von OTC-Optionen.

**Beweis:**    Einholung eines Sachverständigengutachtens.

### 2.1.1  Vertragsbeziehungen und ihre „Dokumentation"

Es nimmt nicht wunder, dass die tatsächlichen Vertragsbeziehungen teils gar nicht – wie die meist mündliche und nur in Einzelfällen mit E-Mails (teilweise) dokumentierte Beratung – oder – wie die Transaktionen -  nur unvollständig in schriftlichen Verträgen festgehalten sind. Monate nach Beginn hat die Beklagte zu 1) den Abschluss eines „Agreement on Direct Orders" mit Herr Hranov, einer als „Trading Authorization" bezeichneten Vereinbarung zwischen Bank Julius Bär und Herrn Hranov und einer als „Trading Authorization" bezeichneten Vereinbarung zwischen der Bank Julius Bär und der Beklagten zu 1) initiiert.

### a)  Agreement on Direct Orders

Mit Schreiben vom 19.10.2006 übersandt die Beklagte zu 1), vertreten durch den Beklagten zu 2 und seinen Mitarbeiter Daniel Baltensperger, Herrn Hranov den Entwurf eines Direct Order Agreement und teilte ihm folgendes mit:

> „Gerne setzen wir Sie darüber in Kenntnis, dass die Deutsche Bank AG **ihre Handelsaktivitäten** auch direkt über ihre Zweigniederlassung Zürich in der Schweiz aufnehmen wird. Damit wir eine ordnungsgemäße Entgegennahme, Durchführung und Abwicklung dieser Geschäfte garantieren können, möchten wir Sie in der Folge höflich bitten, das diesem Schreiben beigelegte „Direct Order Agreement" zu unterschreiben bzw. von der Konto/Depot führenden Bank mit unterschreiben zu lassen und uns mittels dem beigelegten Antwortcouvert zurückzusenden.
>
> Selbstverständlich steht es Ihnen oder der Konto/Depot führenden Bank frei, uns ihr eigenes „Direct Order Agreement/Trading Authority Agreement/Third Party Agreement" oder auch nur eine entsprechende Vollmacht uns zukommen zu lassen, welches im Wesentlichen die wichtigsten Punkte bezüglich der Abwicklung, der Bestätigungsmodalitäten, der Übermittlungsart wie auch der jeweiligen Kontaktadressen mit zu enthalten hat. [. . .]"

**Beweis:**   Schreiben der Beklagten zu 1) vom 19.10.2006 in Fotokopie –
**Anlage K 9 a**

Die Beklagte zu 1) hat bereits in diesem Schreiben durch die Bezugnahme

auf ihre **Handelsaktivitäten** den Eindruck erweckt, dass sie als Händlerin für Herrn Hranov und nicht ihm als Emittenten gegenübertritt.

Im Rubrum dies Agreement on Direct Orders sind drei Parteien vorgesehen, nämlich die Beklagte zu 1) als Broker, eine ungenannte weitere Partei als Bank, und Herr Hranov als External Asset Manager. Die Stelle, die für den Namen der Bank vorgesehen ist, wurde frei gelassen.

**Beweis:**  Agreement on Direct Orders in Fotokopie – **Anlage K 9 b**

Das Agreement on Direct Orders hat in Ziffer 1 folgenden Wortlaut:

> „1.  The Bank has entered into an agreement with the External Asset Manager pursuant to which the External Asset Manager is entitled to give direct orders to the Broker for the purchase and sale of securities [(to the exception of US-Equities and OTC-derivatives)] in the name and for the account of the Bank (hereinafter singular "Direct Order" or plural "Direct Orders"). The Direct Orders are executed "delivery upon payment".
>
> The Bank confirms to the Broker that these Direct Orders are covered by a power of attorney given to the External Asset Manager and the External Asset Manager is aware, of the risks involved with the Direct Orders. The Bank herewith acknowledges vis-à-vis the Broker the responsibilities emanating from Direct Orders given in accordance with the following provisions. The risk of erroneous transmission between the External Asset Manager and the Broker shall be carried by the External Asset Manager."

**Beweis:**  wie vor.

In Ziffer 2 ist geregelt, dass die Bank alle Direct Orders, die der External Asset Manager der Beklagten  zu 1) erteilt, bis zu einem bestimmten Limit akzeptieren muss, ohne dass der dafür vorgesehenen Stelle ein Limit angegeben ist.

**Beweis:**  wie vor.



Ziffer 8 lautet wie folgt:

> „8.    [. . .] The External Asset Manager and the Bank herewith acknowledge that all Direct Orders under this agreement are not executed on the basis of any advice or recommendation by the Broker, but on their own initiative and on the basis of their own assessment of market conditions.
>
> The external Asset Manager and the Bank hereby confirm that they are informed of the risks inherent in all Direct Orders and that they understand the risks inherent in such transactions.
>
> The External Asset Manager furthermore declares that prior to the conclusion of each transaction, he shall carefully assess whether the respective transaction is appropriate for his objectives, knowledge and experience, financial risk capacity and ability to monitor the transaction"

**Beweis:**    wie vor.

Die Beklagte zu 1) hat Herrn Hranov, einer Privatperson mit - wie der Beklagte zu 2) wusste -  keinerlei Kenntnissen über die Funktionsweise und Risiken von Aktienoptionen und fehlenden Kenntnissen der englischen Rechtssprache, angetragen, als External Asset Manager einer Bank in deren Namen und für deren Rechnung Wertpapiere zu kaufen und zu verkaufen. Des Weiteren hat die Beklagte zu 1) Herrn Hranov in Ziffer 8 bestätigen lassen, dass alle Transaktionen, die sie im Zuge dieser Vereinbarung durchführen wird, nicht auf einem Rat oder einer Empfehlung der Beklagten zu 1) beruhen, sondern auf seiner eigenen Initiative.

Diese Regelungen widersprechen der Durchführung der streitgegenständlichen Optionsgeschäfte in eklatanter Weise. Sämtliche Optionsgeschäfte beruhten, wie nachfolgend im Einzelnen dargestellt wir, auf der Empfehlung der Beklagten. Die Beklagte zu 1) hatte aber gar nicht als Broker Fremdprodukte vermittelt, sondern als Emittentin Eigenprodukte, nämlich die von ihr emittierten als „Warrants" bezeichneten Optionen über die Depotbanken in den Depots von Herrn Hranov, Frau Hranova und Frau Schulz platziert.



Alle Optionsgeschäfte wurden von den Beklagten initiiert und Herrn Hranov vom Beklagten zu 2) empfohlen.

**Beweis:**   Rumen Hranov als Zeuge

Durch die von der Beklagten zu 1) so vorgeschobenen „Vertrags-Konstruktion" sollte verschleiert werden, dass die Beklagte zu 1) als Emittentin und Verkäuferin ihr eigenes wirtschaftliches Interesse verfolgt und Herrn Hranov, ohne dies offen zu legen, von ihr selbst emittierte Warrants als Anlage empfiehlt. Ganz ignorieren konnte sie ihre Rolle aber doch nicht.

Zusammen mit dem Vertragsentwurf hat die Beklagte zu 1 Herrn Hranov ein mit „Settlement Instructions" überschriebenes Formular übersandt, in dem sie Herrn Hranov als „Client", also als Kunden, bezeichnet.

**Beweis:**   Settlement Instructions in Fotokopie **– Anlage K 9 c**

Herrn Hranov war also auch nach den Entwürfen der Beklagten zu 1) nicht (nur) External Asset Manager einer anderen Bank, sondern auch Kunde, bei dem sie von ihr emittierte Optionen platzieren wollte.

**b)   Trading Authorization zwischen Bank Julius Bär und der Beklagten zu 1)**

Am 19.04.2007 schlossen die Bank Julius Bär und die Beklagte zu 1) die zu der vorstehenden unter lit. b) dargestellten Trading Authorization mit Herrn Hranov „passende" Trading Authorization for Direct Orders ab.

**Beweis:**   Trading Authorization for Direct Orders zwischen Bank Julius und Bär und der Beklagten zu 1) in Fotokopie **– Anlage K 9 d**

**c)   Trading Authorization for Direct Orders zwischen Bank Julius Bär und Herrn Hranov**

Erst am 30.04. 2007, also mehr als fünf Monate, nach dem Herr Hranov, seine Mutter und seine Schwester begonnen hatten, die von dem Beklagten zu 2) empfohlenen Aktienoptionen zu erwerben, schickte die Bank Julius Bär eine Trading Authorization for Direct Orders unterzeichnet an die Beklagte zu 1) zurück.

Die Vereinbarung hat im Wesentlichen folgenden Wortlaut:

„**1. Scope**

In accordance with the present Authorization, the Bank [i.e. Bank Julius Bär, Anm. d. Unterzeichner]permits the Agent [i.e. Herr Hranov, Anm. d. Unterzeichner] to directly place orders in the Bank`s name with a specified external broker or counterparty of the Bank instead of placing these orders with the Bank. The Agent acts as the Bank`s non-exclusive agent and attorney-in-fact with respect to these transactions.

**2. Allowed Transactions and Markets**

The Agent may only undertake direct transactions on a "Delivery versus Payment (DvP") basis with respect to the following securities:

Listed stocks

———————————

Warrants

———————————

("Allowed Transactions")

[. . .]

Allowed Transactions may only be executed through the following broker ("Broker") on the following markets / exchanges:

Name of Broker:
DEUTSCHE BANK AG, Zürich

———————————————

[. . .]

**3. Daily Limits**

This Authorization is restricted to a „Daily Limit" of <u>CHF</u>

30'000'000 or its equivalent in any other currency.

"Limit" means the total consideration for all securities pur-
chased or sold (purchases and sales cumulated) at the price of
the relevant exchange at the moment of purchase or sale,
which are covered by this Authorization.

[. . .]

## 4.  Confirmations/Allocations

Immediately after placing an Allowed Transaction, the Agent is
required to provide the Bank with the following information by
e-mail to an address as specified from time to time by the Bank:

- Name of Security
- ISIN and/or Valor
- Buy / Sell
- Amount
- Trade date
- Settlement date
- Price and Currency
- Commission
- Net amount
- Broker (precise name, e.g. Goldman Sachs, London)
- the number(s), settlement currency(ies) of the account
  concerned and all other relevant allocation information

[. . .]

## 5.  Commissions/Fees

The Agent ensures that the Broker discloses its commission/fee
in the settlement note delivered to the Bank.
[. . .]

The Agent further agrees to disclose to the clients any fees or
commissions received as remuneration under the present Au-
thorization.

## 6.  Rights and duties of the Agent

The Agent acts as the Bank's non-exclusive agent and attor-
ney-in-fact (without the right of substitution) in relation to the
respective Broker. Transactions instructed by the Agent are ex-
ecuted in the name and for the account of the Bank on the
books of the Broker. With respect to Allowed Transactions the
Agent is authorized to act for and on the Bank's behalf in the
same manner and with the same force and effect as the Bank
might or could do.

> <u>The Agent ensures to execute the transactions as instructed by
> the client, promptly and in accordance with best execution prin-
> ciples. The Agent will inform the client about any potential con-
> flict of interest in connection with the present Authorization.[. .
> .]"</u>

**Beweis:**      Trading Authorization for Direct Orders zwischen Bank Julius
Bär und Herrn Rumen Hranov in Fotokopie – **Anlage K 9 e**

Auch diese Vereinbarung stimmt nicht mit der Struktur der von den Beklag-
ten geplanten und auch tatsächlich durchgeführten Optionsgeschäften mit
Herrn Hranov überein. Herr Hranov hatte niemals die Absicht, als Vertreter
der Bank Julius Bär und für deren Rechnung Aktienoptionsgeschäfte mit
Dritten („client") durchzuführen, noch wäre er dazu fachlich qualifiziert ge-
wesen. Die Regelungen in Ziffern 5 und 6 der Vereinbarung setzen die
Existenz eines „client" voraus, also eines Kunden der Bank Julius Bär, an
den die Aktien oder Warrants verkauft werden. Nach der Vertragskonstruk-
tion kann es sich bei diesem Kunden nicht um Herrn Hranov handeln, der
die Funktion des Agents oder Vertreters der Bank Julius Bär haben sollte.
Einen solchen Dritten als „Client" der Bank Julius Bär gab es aber nicht.
Verschleiert wurde damit, dass von der Beklagten zu 1) emittierte Optionen
an Herrn Hranov, seine Mutter und seine Schwester verkauft werden soll-
ten. Da die Beklagte zu 1) aufsichtsrechtlich Probleme sah, diese Options-
geschäfte mit Privatpersonen direkt abzuschließen, schaltete sie über die
vorstehend genannten Vereinbarungen zum Schein die Depotbanken von
Herrn Hranov, Frau Hranova und Frau Schulz dazwischen, um zu verber-
gen, dass sie die Geschäfte mit diesen direkt abschloss.

d)     **„Besonderheiten" der Dokumentation**

„Besonders" ist an diesen Verträgen nicht nur, dass sie „Dritte" berücksich-
tigen, die es - wie alle Beteiligten wussten – gar nicht gibt. „Besonders" ist
auch, dass „Vereinbarungen" teils erst Monate <u>nach</u> Aufnahme der „Han-
delsaktivitäten" unterzeichnet wurden, also gar nicht ihre Grundlage waren.
„Besonders" ist auch die Wahl der Sprache. Alle Verträge sind – obwohl es



nur deutsch sprechende Beteiligte gab – in Englisch verfasst. Die Englisch-kenntnisse von Herrn Hranov sind ausreichend, um sich in englischer Spra-che zu unterhalten. Er ist jedoch in der Lage, englische Verträge vollum-fänglich zu verstehen, da ihm die englische Rechtssprache nicht geläufig ist.

### 2.1.2 Die Transaktionen im Einzelnen

Entgegen den dokumentierten vertraglichen Beziehungen wurde die Transaktion wie im Folgenden dargestellt durchgeführt.

Herr Hranov hat auf Empfehlung des Beklagten zu 2) in dem Zeitraum vom 21.11.2006 bis 20.10.2008 für sich selbst und als Vertreter von Frau Hranova und Frau Schulz die in der als **Anlage K 10** beigefügten Liste aufgeführten Trans-aktionen getätigt. Es wurden insgesamt 80 Transaktionen durchgeführt, die sich aus 49 Kauf- und 18 Verkaufstransaktionen zusammensetzen. Des Weiteren sind 13 Warrants wertlos verfallen, was die wertlose Ausbuchung der jeweiligen Warrant-Positionen zur Folge hatte. Eine wertlose Ausbuchung findet immer dann statt, wenn der Marktpreis (Aktienkurs) der der Option zugrundeliegenden Aktie im Ausübungszeitpunkt der Option niedriger ist als der Ausübungspreis der Option. Denn eine Ausübung der Option macht dann wirtschaftlich keinen Sinn, da die Aktie zu einem höheren Preis als dem Aktienkurs erworben werden müsste.

**Beweis:**      Einholung eines Sachverständigengutachtens

Durch diese Transaktionen sind Herrn Hranov, Frau Maria Hranova und Frau Elissaveta Schulz insgesamt Verluste von CHF 316.011.961,00 entstanden.

Dieser Verlust setzt sich aus folgenden Einzelpositionen zusammen:

**OERDA**[1]            **Valor**[2] **2758815**            **CHF    14.335.000,00**

Mit dem Warrant OERDA wurde vom 13.12.2006 bis zum 08.03.2007 mit den in der **Anlage K 11** aufgeführten Einzeltransaktionen ein Gewinn von CHF 14.335.000,00 erzielt.

**OERDC**            **Valor 2865659**            **CHF    - 23.806.000,00**

Mit dem Warrant OERDC wurde vom 16.01. bis zum 21.09.2007 mit den in der **Anlage K 12** aufgeführten Einzeltransaktionen ein Verlust von CHF 23.806.000,00 erzielt.

**OERDD**            **Valor 2796329**            **CHF    - 49.524.850,00**

Mit dem Warrant OERDD wurde vom 21.11.2006 bis zum 16.10. 2007 mit den in der **Anlage K 13** aufgeführten Einzeltransaktionen ein Verlust von CHF 49.524.850,00 erzielt.

**OERDE**            **Valor 2796323**            **CHF    3.100.000,00**

Mit dem Warrant OERDE wurde vom 27.02.2007 bis zum 15.03.2007 mit den in der **Anlage K 14** aufgeführten Einzeltransaktionen ein Gewinn von CHF 3.100.000,00 erzielt.

**OERDF**            **Valor 2865661**            **CHF    - 17.750.000,00**

Mit dem Warrant OERDF wurde vom 16.01. bis zum 17.07. 2007 mit den in der **Anlage K 15** aufgeführten Einzeltransaktionen ein Verlust von CHF 17.750.000,00 erzielt.

**OERDG**            **Valor 2865662**            **CHF    - 4.147.410,00**

Mit dem Warrant OERDG wurde vom 31.05. bis zum 16.10.2007 mit den in der **Anlage K 16** aufgeführten Einzeltransaktionen ein Verlust von CHF 4.147.410,00 erzielt.

**OERDI**            **Valor 2758816**            **CHF    4.020.000,00**

Mit dem Warrant OERDI wurde vom 02.03. bis zum 08.03.2007 mit den in der

---

[1] Die Beklagte zu 1) hat jeden Warrant mit fünf Buchstaben bezeichnet
[2] Valor entspricht der deutschen WKN (Wertpapierkennnummer)

**Anlage   K   17**   aufgeführten   Einzeltransaktionen   ein   Gewinn   von CHF 4.020.000,00 erzielt.


**OERDK**              **Valor 3066051**              **CHF    - 21.500.000,00**

Mit dem Warrant OERDK wurde vom 17.07. bis zum 16.10.2007 mit den in der **Anlage K 18** aufgeführten Einzeltransaktionen ein Verlust von CHF 21.500.00,00 erzielt.


**OERDL**              **Valor 2938211**              **CHF   23.750.000,00**

Mit dem Warrant OERDL wurde vom 14.02. bis zum 22.03.2007 mit den in der **Anlage   K   19**   aufgeführten   Einzeltransaktionen   ein   Gewinn   von CHF 23.750.000,00 erzielt.


**OERDS**              **Valor 2796325**              **CHF 60.527.200,00**

Mit dem Warrant OERDS wurde vom 21.11.2006 bis zum 21.09.2007 mit den in der **Anlage   K   20**   aufgeführten   Einzeltransaktionen   ein   Gewinn   von CHF 60.527.200,00 erzielt.


**OERDT**              **Valor 2796327**              **CHF – 26.499.901,00**

Mit dem Warrant OERDT wurde vom 06.12.2006. bis zum 16.10.2007 mit den in der **Anlage   K   21**   aufgeführten   Einzeltransaktionen   ein   Verlust   von CHF 26.499.901,00 erzielt.


**OERDY**              **Valor 3330757**              **CHF    - 2.530.000,00**

Mit dem Warrant OERDY wurde vom 29.02. bis zum 22.09.2008 mit den in der **Anlage K 22** aufgeführten Einzeltransaktionen ein Verlust von CHF 2.530.000,00 erzielt.


**OERDZ**              **Valor 2983946**              **CHF    - 6.508.200,00**

Mit dem Warrant OERDZ wurde vom 08.03.2007 bis zum 20.10.2008 mit den in der **Anlage   K   23**   aufgeführten   Einzeltransaktionen   ein   Verlust   von CHF 6.508.200,00,00 erzielt.

**OERHA**            **Valor 3330758**            **CHF    - 4.560.000,00**

Mit dem Warrant OERHA wurde vom 25.02. bis zum 22.09.2008 mit den in der **Anlage K 24** aufgeführten Einzeltransaktionen ein Verlust von CHF 4.560.000,00 erzielt.

**OERIA**            **Valor 3002144**            **CHF    - 3.798.800,00**

Mit dem Warrant OERIA wurde vom 15.03. bis zum 15.06.2007 mit den in der **Anlage K 25** aufgeführten Einzeltransaktionen ein Verlust von CHF 3.789.800,00 erzielt.

**OERIB 2007**            **Valor 3016890**            **CHF    - 92.000.000,00**

Mit dem Warrant OERIB 2007 wurde vom 22.03. bis zum 21.09.2007 mit den in der **Anlage K 26** aufgeführten Einzeltransaktionen ein Verlust von CHF 92.000.000,00 erzielt.

**OERIB 2008**            **Valor 3564689**            **CHF    - 14.100.000,00**

Mit dem Warrant OERIB 2008 wurde vom 16.11.2007 bis zum 22.09.2009 mit den in der **Anlage K 27** aufgeführten Einzeltransaktionen ein Verlust von CHF 14.100.000,00 erzielt.

**OERIQ**            **Valor 3481919**            **CHF    - 42.393.000,00**

Mit dem Warrant OERIQ wurde vom 16.10.2007 bis zum 15.02.2008 mit den in der **Anlage K 28** aufgeführten Einzeltransaktionen ein Verlust von CHF 42.393.000,00 erzielt.

**OERIR**            **Valor 3481920**            **CHF    -39.471.000,00**

Mit dem Warrant OERIR wurde vom 16.10.2007 bis zum 22.04.2008 mit den in der **Anlage K 29** aufgeführten Einzeltransaktionen ein Verlust von CHF 39.471.000,00 erzielt.

**OERIS**            **Valor 3481921**            **CHF    - 28.867.500,00**

Mit dem Warrant OERIS wurde vom 16.10.2007 bis zum 18.08.2008 mit den in der **Anlage K 30** aufgeführten Einzeltransaktionen ein Verlust von CHF 28.867.500,00 erzielt.



**OERIZ**            **Valor 3296567**            **CHF   - 31.850.000,00**

Mit dem Warrant OERIZ wurde vom 30.07.2007 bis zum 20.06.2008 mit den in der **Anlage K 31** aufgeführten Einzeltransaktionen ein Verlust von CHF 31.850.000,00 erzielt.

**OERLU**            **Valor 3302116**            **CHF   - 23.000.000,00**

Mit dem Warrant OERLU wurde vom 03.08.2007 bis zum 20.06.2008 mit den in der **Anlage K 32** aufgeführten Einzeltransaktionen ein Verlust von CHF 23.000.000,00 erzielt.

**Spread Wts. 525/575  Valor 2826896**            **CHF   11.437.000,00**

Mit dem Warrant Spread Wts. 525/575 wurde vom 06.12.2006 bis zum 15.03.2007 mit den in der **Anlage K 33** aufgeführten Einzeltransaktionen ein Gewinn von CHF 11.437.000,00 erzielt.

**Spread Wts. 625/675  Valor 2875956**            **CHF   - 875.000,00**

Mit dem Warrant Spread Wts. 625/675 wurde vom 12.01. bis zum 23.05.2007 mit den in der **Anlage K 34** aufgeführten Einzeltransaktionen ein Verlust von CHF 875.000,00 erzielt.

**Eurex Call March 560 Valor 9280273**            **CHF   12.730.000,00**

Mit dem Warrant EUREX March 560 wurde vom 09.11.2007 bis zum 04.01.2008 mit den in der **Anlage K 35** aufgeführten Einzeltransaktionen ein Gewinn von CHF 12.730.000,00 erzielt.

**Eurex Put March 560  Valor 9280944**            **CHF   - 22.790.000,00**

Mit dem Warrant Eurex Put March 560 wurde vom 09.11.2007 bis zum 22.01.2008 mit den in der **Anlage K 36** aufgeführten Einzeltransaktionen ein Verlust von CHF 22.790.000,00 erzielt.

Sämtliche Einzeltransaktionen mit den einzelnen Warrants, die in den Anlagen K 11 bis K 36 im Einzelnen dargestellt sind, wurden Herrn Hranov von dem Beklagten zu 2) empfohlen.

**Beweis:**      Rumen Hranov, b.b., als Zeuge.

### 2.1.3  Courtagen und Börsengebühren

Herrn Hranov, Frau Hranova und Frau Schulz sind im Zusammenhang mit den streitgegenständlichen Transaktionen Courtagen in Höhe von insgesamt CHF 2.073.843,55 in Rechnung gestellt worden, die sie an die Bank Julius Bär in Höhe von CHF 1.093.816,10 und die Thurgauer Kantonalbank in Höhe von CHF 980.027,45 bezahlt haben. Zusätzlich haben Herr Hranov, Frau Hranova und Frau Schulz Börsengebühren der SWX, der EBK (Eidgenössische Bankenkommission) und der Eurex in Höhe von CHF 91.243,60 bezahlt.

**Beweis:**      wie vor.

Die von Herrn Hranov, Frau Hranova und Frau Schulz für die streitgegenständlichen Transaktionen bezahlten Courtagen und Börsengebühren sind in den beiden als **Anlage K 37** beigefügten Aufstellungen, auf die wir uns beziehen, im Einzelnen aufgeführt. Die in der Spalte Partei verwendeten Abkürzungen haben folgende Bedeutung:

DBK   =   Deutsche Bank,
JB    =   Bank Julius Bär und
TKB   =   Thurgauer Kantonalbank.

### 2.1.3  Wertpapierprospekte

Die Beklagte zu 1) hat sämtliche von Herrn Hranov, Frau Hranova und Frau Schulz erworbene Warrants auf der Grundlage jeweils gleichlautender Wertpapierprospekte emittiert, die sich lediglich hinsichtlich der ISIN Nummern, des Ausübungspreises, des Ausübungszeitraums und des Emissionsdatums unterscheiden.

Die Wertpapierprospekte sind in englischer Sprache verfasst und mit „Offering

Circular" bezeichnet. Beispielhaft legen wir das Offering Circular für die Warrants mit den ISIN Nummern

CH00286565902865659

CH00286566162865661

CH00286566242865662 und

CH00286566322865663

als **Anlage K 38** vor.

Auf Seite I-15 des Offering Circular findet sich, wie bei sämtlichen anderen von der Beklagten zu 1) herausgegebenen Offering Circulars, folgende Rechtswahl- und Gerichtsstandsklausel:

> „5. **Governing Law and Place of Jurisdiction**
> The Securities are governed by and shall be construed in accordance with German law save with respect to the constituting of the Securities, as described in Product Condition 2 which shall be governed by and construed in accordance with the laws of Switzerland. The place of jurisdiction for all proceedings arising from matters provided for in these Conditions of the Securities shall, to the extent legally permitted, be Frankfurt am Main."

**Beweis:**        Offering Circular – **Anlage K [●]**

Die deutsche Übersetzung lautet wie folgt:

> „5. **Anwendbares Recht und Gerichtsstand**
> Die Wertpapiere unterliegen deutschem Recht und sind nach deutschem Recht auszulegen mit Ausnahme der Errichtung der Wertpapiere, wie in Product Condition 2 beschrieben, die wiederum schweizerischem Recht unterliegt und nach schweizerischem Recht auszulegen ist. Gerichtsstand für alle Verfahren im Hinblick auf Angelegenheiten, die in diesen Wertpapierbedingungen geregelt sind, ist, soweit rechtlich möglich, Frankfurt am Main."

**Beweis:**        Einholung eines Sachverständigengutachtens

Die Beklagten haben Herrn Hranov, Frau Hranova und Frau Schulz in keinem

einzigen Fall vor oder nach Abschluss einer Transaktion einen Wertpapierprospekt ausgehändigt.

**Beweis:**        Rumen Hranov, b. b., als Zeuge.

### 2.1.4   Ursachen der eingetretenen Verluste

Die von Herrn Hranov, Frau Hranova und Frau Schulz erlittenen Verluste haben im Wesentlichen zwei Ursachen:

Zum einen hat die Beklagte zu 1) auf die Preise der von ihr emittierten Optionen als Leistungsentgelt drastisch überhöhte Aufschläge auf den fairen Marktpreis vorgenommen, so dass die Optionspreise zwischen 9 % und 20,20 % - im Durchschnitt 17,83 % - über dem fairen Marktpreis gelegen haben (dazu unten Ziff. 2.2) und die Leistungsentgelte der Beklagten zu 1) im gewichteten Durchschnitt um 594 % überhöht waren.

Zum anderen hat die Beklagte zu 1) Herrn Hranov, Frau Hranova und Frau Schulz unter gröblichster Missachtung ihrer Kundeninteressen von dem Beklagten zu 2) Anlageempfehlungen erteilen lassen, die planmäßig darauf gerichtet waren, dass das für die Optionstransaktionen von ihnen eingesetzte Kapital verloren ging und von der Beklagten zu 1) als Gewinn vereinnahmt wurde (dazu unten Ziff. 2.3). Der Beklagte zu 2) hatte Herrn Hranov wohlweislich verschwiegen, dass die Beklagte zu 1) als Emittentin an den Aktienoptionen verdient, weil sie den Kaufpreis bzw. die Optionsprämie für die Optionen erhielt. Ebenfalls verschwiegen hatte der Beklagte zu 2), dass er selbst aufgrund seiner Bonusvereinbarung mit der Beklagten zu 1) ein eigenes wirtschaftliches Interesse an den Geschäften hatte.

Beweis:      wie vor.



## 2.2     Verluste durch Overpricing

### 2.2.1   Ermittlung des fairen Preises der Optionen

#### a)   Bewertungsmethode

Für die Beurteilung, ob die Beklagte zu 1) für die Emission der von ihr struk-
turierten Warrants überhöhte Leistungsentgelte in Rechnung gestellt hat,
muss zunächst der faire Preis der Optionen ermittelt werden. Zieht man von
dem Preis, den Herr Hranov, Frau Hranova und Frau Schulz bezahlt haben,
den fairen Marktpreis ab, erhält man den Teil des Preises, der dem Leistungs-
entgelt der Beklagten zu 1) entspricht. Bei den streitgegenständlichen War-
rants handelt es sich um klassische sogenannte Plain-Vanilla-Optionen. Als
Plain-Vanilla-Optionen werden Put- und Call-Optionen bezeichnet, deren
Auszahlungsprofil proportional zur Differenz zwischen Kurs und Ausübungs-
preis des Basisinstruments (Underlyings) liegt. Zu einem fest vereinbarten
Ausübungszeitpunkt oder an jedem Tag während der Laufzeit der Option
kann der Optionsinhaber die Option zu einem fest vereinbarten Preis (Strike
Price) ausüben.

**Beweis:**     Einholung eines Sachverständigengutachtens

Wenn der Optionsinhaber zum Beispiel eine Kauf- oder Call Option erworben
hat, die eine Laufzeit von drei Monaten und einen Strike Price von CHF
500,00 hat und die der Aktie zugrundeliegende Aktie am Ausübungszeitpunkt
(also am letzten Tag der drei Monate) einen Börsenkurs von CHF 550 hat,
wird er die Option ausüben und so pro Aktie CHF 50,00 Gewinn machen.
Wenn der Kurs am Ausübungszeitpunkt unter CHF 500,00 liegt, z.B. bei CHF
480,00, wird der Optionsinhaber die Option nicht ausüben, weil er sonst CHF
550,00 für eine Aktie bezahlen müsste, die er an der Börse für CHF 480,00
kaufen könnte. Die Option verfällt in diesem Fall wertlos und wird ausgebucht.

**Beweis:**     wie vor.

Solche Plain-Vanilla-Optionen auf OC Oerlikon-Aktien wurden im fraglichen Zeitraum an der EUREX gehandelt. EUREX ist die Abkürzung für European Exchange und ist eine der weltweit größten Terminbörsen für Finanzderivate (Futures und Optionen), die 1988 aus dem Zusammenschluss der Deutsche Terminbörse und der zur SWX Swiss Exchange gehörenden Soffex (Swiss Options and Financial Futures Exchange) hervorgegangen ist.

Als der faire Preis der Optionen kann der Preis angenommen werden, der sich für eine identische Option zum gleichen Zeitpunkt an der EUREX herausgebildet hätte. Die Bewertung derartiger Warrants wird üblicher- und sachgerechter Weise auf der Grundlage des Black-Scholes-Modells durchgeführt.

**Beweis:**     Einholung eines Sachverständigengutachtens.

Nach diesem Modell errechnet sich der Wert der so genannten europäischen Call Option, also einer Option, die dem Käufer das Recht gibt, die der Option zugrundeliegende Aktie (Underlying) bei Fälligkeit zu dem heute vereinbarten Preis K kaufen zu dürfen (im Gegensatz zur amerikanischen Call Option, die während der Laufzeit an jedem beliebigen Tag ausgeübt werden kann), wie folgt:

(1) $C(\mathrm{K}, t_n) = S_0 e^{-\mathrm{rt}} N(d_1) - \mathrm{K} e^{-\mathrm{rt}} N(d_2)$

Dabei gilt:

(2) $d_1 = \dfrac{ln\left(\frac{S_0}{K}\right) + \left(r + \frac{\sigma^2}{2}\right)t}{\sigma\sqrt{t}} \; und \; d_2 = d_1 - \sigma\sqrt{t}$

**Beweis:**     wie vor

Der Wert der europäischen Put-Option ergibt sich unter Zuhilfenahme der Put-Call-Parität wie folgt:

(3) $P(\mathrm{K}, t) = C(\mathrm{K}, t) - S_0 + \mathrm{K} e^{-\mathrm{rt}}$

**Beweis:**   wie vor

Dabei bezeichnet $S_0$ den Kurs des Underlyings (d.h. der zugrundeliegenden Aktie, hier die OC Oerlikon Aktie) zum Bewertungsstichtag. K ist der Ausübungspreis und r bezeichnet den stetigen laufzeitkonkruenten Zins. σ gibt die jährliche Volatilität des Underlyings an und t die Laufzeit der Option in Jahren. N(x) bezeichnet die Standard-Normalverteilungsfunktion. Zu beachten ist, dass in diesem Modell noch Dividendenzahlungen zu berücksichtigen wären. Hierfür gibt es auch entsprechende Anpassungen der Black-Scholes-Formel. Im hier vorliegenden Zusammenhang spielt das aber keine Rolle, da OC Oerlikon während des hier in Frage stehenden Zeitraums keine Dividenden gezahlt hat.

**Beweis:**   wie vor

Deshalb ist auch nicht davon auszugehen, dass die Erwartung einer baldigen Aufnahme der Dividendenzahlungen die Bewertung der Optionen in den Jahren 2006 bis 2008 beeinflusst hat.

**Beweis:**   wie vor

Das Black-Scholes-Modell ist das Standardmodell, das in der Praxis verwendet wird. Insbesondere stellen die Händler auf den Optionsmärkten keine Geld- oder Briefkurse (Bit-/Ask-Quotes), wie dies auf den Aktienmärkten üblich ist, sondern sie stellen Bit- oder Ask-Volatilitäten. Grob vereinfachend bedeutet dies, dass ein Händler bereit ist, eine Option zu einem Preis zu kaufen, der sich ergibt, wenn man den Optionswert gemäß den oben dargestellten Gleichungen (1) bzw. (3) mit der niedrigeren Bit-Volatilität ermittelt. Hingegen ist er bereit, zur höheren Ask-Volatilität zu verkaufen. Der Mittelwert zwischen Bit- und Ask-Volatilität wird als Mid-Volatilität bezeichnet.

**Beweis:**   wie vor

Alle diese Volatilitäten bezeichnet man als implizite Volatilitäten, um sie von



den historischen, also auf der Basis der in der Vergangenheit beobachteten Kursentwicklung gemessenen Volatilität abzugrenzen. Für eine marktnahe Bewertung muss man also diese impliziten Volatilitäten verwenden, da diese allein schon wegen der Geld-Briefspanne von den historischen Volatilitäten abweichen werden. Hinzu kommt, dass diese implizite Volatilität die Erwartung hinsichtlich der zukünftigen Kursschwankungen der Aktie ausdrückt, wohingegen die historische Volatilität die in der Vergangenheit realisierten Kursschwankungen misst.

**Beweis:**    wie vor

Um die implizite Volatilität der OC Oerlikon-Aktie zu schätzen, können die von der Deutschen Börse zur Verfügung gestellten EUREX-Tickdaten verwendet werden. Im Idealfall wurde am gleichen Tag, an dem Herr Hranov, Frau Hranova oder Frau Schulz eine Transaktion durchgeführt haben, auch an der EUREX eine OC Oerlikon-Option gleichen Typs mit gleichem Ausübungspreis und gleicher Laufzeit gehandelt. In diesem Fall kann aus dem so festgestellten Marktpreis der EUREX-Option gemäß dem in der Praxis üblicherweise verwendeten und vorstehend beschriebenen Black-Scholes-Modell die implizite Volatilität extrahiert werden. Dieser Parameter wird dann verwendet, um gemäß dem Black-Scholes-Modell den fairen Preis der von der Beklagten zu 1) emittierten Warrants zu bestimmen. Für diese Berechnungen ist außerdem die Verwendung der Zinsstruktur erforderlich. Hierzu werden für jeden Tag, an dem Herr Hranov, Frau Hranova und Frau Schulz Warrants gehandelt haben, die den Warrants bzw. Optionen laufzeitentsprechenden LIBOR-Zinssätze (London Interbank Offered Rate) ermittelt. Hierbei handelt es sich um die LIBOR-Swap-Kurve in Schweizer Franken, die angibt, zu welchen Swap-Rates Banken untereinander bereit wären, sich gegenseitig Geld zu leihen. Zur Sicherstellung der Laufzeiten-Äquivalenz werden die Werte der Swap-Kurve entsprechend den Laufzeiten der Warrants interpoliert.

**Beweis:**    wie vor

Das Problem, dass an der EUREX häufig keine identischen Optionen am gleichen Tag gehandelt wurden, kann durch folgenden Algorithmus gelöst werden, um vergleichbare Transaktionen an der EUREX zu identifizieren, aus denen dann die implizite Volatilität abgeleitet werden kann: Zunächst wird am gleichen Handelstag nach Optionen gleichen Typs und mit gleicher Laufzeit und gleicher Moneyness, also dem Verhältnis von Aktienkurs $S_0$ zu Basispreis K, gesucht. Sofern es diese gibt, wird die implizite Volatilität dieser Optionen ermittelt und – wie oben bereits beschrieben – so der faire Preis des Warrants ermittelt. Stehen solche Optionen nicht zur Verfügung, werden dann auch andere Optionen gleichen Typs, die am gleichen Tag gehandelt wurden, in Betracht gezogen. Dabei werden Optionen mit kürzerer und längerer Laufzeit und größerer und kleinerer Moneyness genommen, wobei jeweils die Optionen verwendet werden, die möglichst nah an der Laufzeit und der Moneyness der zu bewertenden Warrants liegen. Aus den impliziten Volatilitäten dieser Optionen wird durch lineare Interpolation die implizite Volatilität einer Option mit gleicher Laufzeit und Moneyness wie der zu bewertende Warrant ermittelt. Damit wird dann wiederum der faire Preis des Warrants berechnet.

**Beweis:**   wie vor

Ist auch der zweite Weg nicht möglich, werden Optionen gleichen Typs betrachtet, die am gleichen Tag gehandelt wurden, aber eine niedrigere Laufzeit und eine niedrigere oder höhere Moneyness hatten. Auch dabei sind immer die Optionen zu wählen, die hinsichtlich Laufzeit und Moneyness möglichst nahe an dem zu bewertenden Warrant lagen. Durch lineare Extrapolation wird die implizite Volatilität einer Option mit gleicher Laufzeit und Moneyness wie der von der Beklagten zu 1) emittierte Warrant ermittelt. Damit wird wiederum der faire Preis des Warrants berechnet.

**Beweis:**   wie vor

Ist auch der dritte Weg nicht gangbar, ist zu Schritt 1 zurückzugehen, allerdings mit der Modifikation, dass nunmehr auch Optionen betrachtet werden,



die in einem Zeitintervall von plus/minus drei Handelstagen um den Transaktionszeitpunkt gehandelt wurden. Sofern dies immer noch zu keinen verwertbaren Preisbeobachtungen führt, werden die Schritte 2 und 3 wiederholt, wiederum mit der Modifikation, dass alle Optionen, die in einem Zeitintervall von plus/minus drei Handelstagen um den Transaktionszeitpunkt gehandelt wurden, betrachtet werden. Muss auf einen anderen Handelstag ausgewichen werden, wird die entsprechende Zinsstrukturkurve an diesem Tag für alle weiteren Berechnungen zugrunde gelegt. Dem Black-Scholes-Modell wird als Aktienkurs wird immer der Schlusskurs der OC Oerlikon-Aktie am Transaktionsstichtag zugrunde gelegt.

**Beweis:**   wie vor

**b)   Vergleich des fairen Preises mit dem von der Beklagten zu 1) in Rechnung gestellten Preis**

Wird die vorstehend in lit. a) dargestellte Bewertungsmethode auf die in **Anlage K 10** dargestellten Transaktionen angewendet, ergeben sich die in der **Anlage K 39** dargestellten Werte.

**Beweis:**   wie vor

Herrn Hranov, Frau Hranova und Frau Schulz ist alleine durch das Overpricing durch die Beklagte zu 1) ein Verlust von insgesamt CHF 107.264.931,00 entstanden. In der Tabelle **Anlage K 39** werden alle Transaktionen aus der Tabelle **Anlage K 10** bewertet, wobei alle Transaktionen mit einem Volumen von weniger als CHF 10.000,00 aus Vereinfachungsgründen nicht bewertet wurden. Es handelt sich hierbei lediglich um vier Transaktionen.

Wie aus der Tabelle **Anlage K 39** ersichtlich, weichen in 42 der untersuchten 64 Transaktionen die tatsächlichen von Herrn Hranov, Frau Hranova und Frau Schulz gezahlten bzw. erhaltenen Preise zu seinem Nachteil von den fairen Preisen ab. Bei Kauftransaktionen hat er einen zu hohen Preis bezahlt

und bei Verkaufstransaktionen einen zu niedrigen Preis erhalten. In der vorletzten Spalte der Tabelle **Anlage K 39** („Verlust") wird für jede Transaktion der sich daraus ergebende Verlust ausgewiesen.

**Beweis:**   wie vor

In 21 Fällen weicht der tatsächliche Preis zu Gunsten von Herrn Hranov, Frau Hranova und Frau Schulz vom fairen Preis ab. In diesen Fällen ergibt sich ein Gewinn, der in der vorletzten Spalte durch ein negatives Vorzeichen gekennzeichnet ist. Die Summe der sich aus der Abweichung des tatsächlichen vom fairen Preis der Warrants ergebenden Gewinne und Verluste aus allen Transaktionen ergibt sich aus der letzten Zeile der **Anlage K 39** mit einem Verlust in Höhe von CHF 107.264.931,00.

**Beweis:**   Einholung eines Sachverständigengutachtens

Aus den in der **Anlage K 39** dargestellten Ergebnissen ergibt sich, dass der Bewertungsfehler der Beklagten zu 1) ein systematisches Muster aufweist.

**Beweis:**   wie vor

Bei den Kauftransaktionen liegt der durchschnittliche Aufschlag für die Leistungen der Beklagten zu 1) gegenüber dem fairen Preis bei 12,38 %. Allerdings fällt dieser Aufschlag umso höher aus, je höher das Transaktionsvolumen ist. Bei Kauftransaktionen mit einem Wert von über CHF 10.000.000,00 liegt der Aufschlag bei 16,64 %, bei Kauftransaktionen mit einem Wert von über CHF 20.000.000,00 liegt der Aufschlag bei 17,30 %.

**Beweis:**   wie vor

Der mit dem Transaktionsvolumen gewichtete, durchschnittliche Aufschlag liegt entsprechend bei ca. 17,65 %.

**Beweis:**   wie vor

Dies spricht gegen ein rein zufälliges Muster in der Bewertung der Warrants durch die Beklagte zu 1) und für ein absichtliches Overpricing.

**Beweis:**    wie vor

Gegen ein zufälliges Muster spricht außerdem die Tatsache, dass bei 8 von 16 Verkaufstransaktionen eine Überbewertung der Warrants zu Gunsten von Herrn Hranov, Frau Hranova und Frau Schulz vorlag, wo hingegen bei 34 von 47 Kauftransaktionen eine Überbewertung zu Ungunsten von Herrn Hranov, Frau Hranova und Frau Schulz vorlag. Dabei ist zu beachten, dass es bei fast allen Verkäufen in unmittelbar zeitlicher Nähe auf Empfehlung des Beklagten zu 2) wiederum zu einem Kauf von Warrants durch Herrn Hranov, Frau Hranova und Frau Schulz gekommen ist. Insoweit spricht der asymmetrische Bewertungsfehler zwischen Käufen und Verkäufen für eine strategische Verzerrung in den Warrant-Preisen durch die Beklagte zu 1).

**Beweis:**    wie vor

### 2.2.2    „Marktübliche" Leistungsentgelte für Emittenten von Warrants

Vorstehend in 2.2.1 lit. b) haben wir dargelegt, dass Herr Hranov, Frau Hranova und Frau Schulz bei Kauftransaktionen mit einem Volumen von größer als CHF 20.000.000,00 einen verdeckten Preisaufschlag von rund 17,30 % bezahlt haben. Der mit dem Transaktionsvolumen gewichtete durchschnittliche Aufschlag lag bei rund 18 %. Hätte die Beklagte zu 1) für ihre Warrants die gleichen Preise gestellt, wie sie für ansonsten identische Optionen an der EUREX zu bezahlen gewesen wären, hätten Herr Hranov, Frau Hranova und Frau Schulz die durch diese Preisaufschläge verursachten Verluste nicht erlitten.

**Beweis:**    wie vor

Die von der Beklagten zu 1) auf den fairen Marktpreis der Warrants aufgeschlagenen Leistungsentgelte waren nicht marktüblich.



**Beweis:**     wie vor

Die Ermittlung eines „üblichen" Preisaufschlags bei Warrants bzw. strukturierten Produkten ist relativ schwierig, weil der Markt, insbesondere der europäische, sehr heterogen und sehr stark zersplittert ist.

**Beweis:**     Einholung eines Sachverständigengutachtens

Es existiert jedoch eine Reihe von akademischen Studien, die sich mit der Bewertung von strukturierten Produkten im europäischen Raum bzw. schwerpunktmäßig mit der Schweiz und Deutschland beschäftigen. Es handelt sich um sieben wissenschaftliche Darstellungen, die wir in der als **Anlage K 40** beigefügten Tabelle nach Verfassern, untersuchtem Markt, untersuchter Datenmenge, Referenzinstrumenten/Hauptdatenquellen und ermitteltem Preisaufschlag darstellen. Die in der Tabelle **Anlage K 40** aufgeführten Studien beziehen sich auf strukturierte Produkte, die mittels einfacher Optionsstrategien repliziert werden können. Barth et al. (2001) betrachten beispielsweise in ihrer Studie 275 Plain-Vanilla-Produkte, wie die hier streitgegenständlichen OC Oerlikon-Warrants, deren theoretische Preise sie analog zu der vorstehend dargestellten Vorgehensweise von an der EUREX gehandelten Optionen ableiten. Als Ergebnis ermitteln sie einen Preisaufschlag von ca. 2 % gegenüber handelsüblichen EUREX-Optionen.

**Beweis:**     Einholung eines Sachverständigengutachtens

Die Mehrheit der Studien kommt zu dem Ergebnis, dass der Aufschlag auf Warrants bei klassischen börsengehandelter Optionen in einem Bereich von 2 – 6 % liegt.

**Beweis:**     wie vor

Gemäß Stoimenov/Wilkens (2005) sind darüber hinaus z. B. die Art des Basiswerts oder die Komplexität der strukturierten Produkte Treiber dieses Overpricing-Effekts. Kompliziertere Produkte sind vergleichsweise teurer, da sie für den

Emittenten deutlich schwerer abzusichern sind.


**Beweis:**        wie vor


Da es sich bei den streitgegenständlichen Warrants um klassische Plain-Vanilla-Optionen handelt, würde sich der marktübliche Preisaufschlag der Warrants gegenüber EUREX-Optionen eher im unteren Bereich des obigen Intervalls bei ca. 2 – 3 % bewegen.


**Beweis:**        wie vor


Wilkens et al. (2003) analysieren diese Bewertungen schließlich sogar für einzelne Emittenten und zeigen, dass die durchschnittliche Überbewertung bei Zertifikaten der Beklagten zu 1) bei 3 % liegt.


Daraus folgt, dass die vorstehend in lit. b) ermittelte Überbewertung der von Herrn Hranov, Frau Hranova und Frau Schulz gekauften Warrants in Höhe von rund 18 % mit dem Faktor 6 – 9 über der am Markt für Warrants durchschnittlich feststellbaren Überbewertung von 2 – 3 % gelegen hat.


**Beweis:**        wie vor


Prozentual entspricht die Überschreitung des marktüblichen Leistungsentgelts, einer Überschreitung um 600 %.


**Beweis:**        wie vor


### 2.3    Auf Totalverlust ausgerichtete Anlagestrategie


Die von dem Beklagten zu 2) empfohlene Anlagestrategie war für Herrn Hranov, Frau Hranova und Frau Schulz eklatant falsch. Außerdem beruhte sie auf dem Plan der Beklagten zu 1) und des Beklagten zu 2), Herrn Hranov, Frau Hranova und Frau Schulz zum Erwerb chancenloser Aktienoptionen zu veranlassen und ihre aus OC Oerlikon-Warrants bestehenden Portfolien so zu steuern, dass die

Optionen zum überwiegenden Teil wertlos verfielen (weil der Ausübungspreis zum Ausübungszeitpunkt höher war als der Börsenkurs der OC Oerlikon-Aktie). Die Beklagten haben mit dieser Anlagestrategie erreicht, dass das von Herrn Hranov, Frau Maria Hranova und Frau Elissaveta Schulz eingesetzte Kapital verloren war und von der Beklagten zu 1) eins zu eins als Gewinn vereinnahmt wurde.

Für diese „erfolgreichen" Geschäfte hat der Beklagte zu 2) nach eigenen Bekundungen von der Beklagten zu 1) Bonusse von rund CHF 50 Mio. erhalten.

**Beweis:    Rumen Hranov, b.b., als Zeuge**

Dass Herr Hranov, Frau Hranova und Frau Schulz von der Beklagten zu 1) unter Ausnutzung seines Vertrauens zu dem Beklagten zu 2) auf beispiellose Weise ausgenommen wurde, war innerhalb der Beklagten zu 1), insbesondere bei dem Vorgesetzten des Beklagten zu 2) allgemein bekannt. Der damaligen Vorgesetzte des Beklagten zu 2) bei der Beklagten zu 1), Herr Maroan Maizar (zum damaligen Zeitpunkt General Manager, Head Capital Markets & Treasury Solutions (CMTS) Switzerland der Deutsche Bank AG, Frankfurt am Main Zweigniederlassung Zürich), kommentierte am 26.06.2015 gegenüber Herrn Claude Schmidt, Mitglied der Geschäftsleitung von Goldman Sachs in Zürich, bei einem Mittagessen im Restaurant Metropol in Zürich die Optionsgeschäfte, die die Beklagten mit Herrn Hranov, Frau Hranova und Frau Schulz machten, mit folgenden Worten:

> „Simon Biner hat alle Regeln gebrochen. Es war Diebstahl am Kunden. Wir hatten riesiges Glück, dass die Finanzaufsicht den Fall Oerlikon / Hranov nicht untersucht hat."

**Beweis:**       Claude Schmidt, zu laden über Goldman Sachs Zürich, Hauptstrasse 71, 8823 Wollerau, Schweiz, als Zeuge.

Maroan Maizar, Morgental 24, 8126 Zumikon, Schweiz, als Zeuge.



Bei einem Abendessen im Haus von Herrn Daniel Sandmeier hat Herr Claude Schmidt den ehemaligen Kollegen des Beklagten zu 2) bei der Beklagten zu 1), Herrn Chris Stainbrook auf den Fall Hranov angesprochen. Ohne zu wissen, dass sich Herr Schmidt und Herr Hranov kennen, hat Herr Stainbrook wörtlich folgendes gesagt:

> „It was heist. It was bank robbery by the bank. It was like a mafia ring"

**Beweis:**　　　Claude Schmidt, b.b., als Zeuge.

Auf Deutsch bedeutet dies:

> „Es war ein Raubüberfall. Es war Bankraub durch die Bank. Es war wie ein Mafia Ring."

**Beweis:**　　Einholung eines Sachverständigengutachtens

Aus folgenden Gründen ist es evident, dass die empfohlene Anlagestrategie falsch und diametral gegen die Interessen von Herrn Hranov, Frau Maria Hranova und Frau Elissaveta Schulz gerichtet war:

- Die Anlageempfehlungen des Beklagten zu 2) haben dazu geführt, dass Herr Hranov, Frau Hranova und Frau Schulz mit ihren Anlagen einem enormen Verlustrisiko ausgesetzt waren, das durch die gegebenen Gewinnchancen nicht zu rechtfertigen war.

- Die Gewinnchancen waren aufgrund der Zeitwertverluste der Warrants stark geschmälert.

- Die geringen Gewinnchancen hätten zum überwiegenden Teil auch durch den Aufbau eines deutlich weniger riskanten Portfolios gewahrt werden können.



•      Zwischen den Anlagezielen von Herrn Hranov, Frau Hranova und Frau
Schulz und den Einkommenszielen der Beklagten zu 1) und des Beklagten
zu 2) bestand im Hinblick auf die empfohlenen Optionen, die ausnahmslos
von der Beklagten zu 1) emittiert worden waren, ein erheblicher Interes-
senskonflikt, weil die Beklagte zu 1) an dem Verkauf der Optionen ver-
diente. Aufgrund des exorbitanten Preisaufschlags auf den fairen Markt-
preis verdiente sie sogar überdurchschnittlich.

### 2.3.1   Verlustrisiken der empfohlenen Anlagestrategie

### a)   Verlustrisiko einer Aktienoption im Vergleich zum fremdfinanzierten Erwerb einer Aktie

Die mit den Anlageempfehlungen des Beklagten zu 2) verbundenen Ver-
lustrisiken werden ersichtlich, wenn man das Verlustrisiko einer Aktienop-
tion mit dem Verlustrisiko einer mit Eigenkapital finanzierten Geldanlage
in Aktien vergleicht.

Der Kauf einer Kaufoption auf eine bestimmte Aktie (Call-Option) ent-
spricht wirtschaftlich betrachtet einem fremdfinanzierten Erwerb dieser
Aktie auf dem Kassa-Markt. Das Zahlungsprofil eines fremdfinanzierten
Aktienerwerbs sei zunächst anhand eines kurzen Beispiels erläutert, bei
dem heute ($t = 0$) die Aktie zum aktuellen Preis $S_0$ gekauft und bis zu ei-
nem Zeitpunkt $t$ gehalten wird. Zur Vereinfachung wird angenommen,
dass zwischenzeitlich keine Dividenden gezahlt werden. Weitere Annah-
men sind, dass der Kurs der Aktie heute bei $S_0 = 100$ und eine Periode
später in $t = 1$ der Kurs entweder bei $S_1 = 120$ oder $S_1 = 80$ steht. Der
Anleger verfügt über ein Eigenkapital von 20, so dass er 80 über einen
Kredit finanzieren muss. Zur weiteren Vereinfachung wird unterstellt, dass
der Kreditzins $r = 0$ % beträgt. Wenn der Kurs der Aktie von 100 auf 120
steigt, erzielt der Anleger einen Gewinn von 20 (120-20-80 = 20). Sinkt
der Kurs auf 80, erzielt der Anleger einen Verlust von 20 (80-20-80 = -20).

Dasselbe Gewinn-/Verlustprofil könnte der Anleger aber auch durch den Erwerb von Kaufoptionen herstellen. Auch dies sei anhand eines Beispiels anschaulich gemacht: Angenommen, es gibt eine Kaufoption mit einem Ausübungspreis 100, d. h. diese Option gewährt dem Anleger das Recht in t = 1 die Aktie zum Preis von 100 zu erwerben. Ferner soll angenommen werden, dass der Preis für diese Kaufoption 10 ist, so dass der Anleger mit seinem Eigenkapital von 20 zwei dieser Optionen kaufen kann. Steigt die Aktie nun in t = 1 auf einen Kurs von 120, ergibt sich für den Anleger ein Gewinn von 2 x (120-100)-20 = 20. Sinkt der Kurs hingegen auf 80, wird der Anleger die Kaufoption nicht ausüben, da es wirtschaftlich unsinnig wäre, die Aktie im Rahmen der Kaufoption für 100 zu erwerben, wenn sie an der Börse für 80 gekauft werden könnte. Somit verliert der Anleger in diesem Fall seinen Kapitaleinsatz und macht entsprechend einen Verlust von 20.

Diese beiden Beispiele zeigen, dass das Zahlungsprofil eines kreditfinanzierten Aktienkaufs identisch ist mit dem Zahlungsprofil einer in geeigneter Weise ausgestatteten Kaufoption. Der Erwerb einer Kaufoption entspricht demnach dem kreditfinanzierten Erwerb der der Option zugrundeliegenden Aktie. Daraus wird gleichzeitig ersichtlich, dass die Risiken beim Erwerb einer Option weit über die Risiken hinausgehen, die man bei einer mit Eigenkapital finanzierten Geldanlage in Aktien zu tragen hat. Dieser Effekt wird allgemein als Hebeleffekt des Optionserwerbs bezeichnet.

**Beweis für alles Vorstehende:** Einholung eines Sachverständigengutachtens

Dieser Hebeleffekt kann anhand folgenden kurzen Beispiels illustriert werden:

Würde ein Anleger das Eigenkapital von 20 in eine Aktie mit einem Kurs von 100 investieren, dann könnte er 1/5 einer Aktie kaufen. In t = 1 hätte dieses Fünftel dann entweder einen Wert von 120/5 = 24 (Kurs 120) oder

von 80/5 = 16 (Kurs 80). Er würde also entweder eine Rendite von 24/20-
1 = 20 % oder von 16/20-1 = -20 % erwirtschaften.

**Beweis:**     wie vor

Beim fremdfinanzierten Erwerb der Aktie würde er hingegen einen Ge-
winn von 20 bzw. von -20 erzielen, was bezogen auf das Eigenkapital des
Anlegers einer Rendite von + 100 % oder – 100 % entspricht. Der Anleger
kann also sein Eigenkapital entweder verdoppeln oder er erleidet einen
Totalverlust. Der Hebel liegt hier bei 1 + 80/20 = 5, weil für jeden Euro
Eigenkapital vier Euro Fremdkapital eingesetzt werden. Somit muss die
Rendite in diesem Fall dem 5-fachen der Rendite entsprechen, die sich
beim eigenkapitalfinanzierten Erwerb der Aktie ergibt.

**Beweis:**     wie vor

Dasselbe gilt für den Fall, dass der Anleger die beiden Kaufoptionen er-
wirbt. Die Kaufoption hat nämlich ebenfalls einen Hebel von 5, weil der
Anleger erstens an der Kursbewegung der Aktie voll partizipiert, obwohl
er nur 1/10 (100/10) des Geldbetrages einsetzt, der für den Erwerb der
Aktie notwendig gewesen wäre und weil sich zweitens für eine Kursbewe-
gung der Aktie um +/-20 eine Veränderung im Optionswert von +/-10
ergibt. Der Hebel der Option beträgt daher (100/10) x (10/20) = 5.

An diesen Beispielen ist ersichtlich, dass über den Hebeleffekt das Risiko
einer Optionsanlage um ein Vielfaches höher ist als das Risiko einer Ak-
tienanlage. Zwar stehen diesem erhöhten Risiko auch erhöhte Gewinn-
chancen gegenüber, dies ändert aber nichts daran, dass insbesondere
das Risiko eines Totalverlusts bei einer optionsbasierten Anlagestrategie
weit höher als bei einer Aktienanlage ist.

**Beweis:**     Einholung eines Sachverständigengutachtens



**b)    Auswirkung des Hebeleffekts auf das Verlustrisiko**

Mit den von den Beklagten empfohlenen Warrants waren enorme Risiken verbunden. Berechnet man den Hebel für die insgesamt 49 Kauftransaktionen mit der folgenden Gleichung:

$$(5)\ \Omega = \frac{S_0}{c} N(d_1)$$

Unter Verwendung der impliziten Volatilität und des fairen Preises der Option, ergeben sich die in der ersten Spalte der als **Anlage K 41** beigefügten Tabelle dargestellten Werte.

**Beweis:**        Einholung eines Sachverständigengutachtens

Danach liegt der mittlere Hebel bei knapp unter 4, was gemäß den Erläuterungen vorstehend unter lit. a) einem fremdfinanzierten Aktienkauf entsprechen würde, bei dem 3/4 des Kapitaleinsatzes kreditfinanziert ist. Angesichts der Risiken, die mit einem Aktienkauf verbunden sind, ist dies ein enorm hoher Fremdfinanzierungsanteil, den ein voll informierter Investor nicht – oder allenfalls nur bei einem sehr kleinen Teil seines Gesamtvermögens – eingehen würde.

**Beweis:**        wie vor

Wie sich aus **Anlage K 42** ferner ergibt, lag der Hebel bei keiner einzigen Transaktion unter 2 und in der Spitze sogar über 7. Ein Hebel von 7 entspricht einem Fremdkapitalanteil von rund 86 %.

**Beweis:**        wie vor

Der Hebeleffekt erhöht die Verlustwahrscheinlichkeit. Eine exakte Quantifizierung des Verlustrisikos, also der Wahrscheinlichkeit, mit der ein Ver-



lust eintritt und der Höhe des zu erwartenden Verlustes, ist von den einzelnen Elementen der Anlagestrategie abhängig. Wichtige Parameter sind dabei die Charakteristiken der Optionen, wie etwa das Underlying (i.e. die Aktie, die Gegenstand der Option ist), die Laufzeit und die so genannte Moneyness. Unter Moneyness versteht man das Verhältnis von aktuellem Aktienkurs und Ausübungspreis, also $S_0/K$. Je höher diese Moneyness, umso geringer ist das Verlustrisiko bei einer Kaufoption, weil der Aktienkurs dann stärker fallen muss, damit der Optionsinhaber in die Verlustzone kommt.

**Beweis:**     wie vor

In den von Herrn Hranov, Frau Hranova und Frau Schulz erworbenen 46 Warrants, die eine Kaufoption zum Gegenstand hatten, lag die durchschnittliche Moneyness nahe bei 1, allerdings mit eine großen Spannweite zwischen 0,64 und 1,26.

**Beweis:**     wie vor

Herr Hranov hat das Verlustrisiko der von dem Beklagten zu 2) empfohlenen Anlagestrategie von Herrn Prof. Dr. Christoph Kaserer, Inhaber des Lehrstuhls für Finanzmanagement und Kapitalmärkte der technischen Universität München, begutachten und berechnen lassen. Herr Prof. Kaserer kommt in seinem Gutachten vom 5. Oktober 2016 zu dem Ergebnis, dass die Anlagestrategie extrem risikobehaftet war. Im Einzelnen führt er in seinem Gutachten auf Seite 32 Folgendes aus:

> *„Tatsächlich lag die Totalverlustwahrscheinlichkeit im Durchschnitt aller Transaktionen bei 50 – 55 %, je nachdem ob man die historische oder die implizite Volatilität und den Mittelwert oder den Median betrachtet. In der Spitze lag die Wahrscheinlichkeit eines Totalverlustes sogar bei 79 %. Naturgemäß muss die Wahrscheinlichkeit, dass überhaupt ein Verlust eintritt, nochmals deutlich höher sein. Tatsächlich sieht man in Tabelle 8, dass diese zwischen 71 und 74 % lag, und in der Spitze sogar 87 % betrug.*

| | Hebel | Totalver-lustwahr. (hist. Volat.) | Totalver-lustwahr. (impl. Volat.) | Verlust-wahr. (hist. Volat.) | Verlust-wahr. (impl. Volat.) | ETL in % des Einsatzes (hist. Volat.) |
|---|---|---|---|---|---|---|
| Mittelwert | 3,91 | 51% | 55% | 74% | 71% | 83% |
| Median | 3,86 | 50% | 55% | 74% | 71% | 84% |
| Maximum | 7,17 | 79% | 76% | 87% | 83% | 96% |
| Minimum | 2,05 | 8% | 18% | 50% | 51% | 55% |
| Summe | | | | | | 599.717.478 CHF |

**Tabelle 8: Verschiedene Risikokennzahlen der 46 Kauftransaktionen von als Kaufoptionen ausgestalteten Warrants**

> *Und schließlich kann man auch noch den bedingten Erwartungsverlust (ETL) berechnen, also den Erwartungsverlust für den Fall, dass überhaupt ein Verlust eintritt. Da die Transaktionen jeweils ein unterschiedliches Volumen hatten, drücke ich den ETL in Prozent des geleisteten Kapitaleinsatzes aus. Wie man in der letzten Spalte von Tabelle 8 sieht, lag dieser Erwartungsverlust im Durchschnitt bei 83 – 84 %, wobei er in der Spitze sogar bei 96 % lag. Summiert man die Erwartungsverluste über alle betrachteten 46 Kauftransaktionen auf, dann ergibt sich ein Wert von knapp 600 Mio. CHF.*
>
> *Zusammenfassend kann man sagen, dass bei den hier betrachteten 46 Kauftransaktionen von Warrants auf die Oerlikon-Aktie mit einer Wahrscheinlichkeit von 71 – 74 % mit einem Verlust zu rechnen war und dass sich dieser Verlust im Erwartungswert auf knapp 600 Mio. CHF aufsummiert. Es scheint unwahrscheinlich zu sein, dass selbst ein vermögender Anleger wie Herr Hranov, wäre er über dieses enorme Risiko in transparenter Weise aufgeklärt worden, bereit gewesen wäre, dieses zu tragen. Dies gilt insbesondere auch deshalb, weil der größte Teil der mit diesem Risiko verbundenen Gewinnchancen auch durch eine weniger riskante Strategie hätte gewahrt werden können."*

**Beweis:**     Gutachten von Herrn Prof. Kaserer vom 05.10.2016 in Fotokopie – **Anlage K 43**

Die vorstehend zitierten Ausführungen von Herrn Prof. Kaserer sind zutreffend. Die von Herrn Prof. Kaserer vorgenommenen Berechnungen sind richtig und geben ein zutreffendes Bild der Risikostruktur der empfohlenen Anlagestrategie.

**Beweis:**     Einholung eines Sachverständigengutachtens

### 2.3.2  Anlagestrategie bezweckte den Totalverlust

Die Anlageempfehlungen der Beklagten zu 1) und 2) beruhten auf keiner plausiblen und nachvollziehbaren Anlagestrategie. Über den gesamten streitgegenständlichen Zeitraum wurde mit einem enormen Hebel auf die positive Kursentwicklung der OC Oerlikon-Aktie gewettet. Erstmals mit dem Kauf einer Put-Option am 3. Oktober 2008 wurde auf eine Abwärtsbewegung der Aktien gewettet.

Die Herrn Hranov, Frau Hranova und Frau Schulz empfohlene Strategie wäre allenfalls dann nachvollziehbar, wenn entweder auf eine positive Sonderentwicklung der OC Oerlikon-Aktie selbst oder eine generelle Aufwärtsbewegung des Aktienmarktes zu erwarten gewesen wäre.

**Beweis:**        Einholung eines Sachverständigengutachtens

Der Beklagte zu 2) hat die Gründe für die von ihm empfohlene Anlagestrategie Herrn Hranov gegenüber nie dezidiert begründet. Er hat sich stets darauf beschränkt, seine Strategie mit seiner persönlichen Erwartung eines steigenden Kurses der OC Oerlikon Aktie zu begründen.

**Beweis:**        Rumen Hranov, b. b., **als Zeuge**

Die Erwartung einer positiven Sonderentwicklung der OC Oerlikon-Aktie im streitgegenständlichen Zeitraum hätte mit dem Einstieg des russischen Investors Victor Vekselberg bei OC Oerlikon im Jahr 2006 begründet werden können, weil dies eine gewisse Wahrscheinlichkeit für einen Übernahmekampf bei OC Oerlikon begründete. Übernahmekämpfe führen häufig zu einer positiven Kursentwicklung der Aktie des betreffenden Unternehmens.

**Beweis:**        Einholung eines Sachverständigengutachtens

Victor Vekselberg erwarb innerhalb kürzester Zeit, nämlich bis zum 18. Januar 2007, 13,79 % der Aktien der OC Oerlikon AG.

**Beweis:**       Offenlegungsmeldung der OC Oerlikon AG vom 18. Januar 2007
                  in Fotokopie **- Anlage K 43**


Eine Strategie, die auf einen steigenden Aktienkurs wegen eines Übernahme-
kampfes wettet, kann jedoch nur aufgehen, wenn sich der Übernahmekampf
noch während der Laufzeit der Option in stark steigenden Aktienkursen nieder-
schlägt.


**Beweis:**       wie vor


Die durchschnittliche Laufzeit der streitgegenständlichen Warrants lag aber unter
einem halben Jahr, so dass hier ein enorm hohes Risiko eingegangen wurde,
denn Übernahmeschlachten dauern in der Regel länger als ein halbes Jahr, nicht
selten sogar mehrere Jahre.


**Beweis:**       Einholung eines Sachverständigengutachtens


Ein erheblicher Teil des Wertes einer Option besteht aus dem sogenannten Zeit-
wert. Dieser ist definiert als $C-(S_0-K)$.


**Beweis:**       Einholung eines Sachverständigengutachtens


Der Zeitwert sagt aus, wieviel man für den indirekten Erwerb der Aktie über das
Optionsgeschäft mehr bezahlt als bei einem zeitgleichen direkten Erwerb der Ak-
tie.


**Beweis:**       wie vor


Der Grund für die Existenz des Zeitwerts besteht darin, dass wegen des Hebel-
effekts an der Kursentwicklung der Aktie überproportional partizipiert werden
kann, ohne dass der für den Erwerb der Aktie notwendige Kapitaleinsatz geleistet
werden muss.


**Beweis:**       wie vor

Wie oben unter Ziffer 2.3.1 lit. b dargestellt, lag die durchschnittliche Moneyness der von Herrn Hranov, Frau Hranova und Frau Schulz erworbenen Warrants nahe bei 1. Der Wert der Warrants bestand also zum allergrößten Teil aus ihrem Zeitwert.

**Beweis:**      wie vor

Der Zeitwert baut sich über die Laufzeit der Option unweigerlich ab, weil er im Fälligkeitszeitpunkt der Option definitionsgemäß bei null liegen muss. Zwar konnte die Spekulation auf einen Übernahmekampf durch das Weiterrollen der Warrants (i. e. Verkauf von Warrants, die im Geld sind und gleichzeitiger Kauf neuer Warrants mit längerer Laufzeit und höherem Ausübungspreis) zeitlich verlängert werden, jedoch muss bei jedem Weiterrollen der Zeitwert der Option wieder neu bezahlt werden. Damit steigt der Kapitaleinsatz kontinuierlich an.

**Beweis:**      wie vor

Aufgrund der hohen Volumina, die von Herrn Hranov, Frau Hranova und Frau Schulz eingesetzt werden mussten, bestand eine hohe Wahrscheinlichkeit für einen vorzeitigen und mit einem Totalverlust verbundenen Abbruch der Strategie bestand.

**Beweis:**      wie vor

### 2.3.3   Keine Diversifikation

Zur Begründung der von den Beklagten empfohlenen Anlagestrategie kam neben der Erwartung einer positiven Kursentwicklung der OC Oerlikon-Aktie lediglich die Erwartung einer generellen Aufwärtsentwicklung am schweizerischen Aktienmarkt in Betracht.

**Beweis:**      Einholung eines Sachverständigengutachtens

Die mit einer allgemeinen Marktentwicklung verbundenen Gewinnchancen hätte eine Anlagestrategie, die eine diversifizierte Anlage vorgesehen hätte, mit einem deutlich geringeren Risiko gewahrt. Dadurch wäre die unnötige Inkaufnahme von Risiken vermieden worden.

**Beweis:**     wie vor

Bei der OC Oerlikon-Aktie hat es sich im streitgegenständlichen Zeitraum um eine sehr volatile, mit einem überdurchschnittlichen Risiko behaftete Aktie gehandelt.

**Beweis:**     wie vor

In dem als **Anlage K 44** beigefügten Diagramm ist für den streitgegenständlichen Zeitraum von November 2006 bis 2008 die jährliche Volatilität der OC Oerlikon-Aktie und des schweizerischen Aktienmarkts gemessen am Swiss Performance Index (SPI) dargestellt. Die Volatilität ist als rollierende Standardabweichung der logarithmierten Aktienrendite über die jeweils letzten 250 Handelstage berechnet.

**Beweis:**     wie vor

Danach hat im streitgegenständlichen Zeitraum die Volatilität der OC Oerlikon-Aktie im Durchschnitt 45 % betragen mit einer Schwankungsbreite zwischen 30 und 61 %. Demgegenüber war das Risiko eines Investments in den schweizerischen Aktienmarkt im Hinblick auf die Volatilität des SPI deutlich niedriger. Die Volatilität des SPI lag im Durchschnitt bei 16 % mit einer Schwankungsbreite zwischen 11 und 30 %.

**Beweis:**     wie vor

Das Gesamtrisiko der OC Oerlikon-Aktie war also nahezu dreimal so hoch wie das Gesamtrisiko des SPI.

**Beweis:**     wie vor

Außerdem war nicht nur das Gesamtrisiko der OC Oerlikon-Aktie sehr hoch, sondern auch ihr sogenanntes systematisches Risiko oder Marktrisiko.

**Beweis:**      wie vor

Das systematische Risiko oder Marktrisiko wird in der **Anlage K 44** durch den Betafaktor gemessen, der die Abhängigkeit der Aktienrendite von der Marktrendite angibt. Danach betrug der Betafaktor der OC Oerlikon-Aktie im streitgegenständlichen Zeitraum im Durchschnitt 1,74 mit einer Schwankungsbreite zwischen 1,30 und 2,37.

**Beweis:**      wie vor

Im Durchschnitt war das Marktrisiko bei einem Investment in die OC Oerlikon-Aktie rund 1,7-mal so noch wie bei einem Investment in den schweizerischen Aktienmarkt.

Wenn der von den Beklagten empfohlenen Anlagestrategie die Idee zugrunde gelegen haben sollte, mit einem hohen Hebel auf eine Aufwärtsbewegung des Aktienmarktes zu setzen, wäre die Verwendung eines diversifizierten Basiswertes, wie z. B. dem SPI, anstatt der OC Oerlikon-Aktie, mit einem deutlich geringeren Risiko verbunden gewesen.

**Beweis:**      wie vor

Eine Anlage ausschließlich in Kaufoptionen auf die OC Oerlikon-Aktie setzt auch auf eine Aufwärtsbewegung des Aktienmarktes. Bei einem Beta der OC Oerlikon-Aktie von 1,74 würde es bei einem Kursanstieg des SPI von 10 % zu einem Kursanstieg der Aktie von 17,4 % kommen. Der Kursanstieg der Kaufoption wäre noch deutlich höher, weil der Kursanstieg der Aktie dann noch mit dem Hebel multipliziert werden muss. Bei einem Hebel von 3,9 läge der Kursanstieg der Kaufoption bei 17,4 % x 3,9 = 67,9 % (der Zeitwertverlust der Option, der darauf beruht, dass die Laufzeit der Option laufend abnimmt, ist dabei unberücksichtigt geblieben).



**Beweis:** Einholung eines Sachverständigengutachtens

Der Betafaktor einer Option $\beta_C$ beträgt die folgende Abhängigkeit vom Betafaktor des Basiswerts $\beta_i$:

$$(7)\ \beta_C = \Omega \cdot \beta_i$$

Dabei ist $\Omega$ der Hebel der Option, wie in oben stehender Gleichung (5) (s.o. Ziffer 2.3.1 lit b). Um die im Betafaktor $\beta_C$ zum Ausdruck kommende Marktabhängigkeit der Anlagestrategie zu erreichen, muss der Anleger das mit der Option verbundene Risiko eingehen. Misst man dieses Risiko über die Volatilität der Option $\sigma_c$, gilt folgende Formel:

$$(8)\ \sigma_C = \Omega \cdot \sigma_i = \Omega \sqrt{\beta_i^2 \sigma_m^2 + \sigma_{\epsilon_i}^2}$$

**Beweis:** wie vor

Der zweite Teil der Gleichung greift dabei auf den aus dem CAPM bekannten Ansatz zurück, dass das Risiko einer Aktie zerlegt werden kann in seinen systematischen Teil, hier repräsentiert durch den ersten Summanden unter der Wurzel, bei dem der quadrierte Betafaktor der Aktie mit der quadrierten Volatilität des Marktportfolios multipliziert wird, und seinen idiosynkratischen Teil, hier präsentiert durch den zweiten Summanden unter der Wurzel.

**Beweis:** Einholung eines Sachverständigengutachtens

Würde man die Anlagestrategie hingegen durch den Erwerb von Kaufoptionen auf den SPI realisieren, ließe sich dieselbe Marktsensitivität bei deutlich geringerem Risiko realisieren. Um denselben Betafaktor bei Erwerb einer Kaufoption auf den Index zu realisieren, muss die Kaufoption über einen Hebel von $\beta_i$ x $\Omega$ verfügen. Ist dies der Fall, dann ergibt sich für die Volatilität dieser Option gemäß nachfolgender Gleichung die folgende Beziehung:



(8) $\sigma_C = \Omega \cdot \beta_i \cdot \sigma_m < \Omega \sqrt{\beta_i^2 \sigma_m^2 + \sigma_{\epsilon_i}^2} \quad \forall \sigma_{\epsilon_i}^2 > 0$

Da das idiosynkratische Risiko einer Aktie mit an Sicherheit grenzender Wahrscheinlichkeit größer 0 sein wird, weist die Optionsstrategie, die auf den Erwerb von Kaufoptionen auf dem Marktindex beruht, bei gleicher Marktsensitivität ein geringeres Risiko auf.

**Beweis:**        wie vor

Die durchschnittliche Volatilität der OC Oerlikon-Aktie im streitgegenständlichen Zeitraum lag bei 45 %, die durchschnittliche Volatilität des SPI bei 16 % und der durchschnittliche Betafaktor der Aktie bei 1,74. Aus dem oben dargestellten Zusammenhang ergibt sich, dass für die idiosynkratische Volatilität der Aktie $\sigma_{yi}$ = 36 % gilt. Somit beträgt bei einem Hebel von 3,9 die Volatilität der Option $\sigma_c$ = 3,9 x 45 % = 176 %. Bei der Anwendung derselben Strategie auf Indexoptionen läge die Volatilität der Option bei $\sigma_c$ = 3,9 x 1,74 x 16 % = 109 %. Das Risiko wäre also bei gleicher Marktsensitivität nur 0,62-mal so hoch wie bei der auf Aktienoptionen basierenden Strategie.

**Beweis:**        wie vor

In dem als **Anlage K 45** beigefügten Diagramm wird der vorstehend beschriebene Zusammenhang für die hier vorliegende Zahlenkonstellation für unterschiedliche Hebel zwischen 1 und 5 dargestellt. Dabei wird deutlich, dass die mit dem Erwerb von Aktienoptionen verbundene Strategie immer deutlich risikoreicher als die mit dem Erwerb von Indexoptionen verbundene Strategie ist. Der Unterschied beruht auf dem Diversifikationseffekt, der beim Erwerb einer Option auf ein diversifiziertes Underlying, nämlich dem Index, erzielt wird.

**Beweis:**        Einholung eines Sachverständigengutachtens

Die Vermeidung einer unnötigen Inkaufnahme von Risiken reduziert für den Anleger das Verlustrisiko.

**Beweis:**       wie vor

Dies wäre durch eine Anlagestrategie, die Kaufoptionen auf einen Index vorsieht, leicht umzusetzen gewesen.

**Beweis:**       wie vor

Ein Vergleich der Verlustwahrscheinlichkeit der streitgegenständlichen 46 Kauftransaktionen mit der Verlustwahrscheinlichkeit im Falle von Kaufoptionen auf den Index führt zu dem Ergebnis, dass die Verlustwahrscheinlichkeit unter Verwendung der historischen Volatilität der OC Oerlikon-Aktie bei 74 % lag, bei Kaufoptionen auf den Index dagegen nur 0,82 mal so hoch gewesen wäre.

**Beweis:**       Einholung eines Sachverständigengutachtens

Die vorstehenden Überlegungen sollen keinesfalls so verstanden werden, dass eine Vermögensanlage, bei der mit einem hohen Hebel auf die Aufwärtsbewegung einer einzelnen Aktie oder des Aktienmarktes insgesamt gesetzt wird, auch nur annähernd als zweckmäßig eingestuft werden kann. Vielmehr soll damit deutlich gemacht werden, dass selbst bei einer solchen übermäßig riskanten Anlagestrategie der Einsatz von Kaufoptionen auf eine einzelne Aktie den Anleger mit leicht vermeidbaren Risiken belastet. Eine derartige Anlagestrategie liegt deshalb keinesfalls im Interesse eines Anlegers und hat deshalb keinesfalls im Interesse von Herrn Hranov, Frau Hranova und Frau Schulz gelegen.

**Beweis:**       wie vor

### 2.3.4   Die Anlageempfehlungen zielten darauf ab, die Gewinnrealisierung zu verhindern

Die Beklagten haben mit ihren Anlageempfehlungen gezielt verhindert, dass Herr Hranov, Frau Hranova und Frau Schulz Gewinne aus Optionen realisierten, die

sich für sie positiv entwickelt hatten. Die Beklagten sind dabei bewusst und plan-
mäßig vorgegangen. Sie waren davon angetrieben, dass jeder CHF Gewinn von
Herrn Hranov, Frau Hranova und Frau Schulz gleichzeitig ein entsprechender
Verlust der Beklagten zu 1) und jeder CHF Verlust von Herrn Hranov, Frau Hra-
nova und Frau Schulz gleichzeitig ein entsprechender Gewinn der Beklagten zu
1) war.

## a) Neutralisierung von Verkäufen mit Gewinn durch zeitgleiche Abschlüsse neuer Transaktionen

Von den insgesamt 49 Kauftransaktionen betrafen 46 den Erwerb von Warrants, die als Kaufoptionen ausgestaltet waren. Diese 46 Transaktionen bezogen sich auf insgesamt 22 verschiedene Warrants. Von diesen 22 Warrants wurden 14 bis zur Fälligkeit gehalten, die dann wertlos verfielen. 13
Warrants wurden aufgrund einer Anlageempfehlung der Beklagten vor ihrer
Fälligkeit vorzeitig verkauft. Die Beklagten haben Herr Hranov, Frau Hranova
und Frau Schulz durch ihre Anlageberatung veranlasst, in unmittelbarem
zeitlichem Zusammenhang zu jedem dieser Verkäufe, meist sogar noch am
selben Tag, unter Verwendung des gerade erzielten Gewinns neue Warrants
zu kaufen. Da die neuen Warrants aber eine längere Laufzeit und teilweise
auch einen niedrigeren Ausübungspreis hatten und sich zudem auch die
Stückzahlen der zugrundeliegenden Aktien unterschieden, kam es bei allen
Verkäufen trotzdem zu einem Nettozahlungsfluss für die Beklagte zu 1).

**Beweis:**    Rumen Hranov, b. b., **als Zeuge**

Einholung eines Sachverständigengutachtens

Die von Herrn Hranov, Frau Hranova und Frau Schulz aufgrund der Anlageempfehlung der Beklagten getätigten Käufe und Verkäufe von Warrants, die
als Kaufoptionen ausgestaltet waren, sind in dem als **Anlage K 46** beigefügten Diagramm dargestellt. Daraus ist ersichtlich, dass Verkäufe immer zeitgleich oder jedenfalls in sehr engem zeitlichem Zusammenhang mit Käufen
getätigt wurden.

**Beweis:**   wie vor

Zum Beispiel wurde am 17.01.2007 erstmals ein Warrant verkauft. Aufgrund des gestiegenen Aktienkurses hat Herr Hranov einen Gewinn von CHF 14,4 Mio. erzielt. Jedoch hatte er aufgrund einer Anlageempfehlung der Beklagten am 16.01.2007 zwei Warrants mit einem Transaktionswert von insgesamt CHF 32,8 Mio. gekauft, so dass sich saldiert ein Zufluss von CHF 18,4 Mio. für die Beklagte zu 1) ergab.

**Beweis:**   wie vor

Am 14.02.2007 verkaufte Herr Hranov aufgrund einer Anlageempfehlung der Beklagten Warrants im Wert von rund CHF 129 Mio. Am gleichen Tag kaufte er, ebenfalls aufgrund der Beratung durch die Beklagten, Warrants im Wert von insgesamt CHF 91 Mio. Außerdem kaufte er bis zum Ende des Monats Februar noch weitere Warrants im Wert von CHF 28 Mio., ebenfalls aufgrund einer Anlageempfehlung der Beklagten. Aus diesen Transaktionen ergab sich ein minimaler Abfluss für die Beklagte zu 1).

**Beweis:**   wie vor

Am 16.10.2007 verkaufte Herr Hranov aufgrund einer entsprechenden Empfehlung der Beklagten Warrants im Gesamtwert von rund CHF 50 Mio. Gleichzeitig kaufte er neue Warrants im Wert von CHF 111 Mio.

**Beweis:**   Rumen Hranov, b. b., **als Zeuge**

                 Einholung eines Sachverständigengutachtens

Ähnliche Muster finden sich auch bei den anderen streitgegenständlichen Verkaufstransaktionen. Alle diese Transaktionen haben das Muster des kontinuierlichen Vorwärtsrollens der Optionspositionen gemeinsam. Die War-



rants wurden entweder deutlich vor Fälligkeit verkauft oder – wenn sich ab-
zeichnete, dass ein Warrant wertlos verfallen würde – bis zur Fälligkeit ge-
halten. Gleichzeitig wurden Warrants laufend durch neue, länger laufende
ersetzt oder ergänzt. Da beim Vorwärtsrollen aber die Position meistens ver-
größert wurde, weil der Wert der neu erworbenen Warrants meist höher war
als der Wert der verkauften, kam es zu keinen, jedenfalls nicht nennenswer-
ten, Gewinnrealisationen durch Herrn Hranov, Frau Hranova und Frau
Schulz.

**Beweis:**   Einholung eines Sachverständigengutachtens

Diese von den Beklagten empfohlene Strategie musste ganz zwangsläufig
zu einem Totalverlust für Herrn Hranov, Frau Hranova und Frau Schulz füh-
ren. Denn immer dann, wenn Gewinne realisiert werden konnten, wurden
diese durch Neuinvestitionen in mindestens derselben Höhe wieder neu an-
gelegt, so dass es per Saldo zu keiner Gewinnrealisation kommen konnte.
Gleichzeitig kam es in anderen Fällen allein schon wegen der an der Börse
üblichen Kursschwankungen zu Totalverlusten bei einzelnen Warrants. In
diesen Fällen konnte die Strategie nur durch den Einsatz von frischem Kapi-
tal weiterverfolgt werden. Da aufgrund der Anlageempfehlungen der Beklag-
ten der Kapitaleinsatz von Herrn Hranov, Frau Hranova und Frau Schulz
kontinuierlich anstieg, musste ganz zwangsläufig der Punkt kommen, an
dem die Strategie abgebrochen werden musste, sei es, weil Herr Hranov,
Frau Hranova und Frau Schulz kein frisches Kapital mehr nachschießen
konnte, sei es, weil sie dazu nicht mehr bereit war.

**Beweis:**   Einholung eines Sachverständigengutachtens

**b)   Interesse der Beklagten zu 1), eine Risikoabsicherung bezüglich der
streitgegenständlichen Geschäfte zu vermeiden**

Die Beklagte zu 1) hatte ein starkes Interesse, ihre Risiken aus den streitge-
genständlichen Aktienoptionsgeschäften nicht abzusichern, weil die Absi-
cherungskosten rund CHF 57 Mio. betragen hätten. Der Beklagte zu 2) hat

die Verwirklichung der Risiken für die Beklagte zu 1) dadurch verhindert, dass er durch die Herrn Hranov, Frau Hranova und Frau Schulz empfohlene Anlagestrategie dafür gesorgt hat, dass kein einziger Warrant, den diese erworben hatten, ausgeübt wurde. Entweder empfahl der Beklagte Warrants, die im Geld waren, zu verkaufen und sie gleichzeitig durch länger laufende Warrants mit niedrigeren Ausübungspreisen zu ersetzen, wodurch etwaige Gewinne aus den Verkäufen sofort neutralisiert wurden. Oder er hat dafür gesorgt, dass die Ausübungspreise über dem Aktienkurs der OC Oerlikon-Aktie lagen, so dass die Optionen wertlos verfielen.

**Beweis:**   Rumen Hranov, b. b., **als Zeuge**

Eine Bank, die einen Warrant verkauft, muss sich gegen das aus dem Warrant für sie bestehende Risiko absichern. Das Risiko für die emittierende Bank besteht darin, dass der Erwerber nach den Emissionsbedingungen die Option am Fälligkeitsdatum ausübt, wenn es sich um eine sogenannte europäische Option handelt oder an jedem Handelstag vor der Fälligkeit, wenn es sich um eine sogenannte amerikanische Option handelt.

**Beweis:**   Einholung eines Sachverständigengutachtens

Bei einem Warrant, der z. B. die Option zum Erwerb der OC Oerlikon-Aktie zum Ausübungspreis K = CHF 500 beinhaltet, kann – wenn er die Option ausübt – die Lieferung einer OC Oerlikon-Aktie verlangen, für die er dann CHF 500 bezahlen muss. Hat die Bank keine Risikoabsicherung vorgenommen und liegt der Kurs der Aktie bei CHF 600, muss sie – um die Option erfüllen zu können – die Aktie für CHF 600 an der Börse kaufen. Die Bank würde dann einen Verlust von CHF 100 pro ausgegebene Kaufoption machen. Neben den wirtschaftlichen Gründen, aus denen sich eine Bank gegen derartige Risiken absichert, bestehen auch aufsichtsrechtliche Gründe. Wird das Risiko nicht abgesichert, müsste es gemäß § 10 KWG i.V.m. den Bestimmungen der Capital Requirements Regulation (Verordnung (EU) Nr. 575/2013 – (CRR)-) und der Solvabilitätsverordnung (Verordnung zur ange-

messenen Eigenmittelausstattung von Instituten, Institutsgruppen, Finanz-
holding-Gruppen und gemischten Finanzholding-Gruppen – (SolvV) -) durch
Eigenkapital unterlegt werden, was Banken typischerweise vermeiden
möchten.

**Beweis:**   wie vor

Außerdem müssen nicht abgesicherte Risiken nach den MaRisk auf die im
Handelsbuch geführten Risikolimite angerechnet werden, wodurch die
Handlungsfähigkeit der Bank bei anderen, ebenfalls mit Marktpreisrisiken
behafteten Geschäften, eingeschränkt wird.

**Beweis:**   Einholung eines Sachverständigengutachtens

Das Handelsbuch ist im Kreditwesen der Bankenaufsicht der rechtliche Be-
griff für alle Risikopositionen, die von einem Kreditinstitut zum Zwecke des
kurzfristigen Wiederverkaufs unter Ausnutzung von Preis- und/oder Zins-
schwankungen gehalten werden. Das Handelsbuch ist in Art. 4 Abs. 1 Nr. 86
CRR legal definiert und gilt gemäß § 1a KWG für die Beklagte zu 1).

Im Normalfall ist davon auszugehen, dass die Handelsabteilung einer Bank
(Trade Desk) für jeden platzierten Warrant eine Gegenposition aufbaut, die
das damit verbundene Marktpreisrisiko eliminiert oder zumindest erheblich
reduziert. Hierzu stehen zwei Wege zur Verfügung:

(1) Die Bank, die eine Kaufoption verkauft hat, bei der sie die Funktion der
Stillhalterin hat, erwirbt ihrerseits eine gegenläufige Optionsposition auf die
OC Oerlikon-Aktie. Verkauft der Kunde den Warrant wieder an die Bank zu-
rück, so muss die Bank ihre Call-Option wieder auflösen, was sie durch den
Verkauf einer gleichwertigen Kaufoption bewerkstelligen kann.

(2) Die Bank kann auch unmittelbar OC Oerlikon-Aktien erwerben. Damit
wäre sie zwar gegen das Risiko eines Preisanstiegs der Aktie abgesichert,

allerdings würde sie dann das Risiko eines Preisverfalls tragen. Im Falle ei-
nes Preisverfalls würde der Warrant des Kunden zwar wertlos verfallen und
die Bank hätte den für den Warrant gezahlten Preis verdient, gleichzeitig
würde sie aber über den Kursverlust der Aktie einen Verlust erleiden. Dieser
zweite Weg würde also nicht zu einer vollständigen Risikoabsicherung der
Bank führen, weshalb sie zumindest einen Teil des Marktpreisrisikos durch
Eigenkapital absichern müsste.

**Beweis:**   Einholung eines Sachverständigengutachtens

Unabhängig davon, welchen der beiden Wege zur Risikoabsicherung die Be-
klagte zu 1) gewählt hätte, hätten beide Wege aufgrund der schieren Größe
der mit Herrn Hranov, Frau Hranova und Frau Schulz getätigten Transaktio-
nen wegen der fehlenden Liquidität in der OC Oerlikon-Aktie bzw. der OC
Oerlikon-Option zur Folge gehabt, dass der Abschluss eines gegenläufigen
Absicherungsgeschäfts den Kurs der Aktie zu Ungunsten der Beklagten zu
1) beeinflusst hätte.

**Beweis:**   Einholung eines Sachverständigengutachtens

Dieser Zusammenhang wird ersichtlich, wenn man das Volumen der benö-
tigten Absicherungsgeschäfte in das Verhältnis zur Liquidität des Marktes für
OC Oerlikon-Aktien und -Optionen setzt.

aa)   Absicherung durch den Erwerb von gegenläufigen Optionen an der
      EUREX

Die Beklagte zu 1) hätte über den Erwerb von exakt gegenläufigen Op-
tionen an der EUREX das für sie aus dem Verkauf der Warrants be-
stehende Risiko vollkommen absichern können.

**Beweis:**      Einholung eines Sachverständigengutachtens

Hätten Herr Hranov, Frau Hranova und Frau Schulz z. B. Warrants in einem Volumen, das diese zum Bezug von 1.000 OC Oerlikon-Aktien zum Ausübungspreis K berechtigt, auf Empfehlung der Beklagten erworben, hätte die Beklagte zu 1) am gleichen Tag 1.000 Kaufoptionen auf die OC Oerlikon-Aktie zum Ausübungspreis K mit einer dem Warrant entsprechenden Laufzeit erwerben können.

Aufgrund der exorbitant hohen Volumina, die Herr Hranov, Frau Hranova und Frau Schulz aufgrund der Anlageempfehlung der Beklagten erworben, hätte eine derartige Absicherung den Preis der OC Oerlikon-Aktien bzw. der OC Oerlikon-Optionen zu Lasten der Beklagten zu 1) erheblich beeinflusst.

**Beweis:** Einholung eines Sachverständigengutachtens

In der als **Anlage K 47** beigefügten Tabelle ist für jede Transaktion die Anzahl der damit bewegten Optionen dargestellt (siehe Spalte „bewegte Stückzahl Optionen"). In der Spalte rechts daneben ist das taggleiche Handelsvolumen in entsprechenden OC Oerlikon-Optionen an der EUREX aufgeführt. Der Vergleich der mit den Warrants bewegten Optionen mit dem tatsächlichen Handelsvolumen an der EUREX (Spalte „bewegte zu geh. Optionen") zeigt, dass es zahlreiche Fälle gegeben hat, in denen allein die an Herrn Hranov, Frau Hranova und Frau Schulz verkauften Optionen einem Vielfachen des Handelsvolumens an der EUREX entsprachen. Im Durchschnitt aller Transaktionen waren die von der Beklagten zu 1) gehandelten Optionen mehr als viermal so hoch wie das Handelsvolumen an der EUREX an den entsprechenden Tagen. Es kann deshalb praktisch ausgeschlossen werden, dass es für die Beklagte zu 1) tatsächlich möglich gewesen wäre, an diesen Tagen gegenläufige Optionsgeschäfte an der EUREX abzuschließen, ohne den Preis der Optionen – und damit indirekt auch den Preis der Aktien – massiv zu ihren Ungunsten zu beeinflussen.

**Beweis:** Einholung eines Sachverständigengutachtens

bb)   Absicherung durch den Erwerb von OC Oerlikon Aktien

Hätte sich die Beklagte zu 1) über den Kassamarkt durch den Erwerb von OC Oerlikon-Aktien abgesichert, wäre sie – wie oben bereits ausgeführt – nicht gegen den Kursverfall der OC Oerlikon-Aktie abgesichert gewesen. Doch selbst wenn sie dies in Kauf genommen hätte, wäre es im Hinblick auf die Liquidität am Kassamarkt so gut wie ausgeschlossen gewesen, die hohe Stückzahl der benötigten OC Oerlikon-Aktien zu bewegen, ohne den Kurs nennenswert zu Ungunsten der Beklagten zu 1) zu beeinflussen. In der als **Anlage K 47** vorgelegten Tabelle ergibt sich aus dem Vergleich der „bewegte Stückzahl Aktien" mit „durchschnittliche Stückzahl SIX (-2; 0)" (-2; 0 bedeutet den Durchschnitt der Kurse zwei Handelstage vor dem Handelstag und am Handelstag), in der die durchschnittlich gehandelte Stückzahl von OC Oerlikon-Aktien an der SIX Swiss Exchange dargestellt ist, dass das Verhältnis im Durchschnitt bei 26 %, an einigen Tagen aber auch deutlich über 100 % lag. Welchen Einfluss ein durchschnittliches Absicherungsvolumen in Höhe von 26 % des Tagesumsatzes in der OC Oerlikon-Aktie hat, hängt ganz wesentlich davon ab, welche voraussichtliche Kursbeeinflussung damit verbunden ist.

**Beweis:**   Einholung eines Sachverständigengutachtens

Je stärker der Kurs durch entsprechende Käufe nach oben bzw. durch entsprechende Verkäufe nach unten getrieben wird, umso höher sind die Absicherungskosten für die Beklagte zu 1), weil dieser Kurseffekt rein liquiditätsgetrieben und damit nur vorübergehend ist.

**Beweis:**   wie vor

Sobald die Beklagte zu 1) die erforderlichen Stücke gekauft oder verkauft hat, wird sich der Kurs wieder auf das alte Niveau zurückbewe-

gen, weshalb der Beklagten zu 1) ein Verlust in Höhe dieser vorüber-
gehenden Kursbewegung entsteht.

**Beweis:**     wie vor

Bei Anwendung des sogenannten Amihud Liquidity Measure (ALM)
kann der durchschnittliche Kurseffekt eines bestimmten Handelsvolu-
mens bestimmt werden.

**Beweis:**     Einholung eines Sachverständigengutachtens

Üblicherweise wird dieser Effekt über einen Zeitraum von 250 Handels-
tagen ermittelt, um den Einfluss von zufälligen Effekten zu reduzieren.
Die Formel lautet wie folgt:

$$(9)\ ALM_{it} = \frac{1}{250}\sum_{t=1}^{250}\frac{|r_{it}|}{Vol_{it}}$$

**Beweis:**     wie vor

In der als **Anlage K 48** beigefügten Tabelle ist das ALM für die OC
Oerlikon-Aktie an den jeweiligen Stichtagen dargestellt. Im Durch-
schnitt liegt das ALM bei 0,53 Basispunkten, d. h. pro Million Franken
Transaktionsvolumen bewegt sich der Kurs der Aktie im Erwartungs-
wert um 0,0053 %. In der als **Anlage K 48** beigefügten Tabelle ist fer-
ner für jeden Stichtag die Stückzahl der zu bewegenden Aktien im Falle
einer Absicherung über den Kassamarkt dargestellt. Wird diese Stück-
zahl mit dem Aktienkurs multipliziert, erhält man das für das Absiche-
rungsgeschäft notwendige Transaktionsvolumen. Z. B. wären für den
Warrant, der am 21.11.2006 an Herrn Hranov verkauft wurde, 1,24
Mio. Stück Aktien erforderlich gewesen, was einem Wert von rund CHF
639 Mio. entsprochen hätte.

**Beweis:**     wie vor

Bei einem ALM von 0,00587 % ergibt sich somit ein erwarteter Kurseffekt von 0,00587 % x 639 = 3,75 %. Wenn sich durch das Absicherungsgeschäft der Kurs um 3,75 % erhöht, steigt der Kurs der Aktie auf CHF 534,52, wodurch sich pro Aktie das Absicherungsgeschäft um CHF 534,52 – CHF 515,20 = CHF 19,32 verteuert. Bei einer Stückzahl von 1,24 Mio. entstehen der Bank dadurch zusätzliche Absicherungskosten in Höhe von 1,24 Mio. x CHF 19,32 = CHF 23,97 Mio. Trotz des scheinbar geringen Liquiditätseffektes hätten sich für die Beklagte zu 1) erhebliche Zusatzkosten ergeben, weil das abzusichernde Volumen sehr hoch war.

**Beweis:**     wie vor

Aus der als **Anlage K 48** beigefügten Tabelle ist ersichtlich, dass im Durchschnitt aller Transaktionen für die Beklagte zu 1) zusätzliche, rein liquiditätsbedingte Absicherungskosten in Höhe von CHF 1,7 Mio. entstanden wären, wenn sie die emittierten Warrants durch entsprechende Aktienkäufe voll abgesichert hätte. Insgesamt würden sich diese Absicherungskosten auf rund CHF 57 Mio. addieren.

**Beweis:**     wie vor

Hieraus ergibt sich ein starkes Interesse der Beklagten zu 1), diese Kosten zu vermeiden.

**2.4     Keine Aufklärung über Funktionsweise und Risiken der Warrants**

Die Beklagte zu 1) hat Herrn Hranov, Frau Hranova und Frau Schulz weder schriftlich noch mündlich über die Funktionsweise und die Risiken von Warrants bzw. Aktienoptionen aufgeklärt.

**Beweis:**     Rumen Hranov, b. b., **als Zeuge**

Insbesondere hat die Beklagte zu 1) Herrn Hranov, Frau Hranova und Frau

Schulz nicht die Kenntnisse vermittelt, die sie in die Lage versetzt hätten, den Umfang des ihnen aufgebürdeten Verlustrisikos und die durch die bis zu rund 18 % über dem fairen Marktpreis liegenden Optionsprämien eingetretene Verringerung ihrer Gewinnchancen zutreffend einzuschätzen. Die Beklagte zu 1) hat Herrn Hranov, Frau Hranova und Frau Schulz ferner nicht offengelegt, dass die von dem Beklagten zu 2) empfohlene und selbst umgesetzte Anlagestrategie zum Totalverlust der investierten Mittel führen würde.

**Beweis:**        wie vor

Herr Hranov, Frau Hranova und Frau Schulz wurden ferner nicht über die wirtschaftlichen Zusammenhänge des Aktienoptionsgeschäfts und die Bedeutung der Optionsprämie sowie ihren Einfluss auf das mit dem Geschäft verbundene Risiko aufgeklärt.

**Beweis:**        wie vor

Der Beklagte zu 2) hat Herrn Hranov, Frau Hranova und Frau Schulz auch nicht die für ihn oder die Beklagte zu 1) bestehenden Interessenkonflikte offen gelegt, die unter anderem darin bestanden, dass jeder CHF Gewinn von Herrn Hranov, Frau Hranova und Frau Schulz einen entsprechenden Verlust für die Beklagte zu 1) und jeder CHF Verlust von Herrn Hranov, Frau Hranova und Frau Schulz einen entsprechenden Gewinn für die Beklagte zu 1) zur Folge hatte, weil die Beklagte zu 1) die Emittentin der Optionen war.

**Beweis:**        wie vor

Herr Hranov, Frau Hranova und Frau Schulz wurde von dem Beklagten zu 2) nicht darauf hingewiesen, dass dieser von der Beklagten zu 1) erfolgsabhängig vergütet wurde und über von der Beklagten zu 1) gezahlten Bonusse an dem Ergebnis der Optionsgeschäfte unmittelbar beteiligt war.

**Beweis:**        wie vor



Schließlich verschwieg der Beklagte zu 2), dass seine Anlagestrategie darauf ausgerichtet war, dass sämtliche Optionen wertlos verfielen.

**Beweis:**       wie vor

Die Beklagte zu 1) musste keine einzige Aktienoption durch die Lieferung von Aktien erfüllen. Sie konnte deshalb auf die Absicherung der Optionsgeschäfte durch den Abschluss gegenläufiger Geschäfte mit Dritten verzichten, wodurch sie – wie oben bereits dargestellt – rund CHF 57 Mio. Absicherungskosten sparte.

Herrn Hranov, Frau Hranova und Frau Schulz, die mit Aktienoptionsgeschäften keine Erfahrung und keine Kenntnis über deren Funktionsweise und Risiken hatten, war nicht bewusst, dass die Beklagte zu 1) an den Optionsgeschäften auf mehreren Ebenen verdiente: Die Beklagte zu 1) verdiente an den Optionsprämien, die Herr Hranov, Frau Hranova und Frau Schulz für den Erwerb der Aktienoptionen bezahlen mussten. Die Beklagte zu 1) verdiente aber nicht nur die marktüblichen Optionsprämien, sondern auch noch den von ihr stillschweigend vorgenommenen Aufschlag auf die marktübliche Optionsprämie von durchschnittlich 18 %. Alleine durch dieses Overpricing nahm die Beklagte zu 1) CHF 107.264.931,00 Mio. ein, denen entsprechende Verluste von Herrn Hranov, Frau Hranova und Frau Schulz gegenüber stehen.

**2.5     Anlageberatung durch den Beklagten zu 2)**

Der Beklagte zu 2) hat im streitgegenständlichen Zeitraum eine höchst intensive Anlageberatung gegenüber Herrn Hranov, Frau Hranova und Frau Schulz entfaltet. In den Jahren 2006, 2007 und 2008 hat er sich insgesamt 63 Mal mit Herrn Hranov persönlich getroffen und 347 Telefongespräche mit ihm geführt. Darüber hinaus hat er bei den Depotbanken von Herrn Hranov, Frau Hranova und Frau Schulz, der Bank Julius Bär und der Thurgauer Kantonalbank, telefonisch Kauf- und Verkaufsaufträge im Namen von Herrn Hranov, Frau Hranova und Frau Schulz erteilt oder einen der Händler aus seinem Team, in der Regel Herrn Gregor Klomp, dazu veranlasst.



**Beweis:**     Claudio Studer,
                b. b., **als Zeuge**

                Vivien Brunner,
                b. b., **als Zeugin**

### 2.5.1  Persönliche Treffen

Der Beklagte zu 2) hat Herrn Hranov die Anlageempfehlungen in der Regel bei gemeinsamen Mittagessen in Zürich in den Restaurants Tapas, Brasserie Lipp oder einem Kaffe im Lions Pub erteilt, die stets der Beklagte zu 2) initiiert hat.

**Beweis:**     Rumen Hranov, b. b., **als Zeuge**

Die Restaurants lagen alle im Umkreis von 50 Metern zu den Geschäftsräumen der Zweigniederlassung der Beklagten zu 1).

Beweis:     wie vor.

Im Jahr 2006 haben sich der Beklagte zu 2) und Herr Hranov auf Initiative des Beklagten zu 2) 29 Mal zum Mittagessen getroffen, und zwar am 5. Januar, 1., 7. und 27. Februar, 5., 15. und 23. März, 20. April, 10., 12. und 15. Mai, 4. Juli, 14. und 16. August, 28. September, 6. und 27. Oktober, 8., 10., 12., 15., 20., 21., 24., 29. und 30. November sowie am 1., 4. und 11. Dezember 2006.

**Beweis:**     wie vor

Im Jahr 2007 haben sich der Beklagte zu 2) und Herr Hranov auf Initiative des Beklagten zu 2) 23 Mal zum Mittagessen getroffen, und zwar am 15., 17., 30. und 31. Januar, 5. und 6. Februar, 28. März, 10., 11., 16., 17., 23. und 24. April, 16. Mai, 4., 20. und 22. Juni, 16. und 30. Juli, 6. August, 26. September sowie am 22. und 29. Oktober 2007.

**Beweis:**     wie vor

Im Jahr 2008 fanden auf Initiative des Beklagten zu 2) insgesamt 11 Mittagessen statt, und zwar am 19. Februar, 5., 9. und 14. Mai, 12. Juni, 28. Juli, 12. August, 17. und 24. Oktober sowie am 5. und 7. November 2008.

**Beweis:**      wie vor

Bei allen Mittagessen hatte der Beklagte zu 2) jeweils von ihm handschriftlich ausgearbeitete Anlageempfehlungen dabei, die er im Vorhinein gefertigt hatte. Die handschriftlichen Empfehlungen enthielten Kauf- und/oder Verkaufsempfehlungen für Warrants der OC Oerlikon-Aktie sowie die jeweiligen Daten der Warrants, wie z. B. Größe, Laufzeit, Optionsprämie, Ausübungspreis und Sensitivitäten.

**Beweis:**      wie vor

Anhand dieser Aufzeichnungen erläuterte der Beklagte zu 2) Herrn Hranov seine Anlageempfehlungen, die dieser ausnahmslos aufgrund des großen Vertrauens, das er dem Beklagten zu 2) entgegen brachte, akzeptierte, ohne diese zu hinterfragen.

**Beweis:**      wie vor

Der Beklagte zu 2) legte großen Wert darauf, Herrn Hranov nicht in den Geschäftsräumen der Deutschen Bank zu treffen, sondern bestand darauf, die Besprechungen in Restaurants abzuhalten. Der Beklagte zu 2) empfing den Herrn Hranov grundsätzlich nicht in den Geschäftsräumen der Beklagten zu 1).

**Beweis:**      wie vor

Es liegt auf der Hand, dass der Beklagte zu 2) darauf deswegen so großen Wert legte, weil ihm als Head of Global Markets Equity Switzerland direkter Kundenkontakt nach den Compliance-Regeln der Beklagten zu 1) sowie nach dem WpHG untersagt war.

### 2.5.2   Telefonische Beratung

Zusätzlich zu den vorstehend beschriebenen, im Rahmen der vorstehend unter Ziffer 2.5.1 beschriebenen Mittagessen erteilten Anlageempfehlungen hat der Beklagte zu 2) Herrn Hranov in großem Umfang telefonisch Anlageempfehlungen erteilt. In dem streitgegenständlichen Zeitraum in den Jahren 2006 bis 2008 haben der Beklagte zu 2) und Herr Hranov mindestens 347 Telefongespräche geführt. Der Beklagte zu 2) hat Herrn Hranov 303 Mal angerufen, Herr Hranov den Beklagten zu 2) 44 Mal.

**Beweis:**   Frau Jasmin Wolter, Rebhaldenweg 22, 5443 Niederrohrdorf, Schweiz, als Zeugin

### 2.5.3   Portfolioverwaltung durch den Beklagten zu 2)

### a)   Kauf- und Verkaufsorder durch den Beklagten zu 2) im Namen von Herrn Hranov, Frau Hranova und Frau Schulz

Der Beklagte zu 2) hat sich nicht nur darauf beschränkt, Herrn Hranov, Frau Hranova und Frau Schulz Anlageempfehlungen zu erteilen. Er hat darüber hinaus in zahlreichen Fällen den beiden Depotbanken von Herrn Hranov, Frau Hranova und Frau Schulz, der Bank Julius Bär und der Thurgauer Kantonalbank, in deren Namen telefonisch Kauf- und/oder Verkaufsorder bezüglich der streitgegenständlichen Warrants erteilt.

**Beweis:**   Claudio Studer, b. b., **als Zeuge**

Vivian Brunner, b. b., **als Zeugin**

Die beiden Depotbanken von Herrn Hranov, Frau Hranova und Frau Schulz haben die telefonischen Order des Beklagten zu 2) ausgeführt, weil Herr

Hranov aufgrund seines großen Vertrauens zum Beklagten zu 2) und wie von diesem gefordert, die Depotbanken dahingehend instruiert hatte, dass Order, die der Beklagte zu 2) fernmündlich im Namen von Herrn Hranov, Frau Hranova und Frau Schulz erteilt, ausgeführt werden sollen.

**Beweis:**     Rumen Hranov, b. b., **als Zeuge**

Claudio Studer, b. b., **als Zeuge**

Vivian Brunner, b. b., **als Zeugin**

**b)   Verwaltung der Portfolien von Herrn Hranov, Frau Hranova und Frau Schulz**

Der Beklagte zu 2) hat die Portfolien von Herrn Hranov, Frau Hranova und Frau Schulz verwaltet und sich auch Dritten gegenüber als deren Portfolioverwalter bezeichnet.

Unter anderem hat er sich gegenüber Herrn Thomas Limberger, der in den Jahren 2006 und 2007 CEO und Vizepräsident des Verwaltungsrats der OC Oerlikon AG war, dahingehend geäußert, dass er das OC Oerlikon Portfolio der Familie Hranov verwalte.

**Beweis:**     Thomas Limberger, Suite 302, The Chart House, 6 Burrells Wharf Square, London E14 3TN, England, **als Zeuge**

**c)   Bewusste Ausnutzung der Portfolioverwaltung zum Vorteil der Beklagten zu 1)**

Der Beklagte zu 2) hat seine Stellung als Portfolioverwalter von Herrn Hranov, Frau Hranova und Frau Schulz dazu ausgenutzt, in deren Namen Geschäfte zum Vorteil der Beklagten zu 1) und zum Nachteil von Herrn Hranov, Frau Hranova und Frau Schulz abzuschließen. Beispielsweise führte der Beklagte zu 2) durch von ihm am 16.10.2007 direkt erteilte Verkaufs- und Kauforder an die beiden Depotbanken absichtlich und aufgrund eines vorher gefassten Plans einen Verlust in Höhe von rund CHF 50 Mio. herbei.



Der Beklagte zu 2) erteilte folgende Order:

Verkauf folgender Warrants:

| Anzahl | Bezeichnung | Call/Put | Strike CHF | Laufzeit | Valor | Preis CHF | Wert total CHF | Depot |
|---|---|---|---|---|---|---|---|---|
| 30.000.000 | OERDK | C | 650 | 2007-20.03.2008 | 3066051 | 0,12 | 3.600.000 | 156429 |
| 56.6000.000 | OERDT | C | 700 | 2006-21.12.2007 | 2796327 | 0,157 | 8.886.200 | 1001362.649-09 |
| 73.300.000 | OERDD | C | 650 | 2006-21.03.2008 | 2796329 | 0,258 | 18.911.400 | 1001362.649-09 |
| 10.900.000 | OERDG | C | 750 | 2007-20.03.2008 | 2865662 | 0,13 | 1.417.000 | 1001362.649-09 |
| 145.000.000 | OERDK | C | 650 | 2007-20.03.2008 | 3066051 | 0,12 | 17.400.000 | 1001362.649-09 |
| 42.000.000 | OERDD | C | 650 | 2006-21.03.2008 | 2796329 | 0,258 | 10.836.000 | 15.7363 (S.A.) |

**SUMME CHF 61.050.600**

**Beweis:**    Rumen Hranov, b.b., als Zeuge.

Aus diesen Verkäufen wurden CHF 61.050.600,00 realisiert.

**Beweis:**    Rumen Hranov, b.b., als Zeuge.

Zeitgleich erteilte der Beklagte zu 2) folgende Kauforder:

| Anzahl | Bezeichnung | Call/Put | Strike CHF | Laufzeit | Valor | Preis CHF | Wert total CHF | Depot |
|---|---|---|---|---|---|---|---|---|
| 62.500.000 | OERIS | C | 600 | 2007-15.08.2008 | 3481921 | 0,46188 | 28.867.500 | 156426 |
| 60.0000.000 | OERIR | C | 500 | 2007-20.03.2008 | 3481920 | 0,65785 | 39.471.000 | 156426 |
| 75.500.000 | OERIQ | C | 450 | 2007-15.02.2008 | 3481919 | 0,56524 | 42.393.000 | 1001362.649-09 |

**SUMME CHF   110.731.500**

**Beweis:**    Rumen Hranov, b.b., als Zeuge.

Für den Erwerb dieser Warrants wurden CHF 110.731.500 bezahlt.

**Beweis:**    Rumen Hranov, b.b., als Zeuge.

Alle am 16.10.2007 gekauften Warrants sind wertlos verfallen, weil der Kurs

der OC Oerlikon Aktie in der Folgezeit durch gezielte Verkäufe großer Stück-
zahlen von OC Oerlikon Aktien durch die Beklagte zu 1) so stark gefallen ist,
dass er jeweils niedriger war, als der Ausübungspreis der Warrants.

**Beweis:**   Rumen Hranov, b.b., als Zeuge.

Der Kurs der OC Oerlikon Aktie hat aufgrund der massiven Verkäufe der
Beklagten zu 1) alleine während des Zeitraum 01.01. bis 29.02. 2008 rund
30 % verloren:

| Datum | Kurs in CHF | Veränderung gegenüber 01.01.2008 in % |
|-------|-------------|----------------------------------------|
| 01.01.2008 | 473,25 | |
| 07.01.2008 | 386,25 | -18,39 |
| 29.01.2008 | 374,50 | -20,87 |
| 29.02.2008 | 339,74 | -28,21 |

**Beweis:**   Einholung eines Sachverständigengutachtens

Besonders auffällig ist die Entwicklung der OC Oerlikon Aktie im Vergleich
zum Gesamtmarkt (die obere grüne Linie zeigt die Entwicklung des Swiss
Performance Index, die untere blaue Linie die der OC Oerlikon Aktie):





**Beweis:**   Einholung eines Sachverständigengutachtens

Am Ende der Laufzeit der Warrants lag der Kurs der OC Oerlikon Aktie bei:

| Bezeichnung | Strike CHF | Laufzeitende | Aktienkurs CHF |
|---|---|---|---|
| OERIS | 400,00 | 15.02.2008 | 377,50 |
| OERIR | 500,00 | 20.03.2008 | 315,50 |
| OERIQ | 600,00 | 15.08.2008 | 268,25 |

**Beweis:**   Einholung eines Sachverständigengutachtens

Den Kursverfall der OC Oerlikon Aktie hatte der Beklagte zu 2) herbeigeführt, indem er bei den vorstehend dargestellten Verkäufen von großen Positionen der Beklagten zu 1) gezielt deren Position als Market Maker ausgenutzt hat.

**Beweis:**   Vorlage eines Auszugs aus den Handelsbüchern der Beklagten zu 1), aus denen die Käufe und Verkäufe von Aktien der OC O-erlikon AG durch die Beklagte zu 1) in dem Zeitraum vom 01. bis 29.02.2008 ersichtlich sind, durch die Beklagte zu 1).

Einvernahme des Beklagten zu 2) als Partei.

Market Maker ist nach der Legaldefinition des Art. 4 Abs. 1 Nr. 8 der Richtlinie 2004/39/EG

> „eine Person, die an den Finanzmärkten auf kontinuierlicher Basis ihre Bereitschaft anzeigt, durch den An- und Verkauf von Finanzinstrumenten unter Einsatz des eigenen Kapitals Handel für eigene Rechnung zu von ihr gestellten Kursen zu betreiben."

Market Making liegt vor, wenn Kreditinstitute bei einem gehandelten Finanzinstrument als Eigenhändler auftreten und dabei das Stellen fester An- und Verkaufskurse und/oder das Festpreisgeschäft wahrnehmen. Handelt ein Kreditinstitut als Market Maker, ist es gemäß Art. 17 Abs. 1 der Verordnung


(EU) Nr. 236/2012 (LeerverkaufsVO) unter anderem von den Beschränkungen ungedeckter Leerverkäufe in Aktien befreit. Dadurch sichert der Market Maker die Marktliquidität **und beeinflusst den Kurs**.

**Beweis:**   Einholung eines Sachverständigengutachtens.

Dass die Beklagte zu 1) bezüglich der Aktie der OC Oerlikon AG Market Maker war, folgt bereits daraus, dass sie die streitgegenständlichen Warrants emittiert, an Herrn Hranov, Frau Hranova und Frau Schulz vor dem Listing an der Börse im Rahmen eines OTC Geschäfts verkauft und sie erst danach an der Börse gelistet hat.

**Beweis:**   wie vor.

Dementsprechend hat die Beklagte zu 1) in die Emissionsprospekte (Offering Circular) der streitgegenständlichen Warrants in Abschnitt II (Section II), Unterabschnitt Generelle Risikofaktoren (General Risk Factors) in Ziffer 5. unter der Überschrift „Die Wertpapiere können illiquide sein" („The Securities May Be Illiquid") jeweils folgende gleichlautende Formulierungen bezüglich ihrer Funktion als Market Maker aufgenommen:

> „The Issuer may, but is not obliged to, at any time purchase Securities at any price in the open market or by tender or private agreement. Any Securities so purchased may be held or resold or surrendered for cancellation. Since the Issuer may be the only marketmaker in the Securities, the secondary market may be limited. The more limited the secondary market is, the more difficult it may be for holders of the Securities to realise value for the Securities prior to the exercise, expiration, redemption or maturity date."

**Beweis:**   Offering Circular, bereits als **Anlage K [•]** vorgelegt.

Die deutsche Übersetzung lautet:

> „Der Emittent darf, ist dazu aber nicht verpflichtet, jederzeit Wertpapiere [gemäß Definition unter Ziffer 1. Definitions sind damit die streitgegenständlichen Warrants gemeint, Anm. der Unterzeichner]



zu einem beliebigen Preis im offenen Markt oder wenn sie ihm an-
geboten werden oder durch eine Vereinbarung mit einem Dritten
kaufen. Alle Wertpapiere, die so gekauft werden, dürfen gehalten
oder verkauft oder zur Einziehung aufgegeben werden. Da der
Emittent der einzige Market Maker für das Wertpapier sein kann, ist
der Zweitmarkt möglicherweise limitiert. Je limitierter der Zweitmarkt
ist, umso schwieriger kann es für den Inhaber von Wertpapieren
sein, den Wert der Wertpapiere vor deren Ausübung, Ablauf des
Ausübungszeitraums, Rückkauf oder Fälligkeitszeitpunkt zu reali-
sieren."

**Beweis:**     Einholung eines Sachverständigengutachtens

Die Anlageempfehlungen des Beklagten zu 2) hatten ausschließlich das Ziel,
Herrn Hranov, Frau Hranova und Frau Schulz zu schädigen. Eine Anlage-
strategie, Warrants gegen Warrants mit einer kurzen Laufzeit und einem
niedrigeren Ausübungspreis zu ersetzen, nutzen nur dem Emittenten, nicht
dem Anleger, insbesondere dann, wenn absehbar ist, dass der Aktienkurs
fallen wird.

**Beweis:**     Einholung eines Sachverständigengutachtens

Der Beklagte zu 2) wusste, dass der Kurs der OC Oerlikon verfallen würde,
denn er hatte die Absicht und aufgrund der Market Maker Stellung der Be-
klagten zu 1) die Mittel, den Kurssturz selbst herbeizuführen.

Am 16.10.2007 betrug der Kurs der OC Oerlikon Aktie CHF 524,00 und am
15.08.2008 CHF 268,25.

**Beweis:**     wie vor

Innerhalb von 10 Monaten hat sich der Kurs praktisch halbiert. Dies beruhte
darauf, dass die Beklagte zu 1) Anfang Januar 2008 massiv begann, große
Positionen OC Oerlikon Aktien über die Börse zu verkaufen, um den Kurs
nach unten zu drücken.

**Beweis:**     Vorlage eines Auszugs aus den Handelsbüchern der Beklagten

zu 1), aus denen die Käufe und Verkäufe von Aktien der OC Oerlikon AG durch die Beklagte zu 1) in dem Zeitraum vom 01. bis 29.02.2008 ersichtlich sind, durch die Beklagte zu 1).

Einvernahme des Beklagten zu 2) als Partei.

Ein Aktienhändler der Bank Vontobel AG in Zürich machte Herrn Hranov am 05.02.2008 darauf aufmerksam, dass die Beklagte zu 1) „in großem Stil Oerlikon verkauft".

**Beweis:**     Rumen Hranov, b.b., als Zeuge.

Herr Hranov konfrontierte den Beklagten zu 2) einige Tage später mit dieser Information. Der Beklagte zu 2) reagierte darauf mit der Bemerkung:

*„Ich verkaufe nur, solange der Kurs bei über CHF 400,00 liegt."*

**Beweis:**     wie vor.

Er begründete dies damit, dass er von seinen Vorgesetzten bei der Beklagten zu1) so instruiert worden sei.

**Beweis:**     wie vor.

Dass der Beklagte zu 2) diesen Plan schon vorher gefasst hatte, offenbarte er Herrn Ronny Pecik bereits am 12.10.2007. Herr Pecik und seine Mitgesellschafter hatten im Jahr 2005 über ihre Beteiligungsgesellschaft VICTORY Industriebeteiligung AG die Aktienmehrheit der OC Oerlikon AG übernommen. Am 12.10.2007 erklärte der Beklagte zu 2) Herrn Ronny Pecik bei einem Treffen in Wien, dass er beabsichtige, Herrn Hranov neue Optionen auf OC Oerlikon-Aktien zu verkaufen, die eine kurze Laufzeit und einen sehr tiefen Ausübungspreis („deep in the money") haben. Dadurch werde er für die Beklagte zu 1) einen hohen Mittelzufluss generieren. Diese Überlegung beruhte darauf, dass Warrants, die tief im Geld sind, wegen der damit

verbundenen erhöhten Gewinnchancen einen hohen Preis haben. Daran anschließend beabsichtige er, einen Kurssturz der OC Oerlikon-Aktie zu verursachen, damit die an Herrn Hranov, Frau Hranova und Frau Schulz verkauften Optionen wertlos verfallen. Voraussetzung war, dass der Kurs der OC Oerlikon-Aktie unter den Ausübungspreis der Optionen fallen würde. Herr Pecik antwortete dem Beklagten zu 2), dass er Herrn Hranov doch nicht derart schädigen könne. Der Beklagte zu 2) antwortete Herrn Pecik wörtlich:

*„Was kümmert Dich das? Es ist nicht Dein Geld, es ist Hranovs Geld."*

**Beweis:**   Erklärung von Herrn Ronny Pecik vom 09.04.2013
                in Fotokopie – **Anlage K 49**

                Ronny Pecik, zu laden über die VICTORY Industrie-
                Beteiligungen AG, Wipplinger Str. 35, 1010 Wien,
                Österreich, **als Zeuge**

Am 16.10.2007 befand sich Hranov mit seiner Familie im Urlaub in der Türkei.

**Beweis:**   Rumen Hranov, b. b., **als Zeuge**

Der Beklagte zu 2) veranlasste die oben dargestellten Transaktionen, ohne Herrn Hranov vorher darüber zu informieren.

## 2.6   Zeitpunkt der Kenntniserlangung durch Herrn Hranov, Frau Hranova und die Erben von Frau Schulz von den Ansprüchen gegen die Beklagten

Herr Hranov bemühte sich über einen längeren Zeitraum erfolglos, die Ursachen für die immensen Verluste, die er, Frau Hranova und Frau Schulz durch die Optionsgeschäfte mit der Beklagten zu 1) erlitten haben, aufzuklären. Am 20.Oktober 2015 führte er ein erstes Gespräch mit den Unterzeichnern zu der Frage, ob Ansprüche gegen die Beklagte zu 1) im Zusammenhang mit den streitgegenständlichen Optionsgeschäften mit Aussicht auf Erfolg geltend werden können.

**Beweis:**    RA Prof. Dr. Wolf-Rüdiger Bub, Promenadeplatz 9, 80333 München, als Zeuge.

RA Dr. Henning Krauss, Promenadeplatz 9, 80333 München, als Zeuge.

Nach Durchsicht und Prüfung der von Herrn Hranov überlassenen Unterlagen, empfahlen die Unterzeichner im Hinblick auf die Komplexität von Aktienoptionsgeschäften, der hohen Anzahl getätigter Geschäfte und der von den Beklagten empfohlenen komplexen Anlagestrategie, die Optionsgeschäfte von einem Fachmann untersuchen zu lassen.

**Beweis:**    wie vor.

Herr Hranov beauftragte Herrn Prof. Dr. Christoph Kaserer mit der Erstattung eines Gutachtens.

**Beweis:**    wie vor.

Nach mehreren Besprechungen der Unterzeichner mit Herrn Prof. Kaserer und weiteren Untersuchungen des Sachverhalts durch Herrn Prof. Kaserer kam dieser zu dem Ergebnis, dass das Leistungsentgelt der Beklagten zu 1) um 600 % überhöht und die Anlagestrategie der Beklagten auf den Totalverlust der eingesetzten Mittel von Herrn Hranov, Frau Hranova und Frau Schulz zielte. Herr Hranov wurde daraufhin erstmals von den Unterzeichnern darauf hingewiesen, dass damit auch eine Haftung des Beklagten zu 2) in Betracht komme. Dies war ihm bis dahin nicht bekannt

**Beweis:**    wie vor.

Das Gutachten von Prof. Kaserer datiert vom 5. Oktober 2016. Erst seit dessen Vorlage ist klar, dass das drastisch überhöhte Leistungsentgelt der Beklagten zu

1) zur Nichtigkeit der Aktienoptionsgeschäfte geführt hat und deshalb eine Rück-
abwicklung nach Bereicherungsrecht stattzufinden hat.

**Beweis:**   wie vor.

3.      **Rechtliche Würdigung**

3.1     **Zulässigkeit der Klage**

Die Klage ist zulässig, insbesondere ist das LG Frankfurt am Main zuständig

3.1.1   **Internationale Zuständigkeit für die Klage gegen die Beklagte zu 1)**

   a)    **Internationale Zuständigkeit gemäß Art. 4 Abs. 1 EuGVVO**

         Das LG Frankfurt am Main ist für die Klage gegen die Beklagte zu 1) ge-
         mäß Art 4 Abs. 1 i.V. m. Art. 63 Abs. 1 lit. a der Verordnung des Europäi-
         schen Parlaments und des Rates vom 12. Dezember 2012 über die gericht-
         liche Zuständigkeit und die Anerkennung und Vollstreckung von Entschei-
         dungen in Zivil- und Handelssachen vom 12. Dezember 2012 (EU-
         Verordnung Nr. 1215/2012,veröffentlicht im Amtsblatt der Europäischen Ge-
         meinschaften L 351/01 S. 1) („**EuGVVO**") international zuständig.

         Gemäß Art. 4 Abs. 1 EuGVVO sind Personen, die ihren Wohnsitz im Ho-
         heitsgebiet eines Mitgliedstaates haben, vor den Gerichten dieses Mit-
         gliedstaates zu verklagen. Juristische Personen haben gemäß Art. 63
         Abs. 1 lit. a für die Anwendung der EuGVVO ihren Wohnsitz an dem Ort,
         an dem sich ihr satzungsmäßiger Sitz befindet.

   b)    **Internationale Zuständigkeit gemäß Art. 2 Abs. 1 LugÜ-II**

         Das LG Frankfurt am Main ist für die Klage gegen die Beklagte zu 1) auch

gemäß Art 2 Abs. 1 i.V. m. Art. 60 Abs. 1 lit. a LugÜ-II international zuständig.

aa)   Gemäß Art. 73 Abs. 1 EuGVVO lässt die EuGVVO die Anwendung des Übereinkommens von Lugano von 2007 (Übereinkommen von Lugano über die gerichtliche Zuständigkeit und die Anerkennung und Vollstreckung von Entscheidungen in Zivil- und Handelssachen vom 30.10.2007 - ABl. EU Nr. L 339 S. 3 – nachfolgend „**LugÜ-II**") unberührt.

bb)   Gemäß Art. 63 Abs. LugÜ-II ist das LugÜ-II in zeitlicher Hinsicht anwendbar, weil es am 01.01.2010 für Deutschland in Kraft getreten ist (OLG München, BeckRS 2012, 14153; Musielak/Stadler, ZPO, 13. Auflage, Europäisches Zivilprozessrecht, Rn. 13). Für die Schweiz ist es am 01.01.2011 in Kraft getreten. (www.bj.admin.ch/bj/de/home/wirtschaft/privatrecht/lugue-2007.html).

cc)   Das LugÜ-II auch in sachlicher Hinsicht anwendbar, weil es sich um eine Zivilsache im Sinne des Art. 1 Abs. 1 Satz 1 LugÜ-II handelt. Das LugÜ-II findet Anwendung im Verhältnis zwischen Mitgliedstaaten der EuGVVO und Staaten, die einzig Vertragsstaaten des LugÜ-II sind. In dieser Konstellation sind die Mitgliedstaaten der EuGVVO verpflichtet, das LugÜ-II anzuwenden. Wenn ein maßgeblicher Anknüpfungspunkt zu einem Mitgliedstaat führt, der ausschließlich Mitgliedstaat des LugÜ-II ist, so ist dies ausreichend, um das LugÜ-II gegenüber Mitgliedstaaten des EuGVVO zu erklären (Rauscher/Peter Mankowski, EuZPR (2016), Art 73 Brüssel Ia-VO, Rn. 4 [Anm.: die EuGVVO wird in dieser Kommentierung als „Brüssel Ia-VO" bezeichnet]).

dd)   Gemäß Art. 2 Abs. 1 LugÜ-II ist das LG Frankfurt am Main international zuständig. Personen, die ihren Wohnsitz im Hoheitsgebiet eines durch das LugÜ-II gebundenen Staates haben, sind gemäß Art.



2 Abs. 1 LugÜ-II vor den Gerichten dieses Staates zu verklagen. Gemäß Art. 60 Abs. 1 lit. a LugÜ-II hat die Beklagte zu 1) als juristische Person für die Anwendung des LugÜ-II ihren Wohnsitz an dem Ort, an dem sich ihr satzungsmäßiger Sitz befindet, also in Frankfurt am Main.

**c)   Gerichtsstand gemäß Ziffer 5 (Seite I-15) des Offering Circular**

Außerdem hat sich die Beklagte zu 1) im Zusammenhang mit den von ihr emittierten streitgegenständlichen Warrants der Jurisdiktion des LG Frankfurt am Main unterworfen.

In Ziffer 5 auf Seite I-15 des als **Anlage K 38** vorgelegten Offering Circular hat die Beklagte zu 1) erklärt, dass Gerichtsstand für alle Verfahren im Hinblick auf Angelegenheiten, die in den Wertpapierbedingungen für die streitgegenständliche Warrants geregelt sind, Frankfurt am Main ist. Auch dies begründet die Zuständigkeit des LG Frankfurt am Main (Geimer/Schütze, a.a.O., A 1 Art. 2 Rn. 78).

### 3.1.2   **Internationale Zuständigkeit für die Klage gegen den Beklagte zu 2)**

Das LG Frankfurt am Main ist für die Klage gegen den Beklagten zu 2) gemäß Art 6 Nr. 1 LugÜ-II international zuständig.

Nach Art. 6 Nr. 1 LugÜ-II sind die Gerichte eines durch dieses Übereinkommen gebundenen Staates auch für Klagen gegen einen Beklagten zuständig, der seinen Wohnsitz in einem anderen Vertragsstaat hat, wenn er zusammen mit einem im Gerichtssaat ansässigen Beklagten verklagt wird und zwischen den Klagen eine so enge Beziehung besteht, dass eine gemeinsame Verhandlung und Entscheidung geboten erscheint, um zu vermeiden, dass in getrennten Verfahren widersprechende Entscheidungen ergehen könnten. Diese Voraussetzungen sind im Hinblick auf die Beklagten zu 1) und 2) erfüllt.

a)   Der Beklagte zu 2) hat seinen Wohnsitz in Rüschlikon, Schweiz.

b)   Die passive Streitgenossenschaft begründet die internationale Zuständig-
keit auch in Richtung gegen den oder die anderen Beklagten. Art. 6 Nr. 1
eröffnet die Zuständigkeit des LG Frankfurt am Main, weil die Beklagte
ihren Sitz in Frankfurt hat (Geimer/Schütze, a.a.O., A 1 Art. 2 Rn. 171).

c)   Nach der Rechtsprechung des BGH ist bei der Auslegung von Art. 6 Nr.
1 LugÜ-II die Parallelvorschrift des Art. 8 Nr. 1 EuGVVO sowie die hierzu
ergangene Rechtsprechung des Gerichtshofs der Europäischen Union zu
berücksichtigen (BGH, Urteil vom 07.06.2016 – KZR 6/15, NJW 2016,
2266 = SchiedsVZ 2016, 218; BGH, Beschluss vom 30.11.2009 – II ZR
55/09, NJW-RR 2010, 644 = WM 2010, 378). Danach liegt die erforderli-
che Konnexität der Klagen vor, wenn bei derselben Sach- und Rechtslage
die Gefahr einander widersprechender Entscheidungen besteht (EuGH,
Urteil vom 11.04.2013 – C-645/11, NJW 2013, 1661, Rn. 43 – Sapir; Urteil
vom 11.10.2007 – C-98/06, Slg 2007, I-8340, Rn. 40 – Freeport; Geimer
in Geimer/Schütze, Europäisches Zivilverfahrensrecht, 3. Auflage, Art. 6
EuGVVO, Rn. 19; Thomas/Putzo/Hüßtege, ZPO, 37. Auflage, Art. 8 EuG-
VVO, Rn. 4).

Die Konnexität ergibt sich daraus, dass die Klage gegen die Beklagte zu
1) und den Beklagten zu 2) auf demselben Sachverhalt und derselben
Anspruchsgrundlage des § 826 BGB beruhen (Thomas/Putzo/Hüßtege,
a.a.O.). Sie werden als Gesamtschuldner in Anspruch genommen (BGH,
Urteil vom 07.06.2016 – KZR 6/15, NJW 2016, 2266 = SchiedsVZ 2016,
218; BGH, Hinweisbeschluss vom 30.11.2009 – II ZR 55/09, NJW-RR
2010, 644). Zwischen den Klagen gegen die Beklagte zu 1) und den Be-
klagten zu 2) besteht daher eine so enge Beziehung, dass eine gemein-
same Verhandlung und Entscheidung geboten ist, um widersprechende
Entscheidungen zu vermeiden (Geimer/Schütze, a.a.O., A 1 Art 6 Rn. 16
u.Hw.a. EuGH Urteil vom 13.07.2006 – Rs C-103/05 – Reisch Montage
AG / Kiesel Baumaschinen Handels GmbH, NJW-RR 2006, 1568).



### 3.1.3   Örtliche Zuständigkeit

Die örtliche Zuständigkeit des LG Frankfurt am Main ergibt sich aus Art. 2 Abs. 1 LugÜ-II und §§ 12, 17 Abs. 1 S. 1 ZPO.

### 3.2   Begründetheit der Klage

Die Klage ist begründet, weil die Beklagte zu 1) und der Beklagte zu 2) der Klägerin Schadensersatz in Höhe von CHF 318.177.048,15 zu leisten haben.

### 3.2.1   Aktivlegitimation der Klägerin

Die Klägerin ist aktivlegitimiert, denn sie hat die streitgegenständlichen Ansprüche von Herrn Hranov, Frau Hranova und Frau Schulz erworben. Die streitgegenständlichen Ansprüche gegen die Beklagte zu 1) hat die Klägerin mit Abtretungsvereinbarung vom 12.10.2016 (**Anlage K 1**) von Herrn Hranov, Frau Hranova und Frau Schulz erworben. Die streitgegenständlichen Ansprüche von Herrn Hranov gegen den Beklagten zu 2) hat die Klägerin mit Abtretungsvereinbarung vom 12.10.2016 (**Anlage K 1**) erworben. Die streitgegenständlichen Ansprüche von Frau Hranova gegen den Beklagten zu 2) hat die Klägerin mit Abtretungsvereinbarung vom 29.07.2016 (**Anlage K 4**) erworben. Die streitgegenständlichen Ansprüche von Frau Schulz gegen den Beklagten zu 2) hat die Klägerin mit Abtretungsvereinbarung vom 29.07.2016 (**Anlage K 5**) erworben.

Die Klägerin ist somit Inhaberin aller streitgegenständlichen Ansprüche gegen die Beklagte zu 1) und den Beklagten zu 2) und somit aktivlegitimiert.

### 3.2.2 Haftung der Beklagten zu 1)

**a)     Haftung gemäß § 826 BGB**

Die Beklagte zu 1) haftet gemäß § 826 BGB, weil sie Herrn Hranov, Frau Maria Hranova und Frau Elissaveta Schulz in einer gegen die guten Sitten verstoßenden Weise vorsätzlich Schaden zugefügt hat.



**aa)   Sittenwidrige Schadenszufügung**

Die Beklagte zu 1) hat den Geschädigten auf dreifache Weise sitten-
widrig Schaden zugefügt, indem sie

- die Geschädigten hinsichtlich der Warrants nicht aufgeklärt hat,

- für die Aktienoptionen sittenwidrig überhöhte Leistungsentgelte
  vereinnahmt hat, die die marktüblichen Leistungsentgelte von
  2 – 3 % im Durchschnitt um den Faktor 300 % überstiegen ha-
  ben und

- eine Anlagestrategie empfohlen hat, die zum Totalverlust füh-
  ren musste.

**(1)   Unterlassene Aufklärung**

(a)   Die Beklagte zu 1) hat Herrn Hranov, Frau Hranova und
Frau Schulz sittenwidrig einen Schaden dadurch zuge-
fügt, dass sie diese über die Risiken der streitgegen-
ständlichen Aktienoptionsgeschäfte nicht aufgeklärt hat.
Nach ständiger Rechtsprechung des BGH sind gewerbli-
che Vermittler von Terminoptionen – und damit natürlich
auch Banken, die, wie die Beklagte zu 1), Terminoptionen
emittieren und selbst vertreiben – verpflichtet, Kaufinte-
ressenten vor Vertragsabschluss schriftlich die Kennt-
nisse zu vermitteln, die sie in die Lage versetzen, den
Umfang ihres Verlustrisikos und die Verringerung ihrer
Gewinnchance durch den Aufschlag auf die Optionsprä-
mie richtig einzuschätzen (BGH NJW 2002, 2777; NJW-
RR 1999, 843; NJW 1998, 2882; NJW 1994, 512; NJW-
RR 1988, 544; WM 1988, 291; NJW-RR 1991, 1243; NJW
1993, 257; NJW 1994, 997).

Dazu gehört neben der Bekanntgabe der Höhe der Opti-
onsprämie auch die Aufklärung über die wirtschaftlichen
Zusammenhänge des Optionsgeschäfts und die Bedeu-
tung der Prämie sowie ihren Einfluss auf das mit dem Ge-
schäft verbundene Risiko (BGH NJW 2002, 2777). Es
muss darauf hingewiesen werden, dass die Prämie den
Rahmen eines vom Markt noch als vertretbar angesehe-
nen Risikobereichs kennzeichnet und ihre Höhe der noch
als realistisch angesehenen, wenn auch weitgehend spe-
kulativen Kurserwartung des Börsenfachhandels ent-
spricht (BGH, a.a.O.). Ferner ist darzulegen, ob und in
welcher Höhe ein Aufschlag auf die Prämie erhoben wird
und dass ein solcher Aufschlag die Gewinnerwartung ver-
schlechtert, weil ein höherer Kursausschlag als der vom
Börsenfachhandel als realistisch angesehene notwendig
ist, um in die Gewinnzone zu kommen (BGH, a.a.O.). Un-
missverständlich ist in diesem Zusammenhang darauf
hinzuweisen, dass höhere Aufschläge den Anleger aller
Wahrscheinlichkeit nach im Ergebnis praktisch chancen-
los stellen (BGH, a.a.O.).

(b)   Hätte die Beklagte zu 1) Herrn Hranov, Frau Hranova und
      Frau Schulz gehörig aufgeklärt und beraten, wäre der
      Schaden nicht eingetreten, denn diese hätten dann von
      den Aktienoptionsgeschäften Abstand genommen. Nach
      ständiger Rechtsprechung des BGH besteht diesbezüg-
      lich die Vermutung des aufklärungsrichtigen Verhaltens
      zugunsten des geschädigten Anlegers (BGH NJW 1984,
      512, 513 mit umfangreichen Hinweisen auf seine stän-
      dige Rechtsprechung unter Ziff. 2 a).

(c)   Die Beklagte zu 1) hat Herrn Hranov, Frau Hranova und
      Frau Schulz bewusst und absichtlich nicht über die mit



Aktienoptionsgeschäften verbunden Risiken aufge-
klärt. Dies ist ohne weiteres daraus ersichtlich, dass sie
Herrn Hranov, Frau Hranova und Frau Schulz für keine
einzige der streitgegenständlichen Warrants die Emissi-
onsprospekte oder irgendwelche anderen schriftlichen
Unterlagen übergeben hat. Der Beklagte zu 2) hat nicht
einmal mündlich aufgeklärt.

**(2)   Overpricing**

Die Beklagte zu 1) hat Herrn Hranov, Frau Hranova und Frau
Schulz sittenwidrig einen Schaden dadurch zugefügt, dass sie
ihm für die Warrants in Rechnung gestellten Kauf- und Ver-
kaufspreise Beträge in Rechnung gestellt hat, die im Durch-
schnitt aller getätigten Transaktionen um 12,38 % über dem fai-
ren Marktpreis, bei den Transaktionen mit einem Transaktions-
wert von mehr als CHF 10 Mio. um 16,64 % über dem fairen
Marktpreis und bei den Transaktionen mit einem Transaktions-
wert von mehr als CHF 20 Mio. um 17,30 % über dem fairen
Marktpreis lagen. Die gewichtete, durchschnittliche Überschrei-
tung des fairen Marktpreises lag bei 17,30 %. Den Geschädig-
ten ist hierdurch ein Schaden von CHF 107.264.931,00 auf der
Basis der impliziten Volatilität und von CHF 208.795.094,00 auf
der Basis der historischen Volatilität entstanden. Diese drasti-
sche Überschreitung des marktüblichen Preises beruht darauf,
dass die Beklagte zu 1) für ihre Leistung im Zusammenhang
mit der Emission der Warrants nicht marktübliche 2 – 3 % auf
den fairen Marktpreis der Warrants aufgeschlagen hat, sondern
zwischen 9 und 18 %.

(a)   Zwischen dem marktüblichen Bewertungsaufschlag und
dem Bewertungsaufschlag der Beklagten zu 1) besteht
eine Diskrepanz von gewichtet, durchschnittlich 600 %.



Dies ist ein auffällige Missverhältnis, das nach der stän-
digen Rechtsprechung des BGH zu Kreditgebühren zur
Sittenwidrigkeit führt (BGHZ 110, 338). Der BGH bejaht
die Sittenwidrigkeit von Kreditzinsen, wenn der Vertrags-
zins den marktüblichen Effektivzins relativ um 100 % oder
absolut um 12 Prozentpunkte übersteigt (BGH a.a.O.).
Selbst wenn die Grenzwerte von 100 % oder 12 Prozent-
punkte nicht erreicht sind, hat der BGH bei relativen Ab-
weichungen zwischen 90 % und 100 % (BGHZ 104, 105),
bei 91 % (BGH NJW 1982, 2433 und 96 % (BGH NJW
1987, 183) Sittenwidrigkeit bejaht.

(b)     Die Beklagte zu 1) hat bei der Höhe des Bewertungsauf-
schlags ihre überlegene Position gegenüber den mit Ak-
tienoptionen vollkommen unerfahrenen Geschädigten
ausgenutzt. Sie hat die Geschädigten nicht darüber auf-
geklärt, dass sie gegenüber dem fairen Marktpreis für die
streitgegenständlichen Warrants überhaupt einen Bewer-
tungsaufschlag vornimmt, den die Geschädigten nicht
hätten bezahlen müssen, wenn sie entsprechende War-
rants über die Eurex erworben hätten. Dementsprechend
hat sie die Geschädigten auch nicht darüber aufgeklärt,
dass der Bewertungsaufschlag um den Faktor 6 oder 600
% über dem marktüblichen Bewertungsaufschlag liegt,
den andere Marktteilnehmer bei der Emission von War-
rants erheben. Ihre überlegene Position hat die Beklagte
zu 1) bewusst zum Nachteil von Herrn Hranov, Frau Hra-
nova und Frau Schulz und zu ihrem eigenen Vorteil aus-
genutzt. Für die Geschädigten war es aufgrund ihrer
schwächeren Lage gegenüber der Beklagten zu 1) un-
möglich, selbst festzustellen, ob die Beklagte zu 1) einen
Bewertungsaufschlag auf den fairen Marktpreis auf-
schlägt und ob dieser gegebenenfalls marktüblich ist; die-

ses Verhalten der Beklagten zu 1) verstößt gegen die gu-
ten Sitten. Die Ermittlung des fairen Marktpreises von
Warrants ebenso wie die Beurteilung der Marktüblichkeit
des Leistungsentgelts des Emittenten ist so schwierig,
dass sie ganz besondere Kenntnisse voraussetzt, die nur
professionelle Marktteilnehmer oder Fachleute wie z.B.
Hochschullehrer haben.

(c)   Nach der ständigen Rechtsprechung des BGH haftet ein
außerhalb des bankenüblichen Effektenhandels tätiger
gewerblicher Vermittler von Terminoptionen, der von vor-
neherein chancenlose Geschäfte zum ausschließlich ei-
genen Vorteil vermittelt, nicht nur aus Verschulden bei
Vertragsverhandlungen wegen unzureichender Aufklä-
rung über die Chancenlosigkeit der Geschäfte, sondern
auch wegen vorsätzlich sittenwidriger Schädigung nach §
826 BGB, wenn sein Geschäftsmodell darauf angelegt
ist, für den Anleger chancenlose Geschäfte zum aus-
schließlich eigenen Vorteil zu vermitteln (BGH NJW-RR
2011, 1193 Rn. 21).

Der BGH hat diesbezüglich in dem Urteil vom 25.01.2011
– XI ZR 195/08, NJW-RR 2011, 1193 Rn 21 folgendes
ausgeführt:

> „Einem solchen Vermittler geht es nur darum,
> hohe Gewinne zu erzielen, indem er mög-
> lichst viele Geschäfte realisiert, die für den
> Anleger auf Grund überhöhter Gebühren und
> Aufschläge chancenlos sind. Sein Geschäfts-
> modell zielt damit von vorne herein ganz be-
> wusst darauf ab, uniformierte, leichtgläubige
> Menschen unter sittenwidriger Ausnutzung
> ihres Gewinnstrebens und ihres Leichtsinns
> als Geschäftspartner zu gewinnen und sich
> auf deren Kosten zu bereichern (vgl. Senat,
> BGHZ 184, 365 = NZG 2010, 550 = MMR
> 2010, 582 Rdnrn. 25 f.; NJW-RR 2011, 548 =



> *WM 2010, 2025 Rdnr. 41; NJOZ 2010, 2277*
> *= ZIP 2010, 2004 Rdnr. 37 und NJW-RR*
> *2011, 197 = WM 2010, 1590 Rdnr. 39 und*
> *NJW-RR 2011, 551 = WM 2010, 2214 Rdnr.*
> *40 jeweils m.w.Nachw.)*"

Diese Grundsätze gelten für die Beklagte zu 1), die als Bank die Warrants selbst emittiert und selbst verkauft hat, entsprechend. Die Beklagte zu 1) hat an den Geschäften mit den Geschädigten doppelt verdient. Sie hat die Optionsprämien für die Warrants als Gewinne vereinnahmt, soweit diese wertlos verfallen sind – also letztlich für alle Warrants- und zusätzlich das überhöhte Leistungsentgelt. Den Verlauf der Warrants hat sie über die von ihr empfohlene Anlagestrategie so gesteuert, dass alle Warrants entweder verkauft wurden, um mit dem Erlös sofort neue Warrants zu kaufen oder wertlos verfallen sind.

**(3)    Anlagestrategie**

Die streitgegenständlichen Warrants waren nicht nur wegen des Overpricing chancenlos, sondern wurden von der Beklagten zu 1) durch die von ihr empfohlene Anlagestrategie absichtlich chancenlos gemacht. Die Anlagestrategie war, wie oben unter Ziffer 2.3.2 ausgeführt, auf den Totalverlust der eingesetzten Mittel der Geschädigten ausgerichtet, weil jeder CHF Verlust der Geschädigten ein CHF Gewinn bei der Beklagten zu 1) war. Dass es sich bei dieser Vorgehensweise der Beklagten zu 1) um eine sittenwidrige vorsätzliche Schädigung der Geschädigten handelt, liegt auf der Hand.

**(4)    Transaktionen vom 16.10.2007**

Durch die Empfehlung der Verkäufe und Käufe vom



26.10.2007 (oben Ziffer 2.5.3 lit. c) und die persönliche telefonische Erteilung der Order an die Depotbank von Herrn Hranov in der Absicht, den wertlosen Verfall der Optionen durch die absichtliche Herbeiführung eines Kurssturzes der OC Oerlikon Aktie, hat der Beklagte zu 2) eine weitere vorsätzliche sittenwidrige Schädigung begangen. Die Beklagte zu 1) hat sich das Handeln des Beklagten zu 2) gemäß § 31 BGB zurechnen zu lassen.

**bb)  Vorsatz**

Die Beklagte zu 1) hat die Geschädigten vorsätzlich geschädigt.

Nach ständiger Rechtsprechung des BGH haftet gemäß § 826 BGB nicht nur, wer die die Sittenwidrigkeit seines Handelns begründenden Umstände positiv kennt, sondern auch, wer sich dieser Kenntnis bewusst verschließt (BGHZ 176, 281 Rz. 46; 129, 136, 175 f.; ZIP 1994, 789, 792; WM 1989, 1047, 1048 f.) und zum Beispiel seine Berufspflichten in solchem Maße leichtfertig verletzt, dass sein Verhalten als bedenken- und gewissenlos zu bezeichnen ist (BGHZ 176, 281 Rz. 46; WM 1992, 1184, 1187; WM 1991, 2034, 2035; WM 1975, 559, 560). Aus der Art und Weise des sittenwidrigen Handelns kann sich die Schlussfolgerung ergeben, dass mit Schädigungsvorsatz gehandelt worden ist (BGH 129, 136, 177; 176, 281 Tz. 46).

Da der Beklagten zu 1) als Market Maker und weltweit tätige Bank der faire Marktpreis der streitgegenständlichen Warrants und die Höhe des marktüblichen Leistungsentgelts bekannt gewesen war, hat sie mit Schädigungsvorsatz gehandelt, als sie von den Geschädigten ein um durchschnittlich 317,5 % über dem Marktüblichen liegendes Leistungsentgelt in der Optionsprämie versteckt hat.

Dasselbe trifft auf die von der Beklagten zu 1) empfohlenen Anlage-



strategie zu, die nur dem Ziel diente, bei den Geschädigten einen To-talverlust herbeizuführen, um das gesamte eingesetzte Kapital der Geschädigten als Gewinn zu vereinnahmen.

**b)   Haftung gemäß § 823 Abs. 2 S. 1 BGB i.V.m. § 263 Abs. 1 StGB**

aa)   Der Beklagte zu 2) hat Herrn Hranov getäuscht, indem er bei ihm den Eindruck erzeugt hat, ihm eine risikolose Anlagemöglichkeit zu markt-üblichen Preisen zu empfehlen. Er hat ihn darüber hinaus darüber getäuscht, dass die Beklagte zu 1) und er selbst ein wirtschaftliches Interesse an den empfohlenen Geschäften hatten und sie sich in ei-nem massiven Interessenskonflikt befanden. Schließlich hat der Be-klagte zu 2) Herrn Hranov vorgespiegelt, dass er ihn gegenüber an-deren potentiellen Interessenten für die Warrants bevorzugt behan-dele, weil er ihm nach seinen Angaben die Warrants zu einem Zeit-punkt anbot, als diese noch nicht am Markt waren. Dies implizierte aus Sicht von Herrn Hranov, dass es sich um eine besonders gute Investitionsmöglichkeit zu einem fairen Preis handelte. Tatsächlich hatten die Beklagten die Warrants eigens für Herrn Hranov, Frau Hra-nova und Frau Schulz aufgelegt, um diese planmäßig auszunehmen. Andere Marktteilnehmer haben mit den streitgegenständlichen War-rants entweder keine oder nur geringe Umsätze gemacht, wie sich aus **Anlage K 47** ergibt.

Bezüglich der Transaktionen vom 16.10.2007 hat der Beklagte zu 2) Herrn Hranov natürlich verschwiegen, dass seinen Empfehlungen der Plan zugrunde lag, den wertlosen Verfall der Warrants durch die Herbeiführung eines Kurssturzes der OC Oerlikon Aktie herbeizufüh-ren.

bb)   Aufgrund dieser bei Herrn Hranov erzeugten Irrtümer haben er, Frau Hranova und Frau Schulz die streitgegenständlichen Warrants erwor-ben und die im Einzelnen dargelegten Schäden erlitten.



cc)   Die Beklagte zu 1) muss sich das Verhalten des Beklagten zu 2) ge-
mäß § 31 BGB zurechnen lassen. Da der Beklagte zu 2) die Derivate
Abteilung der Zweigniederlassung der Beklagten zu 1) eigenverant-
wortlich geleitet hat und gegenüber Herrn Hranov als Head Global
Markets Equity Switzerland aufgetreten ist, sind die Voraussetzungen
des § 31 BGB erfüllt.

dd)   Die Beklagte zu 1) haftet Herrn Hranov, Frau Hranova und Frau
Schulz gemäß §§ 823 Abs. 2 S. 1, 31 BGB, 263 Abs. 1 StGB für die
durch die betrügerischen Handlungen des Beklagten zu 2) entstan-
denen Schäden.

c)   **Haftung gemäß §§ 280 Abs. 1, 311 Abs. 2 BGB**

Die Beklagte zu 1) haftet gemäß § 280 Abs. 1 i. V. m. § 311 Abs. 2 BGB
auf Ersatz der streitgegenständlichen Schäden wegen der unterlassenen
Aufklärung von Herrn Hranov, Frau Hranova und Frau Schulz (BGH NJW-
RR 2011, 1193 mit weiteren Hinweisen auf die ständige Rechtsprechung).

aa)   Zwischen Herrn Hranov, Frau Hranova sowie Frau Schulz und der
Beklagten zu 1) ist durch Abschluss der streitgegenständlichen Akti-
enoptionsgeschäfte ein Anlageberatungsvertrag zustande gekom-
men. Nimmt ein Anlageinteressent bei einer konkreten Anlageent-
scheidung die Hilfe eines Kreditinstituts in Anspruch und lässt sich
dieses auf eine Beratung ein, kommt auch ohne eine entsprechende
ausdrückliche Abrede und ohne eine Vereinbarung eines Entgelts ein
Beratungsvertrag zustande (BGHZ 123, 126; NJW 2013, 3293). Da-
bei ist ein stillschweigender Vertragsschluss bereits dann zu bejahen,
wenn der Berater, also hier der Beklagte zu 2), erkennt, dass der
Kunde das Ergebnis der Beratung zur Grundlage einer Anlageent-
scheidung machen will (BGH, a.a.O., *Palandt-Grüneberg*, Komm. z.
BGB, 75. Aufl., § 280 Rn. 47). Die Beklagte zu 1) hat sich gemäß §
166 Abs. 1 BGB die Kenntnis des Beklagten zu 2) davon zurechnen

zu lassen, dass Herr Hranov im eigenen Namen sowie im Namen von Frau Maria Hranova und Frau Elissaveta Schulz gehandelt hat.

bb)  Aus dem zwischen Herrn Hranov, Frau Hranova sowie Frau Schulz und der Beklagten zu 1) jeweils zustande gekommenen Anlageberatungsverträgen bestand für die Beklagte zu 1) die Pflicht, Herrn Hranov, Frau Hranova und Frau Schulz über die Risiken, die Funktionsweise und die wirtschaftliche Bedeutung von Aktienoptionsgeschäften aufzuklären. Diese Pflicht hat die Beklagte zu 1) verletzt. Er hat Herrn Hranov nicht darüber aufgeklärt, dass für Aktienoptionen ein Totalverlustrisiko besteht. Ferner hat er Herrn Hranov nicht offenbart, dass die von ihm für die empfohlenen Warrants verlangten Preise weit über dem fairen Marktpreis lagen. Schließlich hat der Herrn Hranov auch nicht darüber aufgeklärt, dass die empfohlene Anlagestrategie zwangsläufig zum Totalverlust führen musste.

cc)  Die Beklagte zu 1) und der Beklagte zu 2) wären darüber hinaus verpflichtet gewesen, Herrn Hranov, Frau Hranova und Frau Schulz darauf hinzuweisen, dass die empfohlenen Warrants von der Beklagten zu 1) emittiert wurde und diese deshalb die Optionsprämie, also eine Rückvergütung, erhält. Der BGH hat in seinem Urteil vom 19.12.2006 zu dieser Pflicht folgendes ausgeführt:

> „Die Aufklärung über die Rückvergütung ist notwendig, um dem Kunden einen insofern bestehenden Interessenkonflikt der Bank (§ 31 I Nr. 2 WpHG) offen zu legen. Erst durch die Aufklärung wird der Kunde in die Lage versetzt, das Umsatzinteresse der Bank selbst einzuschätzen (vergleiche Assmann/Schneider/Koller, § 31 Rdnr. 74; a. A. Schwarz, § 31 WpHG Rdnr. 27) und zu beurteilen, ob die Bank ihm einen bestimmten Titel nur deswegen empfiehlt, weil sie selbst daran verdient. Nach der Rechtsprechung des Senats (BGHZ 146, 235 [239] = NJW 2001, 962) hat eine Bank, die einem Vermögensverwalter Provisionen und Depotgebühren rückvergütet, ihren Kunden vor Abschluss der vom Vermögensverwalter initiierten Effekten Geschäfte darauf hinzuweisen, dass sie dadurch eine Gefährdung der Kundeninteressen durch den Vermögensverwalter geschaffen hat. Diese Rechtsprechung

ist auch auf den vorliegenden Fall zu übertragen. Wenn eine Bank einen Kunden ohne Zwischenschaltung eines Vermögensverwalters berät, Anlageempfehlungen abgibt und dabei an den empfohlenen Fonds durch Rückvergütungen verdient, sind die Kundeninteressen durch die von der Bank erhalten Rückvergütungen gefährdet. Es besteht die konkrete Gefahr, dass die Bank Anlageempfehlungen nicht allein im Kundeninteresse nach den Kriterien anleger – und objektgerechte Beratung abgibt, sondern zumindest auch in ihrem eigenen Interesse, möglichst hohe Rückvergütungen zu erhalten. Dabei spielt es entgegen der Ansicht der Beklagten keine Rolle, ob die Rückvergütungen einem bestimmten Geschäft unmittelbar zugeordnet werden oder in gewissen Zeitabständen gezahlt werden. Wesentlich ist nur, dass die Rückvergütungen umsatzabhängig sind."

- BGH Urteil vom 19.12.2006 – XI ZR 56/05, NJW 2007, 1876 -

In seinem Beschluss vom 20.01.2009 hat der BGH ausgeführt:

„(1) Zutreffend ist die Ansicht der Beschwerdebegründung, dass das genannte Senatsurteil (BGHZ 170, 226 [234f.] = NJW 2007, 1876 Rdnr. 23) auch auf den Vertrieb von Medienfonds durch eine Bank anwendbar ist. Bei der Offenlegung von Rückvergütungen geht es um die Frage ob eine Gefährdungssituation für den Kunden geschaffen wird. Deshalb ist es geboten, den Kunden über etwaige Rückvergütungen aufzuklären und zwar unabhängig von der Rückvergütungshöhe. Dabei macht es keinen Unterschied, ob der Berater Aktienfonds oder Medienfonds vertreibt. Der aufklärungspflichtige Interessenkonflikt ist in beiden Fällen gleich. Der Senat hat zwar § 31 I Nr. 2 WpHG a. F. im Zusammenhang mit der Pflicht zur Vermeidung eines Interessenkonflikts angeführt (BGHZ 170, 226 [234] = NJW 2007, 1876 Rdnr. 23), seine Ausführungen zum Interessenkonflikt aber nicht auf den Anwendungsbereich des WpHG beschränkt. In § 31 I Nr. 2 WpHG a. F. ist lediglich der auch zivilrechtlich allgemein anerkannte Grundsatz der Vermeidung von vertragswidrigen Interessenkonflikten aufsichtsrechtlich für den Bereich des Wertpapierhandels normiert worden (vgl. Möllers, in: KK – WpHG, § 31 Rdnr. 23 m.w. Nachw.; auch Palandt/Spandau, BGB, 68. Aufl., § 654 Rdnr. 4).

(2) Aufgrund dieses Beratungsvertrags war die Bekl. verpflichtet, den Kl. darüber aufzuklären, dass sie von der C für die Vermittlung der Fondsanteile das Agio in voller

Höhe bekam. Für die Berater der Bekl. bestand danach ein ganz erheblicher Anreiz, Anlegern gerade eine Fondsbeteiligung der C zu empfehlen. Darüber und den damit verbundenen Interessenkonflikt musste die Bekl den Kl. im Rahmen des Beratungsgesprächs informieren, um ihn in die Lage zu versetzen, das Umsatzinteresse der Bekl. einzuschätzen und beurteilen zu können, ob die Bekl. und ihr Berater die Fondsbeteiligung nur deshalb empfahlen, weil sie selbst daran verdienten (vgl. Senats-urteil BGHZ 170, 226 [234f.] = NJW 2007, 1876 Rdnr. 23). Dies gilt vorliegend umso mehr, als der Interessenkonflikt noch dadurch gesteigert wurde, dass die Bekl. für die Übernahme einer Platzierungsgarantie eine Vergütung von weiteren 3 % des Kommanditkapitals erhielt und für ihre Gebietsfilialen, die die für sie festgelegten Platzie-rungsquoten zu 100 % erfüllten, von der C eine zusätzli-che Vermittlungsgebühr von 100000 Euro gezahlt wurde. Durch dieses gesteigerte Anreizsystem bestand eine er-höhte Gefahr, dass die im Kundeninteresse zu erfolgende anleger- und objektgerechte Beratung nicht oder nur un-zureichend vorgenommen wurde."

- BGH Beschluss vom 20.10.2009 − XI ZR 510/07, NJW 2009, 1416 -

In dem Hinweisbeschluss vom 9.3.2011 hat der BGH zur Aufklä-rungspflicht im Hinblick auf Rückvergütungen folgendes ausgeführt:

„Zu Recht hat das BerGer. weiter angenommen, dass die Bekl. aus dem Beratungsvertrag verpflichtet war, den Ze-denten über an sie fließende Rückvergütungen aus Ver-triebsprovisionen aufzuklären (vgl. Senat, BGHZ 170, 226 = NJW 2007,1876 Rdnrn. 22f.; NJW 2009, 2298 = NZG 2009, 828 = WM 2009, 1274 Rdnr. 11 und WM 2009, 2306 = ZIP 200 9,2380 = BeckRS 2009, 86793 Rdnr. 31; Senat, NJW 2009 1416 = NZG 2009, 828 = WM 2009, 405 Rdnr. 13 und NJW 2010, 2339 = NZG 2010, 873, = WM 2010, 1694 Rdnr. 5). [. . .]

Aufklärungspflichtige Rückvergütungen liegen dagegen, wie der Senat zuletzt formuliert hat, nur dann vor, wenn Teile der Ausgabeaufschläge oder Verwaltungsgebüh-ren, die der Kunde über die Bank an die Gesellschaft zahlt, hinter seinem Rücken an die beratende Bank um-satzabhängig zurückfließen, sodass diese ein für den Kunden nicht erkennbares besonderes Interesse hat, ge-rade diese Beteiligung zu empfehlen (Senat, WM 200 9,2306 = BeckRS 2009, 86796 Rdnr. 31). [. . .]



> Maßgebend für die Aufklärungspflicht über Rückvergü-
> tungen ist hingegen, dass der Anleger ohne diese Aufklä-
> rung nicht das besondere Interesse der beratenden Bank
> erkennen kann, gerade diese Anlage zu empfehlen. Die
> Fehlvorstellung über die Neutralität der Beratungsleis-
> tung der Bank, der mit der Aufklärungspflicht über Rück-
> vergütungen begegnet werden soll, beruht allein darauf,
> dass die beratende Bank als Empfängerin der Rückver-
> gütung ungenannt bleibt. Sie entsteht dagegen unabhän-
> gig davon, aus welcher offen angegebenen Quelle die
> Rückvergütung an die beratende Bank fließt.

Die Beklagten haben Herrn Hranov gegenüber verschwiegen, dass
die Beklagte zu 1) die Emittentin der Warrants war. Da die Beklagten
Herrn Hranov die Emissionsprospekte vorenthalten haben, war dies
für ihn nicht erkennbar. Aus diesen Gründen, war für ihn auch das
besondere Interesse der Beklagten nicht erkennbar, ihm gerade
diese Warrants zu empfehlen. Er hatte deshalb die Fehlvorstellung,
dass der Beklagte zu 2) ihn neutral beraten würde und dabei die In-
teressen von Herrn Hranov als Anleger wahren und nicht die Gewin-
ninteressen der Beklagten zu 1) bzw. seine eigenen Interessen im
Hinblick auf seine erfolgsabhängige Vergütung durch die Beklagte zu
1) verfolgen würde.

cc)   Die Rechtsfolge dieser Pflichtverletzungen ist, dass die Beklagte zu
1) gemäß §§ 280 Abs. 1, 249 BGB Schadensersatz zu leisten hat.
Der Schadensersatzanspruch richtet sich auf die Rückzahlung der
aufgewandten Beträge und Ersatz etwaiger Folgeschäden (BGHZ
115, 213, 221; NJW 2006, 2042 Rn. 32).

### 3.2.3 Haftung des Beklagten zu 2)

**a.**   **Haftung gemäß § 823 Abs. 2 BGB i.V.m. § 263 Abs. 1 StGB**

Der Beklagte zu 2) haftet Herrn Hranov, Frau Hranova und Frau Schulz
gemäß § 823 Abs. 2 BGB i.V.m. § 263 Abs. 1 StGB auf Ersatz der Schäden,
die diesen aus den streitgegenständliche Aktienoptionen entstanden sind.

Der Beklagte zu 2) hat Herrn Hranov getäuscht. Der dadurch bei Herrn Hranov erzeugte Irrtum hat dazu geführt, dass die streitgegenständlichen Warrants erworben wurden.

Zur Vermeidung von Wiederholungen verweisen wir auf unsere Ausführungen oben unter Ziffer 3.2.2 lit. b).

**b.**    **Haftung gemäß §§ 830 Abs. 1, 826 BGB**

Der Beklagte zu 2) haftet gemäß §§ 830 Abs. 1, 826 BGB als Mittäter für die streitgegenständlichen Schäden.

Zur Vermeidung von Wiederholungen verweisen wir auf unsere Ausführungen oben unter Ziffer 3.2.2 lit a).

Der Vorsatz des Beklagten zu 2) bezüglich des Mitwirkens an der sittenwidrigen Schädigung der Geschädigten durch die Beklagte zu 1) ergibt sich aus der Art und Weise seines sittenwidrigen Handelns. Zur Vermeidung von Wiederholungen verweisen wir auf unsere Ausführungen oben unter Ziffer 3.2.2 lit. a) bb)

3.3    Schadensberechnung

Der geltend gemachte Schaden berechnet sich wie folgt:

| | | |
|---|---|---|
| Verlust aus den Optionsgeschäften | CHF | 316.011.961,00 |
| Courtagen | CHF | 2.073.843,55 |
| Börsengebühren | CHF | 91.243,60 |
| **SUMME** | **CHF** | **318.177.048,15** |

Prof. Dr. Bub
Rechtsanwalt

Dr. Henning Kraus s
Rechtsanwalt