# EXHIBIT 2



# Certificate of Accuracy

This is to certify that the translation from German into English, is an accurate translation of the document with the file name:

**Klageschrift vom 31.10.2016.pdf**

I, Christian Brachvogel, declare under penalty of perjury that I understand the English language and the German language and that, to the best of my knowledge and belief, the statements in the English language in the attached translation have the same meanings as the German statements in the language in the original document, a copy of which I have examined.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on 12 August, 2021

Signature:

**elativum gmbh**      fon: 04131 99 55 00       **geschäftsführung**       **amtsgericht lüneburg** hrb200319
am speicher 17           kontakt@elativum.de     manuela vossenberg         st-nr.: 33/276/00203
21337 lüneburg           www.elativum.de         markus vossenberg          ust.-id nr.: de248760077

RECHTSANWÄLTE
# BUB, GAUWEILER & PARTNER
Partnerschaftsgesellschaft mit beschränkter Berufshaftung

*RAe Bub, Gauweiler & Partner | PartGmbH | Promenadeplatz 9 | 80338 München | Germany*

Frankfurt am Main Regional Court
– Civil Division –
60265 Frankfurt am Main
Germany

[stamp: Frankfurt am Main Regional Court
31 Oct. 2016
[illegible]
[initials] ]

[stamp: Frankfurt am Main Regional Court
31 Oct. 2016 000060
Attachments]

Munich, 31 October 2016
485034 – HK/lp
00327 15                                            [handwritten: 2-05 ˢ Bank]

## COMPLAINT

of **Ms. Isabella Hranov**

Goldhaldenstrasse 37, CH - 8702 Zollikon-Zurich, Switzerland

- **Plaintiff** -

Attorneys of record:   *Rechtsanwälte* Bub, Gauweiler & Partner

Promenadeplatz 9, 80333 München, Germany

v.

1        **Deutsche Bank AG**

Taunusanlage 12, 60325 Frankfurt am Main, Germany

legally represented by the managing board, which in turn is represented by members

John Cryan, Stuart Lewis, Sylvie Matherat, Garth Ritchie, Karl von Rohr, Dr. Marcus

Schenck, Christian Sewing and Jeffrey Urwin

- **Defendant 1** -

2.      **Simon Biner**

Weiherweg 2, 8803 Rüschlikon, Switzerland

- **Defendant 2** -

On account of:        Claim

Value in dispute:        EUR 293,592,000.00

In the Plaintiff's name and on her behalf, we file

**SUIT**.

We will promptly arrange for payment of the advance on court fees in the amount of EUR 329,208.00 once a case number has been assigned.

We further ask that a hearing be convened in the near future and submit the following

**Motions**:

I.      The defendants are ordered, as joint and several debtors, to pay to the Plaintiff the amount of CHF 318,177,048.15 plus interest at a rate of five percentage points above the prime rate since the date on which the proceedings became pending.

II.      The defendants bear the costs of the legal dispute.

III.      The ruling is provisionally enforceable.

In the event that the court calls for written preliminary proceedings, we **move** that a default judgment be entered against the defendants pursuant to § 331 (3) sentence 1 of the Code of Civil Procedure (*Zivilprozessordnung - ZPO*) in the event that the defendants do not provide notice of their intention to mount a defense in a timely manner.

**TABLE OF CONTENTS**

Preamble
1.      Introduction
1.1     The Plaintiff
1.2     Mr. Rumen Hranov
1.3     Defendant 1
1.4     Defendant 2
2.      Facts
2.1     Stock option transactions with Defendant 1
2.1.1   Contractual relations and their "documentation"
        a)    Agreement on direct orders
        b)    Trading authorization for direct orders between Bank Julius Bär and Mr. Rumen
              Hranov
        c)    Trading authorization for direct orders between Bank Julius Bär and Defendant
              1
        d)    "Special characteristics" of documentation
2.1.2   Transaction details
2.1.3   Brokerage and exchange fees
2.1.4   Securities prospectuses
2.1.5   Causes for losses incurred
2.2     Loss resulting from overpricing
2.2.1   Setting fair price for options
        a)    Valuation method
        b)    Comparison of fair price with that invoiced by Defendant 1
2.2.2   Service fees typically collected by issuers of warrants
2.3     Investment strategy geared for total loss
2.3.1   Risks of loss associated with recommended investment strategy
        a)    Risk of loss associated with stock option as compared to leveraged stock
              purchase
        b)    Effect of leverage on risk of loss
2.3.2   Investment strategy aimed for total loss
2.3.3   No diversification
2.3.4   Investment recommendations were designed to prevent any profit from materializing
        a)    Offsetting profitable sales by means of parallel execution of new transactions
        b)    Interest of Defendant 1 in forestalling risk hedging for transactions in dispute
              aa)   Hedging by way of purchase of counterbalancing options at EUREX
              bb)   Hedging by way of purchase of OC Oerlikon AG stock
2.4     Failure to advise as to warrants' functioning and risks

2.5     Investment advice provided by Defendant 2
2.5.1   Personal meetings
2.5.2   Consultation by telephone
2.5.3   Portfolio management by Defendant 2
        a)   Purchase and sales order by Defendant 2 in names of Mr. Rumen Hranov, Ms.
             Maria Hranova and Ms. Elissaveta Schulz
        b)   Management of portfolios of Mr. Rumen Hranov, Ms. Maria Hranova and Ms.
             Elissaveta Schulz
        c)   Deliberate exploitation of portfolio-management function for benefit of
             Defendant 1
2.6     When Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz' heirs
        learned of claims against defendants
3.      Legal analysis
3.1     Suit is admissible
3.1.1   International jurisdiction for suit against Defendant 1
        a)   International jurisdiction pursuant to Art. 4 (1) of Council Regulation (EC) No
             44/2001
        b)   International jurisdiction pursuant to Art. 2 (1) of Lugano Convention II
        c)   Legal venue pursuant to item 5 (pp. 1-15) of Offering Circular
3.1.2   International jurisdiction for suit against Defendant 2
3.1.3   Geographic jurisdiction
3.2     Suit has merit
3.2.1   Plaintiff has standing
3.2.2   Liability of Defendant 1
        a)   Liability under § 826 of Civil Code
             aa)  Immoral infliction of damages
                  (1)   Failure to disclose relevant facts
                  (2)   Overpricing
                  (3)   Investment strategy
                  (4)   Transactions dated 16 October 2007
             bb)  Willful intent
        b)   Liability pursuant to § 823 (2) sentence 1 of Civil Code in conjunction with §
             263 (1) of Criminal Code
        c)   Liability pursuant to §§ 280 (1), 311 (2) of Civil Code
3.2.3   Liability of Defendant 2
        a)   Liability pursuant to § 823 (2) of Civil Code in conjunction with § 263 (1) of
             Criminal Code
        b)   Liability pursuant to § 830 (1) of Civil Code
3.3     Calculation of damages

## LIST OF EXHIBITS

**K 1**   Assignment agreement dated 12 October 2016 between Plaintiff and Mr. Rumen Hranov

**K 2**   Assignment agreement / cession dated 15 September 2014 between Mr. Rumen Hranov and Ms. Maria Hranov

**K 3**   Assignment agreement / cession dated 15 September 2014 between Mr. Rumen Hranov and Ms. Elissaveta Schulz

**K 4**   Assignment agreement dated 29 July 2016 between Ms. Maria Hranova and Plaintiff

**K 5**   Assignment agreement dated 29 July 2016 between Mr. Martin Schulz and Ms. Rumiana Engel on one hand and Plaintiff on other

**K 6**   Death certificate dated 12 March 2015 issued by registry and citizenship association of Mödling, Lower Austria, Austria

**K 7**   Transfer resolution dated 24 June 2015 by Döbling District Court, 1st Division, Vienna, Austria

**K 8**   Excerpt from register of companies of Canton of Zurich, Company ID CHE-105.690.694

**K 9**   *Handelsblatt* article dated 28 June 2004

**K 9a**   Letter dated 19 October 2006 from Defendant 1

**K 9b**   Agreement on direct orders

**K 9c**   Settlement instructions

**K 9d**   Trading authorization for direct orders between Bank Julius Bär and Defendant 1

**K 9e**   Trading authorization for direct orders between Bank Julius Bär and Mr. Rumen Hranov

**K 10**   List of transactions

**K 11**   Individual transactions OERDA

**K 12**   Individual transactions OERDC

**K 13**   Individual transactions OERDD

**K 14**   Individual transactions OERDE

**K 15**   Individual transactions OERDF

**K 16**   Individual transactions OERDG

**K 17**   Individual transactions OERDI

**K 18**   Individual transactions OERDK

**K 19**   Individual transactions OERDL

**K 20**   Individual transactions OERDS

**K 21**   Individual transactions OERDT

**K 22**   Individual transactions OERDY

**K 23**   Individual transactions OERDZ

**K 24**   Individual transactions OERHA

**K 25**   Individual transactions OERIA

**K 26**  Individual transactions OERIB 2007
**K 27**  Individual transactions OERIB 2008
**K 28**  Individual transactions OERIQ
**K 29**  Individual transactions OERIR
**K 30**  Individual transactions OERIS
**K 31**  Individual transactions OERIZ
**K 32**  Individual transactions OERLU
**K 33**  Individual transactions Spread Wts. 525/575
**K 34**  Individual transactions Spread Wts. 625/675
**K 35**  Individual transactions Eurex Call March 560
**K 36**  Individual transactions Eurex Put March 560
**K 37**  List of brokerage and exchange fees paid
**K 38**  Offering circulars ISIN CH00286565902865659, CH00286566162865661, CH00286566242865662 und CH00286566322865663
**K 39**  Transactions table
**K 40**  List of scientific representations
**K 41**  Leverage table
**K 42**  Expert opinion dated 12 May 2016 by Prof. Dr. Christoph Kaserer
**K 43**  Disclosure notice dated 18 January 2007 from OC Oerlikon AG
**K 44**  Beta factor representation
**K 45**  Diagram
**K 46**  Price chart and chronology of purchase and sales transactions
**K 47**  Moving options table
**K 48**  ALM table
**K 49**  Statement dated 9 April 2013 by Mr. Ronny Pecik

**Grounds:**

**Preamble:**

I.     This suit and these proceedings amount to an extraordinary cautionary tale about the
defendants' treatment of their client and (the gross exploitation of) trust. The bank
that once put the advertising slogan

*"Everything Starts With Trust"*

on its banner, through its own Mr. Simon Biner, Head of Global Markets Equities,
Switzerland, criminally misled the Plaintiff's husband and <u>shamelessly exploited</u> his
"<u>blind faith</u>," as the same Mr. Biner freely admitted to third parties: Asked about the
funds needed for another transaction, he observed that he would get them from the
Plaintiff's husband, who "trusts [him] blindly." Indeed, he said, he would sell Mr.
Rumen Hranov short-term call options on OC Oerlikon AG stock that were "deep in
the money" (thus commanding a high price) – and then proceeded to do precisely
that just four days later. Then, he would cause the stock to plummet using his own
positions to render the options worthless. The party with whom Mr. Biner was
conversing declared with indignation that he (Mr. Biner)

*"can't really do that."*

Mr. Biner's response speaks volumes:

*"What do you care? It's not your money, it's Hranov's."*

Not surprisingly, Defendant 2 put his plan into action on 16 October 2007, arranging
for a swap of six options against three. A little while later, the stock price took a dive,
from CHF 524 on 16 October 2007 to CHF 268.25 on 15 August 2008, and the
options pushed into the securities account of the Plaintiff's husband expired
worthless. In the beginning, the Plaintiff's husband was an extremely wealthy Swiss
citizen, who has resided near Zurich for many years.

Defendant 2, who had turned Zürcher Kantonalbank AG into Switzerland's leading derivatives trader with a market share of 23%, signed the Plaintiff's husband as a client in the year 2005 (and likely went about exploiting him for his purposes without delay). When he switched to Defendant 1 in the year 2006, he took the Plaintiff's husband with him "as a client." He recommended that the Plaintiff's husband, who lacked any previous experience in such business, engage in high-volume transactions involving stock options without educating him about the special risks inherent in transactions with stock options, including but not limited to the effects of time limits and the risk of total loss associated with them. Of course, risky investment strategies feeding off the money of clients are neither new nor uncommon where jurisprudence is concerned. What is unusual and novel about the constellation in dispute even for the undersigned is that Defendant 2 not only advised the Plaintiff's husband on behalf of Defendant 1: Without the knowledge of the Plaintiff's husband, Defendant 1 also served as his counterparty. Any CHF gain that accrued to the Plaintiff's husband, his mother and his sister represented a CHF loss for Defendant 1, and, more importantly, each CHF loss suffered by the Plaintiff's husband, his mother and his sister represented a CHF gain for Defendant 1 (and thus served as the basis for the performance-based remuneration of Defendant 2). The loss of CHF 316,011,961.00 incurred by the Plaintiff's husband, his mother and his sister on the "recommendations" of Defendant 2 is therefore offset by CHF 316,011,961.00 in profit for Defendant 1, collected over just two years, which helped Defendant 2 earn variable compensation in these two years in the seven – if not eight – figures.

II.     Under an assigned right, the Plaintiff asserts claims for her husband, Mr. Rumen Hranov, his mother, Ms. Maria Hranova, and his late sister, Ms. Elissaveta Schulz. Between November of 2006 and October of 2008, Mr. Rumen Hranov acquired call and put options issued by Defendant 1 on stock of the Swiss enterprise OC Oerlikon AG for himself, his mother and his sister. Mr. Rumen Hranov, his mother and his sister suffered losses in the total amount of CHF 316,011,961.00 as a result of these option transactions.

In addition, they paid brokerage fees to their custodian banks in the total amount of CHF 2,073,843.55 as well as exchange fees in the total amount of CHF 91,243.60. Total damages thus equal CHF 318,177,048.15.

III.   Defendant 1 issued the stock options and provided investment advice for Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz through its Zurich branch. Investment recommendations were given by Defendant 2, who served as Head of Global Markets Equity, Switzerland, for Defendant 1.

Prior to switching to Defendant 1, Defendant was the head derivatives trader of Zürcher Kantonalbank, where he was so successful in growing the derivatives business that Zürcher Kantonalbank rose to become Switzerland's leading derivatives trader with a market share of 23%. In the year 2005, Defendant 2 approached Mr. Rumen Hranov, who is known in Switzerland for his wealth (he had made his money in the oil trade), and signed him as a client. His investment advice included the recommendation that Mr. Rumen Hranov, who lacked any pertinent experience, invest in high-volume option transactions involving the stock of OC Oerlikon AG. Neither Defendant 2 nor another Zürcher Kantonalbank employee educated Mr. Rumen Hranov about the functioning and the risks of stock options. Invariably, Mr. Rumen Hranov simply followed the investment recommendations of Defendant 2. The options performed so well that Mr. Rumen Hranov made a profit. This is how Defendant 2 gained the unconditional trust of Mr. Hranov.

In the year 2006, Defendant 2 and his team of traders left Zürcher Kantonalbank for Defendant 1. Here, he was put in charge of and given full responsibility for Swiss derivatives division and acted as its head in external relations as well. Following the move of Defendant 2 to Defendant, Mr. Rumen Hranov followed him there as his client. Defendant 2 advised Mr. Rumen Hranov to acquire options on the stock of OC Oerlikon AG at a massive scale.

In each instance, Mr. Rumen Hranov heeded these recommendations for himself as well as for Ms. Hranova and Ms. Schulz as their agent. As Defendant 2 failed to disclose to Mr. Rumen Hranov, the issuer of the stock options he was recommending was Defendant 1 itself, which profited from the option trades so recommended, creating an enormous conflict of interest between Defendant 1 as well as Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz. As a result, Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz were not aware that the funds expended to acquire the stock options were paid to Defendant 1. Nor did Defendant 2 mention that the prices he set for the stock options exceeded the fair market price for these options by 18% on average. On the contrary, he invariably told Mr. Rumen Hranov that he had a good investment opportunity for him – an option that was not yet on the market, to which he was given access ahead of all other potentially interested parties. Defendant 2 further concealed that stock options inevitably carry a risk of total loss. Likewise, he misled Mr. Rumen Hranov about the fact that the investment strategy he was pushing was geared toward total loss – with a view to maximizing the gains of Defendant 1.

His unshaken confidence in Defendant 2 would ultimately seal Mr. Rumen Hranov fate, and that of Ms. Hranova and Ms. Schulz alongside him, because the defendants shamelessly exploited his trust in the most blatant manner. During the period from November of 2006 until October of 2008, the defendants artfully fleeced Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz by recommending that they buy 80 of the stock options issued by Defendant 1 until their losses added up to approx. CHF 316 million.

IV.     For the options recommended by Defendant 2, Defendant 1 immorally charged Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz inflated service fees in amounts that exceeded standard rates by 600% on average. Defendant 1, which ordinarily marked up the fair market price of OC Oerlikon AG options by 2-3% to cover structuring, issue, marketing, distribution and administration for OC Oerlikon AG options, added a premium of 9-20% for the transactions that it recommended to Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz.

The weighted average of such premiums for all option transactions equaled 18%. Solely on account of excessive service fees, Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz incurred damages in the amount of CHF 109,742,440.00. The conspicuous surge in the amount of service fees amounted to 300-666%, or a weighted average of 594%, thus giving new meaning to the concept of usury. Defendant 2 misled Mr. Rumen Hranov about the fact that he was endorsing stock options at vastly inflated prices, that the investment strategy he was recommending did not serve the interests of Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz but instead those of Defendant 1 and, by extension, given his own economic interest with respect to his performance-based remuneration, of Defendant 2 himself, and that total loss had been the idea from the very start.

V.      Moreover, the defendants willfully and immorally inflicted damages on Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz by recommending an investment strategy intentionally geared toward the loss of the capital expended on the option transactions and its transfer to Defendant 1 by way of profit. Defendant 2 deliberately advised Mr. Rumen Hranov with a view to bringing about the lapse of the lion's share of the options. For purpose of illustration, a stock option expires worthless in the case of a call option if its strike price at the agreed time of exercise is greater than the price of the stock underlying such option, because a higher price would be payable for the stock upon exercising the option than would be the case if it were purchased on the exchange. With respect to the options they had purchased, Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz were without a chance as the options could only produce losses under the investment strategy of Defendant 2. Given the excessive amount of the option premiums, which were inflated by excessive service fees, moreover, the options could not have been sold on the secondary market or otherwise – or could have been divested only at a loss.

VI.     Defendant 1 did not educate Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz about the way stock options function or the risks inherent therein.

A central element of the investment advice given by Defendant 2 was the substitution of call options for new, longer-term call options at a lower strike price (so-called "rolling") ahead of the exercise date. Thanks to such "rolling," Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz were unable to recognize the catastrophic outcome of the investment strategy recommended by Defendant 2, or the extent of their losses, until after the options with the longest term had expired in October of 2008. On account of the significant complexity of stock options *per se*, but also due to the investment strategy recommended, the injured parties, who possessed no knowledge about the functioning and risks of stock options, could not see through the scheme pursued by the defendants. Only the expert opinion prepared in October of 2016 at the urging of the Plaintiff's attorney of record by Prof. Dr. Christoph Kaserer, who holds the professorship for financial management and capital markets at Munich's *Technische Universität*, revealed the methodical and systematic injuries visited upon Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz by the defendants.

But this expert opinion did not just shed light on the immoral gouging of service fees charged by Defendant 1, but also on the fact that the investment strategy of Defendant 2 had the effect, among others, of Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz on numerous trading days acquiring and/or selling a greater number of OC Oerlikon AG options than were traded on the exchange in total, and of the number of shares of stock underlying their options exceeding those available on the market. In addition, Prof. Dr. Christoph Kaserer argued that Defendant 1 would not even have been able to supply the requisite number of shares of stock in the event of the options' exercise since it did not dispose of an adequate number of such shares. For this reason alone, the Defendant was compelled to implement the recommended investment strategy with a view to ensuring that the options expired worthless, never to be exercised.

That Defendant 2 hatched just such a plan is evident in a conversation he had on 12 October 2007 with Mr. Ronny Pecik, in whom he confided his intention to advise Mr. Rumen Hranov to purchase a massive number of options at a lower strike price – and thus, at a greater purchase price – before forcing down the price of OC Oerlikon AG stock by deliberately selling off large positions of OC Oerlikon AG stock belonging to Defendant 1, all with the ultimate goal of causing the options recommended to Mr. Rumen Hranov to expire worthless. The defendants then proceeded to successfully implement this scheme.

## 1.      Introduction

### 1.1     The Plaintiff

The Plaintiff sues under a right assigned to her. Her husband, Mr. Rumen Hranov, along with Ms. Maria Hranova, Mr. Rumen Hranov's mother, and the heirs of Ms. Elissaveta Schulz, Mr. Rumen Hranov's sister, who passed away on 9 March 2015, assigned the claims in dispute to the Plaintiff.

1.1.1   Under the assignment agreement date 12 October 2016, Mr. Rumen Hranov assigned to the Plaintiff the claims to which he is entitled against Defendant 1 and Defendant 2. In addition, he assigned the claims of Ms. Maria Hranova and Ms. Elissaveta Schulz against Defendant 1, of which he was the holder.

**Evidence:**      Copy of assignment agreement dated 12 October 2016 between Plaintiff and Mr. Rumen Hranov – **Exhibit K 1**

By assignment agreements / cessions, each dated 15 September 2014, Ms. Hranova and Ms. Schulz had assigned to Mr. Rumen Hranov their respective rights and claims against Defendant 1 in connection with the stock-option transactions involving OC Oerlikon AG stock in the years 2006-2009 – namely, in their (securities) accounts with Bank Julius Bär and Thurgauer Kantonalbank. As a result, Mr. Rumen Hranov was the holder of these claims when he assigned them to the Plaintiff.

**Evidence:**       Copy of assignment agreement dated 15 September 2014 between Mr. Rumen Hranov and Ms. Maria Hranova – **Exhibit K 2**

Copy of assignment agreement dated 15 September 2014 between Mr. Rumen Hranov and Ms. Elissaveta Schulz – **Exhibit K 3**

1.1.2   By assignment agreement dated 29 July 2016, Ms. Maria Hranova assigned to the Plaintiff any and all claims for damages against Defendant 2 to which she is entitled in connection with stock option transactions with Defendant 1 into which she had entered on the advice and at the investment recommendation of Defendant 2.

**Evidence:**       Copy of assignment agreement dated 29 July 2016 between Ms. Maria Hranova and Plaintiff – **Exhibit K 4**

1.1.3   By assignment agreement dated 29 July 2016, the heirs of Ms. Elissaveta Schulz assigned to the Plaintiff any and all claims for damages against Defendant 2 to which she was entitled in connection with stock-option transactions with Defendant 1 into which she had entered on the advice and at the investment recommendation of Defendant 2.

**Evidence:**       Copy of assignment agreement dated 29 July 2016 between Mr. Martin Schulz and Ms. Rumiana Engel on one hand and Plaintiff on other – **Exhibit K 5**

Ms. Schulz passed away in Vienna on 9 March 2015.

**Evidence:**       Death certificate dated 12 March 2015 issued by registry and citizenship association of Mödling, Lower Austria, Austria – **Exhibit K 6**

Her two children, Ms. Rumiana Engel and Mr. Martin Schulz inherited her estate.

**Evidence:**       Transfer resolution dated 24 June 2015 by Döbling District Court, 1st
Division, Vienna, Austria – **Exhibit K 7**

## 1.2    Mr. Rumen Hranov

Mr. Rumen Hranov is a Swiss citizen and resides in Zollikon in the Canton of Zurich.
In his own name as well as in the names of Ms. Maria Hranova and Ms. Elissaveta
Schulz, he acquired options on stock of the Swiss enterprise OC Oerlikon AG issued
by Defendant 1 through his custodian banks in the course of a total of 80
transactions during the period from November of 2006 until October of 2008. Any and
all option trades were undertaken on the advice of Defendant 2, who was then in the
employ of Defendant 1.

**Evidence:**       Rumen Hranov, Goldhaldenstrasse 37, CH - 8702 Zollikon-Zurich,
Switzerland, **as witness**

Defendant 2 invariably told Mr. Rumen Hranov that he had a good investment
opportunity for him – an option that was not yet on the market.

**Evidence:**       See above

He then provided details for the option, such as strike price, exercise period, volume
and option premium, and advised Mr. Rumen Hranov to instruct his custodian bank
to call him in order to execute the transaction.

**Evidence:**       See above

All option transactions unfolded according to this pattern.

**Evidence:**       See above

As a result of these transactions, Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz incurred <u>losses in the total amount of CHF 316,011,961.00</u>.

**Evidence:**      Rumen Hranov, already identified, **as witness**

The losses chiefly owe to the following reasons:

- The defendants <u>did not educate</u> Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz, who were entirely inexperienced in option transactions, about the economic background, <u>the functioning and the risks of such options</u>. They concealed the fact that Defendant 1 was the issuer of the recommended stock options and that, as a result, both Defendant 1 and Defendant 2 had an enormous conflict of interest. For this reason, <u>Mr. Rumen Hranov was not aware that the defendants were making money off of him</u>. Likewise, <u>he was not educated about the risk of total loss associated with stock options</u>. What's more, Mr. Rumen Hranov was under the impression that he was buying the recommended options at market rates when in fact, he was paying <u>prices that exceeded the fair market rates by an average of 18%.</u>

   **Evidence:**      Rumen Hranov, already identified, **as witness**

   Had Mr. Rumen Hranov been properly educated, he would <u>not have entered into the stock options</u> in dispute.

- Defendant 1 charged Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz excessive service fees that equaled between 9% and 20% of the option premium. The standard service fees that issuers of simple (so-called "plain vanilla") stock options charge in connection with structuring, issue, marketing, distribution and administration during the option term, etc. equal 2-3% of the option premium.

   **Evidence:**      Obtaining an expert opinion

Mr. Rumen Hranov, who had no experience with stock-option transactions whatsoever and blindly placed his faith in Defendant 2, did not recognize this and could not have recognized it given the complexity of stock-option pricing.

**Evidence:**    Rumen Hranov, already identified, **as witness**

- Through its agent, Defendant 2, Defendant 1 recommended an investment strategy to Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz that was designed to leave them without a chance and set the options on a path to certain loss – and had precisely that effect. For the most part, Defendant 2 saw personally to the implementation of this investment strategy by communicating sell and buy orders by telephone directly to the custodian banks of Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz.

   **Evidence:**    Rumen Hranov, already identified, **as witness**

   Claudio Studer, Sonnenbergstr. 5, 5621 Zufikon, Switzerland, **as witness**

   Vivian Brunner, Burgstr. 32c, 8570 Weinfelden, Switzerland, **as witness**

Since the acquisition price paid for the warrants exceeded the fair market price by 18% due to the inflated service fees hidden in the option premiums, Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz could not have sold the warrants on the secondary market – or could have done so only at a loss.

   **Evidence:**    Obtaining an expert opinion

- As shown in detail under item 2.5.3 lit. c) (near the end), Defendant 2 deliberately caused the stock price to plunge by selling large positions of OC Oerlikon AG stock from the holdings of Defendant 1 in early 2008, so that the options recommended to Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz would expire worthless.

**1.3     Defendant 1**

Defendant 1 maintains a branch in Zurich, at Uraniastrasse 9, which does business as "Deutsche Bank Aktiengesellschaft, Frankfurt a.M., Zweigniederlassung Zürich" and is entered into the register of companies of the Canton of Zurich under Company ID CHE-105.690.694.

**Evidence:**     Copy of excerpt from register of companies of Canton of Zurich, Company ID CHE-105.690.694 – **Exhibit K 8**

It was through this branch that Defendant 1 transacted the stock-option transactions in dispute.

**Evidence:**     Rumen Hranov, already identified, **as witness**

**1.4     Defendant 2**

Before he joined Deutsche Bank, Defendant 2 had been in the employ of Zürcher Kantonalbank. There, he was among the leading derivatives traders and played a central role in the hostile takeover of Unaxis AG, a Swiss public company renamed OC Oerlikon AG in September of 2006, by the Austrian private equity firm VICTORY Industriebeteiligung AG. Defendant 2 advised VICTORY and its shareholders and helped them in the years 2004 and 2005 – primarily to achieve a 42% stake in Unaxis AG by means of stock-option transactions. On 28 June 2005, *Handelsblatt* reported that VICTORY's representatives had taken the reins of the enterprise following a months-long battle for control in extraordinary Unaxis AG shareholder meetings.

**Evidence:**      Copy of *Handelsblatt* article dated 28 June 2005 – **Exhibit K 9**

As a result, Defendant 2 had the benefit of extensive insider knowledge about the enterprise Unaxis / OC Oerlikon and its stock. Acting on behalf of Zürcher Kantonalbank, he traded stock and options in the first six months of 2005 at such volume that he was a market maker. He very likely was not just able to anticipate the stock's performance, he could influence it.

**Evidence:**      Obtaining an expert opinion

In December of 2005, Defendant 2, aware of his significant wealth, approached Mr. Rumen Hranov and suggested that he invest in options on Unaxis AG stock.

**Evidence:**      Rumen Hranov, already identified, **as witness**

Defendant 2 expected the very public battle for control between private equity firm VICTORY and the existing shareholders of Unaxis AG to fuel the stock's rise. He furnished Mr. Rumen Hranov with carefully calibrated investment recommendations that specified which options on OC Oerlikon AG stock Mr. Rumen Hranov was to acquire, at what strike price and with what term, etc. Mr. Rumen Hranov followed the recommendations of Defendant 2 and exclusively generated profits with the options recommended by Defendant 2 in the year 2005.

**Evidence:**      Rumen Hranov, already identified, **as witness**

This had the effect of Mr. Rumen Hranov increasingly placing his faith in Defendant 2, to the point of trusting him blindly.

**Evidence:**      Rumen Hranov, already identified, **as witness**

This should prove fatal for him, along with Ms. Hranova and Ms. Schulz, as Defendant 2 would exploit Mr. Rumen Hranov's trust in the most blatant manner by recommending that he purchase stock options issued by Defendant 1 in 80 instances during the period from November of 2006 until October of 2008 until the losses of Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz reached approx. CHF 316 million.

In mid-2006, Defendant 2 moved his team of derivatives traders from Zürcher Kantonalbank to the Zurich branch of Defendant 1. Until then, Defendant 1 had directed the Swiss derivatives trade from its Frankfurt and/or London offices, but now it set up a new derivatives division for Defendant 2 in Zurich and gave him the title "Head of Global Markets Equity, Switzerland, Deutsche Bank AG, Zurich Branch." Defendant 2 reported to the directors of the investment banking business of Defendant 1 at the time, Messrs. Anshu Jain and Nino Kjellmann. Defendant 2 was thus placed in charge of and given full responsibility for the newly created derivatives division of Defendant 1 in Switzerland. In external relations, he acted as its head and used the title "Head of Global Markets Equity, Switzerland."

Defendant 2 enticed Mr. Rumen Hranov away from Zürcher Kantonalbank and brought him to Defendant 1 as a client.

**Evidence:**     Rumen Hranov, already identified, **as witness**

Later, the advice provided by Defendant 2 resulted in the purchase of 80 options on OC Oerlikon AG stock by Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz, which caused them to lose CHF 316 million and Defendant 1 to profit in the same amount. In addition, Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz were forced to pay CHF 2,073,843.55 in brokerage fees and CHF 91,243.60 in exchange fees to their two custodian banks for the transactions.

**Evidence:**     Rumen Hranov, already identified, **as witness**

In the year 2008, Defendant 2 told Mr. Rumen Hranov that Defendant 1 had paid him approx. CHF 50 million in bonuses as consideration for the options bought by Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz at his investment recommendations.

**Evidence:**　　Rumen Hranov, already identified, **as witness**

## 2.　　Facts

### 2.1　　Stock option transactions with Defendant 1

At the behest of Defendant 2, and following only his advice on "blind faith, "Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz placed orders with their custodian banks, Bank Julius Bär and Thurgauer Kantonalbank, to purchase a massive number of options on OC Oerlikon AG stock (OERL, Valor: 81682, ISIN: CH0000816824) issued by Defendant 1 during the period from November of 2006 until October of 2008, such options being referred to as "warrants."

**Evidence:**　　Obtaining an expert opinion

A warrant or option certificate certifies the right

- to purchase (call option) or
- to sell (put option)
- a certain underlying asset (in this case: OC Oerlikon AG stock)
- at a pre-arranged strike price
- within a prescribed subscription period (so-called "American Option") or at the end of a subscription period (so-called "European Option")
- subject to a certain subscription ratio

**Evidence:**　　Obtaining an expert opinion

Defendant 1 had specially structured and issued these options for Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz, which they did not recognize and could not have recognized.

**Evidence:**     Rumen Hranov, already identified, **as witness**

Defendant 2 verbally informed Mr. Rumen Hranov, who acted as his mother's as well as his sister's agent at all times, of the terms of the options in question, such as strike price, term and option premium, inducing him to transmit such data to his custodian banks, which then contacted Defendant 1 and bought the options. After Defendant 1 had received the "order" for a given option from the custodian bank in this way, it issued the needed option and sold it to the custodian bank as what is known as a "OTC product." Consequently, Defendant 1 was "involved" on both sides of the deal: It provided the buyer, who placed his "blind faith" in it, with "advice" through Defendant 2. And at the same time – and this, the buyer was unable to discern – it served as the seller with opposing interests. Thanks to a clever trading strategy, it managed to obscure the accruing losses for nearly two years. It was by way of this OTC strategy only that Defendant 1 caused the losses in dispute.

**Evidence:**     Rumen Hranov, already identified, **as witness**

"OTC" is short for "Over the Counter." The OTC trade refers to financial transactions between market participants that are not executed via the exchange. OTC trading used to indicate trading by phone; now it is done by electronic means. One of the principal embodiments of OTC trading is the over-the-counter trade in financial derivatives without standardized specifications, such as OTC options.

**Evidence:**     Obtaining an expert opinion

### 2.1.1    Contractual relations and their "documentation"

It comes as no surprise that the actual contractual relationship manifests itself in written agreements only in part, as in the case of the transactions themselves, or not all, as is true for the advice given verbally in most instances and documented in emails only sporadically. Months into the relationship, Defendant 1 arranged for the execution of an "Agreement on Direct Orders" with Mr. Rumen Hranov, a contract referred to as a "trading authorization" between Bank Julius Bär and Mr. Rumen Hranov as well as a contract referred to as a "trading authorization" between Bank Julius Bär and Defendant 1.

### a)    Agreement on direct orders

By letter dated 19 October 2006, Defendant 1, as represented by Defendant 2 and a member of his staff, Mr. Daniel Baltensperger, sent Mr. Rumen Hranov a draft direct order agreement, informing him as follows:

> "We are pleased to inform you that Deutsche Bank AG will now execute **your trades** directly as well, via its Zurich office. To allow us to guarantee that these transactions are properly received, executed and processed, we respectfully ask that you sign the Direct Order Agreement enclosed with this letter and have the custodian bank do likewise before returning it to us using the attached return envelope.
>
> Naturally, you or your (custodian) bank are free to furnish us with your/their own "Direct Order Agreement / Trading Authority Agreement / Third Party Agreement" or even just an authorization form essentially addressing the most important items regarding transaction, confirmation modalities, means of transmission as well as contact addresses. […]"

**Evidence:**    Copy of letter dated 19 October 2006 from Defendant 1 – **Exhibit K 9a**

By referring to "**trades**," Defendant 1 created the impression in this letter already that it would act as Mr. Rumen Hranov's trader, rather than as issuer.

The cover page of this agreement on direct orders lists three parties – namely, Defendant 1 as broker, an unspecified party as bank and Mr. Rumen Hranov as external asset manager. The space provided for the name of the bank was left blank.

**Evidence:**      Copy of agreement on direct orders – **Exhibit K 9b**

In item 1, the agreement on direct orders states as follows:

> "1.      The Bank has entered into an agreement with the External Asset Manager pursuant to which the External Asset Manager is entitled to give direct orders to the Broker for the purchase and sale of securities [(to the exception of US-Equities and OTC-derivatives)] in the name and for the account of the Bank (hereinafter singular "Direct Order" or plural "Direct Orders"). The Direct Orders are executed "delivery upon payment."
>
> The Bank confirms to the Broker that these Direct Orders are covered by a power of attorney given to the External Asset Manager, and the External Asset Manager is aware of the risks involved with the Direct Orders. The Bank herewith acknowledges vis-à-vis the Broker the responsibilities emanating from Direct Orders given in accordance with the following provisions. The risk of erroneous transmission between the External Asset Manager and the Broker shall be carried by the External Asset Manager."

**Evidence:**      See above

Item 2 provides that the bank must accept all direct orders placed with Defendant 1 by the external asset manager up to a certain limit, although no specific limit is provided in the appropriate space.

**Evidence:**      See above

Item 8 states as follows:

> "8.   [ ...] The External Asset Manager and the Bank herewith acknowledge that all Direct Orders under this agreement are not executed on the basis of any advice or recommendation by the Broker, but on their own initiative and on the basis of their own assessment of market conditions. The External Asset Manager and the Bank hereby confirm that they are informed of the risks inherent in all Direct Orders and that they understand the risks inherent in such transactions.
>
> The External Asset Manager furthermore declares that prior to the conclusion of each transaction, he shall carefully assess whether the respective transaction is appropriate for his objectives, knowledge and experience, financial risk capacity and ability to monitor the transaction"

**Evidence:**   See above

Defendant 1 suggested that Mr. Rumen Hranov, a private individual who, as Defendant 2 was well aware, lacked any experience regarding the functioning and risks of stock options as well as proficiency in English legal terminology, buy and sell securities as external asset manager for a bank, in its name and for its account. In addition, Defendant 1 had Mr. Rumen Hranov confirm in item 8 that all transactions it would execute under such agreement were based not on the advice or recommendation of Defendant 1 but on his own initiative.

These provisions are blatantly at odds with how the option transactions in dispute were actually executed: Any and all option transactions were based on the defendants' recommendation, as will be shown in detail below. However, Defendant 1 did not broker third-party products as an agent but instead placed its own products – namely, the options referred to as warrants, which Defendant 1 itself had issued – in the securities accounts of Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz by way of the custodian banks.

All option transactions were initiated by the defendants and recommended to Mr. Rumen Hranov by Defendant 2.

**Evidence:**     Rumen Hranov, already identified, **as witness**

The contractual terms imposed by Defendant 1 were designed to obscure that Defendant 1 acted in its own economic interest as issuer and seller and recommended that Mr. Rumen Hranov invest in warrants without disclosing that Defendant 1 itself had issued them. However, it was unable to gloss over its role in its entirety.

Along with the draft agreement, Defendant 1 had transmitted to Mr. Rumen Hranov a form titled "Settlement Instructions," in which it referred to Mr. Rumen Hranov as "client."

**Evidence:**     Copy of settlement instructions – **Exhibit K 9c**

Even based on the drafts provided by Defendant 1, therefore, Mr. Rumen Hranov was not (just) the external asset manager for another bank but also a client to whom Defendant 1 wished to sell options it had issued.

**b)**      **Trading authorization between Bank Julius Bär and Defendant 1**

On 19 April 2007, Bank Julius Bär and Defendant 1 entered into the trading authorization for direct orders that "goes with" the trading authorization with Mr. Rumen Hranov represented under lit. b) above.

**Evidence:**     Copy of trading authorization for direct orders with Bank Julius Bär and Defendant 1 – **Exhibit K 9d**

**c)**      **Trading authorization for direct orders between Bank Julius Bär and Mr. Rumen Hranov**

Not until 30 April 2007 – i.e., more than five months from the time Mr. Rumen Hranov, his mother and his sister had started buying the stock options recommended by Defendant 2, Bank Julius Bär returned a signed copy of the trading authorization for direct orders to Defendant 1.

The agreement essentially read as follows:

**"1. Scope**

In accordance with the present Authorization, the Bank [i.e. Bank Julius Bär, note of undersigned] permits the Agent [i.e. Herr Hranov, note of undersigned] to directly place orders in the Bank's name with a specified external broker or counterparty of the Bank instead of placing these orders with the Bank. The Agent acts as the Bank's non-exclusive agent and attorney-in-fact with respect to these transactions.

**2. Allowed Transactions and Markets**

The Agent may only undertake direct transactions on a "Delivery versus Payment (DvP)" basis with respect to the following securities:

Listed stocks

⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

Warrants

⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

("Allowed Transactions")

[ ... ].

Allowed Transactions may only be executed through the following broker ("Broker") on the following markets / exchanges:

Name of Broker:
DEUTSCHE BANK AG, Zurich

⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

[…]

**3. Daily Limits**

This Authorization is restricted to a "Daily Limit" of <u>CHF</u>

30,000,000 or its equivalent in any other currency.

"Limit" means the total consideration for all securities purchased or sold (purchases and sales cumulated) at the price of the relevant exchange at the moment of purchase or sale, which are covered by this Authorization.

[…]

## 4. Confirmations/ Allocations

Immediately after placing an Allowed Transaction, the Agent is required to provide the Bank with the following information by e-mail to an address as specified from time to time by the Bank:

- Name of Security
- ISIN and/or Valor
- Buy / Sell
- Amount
- Trade date
- Settlement date
- Price and Currency
- Commission
- Net amount
- Broker (precise name, e.g. Goldman Sachs, London)
- the number(s), settlement currency(ies) of the account concerned and all other relevant allocation information

[…]

## 5. Commissions/Fees

The Agent ensures that the Broker discloses its commission/fee in the settlement note delivered to the Bank.
[…]

The Agent further agrees to disclose to the clients any fees or commissions received as remuneration under the present Authorization.

## 6. Rights and duties of the Agent

The Agent acts as the Bank's non-exclusive agent and attorney-in-fact (without the right of substitution) in relation to the respective Broker. Transactions instructed by the Agent are executed in the name and for the account of the Bank on the books of the Broker. With respect to Allowed Transactions the Agent is authorized to act for and on the Bank's behalf in the same manner and with the same force and effect as the Bank might or could do.

<u>The Agent ensures to execute the transactions as instructed by the client. promptly and in accordance with best execution principles. The Agent will inform the client about any potential conflict of interest in connection with the present Authorization. […]"</u>

**Evidence:**     Copy of trading authorization for direct orders between Bank Julius Bär and Mr. Rumen Hranov – **Exhibit K 9e**

This agreement, too, is inconsistent with the structure of the option transactions planned by the defendants and actually implemented with Mr. Rumen Hranov. Mr. Rumen Hranov never intended to enter into stock-option transactions with third parties as agent and for the account of Bank Julius Bär, nor would he have been professionally qualified to do so. The clauses in items 5 and 6 of the agreement assume the existence of a "client" – a Bank Julius Bär client, that is – to whom the stock or warrants are sold. Based on how the agreement is constructed, this client could not be Mr. Rumen Hranov, who supposedly served in the function of agent or representative for Bank Julius Bär. Indeed, no such third-party client of Bank Julius Bär existed. This construction served the purpose of obscuring the fact that Defendant 1 itself was the issuer of the options to be sold to Mr. Rumen Hranov, his mother and his sister. Since Defendant 1 was concerned about issues of regulatory law in the event that it entered into these option transactions with private individuals directly, it used the above-mentioned agreements to create the appearance of the custodian banks of Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz being in the middle – the better to conceal the fact that it traded with these individuals directly.

**d)**     **"Special characteristics" of documentation**

These agreements are "special" not only because they referred to "third parties" that, as all parties involved were well aware, did not exist. "Special" is further that "agreements" were signed months <u>after</u> "trades" had commenced, which is to say that any trading could not have been based thereon. And even the language chosen is "special": Even though all parties involved were German-speaking, all agreements were composed in the English language.

Mr. Rumen Hranov speaks English well enough to have a conversation. However, he is able [sic] to fully comprehend English contracts as his knowledge of English legal terminology is insufficient.

### 2.1.2   Transaction details

By contrast to the documented contractual relations, the transactions were executed as shown below.

Acting on the recommendation of Defendant 2, Mr. Rumen Hranov entered into the transactions set forth on the list enclosed as **Exhibit K 10** for himself and as agent for Ms. Maria Hranova and Ms. Elissaveta Schulz during the period from 21 November 2006 until 20 October 2008. A total of 80 transactions were executed, which break down into 49 sales and 18 purchase transactions. In addition, 13 warrants lapsed, which resulted in the derecognition of the warrant positions as worthless. Such derecognition occurs whenever the market price (stock price) of the asset underlying the option is lower than the option's strike price as of the exercise date. After all, exercising an option makes no economic sense if the stock would have to be acquired at a cost that is greater than the prevailing stock price.

**Evidence:**      Obtaining an expert opinion

As a result of these transactions, Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz suffered losses in the total amount of CHF 316,011,961.00.

Such loss is composed of the following individual items:

**OERDA[1]**          **Valor[2] 2758815**          **CHF 14,335,000.00**
A profit in the amount of CHF 14,335,000.00 was generated with the individual transactions set forth in **Exhibit K 11** for Warrant OERDA during the period from 13 December 2006 until 8 March 2007.

**OERDC**          **Valor 2865659**          **CHF −23,806,000.00**
A loss in the amount of CHF 23,806,000.00 was generated with the individual transactions set forth in **Exhibit K 12** for Warrant OERDC during the period from 16 January until 21 September 2007.

**OERDD**          **Valor 2796329**          **CHF −49,524,850.00**
A loss in the amount of CHF 49,524,850.00 was generated with the individual transactions set forth in **Exhibit K 13** for Warrant OERDD during the period from 21 November 2006 until 16 October 2007.

**OERDE**          **Valor 2796323**          **CHF 3,100,000.00**
A profit in the amount of CHF 3,100,000.00 was generated with the individual transactions set forth in **Exhibit K 14** for Warrant OERDE during the period from 27 February until 15 March 2007.

**OERDF**          **Valor 2865661**          **CHF −17,750,000.00**
A loss in the amount of CHF 17,750,000.00 was generated with the individual transactions set forth in **Exhibit K 15** for Warrant OERDF during the period from 16 January until 17 July 2007.

**OERDG**          **Valor 2865662**          **CHF −4,147,410.00**
A loss in the amount of CHF 4,147,410.00 was generated with the individual transactions set forth in **Exhibit K 16** for Warrant OERDG during the period from 31 May until 16 October 2007.

**OERDI**          **Valor 2758816**          **CHF 4,020,000.00**
A profit in the amount of CHF 4,020,000.00 was generated with the individual transactions set forth in **Exhibit K 17** for Warrant OERDI during the period from 2 March until 8 March 2007.

---

[1] Defendant 1 designated each warrant using five letters.
[2] Valor is the equivalent of the German *Wertpapierkennnummer* (Securities ID).

**OERDK**          **Valor 3066051**          **CHF –21,500,000.00**

A loss in the amount of CHF 21,500,000.00 was generated with the individual transactions set forth in **Exhibit K 18** for Warrant OERDK during the period from 17 July until 16 October 2007.

**OERDL**          **Valor 2938211**          **CHF 23,750,000.00**

A profit in the amount of CHF 23,750,000.00 was generated with the individual transactions set forth in **Exhibit K 19** for Warrant OERDL during the period from 14 February until 22 March 2007.

**OERDS**          **Valor 2796325**          **CHF 60,527,200.00**

A profit in the amount of CHF 60,527,200.00 was generated with the individual transactions set forth in **Exhibit K 20** for Warrant OERDS during the period from 21 November 2006 until 21 September 2007.

**OERDT**          **Valor 2796327**          **CHF –26,499,901.00**

A loss in the amount of CHF 26,499,901.00 was generated with the individual transactions set forth in **Exhibit K 21** for Warrant OERDT during the period from 6 December 2006 until 16 October 2007.

**OERDY**          **Valor 3330757**          **CHF –2,530,000.00**

A loss in the amount of CHF 2,530,000.00 was generated with the individual transactions set forth in **Exhibit K 22** for Warrant OERDY during the period from 29 February until 22 September 2008.

**OERDZ**          **Valor 2983946**          **CHF –6,508,200.00**

A loss in the amount of CHF 6,508,200.00 was generated with the individual transactions set forth in **Exhibit K 23** for Warrant OERDZ during the period from 8 March until 20 October 2008.

**OERHA**          **Valor 3330758**          **CHF –4,560,000.00**
A loss in the amount of CHF 4,560,000.00 was generated with the individual
transactions set forth in **Exhibit K 24** for Warrant OERHA during the period from 25
February until 22 September 2008.

**OERIA**          **Valor 3002144**          **CHF –3,798,800.00**
A loss in the amount of CHF 3,798,800.00 was generated with the individual
transactions set forth in **Exhibit K 25** for Warrant OERIA during the period from 15
March until 15 June 2007.

**OERIB 2007**          **Valor 3016890**          **CHF –92,000,000.00**
A loss in the amount of CHF 92,000,000.00 was generated with the individual
transactions set forth in **Exhibit K 26** for Warrant OERIB 2007 during the period from
22 March until 21 September 2007.

**OERIB 2008**          **Valor 3564689**          **CHF –14,100.000.00**
A loss in the amount of CHF 14,100.000.00 was generated with the individual
transactions set forth in **Exhibit K 27** for Warrant OERIB 2008 during the period from
16 November 2007 until 22 September 2009.

**OERIQ**          **Valor 3481919**          **CHF –42,393,000.00**
A loss in the amount of CHF 42,393,000.00 was generated with the individual
transactions set forth in **Exhibit K 28** for Warrant OERIQ during the period from 16
October 2007 until 15 February 2008.

**OERIR**          **Valor 3481920**          **CHF –39,471,000.00**
A loss in the amount of CHF 39,471,000.00 was generated with the individual
transactions set forth in **Exhibit K 29** for Warrant OERIR during the period from 16
October 2007 until 22 April 2008.

**OERIS**          **Valor 3481921**          **CHF –28,867,500.00**
A loss in the amount of CHF 28,867,500.00 was generated with the individual
transactions set forth in **Exhibit K 30** for Warrant OERIS during the period from 16
October 2007 until 18 August 2008.

**OERIZ**          **Valor 3296567**          **CHF −31,850,000.00**
A loss in the amount of CHF 31,850,000.00 was generated with the individual transactions set forth in **Exhibit K 31** for Warrant OERIZ during the period from 30 July 2007 until 20 June 2008.

**OERLU**          **Valor 3302116**          **CHF −23,000,000.00**
A loss in the amount of CHF 23,000,000.00 was generated with the individual transactions set forth in **Exhibit K 32** for Warrant OERLU during the period from 3 August 2007 until 20 June 2008.

**Spread Wts. 525/575** **Valor 2826896**          **CHF 11,437,000.00**
A profit in the amount of CHF 11,437,000.00 was generated with the individual transactions set forth in **Exhibit K 33** for Warrant Spread Wts. 525/575 during the period from 6 December 2006 until 15 March 2007.

**Spread Wts. 625/675** **Valor 2875956**          **CHF −875,000.00**
A loss in the amount of CHF 875,000.00 was generated with the individual transactions set forth in **Exhibit K 34** for Warrant Spread Wts. 625/675 during the period from 12 January until 23 May 2007.

**Eurex Call March 560**     **Valor 9280273**          **CHF −12,730,000.00**
A loss in the amount of CHF 12,730,000.00 was generated with the individual transactions set forth in **Exhibit K 35** for Warrant Eurex Call March 560 during the period from 9 November 2007 until 4 January 2008.

**Eurex Put March 560**     **Valor 3481921**          **CHF −28,867,500.00**
A loss in the amount of CHF 28,867,500.00 was generated with the individual transactions set forth in **Exhibit K 36** for Warrant Eurex Put March 560 during the period from 9 November 2007 until 22 January 2008.

Mr. Rumen Hranov entered into each of the individual transactions under the individual warrants set forth in Exhibits K 11 through K 36 at the recommendation of Defendant 2.

**Evidence:**      Rumen Hranov, already identified, **as witness**

### 2.1.3   Brokerage and exchange fees

In connection with the transactions in dispute, Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz were billed brokerage fees in the total amount of CHF 2,073,843.55, which they paid to Bank Julius Bär (CHF 1,093,816.10) and Thurgauer Kantonalbank (CHF 980,027.45). In addition, Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz paid exchange fees charged by SWX, EBK (*Eidgenössische Bankenkommission*) and Eurex in the total amount of CHF 91,243.60.

**Evidence:**      See above

The brokerage and exchange fees paid by Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz for the transactions in dispute are detailed in the two schedules enclosed as **Exhibit K 37**, to which we are making reference. The abbreviations found in the column titled "Party" have the following meaning:

DBK = Deutsche Bank
JB =    Bank Julius Bär
TKB =  Thurgauer Kantonalbank

### 2.1.3   Securities prospectuses

Defendant 1 issued all of the warrants acquired by Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz on the basis of securities prospectuses of corresponding contents, which differ merely with respect to ISIN number, strike price, exercise period and issue date.

The securities prospectuses are composed in the English language and designated "Offering Circular."

By way of example, we submit the offering circulars for the warrants with the ISIN numbers

CH00286565902865659

CH00286566162865661

CH00286566242865662

CH00286566322865663

as **Exhibit K 38**.

Page I-15 of the Offering Circular contains the following clause governing choice of law and legal venue:

> **"5. Governing Law and Place of Jurisdiction**
> The Securities are governed by and shall be construed in accordance with German law save with respect to the constituting of the Securities, as described in Product Condition 2 which shall be governed by and construed in accordance with the laws of Switzerland. The place of jurisdiction for all proceedings arising from matters provided for in these Conditions of the Securities shall, to the extent legally permitted, be Frankfurt am Main."

**Evidence:**      Offering circular – **Exhibit K [●]**

The German translation reads as follows:

> „**5.  Anwendbares Recht und Gerichtsstand**
> Die Wertpapiere unterliegen deutschem Recht und sind nach deutschem Recht auszulegen mit Ausnahme der Errichtung der Wertpapiere, wie in Product Condition 2 beschrieben, die wiederum schweizerischem Recht unterliegt und nach schweizerischem Recht auszulegen ist. Gerichtsstand für alle Verfahren im Hinblick auf Angelegenheiten, die in diesen Wertpapierbedingungen geregelt sind, ist, soweit rechtlich möglich, Frankfurt am Main."

**Evidence:**      Obtaining an expert opinion

At no time did the defendants furnish Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz with a securities prospectus, be it before or after a transaction.

**Evidence:**        Rumen Hranov, already identified, **as witness**

### 2.1.4   Causes for losses incurred

The losses suffered by Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz essentially owe to two causes:

On the one hand, Defendant 1 drastically marked up the prices of the options it had issued, inflating its consideration far beyond the fair market price, to the effect that option prices exceeded the fair market equivalent by between 9% and 20.20%, or 17.83% on average (see item 2.2 below), and the service fees of Defendant 1 were inflated by 594% (weighted average).

On the other, Defendant 1, in blatant disregard of its clients' interests, had Defendant 2 dispense investment advice to Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz that was methodically geared toward the loss of the capital put into the option transactions as well as its transfer to Defendant 1 as profit 1 (see item 2.3 below). Defendant 2 deliberately kept Mr. Rumen Hranov in the dark about the fact that Defendant 1 profited from the stock options as their issuer since it collected the purchase price or option premium for the options. Defendant 2 likewise concealed that he himself had an economic interest in the transactions due to his bonus agreement with Defendant 1.

**Evidence:**        See above

**2.2      Loss resulting from overpricing**

**2.2.1   Setting fair price for options**

**a)       Valuation method**

In order to determine whether Defendant 1 charged inflated service fees for issuing the warrants structured by it, one must first determine the fair price of the options. Adjusting the price paid by Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz by the fair market price yields the portion of the price that makes up the service fee of Defendant 1. The warrants in dispute are classic so-called "plain vanilla options." Plain vanilla options refer to put and call options with a disbursement profile that is proportionate to the difference between the price and the strike price of the underlying asset (underlying). On an exercise date agreed in advance or any other day during the option's term, the option holder may exercise the option at a fixed price set in advance (strike price).

**Evidence:**     Obtaining an expert opinion

For example, if option holders buy a put or call option with a three-month term and a strike price of CHF 500.00, and the asset underlying the option commands a price of CHF 550.00 on the exercise date (i.e., the last day of the three-month period), they will exercise the option and collect CHF 50.00 in profit per share. If the price as of the exercise date is below CHF 500.00 (say, CHF 480.00), the option holders will not exercise the option since they would otherwise have to pay CHF 550.00 for stock that they could purchase for CHF 480.00 on the exchange. In this scenario, the option lapses and is derecognized as worthless.

**Evidence:**     See above

Plain vanilla options on OC Oerlikon AG stock were traded on the EUREX during the period in question. EUREX – a product of the merger of Deutsche Terminbörse and Soffex (Swiss Options and Financial Futures Exchange), which is part of SWX Swiss Exchange – stands for European Exchange and is one of the world's largest futures exchanges for financial derivatives (futures and options).

A fair price for the options is that which would have developed at the EUREX for an identical option at the same time. As it common and appropriate, such warrants are valued on the basis of the Black-Scholes model.

**Evidence:**     Obtaining an expert opinion

Using this model, the value of the so-called European Call Option – i.e., one that gives the buyer the right to purchase the asset underlying the option (underlying) when due at Price K agreed today (by contrast to the American Call Option, which may be exercised on any day during the term) – is calculated as follows:

$$(1)\ C(K, t_n) = S_0 e^{-rt} N(d_1) - K e^{-rt} N(d_2)$$

And this applies:

$$(2)\ d_1 = \frac{ln\left(\frac{S_0}{K}\right) + \left(r + \frac{\sigma^2}{2}\right)t}{\sigma\sqrt{t}}\ und\ d_2 = d_1 - \sigma\sqrt{t}$$

**Evidence:**     See above

On the basis of put-call parity, the value of the European put option is rendered as follows:

$$(3)\ P(K, t) = C(K, t) - S_0 + K e^{-rt}$$

**Evidence:**    See above

Here, $S_0$ refers to the price of the underlying (i.e., the underlying stock; here:
OC Oerlikon AG) as of the valuation date. K is the strike price and r refers to
the steady, term-congruent interest. $\sigma$ indicates the annual volatility of the
underlying and t the term of the option in years. N(x) refers to the standard
normal distribution function. One should keep in mind that this model does not
yet reflect payments of dividends. The Black-Scholes formula may be
adjusted accordingly. However, for purposes hereof, there is no need as OC
Oerlikon AG did not pay any dividends during the period at issue.

**Evidence:**    See above

For this reason, it should not be assumed that expectations as to the
commencement of dividend payments in the near future had any impact on
the valuation of the options in the years 2006 - 2008.

**Evidence:**    See above

The Black-Scholes model is the widely-used standard. Specifically, traders on
option markets do not provide bit or ask quotes, as is common on stock
markets; instead, they provide bit or ask volatilities. In simple terms, this
means that a trader is willing to buy an option at the price obtained when
determining the option value at a lower bit volatility according to equations (1)
or (3) represented above. Conversely, such trader is willing to sell at the
higher ask volatility. The mean between bit and ask volatility is referred to as
mid-volatility.

**Evidence:**    See above

All of these volatilities are known as implicit volatilities to distinguish them
from the historical volatility – i.e., the volatility gauged on the basis of past
performance.

For a valuation to closely track the market, therefore, one must use these implicit volatilities since they will deviate from the historical ones for reasons of the bit-ask range alone. What's more, such implicit volatility maps expectations regarding the stock's future price fluctuations, whereas the historical volatility measures past price fluctuations.

**Evidence:**     See above

To estimate the implicit volatility of OC Oerlikon AG stock, one may use EUREX tick data provided by Deutsche Börse. In an ideal scenario, an OC Oerlikon AG option of identical type, strike price and term was traded on the EUREX on the very day Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz executed a transaction. In such a case, the implicit volatility may be extracted from the EUREX option's market price so determined using the widely-used Black-Scholes model described above. And such parameter is then used to determine the fair price of the warrants issued by Defendant 1 with the help of the Black-Scholes model. These calculations further rely on the use of the interest structure. For this purpose, the LIBOR (London Interbank Offered Rate) interest rates corresponding with the appropriate warrant or option terms are established for each day on which Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz traded in warrants. Here, one turns to the LIBOR-based swap curve in Swiss francs, which indicates at what swap rates banks would be willing to lend one another money. To ensure term equivalency, the values of the swap curve are interpolated in line with the terms of the warrants.

**Evidence:**     See above

The problem that identical options often were not traded on the EUREX on the same day may be solved with the help of the following algorithm, which identifies comparable transactions on the EUREX, from which the implicit volatility may then be derived: First, one looks for options of identical type, term and moneyness (i.e., the proportion of stock price $S_0$ to base price $K_1$) being traded on the same day. If there were some, then their implicit volatility is determined and the fair price of the warrants is established on the basis thereon as described above. If there are no such options, consideration is given to other options of the same type that were traded on the same day. For this purpose, one would look at options with shorter and longer terms as well as higher and lower moneyness, focusing on those closest to the term and moneyness of the warrants to be valued. The implicit volatilities of these options are then used to determine, by means of linear interpolation, the implicit volatility of an option with the same term and moneyness as the warrant to be valued. And such volatility is then used to establish the fair price of the warrant.

**Evidence:**   See above

In the event that this second path is likewise unavailable, consideration is given to options of the same type that were traded on the same day but had a shorter term or lower / higher moneyness. For this purpose, too, options are to be chosen that match the warrant to be valued as closely as possible as regards term and moneyness. By means of linear interpolation, the implicit volatility of an option with the same term and moneyness as the warrant issued by Defendant 1 is determined. And the result is then used to calculate the fair price of the warrant.

**Evidence:**   See above

If the third path is not passable, either, one skips back to Step 1, but now consideration is also given to options traded up to three trading days before or after the transaction date.

In the event that doing so does not produce any suitable pricing data, Steps 2 and 3 are repeated – once more extending the range to options traded three trading days before or after the transaction date. If another trading day is to be considered instead, all further calculations are to be based on the appropriate yield curve for such day. The stock price used for purposes of the Black-Scholes model is always the final price of OC Oerlikon AG stock on the transaction date.

**Evidence:**     See above

**b)**     **Comparison of fair price with that invoiced by Defendant 1**

When applying the valuation method set forth in lit. a) to the transactions listed in **Exhibit K 10**, the figures shown in **Exhibit K 39** are obtained.

**Evidence:**     See above

Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz incurred losses in the total amount of CHF 107,264,931.00 solely on account of the overpricing of Defendant 1. The table found in **Exhibit K 39** provides values for all transactions from the table in **Exhibit K 10**; for the sake of simplicity, transactions with a volume of less than CHF 10,000.00 were excluded from valuation. There were only four such transactions.

As evident in the table in **Exhibit K 39**, the prices actually paid or received by Mr. Rumen Hranov, along with Ms. Maria Hranova and Ms. Elissaveta Schulz, deviate from the fair market equivalent to his detriment in 42 of the 64 transactions examined: In purchase transactions, he paid too much, and in sales transactions, he received too little.

The second-to-last column of the table in **Exhibit K 39** ("Loss") shows the loss incurred for each transaction as a result.

**Evidence:**     See above

In 21 instances, the actual price deviates from the fair price to the benefit of Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz. In these cases, a profit is obtained, which is marked in the second-to-last column by a minus sign. The balance of the profits and losses resulting from the divergence between actual and fair prices for all transactions is indicated in the last line of **Exhibit K 39**: A loss in the amount of CHF 107,264,931.00.

**Evidence:**     Obtaining an expert opinion

The results shown in **Exhibit K 39** indicate that the valuation error of Defendant 1 is systematic in nature.

**Evidence:**     See above

For the purchase transactions, the average mark-up for the services of Defendant 1 versus the fair price equals 12.38%. However, the higher the transaction volume, the higher such mark-up: For purchase transactions with a value greater than CHF 10,000,000.00, the mark-up is at 16.64%, and for those exceeding CHF 20,000,000.00 in value, the mark-up equals 17.30%.

**Evidence:**     See above

Accordingly, the average mark-up weighted according to transaction volume is approx. 17.65%.

**Evidence:**     See above

This suggests that the valuation of warrants was no accident but part of a deliberate overpricing scheme by Defendant 1.

**Evidence:**     See above

An accidental pattern is further negated by the fact that the warrants were overvalued for the benefit of Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz in eight of 16 sales transactions, whereas warrants were overvalued to their detriment in 34 of 47 purchase transactions. Here, it should be noted that, at the recommendation of Defendant 2, all warrant sales were immediately followed by warrant purchases on the part of Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz. To such extent, the asymmetrical valuation error separating purchases from sales suggests a strategic distortion of warrant prices by Defendant 1.

**Evidence:**     See above

## 2.2.2   Service fees typically collected by issuers of warrants

We have pleaded in 2.2.1 lit. b) above that Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz paid a hidden mark-up of approx. 17.30% in purchase transactions with a volume greater than CHF 20,000,000.00. The average mark-up weighted according to transaction volume equaled approx. 18%. If Defendant 1 had set prices for its warrants to correspond with those of otherwise identical options on the EUREX, Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz would not have suffered the losses caused by these premiums.

**Evidence:**     See above

The service fees that Defendant 1 added to the fair market price of the warrants did not reflect common market practice.

**Evidence:**      See above

Determining a "typical" mark-up for warrants or structured products is relatively difficult because the market, and this goes especially for the European one, is very heterogeneous and highly splintered.

**Evidence:**      Obtaining an expert opinion

However, there is a number of academic studies that examined the issue of the valuation of structured products in Europe and/or with a focus on Switzerland and Germany. There are seven such scientific analyses, which we represent in the table enclosed as **Exhibit K 40**, broken down by author, market examined, data volume examined, reference instruments / principal data sources and mark-up determined. The studies included with the table in **Exhibit K 40** refer to structured products that may be replicated using simple option strategies. For instance, Barth et al. (2001) look at 275 plain vanilla products in their study, which resemble the OC Oerlikon AG warrants and whose theoretical prices they derive from options traded on the EUREX in line with the approach outlined above. The result is a mark-up of approx. 2% versus standard EUREX options.

**Evidence:**      Obtaining an expert opinion

The majority of studies arrives at the conclusion that the mark-up for warrants in cases of classic options traded on an exchange is found within a 2 - 6% range.

**Evidence:**      See above

According to Stoimenov/Wilkens (2005), moreover, this overpricing effect is driven by the nature of the underlying asset or the complexity of structured products. Complicated products are comparatively expensive because they are significantly more difficult to hedge for issuers.

**Evidence:**     See above

Since the warrants in dispute are classic plain vanilla options, the customary mark-up versus EUREX options should be near the lower end of the above-referenced range – i.e., approx. between 2% and 3%.

**Evidence:**     See above

Finally, Wilkens et al (2003) even analyze these valuations for individual issuers and demonstrate that the warrants of Defendant 1 are subject to overvaluation at 3% on average.

This means that the overvaluation of the warrants purchased by Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz as determined in lit. b) above at approx. 18% exceeded the degree of overvaluation that may be observed on the market, 2 - 3% on average, by a factor of 6 - 9.

**Evidence:**     See above

In percent, the standard service fee was exceeded by 600%.

**Evidence:**     See above

## 2.3   Investment strategy geared for total loss

The investment strategy recommended by Defendant 2 was patently wrong for Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz. What's more, it was based on the plan of Defendant 1 and Defendant 2 to induce Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz to purchase stock options devoid of prospects while steering their portfolios composed of OC Oerlikon AG warrants with a view to rendering most of the options worthless (due to the strike price being higher than the price of OC Oerlikon AG stock on the exercise date).

By engaging in this investment strategy, the defendants succeeded in causing the capital wagered to be lost to Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz and gained, in its entirety, in the form of profit by Defendant 1.

And in recognition of the "success" of the underlying transactions, Defendant 2, by his own admission, collected bonuses worth approx. 50 million from Defendant 1.

**Evidence:**      Rumen Hranov, already identified, **as witness**

The fact that Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz were singularly fleeced by Defendant 2, which exploited Mr. Rumen Hranov's faith in Defendant 2 for this purpose, was well known within the organization of Defendant 1 and especially among the superiors of Defendant 2. One of them, Mr. Maroan Maizar, who then served as general manager and head of the Capital Markets & Treasury Solutions (CMTS) division in Switzerland of Deutsche Bank AG, Frankfurt am Main, Zurich branch, on 26 June 2015, while having lunch at Zurich's Restaurant Metropol with Mr. Claude Schmidt, a member of the Goldman Sachs management team in Zurich, made the following comment with respect to the option transactions into which the defendants entered with Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz:

> "Simon Biner broke all of the rules. He stole from the client. We were incredibly lucky that the financial oversight authorities did not examine the Oerlikon / Hranov case."

**Evidence:**      Claude Schmidt, to be summoned via Goldman Sachs Zürich, Hauptstrasse 71, 8823 Wollerau, Switzerland, **as witness**

Maroan Maizar, Morgental 24, Zumikon, Switzerland, **as witness**

On the occasion of a dinner at the residence of Mr. Daniel Sandmeier, Mr. Claude Schmidt asked Mr. Chris Stainbrook, a former colleague of Defendant 2 at Defendant 1, about the Hranov case. Not knowing that Mr. Claude Schmidt and Mr. Rumen Hranov were acquainted, Mr. Chris Stainbrook answered as follows:

"It was heist. It was bank robbery. It was like a mafia ring."

**Evidence:**       Claude Schmidt, already identified, **as witness**

Translated into German, that means:

„Es war ein Raubüberfall. Es war Bankraub durch die Bank. Es war wie ein Mafia Ring."

**Evidence:**       Obtaining an expert opinion

It is evident for the following reasons that the recommended investment strategy was wrong and diametrically opposed to the interests of Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz:

- The investment recommendations of Defendant 2 had the effect of exposing the investments of Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz to an enormous risk of loss that the potential reward was unable to justify.

- Due to the fair value loss of the warrants, the potential reward was severely constrained.

- For the most part, the potential reward could have been secured even with a significantly less risky portfolio.

- With respect to the recommended options, which had been issued exclusively by Defendant 1, a significant conflict of interest existed between the investment goals of Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz on the one hand and the income targets of Defendant 1 and Defendant 2 on the other because Defendant 1 profited from the sale of the options. Indeed, by virtue of the exorbitant mark-up on the fair market price, it profited disproportionately.

### 2.3.1   Risks of loss associated with recommended investment strategy

#### a)   Risk of loss associated with stock option as compared to leveraged stock purchase

The risks of loss associated with the investment recommendations of Defendant 2 become apparent as soon as one compares the risk of loss associated with a stock option with that of an equity-financed investment in stocks.

From an economic viewpoint, purchasing a call option on a certain stock equates to a debt-financed purchase of the same stock on the spot market. To illustrate the payment profile of a debt-financed stock purchase, a brief example is provided, first, in which the stock is purchased today (t = 0) at the current price $S_0$ and held until a point in time t. For the sake of simplicity, it is assumed that no dividends are paid in the interim. It is further assumed that the stock price today is $S_0 = 100$ and one period later (t = 1) has moved to either $S_1 = 120$ or $S_1 = 80$. The investor has equity equaling 20, to the effect that 80 must be debt-financed. To further simplify this example, it is assumed that the interest accruing on such debt is r = 0%. If the stock price climbs from 100 to 120, the investor generates a profit of 20 (120 − 20 − 80 = 20). If the price drops to 80, the investor incurs a loss of 20 (80 − 20 − 80 = −20).

However, the investor could bring about the same profit / loss profile by acquiring call options. Again, an example is provided for purposes of illustration: Assuming there is a call option with a strike price 100 – i.e., such option conveys to the investor the right to buy stock at a price of 100 in t = 1. It is further to be assumed that the price for such call option is 10, to the effect that the investor's equity of 20 is sufficient for the purchase of two of these options. In the event that the stock price climbs to 120 in t = 1, the investor comes into a profit of 2 × (120 – 100) – 20 = 20. However, if the price drops to 80, the investor will not exercise the call option since it makes no economic sense to buy the stock as part of the call option for 100 when it costs only 80 on the stock market. This is how the investor loses the entire capital wagered and thus books a loss of 20.

These two examples demonstrate that the payment profile of a debt-financed stock purchase is identical to that of an appropriately structured call option. Accordingly, buying a call option is the equivalent of a debt-financed purchase of the stock underlying the option. This makes plain that the risks accompanying the purchase of an option by far exceed those one bears in connection with an equity-financed stock investment. The distinguishing mark of option purchases is generally known as leverage.

**Evidence for foregoing as a whole:**          Obtaining an expert opinion

Such leverage may be illustrated using the following brief example:

If an investor was to invest into a stock priced at 100, equity of 20 would be sufficient for the purchase of 1/5 of a share of such stock. In t = 1, such fifth would then be valued at either 120 ÷ 5 = 24 (price = 120) or 80 ÷ 5 = 16 (price = 80).

In other words, the investor would generate a return of either $24 \div 20 - 1 = 20\%$ or $16 \div 20 - 1 = -20\%$.

**Evidence:**    See above

With a debt-financed stock purchase, by contrast, the investor would generate a profit of 20 or a loss of −20 which, in reference to the investor's equity, corresponds with a return of either +100% or −100%. In other words, the investor may either double his/her equity or lose it in its entirety. The leverage in this case equals $1 + 80 \div 20 = 5$ since four euros of borrowed capital are used for each euro in equity. This is why the return in this case may equal five times the return obtained with the equity-financed stock purchase.

**Evidence:**    See above

The same is true in the event that the investor acquires both stock options. After all, the stock option likewise offers 5x leverage because (1) the investor fully participates in any movement of the stock price even though he/she wagers only $1 \div 10$ $(100 \div 10)$ of the amount needed for buying the stock, and (2) a movement of the stock price by +/− 20 results in a change of the option value of +/−10. Consequently, the option's leverage equals $(100 \div 10) \times (10 \div 20) = 5$.

These examples illustrate that the leverage multiplies the risk of an investment in options versus that associated with an investment in stocks. And while such elevated risk is balanced by elevated rewards, this does nothing to change the fact that the risk of total loss is far greater for an option-based investment strategy than it is for stock investments.

**Evidence:**    Obtaining an expert opinion

**b)**     **Effect of leverage on risk of loss**

The warrants recommended by the defendants presented enormous risks. When calculating the leverage for all 49 purchase transactions using the following equation:

$$(5)\ \Omega = \frac{S_0}{C} N(d_1)$$

and using the implicit volatility and the fair price of the option, the values set forth in the first column of the table enclosed as **Exhibit K 41** are obtained.

**Evidence:**     Obtaining an expert opinion

Accordingly, the medium leverage comes in at just below 4 which, according to the explanations under lit. a) above, would correspond to a debt-financed stock purchase in which credit accounts for 3/4 of the capital wagered. In view of the risks associated with a stock purchase, this represents an enormous share of borrowed capital, which a fully informed investor would not accept – or would accept only for a small portion of his/her full wealth.

**Evidence:**     See above

As **Exhibit K 42** further indicates, the leverage was below 2 for none of the transactions, even topping 7 at the top. A 7x leverage corresponds with an 86% share of borrowed capital.

**Evidence:**     See above

Leverage increases the probability of loss. The exact magnitude of the risk of loss – i.e., the probability of a loss being incurred and the amount in which a loss should be expected – depends on the individual elements of the investment strategy.

Critical parameters include the options' characteristics, such as the "underlying" (i.e., the stock on which the option is based), the term and what is known as "moneyness." Moneyness refers to the ratio between the current stock price and the strike price – or $S_0 \div K$. The greater the moneyness, the lower the risk of loss associated with a call option since the stock price must now fall deeper for the option holder to incur a loss.

**Evidence:**     See above

In the case of the 46 warrants purchased by Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz, which took the form of call options, moneyness hovered near 1 but spanned a significant range, between 0.64 and 1.26.

**Evidence:**     See above

Mr. Rumen Hranov had Prof. Dr. Christoph Kaserer, who holds the professorship for financial management and capital markets at Munich's *Technische Universität*, assess and calculate the loss of risk inherent in the investment strategy recommended by Defendant 2. In his expert opinion dated 5 October 2016, Prof. Dr. Christoph Kaserer arrives at the conclusion that the investment strategy was extremely risk-laden. Specifically, he argues as follows on page 32 of his opinion:

> *"In fact, the probability of total loss averaged between 50% and 55% for all transactions, depending on whether one looked at the historical or the implicit volatility and the mean or the median value. At the top, the probability of total loss even reached 79%. Naturally, the probability of any loss being incurred must be substantially higher. Indeed, Table 8 shows that it equaled between 71% and 74%, and reached as high as 87% at the top.*

| | Leverage | Total loss probability (hist. volatility) | Total loss probability (impl. volatility) | Total loss probability (hist. volatility) | Total loss probability (impl. volatility) | ETL (%) of funds wagered (hist. volatility) |
|---|---|---|---|---|---|---|
| Mean | 3.91 | 51% | 55% | 74% | 71% | 83% |
| Median | 3.86 | 50% | 55% | 74% | 71% | 84% |
| Maximum | 7.17 | 79% | 76% | 87% | 83% | 96% |
| Minimum | 2.05 | 8% | 18% | 50% | 51% | 55% |
| Total | | | | | | CHF 599,717,478 |

Table 8: Various risk indicators of the 46 purchase transactions involving warrants in the form of call options.

*And finally, one may determine the contingent expected tail loss (ETL), which is the expected loss in the event that any loss is incurred. Since the transactions differed in volume, I am expressing ETL in percent of funds wagered. As the last column of Table 8 shows, such expected loss averaged 83-84% and reached as high as 96% at the top. Adding up expected losses across all 46 purchase transactions examined, a total of almost CHF 600 million is obtained.*

*It may be noted in summation that the 46 purchase transactions involving warrants on Oerlikon stock examined here presented a loss probability of 71-74%, and that such loss adds up to nearly CHF 600 million as per expectations. It would seem unlikely that even a wealthy investor like Mr. Rumen Hranov would have been willing to bear such a risk had he been informed about its magnitude. This is especially true since most of the potential rewards associated with this risk could have been secured with a less risky strategy.*

**Evidence:**    Copy of expert opinion dated 5 October 2016 by Prof. Dr. Christoph Kaserer – **Exhibit K 43**

Prof. Dr. Christoph Kaserer's above-quoted observations are correct. The calculations he undertook are accurate and faithfully represent the risk structure of the investment strategy recommended.

**Evidence:**    Obtaining an expert opinion

### 2.3.2   Investment strategy aimed for total loss

The investment recommendations of Defendant 1 and Defendant 2 were not based on a plausible and comprehensible investment strategy. Across the entire period in question, enormous leverage was used in a bet that the price of OC Oerlikon AG stock would go up. Not until a put option was purchased on 3 October 2008 was any bet placed on a downward movement of the stock.

The strategy recommended to Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz would make sense only if OC Oerlikon AG stock in particular, or the stock market in general, was broadly expected to trend up.

**Evidence:**   Obtaining an expert opinion

Defendant 2 never explained the reasons for the investment strategy he was recommending to Mr. Rumen Hranov. Instead, he defended his strategy merely by saying that he personally expected the price of OC Oerlikon AG stock to rise.

**Evidence:**   Rumen Hranov, already identified, **as witness**

During the period in question, the anticipation of a rise of the price of OC Oerlikon AG stock in particular might have been explained by noting the involvement of Russian investor Victor Vekselberg in OC Oerlikon AG in the year 2006, which raised the specter of a battle for control at OC Oerlikon AG. After all, such battles often push the stock of the affected enterprise higher.

**Evidence:**   Obtaining an expert opinion

Within a very short period of time – until 18 January of 2007, to be precise – Victor Vekselberg acquired 13.79% of OC Oerlikon AG stock.

**Evidence:**     Copy of disclosure notice dated 18 January 2007 from OC Oerlikon

AG - **Exhibit K 43**

However, a strategy that bets on stock prices being driven up by a battle for control can only meet with success if such battle manifests itself in aggressively rising pricing during the option's term.

**Evidence:**     See above

The average term of the warrants in dispute was below six months, which means that an enormous risk was incurred here: Battles for control typically last longer than six months and may in some cases extend to several years in length.

**Evidence:**     Obtaining an expert opinion

A significant portion of an option's value is made up by the so-called "fair value." This fair value is defined as $C - (S_0 - K)$.

**Evidence:**     Obtaining an expert opinion

The fair value indicates how much more one pays when buying stock indirectly by way of an option transaction as compared to a direct stock purchase at the same time.

**Evidence:**     See above

Fair value exists to facilitate disproportionate participation in a stock's performance by virtue of leverage without the need to wager the capital needed to buy the stock.

**Evidence:**     See above

As shown under item 2.3.1 lit. b) above, the moneyness for the warrants acquired by Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz averaged in the neighborhood of 1. In other words, the warrants' value consisted for the most part of their fair value.

**Evidence:**    See above

The fair value inevitably decreases over the term of the option because, by definition, it must equal 0 when the option expires. And while it was possible to extend speculation regarding the outcome of the battle for control by "rolling" the warrants (i.e., selling warrants that are "in the money" while simultaneously buying new warrants with longer terms and greater strike prices), the option's fair value must be paid anew with each instance of such rolling. This means that the amount of capital wagered continually increases.

**Evidence:**    See above

Given the significant volumes that Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz had to wager, the probability of an early abortion of the strategy accompanied by total loss was high.

**Evidence:**    See above

### 2.3.3   No diversification

Aside from the anticipation of rising prices for OC Oerlikon AG stock, only the expectation of a general uptrend for the Swiss stock market warranted consideration.

**Evidence:**    Obtaining an expert opinion

The potential reward associated with general market trends could have been secured by means of an investment strategy providing for a diversified investment portfolio at far lower risk. This is how the unnecessary incurrence of risk could have been avoided.

**Evidence:**     See above

During the period in question, OC Oerlikon AG stock was a highly volatile investment carrying above-average risk.

**Evidence:**     See above

The diagram enclosed as **Exhibit K 44** depicts the annual volatility of OC Oerlikon AG stock and of the Swiss stock market as measured by the Swiss Performance Index (SPI) for the period in question, from November of 2006 until 2008. Volatility has been calculated as a moving standard deviation of the logarithmized stock yield over the most recent 250 trading days in each instance.

**Evidence:**     See above

Accordingly, the volatility of OC Oerlikon AG stock averaged 45% during the period in question, fluctuating between 30% and 61%. By contrast, the risk of an investment in the Swiss stock market was significantly lower in terms of volatility: The SPI's volatility averaged 16%, fluctuating between 11% and 30%.

**Evidence:**     See above

The total risk of OC Oerlikon AG stock was nearly three times as high as the total risk associated with the SPI.

**Evidence:**     See above

Furthermore, it was not just the total risk of OC Oerlikon AG stock that was very high but also its so-called "systematic risk" or market risk.

**Evidence:**     See above

In **Exhibit K 44**, the systematic or market risk is measured by way of the beta factor indicating the reliance of the stock yield on the market yield. Accordingly, the beta factor of OC Oerlikon AG stock during the period in question averaged 1.74, fluctuating between 1.30 and 2.37.

**Evidence:**     See above

On average, the market risk associated with an investment in OC Oerlikon AG stock was approx. 1.7 times as a high as one in the Swiss stock market.

If the investment strategy recommended by the defendants was based on the idea of betting on an upturn in the stock market at high leverage, then using a diversified underlying asset, such as the SPI, instead of OC Oerlikon AG stock would have carried far lesser risk.

**Evidence:**     See above

An investment exclusively in call options on OC Oerlikon AG stock likewise bets on an upturn in the stock market. At a beta for OC Oerlikon AG stock of 1.74, a SPI price increase of 10% would send the stock 17.4% higher. And the price increase would be significantly higher for the call option since the stock price's climb would then have to be multiplied with the leverage factor. At a leverage factor of 3.9, the price increase for the call option would equal 17.4% × 3.9 = 67.9% (the option's fair value loss, which is a product of the option term's continual abatement, was not taken into account for that purpose).

**Evidence:**      Obtaining an expert opinion

The beta factor of an option $\beta_c$ indicates the following reliance on the beta factor of the underlying asset $\beta_i$:

$$(7)\ \beta_C = \Omega \cdot \beta_i$$

$\Omega$ is the option's leverage factor, as in the equation (5) above (see item 2.3.12 lit. b) above). In order to achieve the degree of market reliance expressed in beta factor $\beta_c$, the investor must enter into the risk associated with the option. If such risk were to be measured on the basis of the volatility of the option $\sigma_{ci}$, the following formula applies:

$$(8)\ \sigma_C = \Omega \cdot \sigma_i = \Omega \sqrt{\beta_i^2 \sigma_m^2 + \sigma_{\epsilon_i}^2}$$

**Evidence:**      See above

For this purpose, the second part of the equation employs the approach known from the Capital Asset Pricing Model (CAPM), according to which the risk of a given stock may be broken down into its systematic portion, represented here by the first addend under the root, in which the squared beta factor of the stock is multiplied with the squared volatility of the market portfolio, and its idiosyncratic portion, represented here by the second addend under the root.

**Evidence:**      Obtaining an expert opinion

If one were to realize the investment strategy by buying call options on the SPI, by contrast, the same market sensitivity could be achieved at far lesser risk. In order to realize the same beta factor when buying a call option on the index, the call option would have to come with a leverage factor of $\beta_i \times \Omega$. If this is the case, the below equation indicates the following relationship for the volatility of such option:

$$(8) \quad \sigma_C = \Omega \cdot \beta_i \cdot \sigma_m < \Omega \sqrt{\beta_i^2 \sigma_m^2 + \sigma_{\epsilon_i}^2} \quad \forall \sigma_{\epsilon_i}^2 > 0$$

Since the idiosyncratic risk of a stock will almost certainly be greater than 0, an option strategy based on buying call options on the market index offers the same market sensitivity at lower risk.

**Evidence:**    See above

The average volatility of OC Oerlikon AG stock during the period in question was 45%, the average volatility of the SPI 16% and the average beta factor of the stock 1.74. The correlation explained above indicates that the idiosyncratic volatility of the stock is subject to $\sigma'_{ci}$ = 36%. This is turn means that, at a leverage factor of 3.9, the volatility of option $\sigma'_c$ = 3.9 × 45% = 176%. When applying the same strategy to index options, the option's volatility would be $\sigma_c$ = 3.9 × 1.74 × 16% = 109%. With market sensitivity being equal, therefore, the risk would only be 0.62 times as high as it would be following the strategy based on stock options.

**Evidence:**    See above

In the diagram enclosed as **Exhibit K 45**, the correlation explained above is mapped for the present constellation of numbers with varying leverage factors (1-5). This illustrates that a strategy calling for the purchase of stock options invariably comes with far greater risk than one based on an investment in index options. The difference is based on the diversification achieved when purchasing an option on a diversified "underlying" – namely, the index.

**Evidence:**    Obtaining an expert opinion

Avoiding the unnecessary incurrence of risk reduces the investor's risk of loss.

**Evidence:**     See above

This would have been easy to achieve with the help of an investment strategy betting on index-based stock options.

**Evidence:**     See above

A comparison of the probability of loss for the 46 purchase transactions in dispute with that associated with index-based call options shows that the probability of loss equaled 74% based on the historical volatility of OC Oerlikon AG stock, whereas it would have been only 0.82 times as high with stock options based on the index.

**Evidence:**     Obtaining an expert opinion

Under no circumstances should the foregoing deliberations be understood to mean that a capital investment that bets on an uptrend in the price of a single stock or the stock market as a whole using significant leverage may be deemed sensible even in the slightest. Instead, they are intended to make plain that even when following an excessively risky investment strategy of this nature, the use of call options based on a single stock burdens the investors with easily avoidable risks. For this reason, such an investment strategy cannot serve an investor's interests and thus did not serve the interests of Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz.

**Evidence:**     See above

### 2.3.4   Investment recommendations were designed to prevent any profit from materializing

The defendants designed their investment recommendations to prevent Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz from profiting from options that had followed what was for them a favorable trajectory.

Here, the defendants proceeded consciously and methodically. They were motivated by the fact that any CHF profit for Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz would mean a loss in the same amount for Defendant 1, and any CHF loss for Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz would mean a profit in the same amount for Defendant 1.

**a)** **Offsetting profitable sales by means of parallel execution of new transactions**

Of the total of 49 purchase transactions, 46 entailed buying warrants in the form of call options. These 46 transactions altogether involved 22 different warrants. Of these 22 warrants, 14 were held until the expiration date and then lapsed. 13 warrants were sold prior to the expiration date at the defendants' recommendation. Through the investment advice they dispensed, the defendants induced Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz to buy new warrants immediately following each of these sales – in most cases, on the same day – using the gains they had just realized. However, since the new warrants had a longer term and, in some instances, a lower strike price, too, and because the number of the underlying shares of stock differed, all of the sales transactions resulted in a net inflow of capital to Defendant 1 nevertheless.

**Evidence:**     Rumen Hranov, already identified, **as witness**

                        Obtaining an expert opinion

The diagram enclosed as **Exhibit K 46** provides an overview of the purchases and sales of warrants in the form of call options, which Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz transacted on the defendants' investment recommendation. Such overview shows that sales were invariably transacted at the same time as, or closely following on the heels of, purchases.

**Evidence:**     See above

For instance, a warrant was sold for the first time on 17 January 2007. As a result of the higher stock price, Mr. Rumen Hranov generated a profit in the amount of CHF 14.4 million. Acting on the investment advice of Defendant 2, however, he had bought two warrants at a total transaction value of CHF 32.8 million on 16 January 2007, to the effect that Defendant 1 achieved a net inflow of capital in the amount of CHF 18.4 million.

**Evidence:**     See above

Acting on the defendants' investment advice, Mr. Rumen Hranov sold warrants valued at approx. CHF 129 million. On the same day, again following the defendants' advice, he purchased warrants worth a total of CHF 91 million. And by the end of that month, he bought additional warrants in the total amount of CHF 28 million – likewise at the defendants' recommendation. These transactions left Defendant 1 with a minimal outflow of capital.

**Evidence:**     See above

On 16 October 2007, Mr. Rumen Hranov followed the defendants' recommendation to sell warrants in the total amount of approx. CHF 50 million. At the same time, he bought new warrants worth CHF 111 million.

**Evidence:**     Rumen Hranov, already identified, **as witness**

                  Obtaining an expert opinion

Similar patterns are exhibited by the other sales transactions in dispute. Indeed, all of these transactions share the feature of the option positions being "rolled" on a continuous basis.

The warrants were either sold well in advance of their expiration date or, if it became clear that a warrant would expire worthless, held until the expiration date. At the same time, warrants were continuously replaced or supplemented with new, longer-term warrants. And since the practice of rolling options forward typically wound up increasing the position because the value of the newly acquired warrants was usually greater than that of those sold, Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz did not realize any gains – certainly none of significance.

**Evidence:**     Obtaining an expert opinion

This strategy recommended by the defendants simply had to give way to a total loss for Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz. After all, whenever gains could have been realized, new investments were transacted in at least the same amount, so that the realization of gains was ruled out simply as a matter of balance. At the same time, for reasons owing to the fluctuations typical of exchanges, some of the warrants suffered a total loss. In these cases, adherence to the strategy required the investment of fresh capital. And since the capital wagered by Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz continued increasing as a result of the defendants' investment recommendations, it was only a matter of time until the point was reached at which the strategy had to be aborted – because Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz were either no longer able or unwilling to put in fresh capital.

**Evidence:**     Obtaining an expert opinion

**b)**     **Interest of Defendant 1 in forestalling risk hedging for transactions in dispute**

Defendant 1 had a pronounced interest in not hedging against its risks from the stock-option transactions in dispute because the cost of doing so would have been approx. CHF 57 million. Defendant 2 simply circumvented these risks for Defendant 1 by making sure, as part of the investment strategy recommended to Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz, that not a single warrant purchased by them would ever be exercised.

Defendant 2 either recommended that warrants in the money be sold and instantly replaced by longer-term warrants with lower strike prices, which had the effect of immediately neutralizing any gains from the sales; or he arranged for strike prices to be higher than the price of OC Oerlikon AG stock, so that the options would expire worthless.

**Evidence:**      Rumen Hranov, already identified, **as witness**

A bank selling a warrant must hedge against the risk to which the warrant exposes it. The risk for the issuing bank comes in the form of the buyer exercising the option in accordance with the terms of issue on the expiration date if it is a so-called "European Option," or on any trading day prior to the expiration date if it is a so-called "American Option."

**Evidence:**      Obtaining an expert opinion

In the case of a warrant, which may take the form of an option for the purchase of OC Oerlikon AG stock at strike price K = CHF 500, the purchaser may, if he/she exercises the option, demand delivery of OC Oerlikon AG stock, for which he/she must then pay CHF 500. In the event that the bank made no arrangement to hedge against the risk, and if the price of the stock is CHF 600, it must buy the stock on the exchange for CHF 600 in order to effect performance under the option. The bank would then incur a loss of CHF 100 per call option issued. Aside from such economic reasons for hedging against the bank's risk, there are considerations to do with regulatory law: If the risk were not hedged against, the bank would need an adequate equity base pursuant to § 10 of the German Banking Act (*Kreditwesengesetz - KWG*) in conjunction with the provisions of the Capital Requirements Regulation (Regulation (EU) No. 575/2013, or CRR) and the Solvability Regulation (*Solvabilitätsverordnung - SolvV*), the directive on the appropriate setting of equity for (financial) institutes, groups of institutes and financial holding groups, which banks typically wish to avoid.

**Evidence:**　　See above

Pursuant to MaRisk, moreover, risks not hedged against count toward the risk limits kept in the account book, which has the effect of constraining the bank's ability to engage in other transactions bearing market price-related risks.

**Evidence:**　　Obtaining an expert opinion

In the parlance of regulatory oversight over the banking industry, the account book (*Handelsbuch*) is the legal term for a list of all risk positions held by a credit institution for the purpose of short-term resale exploiting price and/or interest-rate fluctuations. Its legal definition is found in Art. 4 (1) no. 86 CRR and applies to Defendant 1 pursuant to § 1a of the German Banking Act.

Under normal circumstances, it should be assumed that a bank's trade desk creates a counter-position for each warrant placed, which either eliminates any associated market risk or, at a minimum, significantly reduces such risk. To this end, there are two available approaches:

(1)　　The bank that sold a call option for which it serves as the writer for its part acquires an offsetting option position on OC Oerlikon AG stock. If the client sells the warrant back to the bank, the bank must dissolve its call option, which it can do by selling a call option of identical value.

(2)　　The bank may also buy OC Oerlikon AG stock directly. But while this would protect it against the risk of rising stock prices, it would saddle it with the risk of a price slump.

In the event of the latter, the client's warrant would expire worthless, and the bank would have earned the price paid for the warrant; at the same time, however, it would incur losses as a result of the falling stock price. In other words, this second approach would not fully insulate the bank against its risk, which is why equity would be needed to hedge against at least part of the market-price risk.

**Evidence:**     Obtaining an expert opinion

Irrespective of which of the two approaches to risk hedging Defendant 1 would have chosen, either one would have had the effect of the execution of a balancing hedging transaction influencing the price of the stock to the detriment of Defendant 1 on account of the sheer size of the transactions entered into with Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz given that the OC Oerlikon AG stock or option lacked liquidity.

**Evidence:**     Obtaining an expert opinion

This correlation becomes apparent when considering the volume of the hedging transactions needed in the context of the market liquidity for OC Oerlikon AG stock and options.

aa)     Hedging by way of purchase of counterbalancing options at EUREX

Defendant 1 could have hedged against the risk to which it was exposed as a result of the sale of the warrants by buying options at the EUREX calibrated to precisely balance its exposure.

**Evidence:**     Obtaining an expert opinion

For instance, had Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz acquired warrants at a volume entitling them to buy 1,000 shares of OC Oerlikon AG stock at strike price K on the defendants' advice, Defendant 1 could have bought 1,000 call options on OC Oerlikon AG stock at strike price K and with a term to match that of the warrants on the same day.

Given the enormous volumes that Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz acquired on the basis of the defendants' investment recommendations, such a hedging transaction would have substantially impacted the price of OC Oerlikon AG stock or of OC Oerlikon AG options to the detriment of Defendant 1.

**Evidence:**      Obtaining an expert opinion

The table enclosed with **Exhibit K 47** shows the number of options moved by each transaction (see column "Number of options moved"). The next column to the right lists the same-day trading volume in corresponding OC Oerlikon AG options on the EUREX. The comparison of the options moved by warrants to the actual trading volume on the EUREX (column "Moved v. traded options") demonstrates that there were numerous cases in which the options sold to Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz alone accounted for a multiple of the trading volume on the EUREX. When averaging all transactions, the options traded by Defendant 1 represented more than four times the trading volume on the EUREX on the days in question. This is why one may essentially discount the possibility that Defendant 1 would have actually been able to enter into offsetting option transactions on the EUREX on those days without a massive impact on the price of the options – and, by extension, on the price of the stock – to its own detriment.

**Evidence:**      Obtaining an expert opinion

bb)     Hedging by way of purchase of OC Oerlikon AG stock

Had Defendant 1 entered into hedging transactions in the form of purchases of OC Oerlikon AG stock on the spot market, it would not have succeeded in protecting itself against a drop in the price of OC Oerlikon AG stock, as argued above. But even if it had accepted such bargain, it would have found it practically impossible to move OC Oerlikon AG stock at the volume required without influencing the price to its own detriment in view of the liquidity on the spot market. The table enclosed as **Exhibit K 47** demonstrates by way of a comparison of the "Number of options moved" to "Average number SIX (–2; 0)" ("–2; 0" denotes the average of the price two days prior to the trading day and as of the trading day), which represents the number of shares of OC Oerlikon AG stock traded on the SIX Swiss Exchange on average, that the ratio averaged 26% and, on some days, even topped 100%. Just what impact a hedging volume averaging 26% of the daily trading volume for OC Oerlikon AG stock has critically depends on how this might affect the price.

**Evidence:**     Obtaining an expert opinion

The more the price is pushed up by any relevant purchases, or down by relevant sales, the greater the hedging costs for Defendant 1 since such effect on price is driven purely by liquidity and thus is only temporary.

**Evidence:**     See above

As soon as Defendant 1 has bought or sold the needed units, the price will move back to its original level, which is why Defendant would incur a loss in the amount of such temporary price movement.

**Evidence:**     See above

The average effect on price of a certain trading volume may be
determined using the Amihud Liquidity Measure (ALM).

**Evidence:**     Obtaining an expert opinion

Typically, this effect is calculated over a period of 250 trading days in
order to mitigate the influence of accidental effects. The formula is as
follows:

$$(9)\ ALM_{i\tau} = \frac{1}{250} \sum_{t=1}^{250} \frac{|r_{it}|}{vol_{it}}$$

**Evidence:**     See above

The table enclosed as **Exhibit K 48** shows the ALM for the OC
Oerlikon AG stock on the due dates in question. On average, the ALM
equals 0.53 base points – i.e., the stock's price expected movement is
0.0053% for each CHF million in transaction volume. The table
enclosed as **Exhibit K 48** further depicts the number of shares of
stock to be moved in the event of spot-market hedging on each due
date. If such number is multiplied with the stock price, one obtains the
transaction volume needed for the hedging transaction. For example,
1.24 million shares of stock would have been needed for the warrant
sold to Mr. Rumen Hranov on 21 November 2006, which would have
corresponded with an amount of approx. CHF 639 million.

**Evidence:**     See above

For an ALM of 0.00587%, therefore, the expected effect on price is 0.00587% × 639 = 3.75%. In the event that the hedging transaction pushes the price up by 3.75%, the stock price climbs to CHF 534.52, and the hedging transaction is rendered more expensive by CHF 534.52 – CHF 515.20 = CHF 19.32 per share. At 1.24 million shares, the bank is faced with additional hedging costs in the amount of 1.24 million × CHF 19.32 = 23.97 million. Despite what appears to be a minor liquidity effect, Defendant 1 would have incurred substantial added costs simply due to the sheer hedging volume.

**Evidence:**     See above

The table enclosed with **Exhibit K 48** shows that Defendant 1 would have borne added hedging costs solely on account of liquidity in the amount of CHF 1.7 million per transaction on average had it fully hedged against the risks inherent in the warrants issued by way of stock purchases in a corresponding amount. In all, such hedging costs would have added up to approx. CHF 57 million.

**Evidence:**     See above

This points to a strong interest on the part of Defendant 1 in avoiding such costs.

### 2.4    Failure to advise as to warrants' functioning and risks

Defendant 1 educated Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz about the functioning and risks of warrants and stock options neither verbally nor in writing.

**Evidence:**     Rumen Hranov, already identified, **as witness**

Specifically, Defendant 1 did not convey to Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz the knowledge that would have enabled them to fully grasp the scope of the loss of risk with which they were being saddled, along with the constraint placed on their potential reward by option premiums that were approx. 18% above the fair market price.

Defendant 1 also did not disclose to Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz that the investment strategy recommended and personally implemented by Defendant 2 would lead to the total loss of capital invested.

**Evidence:**      See above

What's more, Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz were not told about the economic aspects of the stock-option transaction as well as the significance of the option premium and its impact on the risk associated with the transaction.

**Evidence:**      See above

Similarly, Defendant 2 did not advise Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz of the conflicts of interest that existed for both defendants, including but not limited to the fact that any CHF profit for Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz would have resulted in a corresponding CHF loss to Defendant 1, and any CHF loss for Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz would have generated a corresponding CHF profit for Defendant 1 because Defendant 1 was the options' issuer.

**Evidence:**      See above

Defendant 2 did not point out to Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz that the remuneration he received from Defendant 1 was based on performance, and that he had a direct stake in the outcome of the option transactions by way of the bonuses paid by Defendant 1.

**Evidence:**      See above

Finally, Defendant 2 concealed that his investment strategy was geared toward the worthless expiry of any and all options.

**Evidence:**     See above

For this reason, Defendant 1 did not have to render performance (i.e., deliver stock) under a single stock option. This enabled it to forego hedging for the option transactions by entering into offsetting transactions with third parties – a move that saved it approx. CHF 57 million in hedging costs, as shown above.

Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz, who had no experience with stock-option transactions and did not understand how they worked or what risks they entailed, had no idea that Defendant 1 profited from the option premiums that Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz had to pay for the purchase of the stock options. However, Defendant 1 did not just charge option premiums at standard rates; it also collected a mark-up it had surreptitiously added to the standard option premium, which averaged 18%. Solely as a function of such overpricing, Defendant 1 took in CHF 107,264,931.00 – the same amount that Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz incurred in losses.

## 2.5     Investment advice provided by Defendant 2

During the period in question, Defendant 2 provided investment advice to Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz at a very intense level: In the years 2006, 2007 and 2008, Defendant 2 met with Mr. Rumen Hranov 63 times and conducted 347 telephone calls with him. In addition, he placed purchase and sales orders by telephone with the custodian banks of Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz – Bank Julius Bär and Thurgauer Kantonalbank – in their names or arranged for a trader on his team, usually Mr. Gregor Klomp, to do so.

**Evidence:**     Claudio Studer, already identified, **as witness**

                     Vivien Brunner, already identified, **as witness**

### 2.5.1   Personal meetings

Defendant 2 usually communicated investment recommendations to Mr. Rumen Hranov during a shared lunch in Zurich at Restaurant Tapas or Brasserie Lipp or over coffee at Lions Pub, and it was always Defendant 2 who initiated these meetings.

**Evidence:**     Rumen Hranov, already identified, **as witness**

The restaurants were all within 50 meters of the branch office of Defendant 1.

**Evidence:**     See above

In the year 2006, Defendant 2 and Mr. Rumen Hranov met for lunch at the initiative of the former 29 times – namely, on the 5th of January, the 1st, 7th and 27th of February, the 5th, 15th and 23rd of March, the 20th of April, the 10th, 12th and 15th of May, the 4th of July, the 14th and 16th of August, the 28th of September, the 6th and 27th of October, the 8th, 10th, 12th, 15th, 20th, 21st, 24th, 29th and 30th of November and the 1st, 4th and 11th of December 2006.

**Evidence:**     See above

In the year 2007, Defendant 2 and Mr. Rumen Hranov met for lunch at the initiative of the former 23 times – namely, on the 15th, 17th, 30th and 31st of January, the 5th and 6th of February, the 28th of March, the 10th, 11th, 16th, 17th, 23rd and 24th of April, the 16th of May, the 4th, 20th and 22nd of June, the 16th and 30th of July, the 6th of August, the 26th of September and the 22nd and 29th of October 2007.

**Evidence:**     See above

In the year 2008, a total of 11 lunches took place at the initiative of Defendant 2 – namely, the 19th of February, the 5th, 9th and 14th of May, the 12th of June, the 28th of July, the 12th of August, the 17th and 24th of October and the 5th and7th of November 2008.

**Evidence:**     See above

During all of the lunches, Defendant 2 had with him handwritten investment recommendations, which he had prepared in advance. These handwritten recommendations contained instructions for purchases and/or sales concerning warrants related to OC Oerlikon AG stock as well as data about such warrants, such as size, term, option premium, strike price and sensitivity.

**Evidence:**     See above

Based on these notes, Defendant 2 explained his investment recommendations to Mr. Rumen Hranov, who invariably accepted them without question due to the enormous faith he had in Defendant 2.

**Evidence:**     See above

Defendant 2 was very adamant that his meetings with Mr. Rumen Hranov not take place in the offices of Deutsche Bank, insisting that they meet in restaurants instead. Defendant 2 did not receive Mr. Rumen Hranov in the offices of Defendant 1 as a rule.

**Evidence:**     See above

It is quite clear that such concern on the part of Defendant 2 owed to the fact that, in his role as Head of Global Markets Equity, Switzerland, he was barred from having any direct contact with clients under both the compliance rules of Defendant 1 and the Securities Trading Act (*Wertpapierhandelsgesetz - WpHG*).

**2.5.2   Consultation by telephone**

In addition to the investment recommendations provided on the occasion of the lunches described under item 2.5.1 above, Defendant 2 frequently communicated investment advice to Mr. Rumen Hranov by telephone. During the period in question, the years 2006 until 2008, Defendant 2 and Mr. Rumen Hranov conducted at least 347 calls. Defendant 2 called Mr. Rumen Hranov 303 times, and Mr. Rumen Hranov called Defendant 2 44 times.

**Evidence:**      Jasmin Wolter, Rebhaldenweg 22, 5443 Niederrohrdorf, Switzerland, **as witness**

**2.5.3   Portfolio management by Defendant 2**

**a)**      **Purchase and sales order by Defendant 2 in names of Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz**

Defendant 2 not only dispensed investment advice to Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz. In numerous cases, he also placed purchase and/or sales orders for the warrants in dispute with the two custodian banks of Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz – Bank Julius Bär and Thurgauer Kantonalbank – by telephone on their behalf.

**Evidence:**      Claudio Studer, already identified, **as witness**

Vivian Brunner, already identified, **as witness**

The two custodian banks of Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz executed the orders communicated by Defendant 2 by telephone because Mr. Rumen Hranov had instructed the custodian banks to act on orders phoned in by Defendant 2 in the names of Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz at the request of Defendant 2 because of the faith he had placed in him.

Evidence:    Rumen Hranov, already identified, **as witness**

Claudio Studer, already identified, **as witness**

Vivian Brunner, already identified, **as witness**

**b)**    **Management of portfolios of Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz**

Defendant 2 managed the portfolios of Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz and referred to himself as their portfolio manager even in relations with third parties.

Among other examples, he indicated to Mr. Thomas Limberger, who served as CEO and deputy chairman of the OC Oerlikon AG administrative board in the years 2006 and 2007, that he was managing the Hranov family's OC Oerlikon AG portfolio.

Evidence:    Thomas Limberger, Suite 302, The Chart House, 6 Burrells Wharf Square, London E14 3TN, England, **as witness**

**c)**    **Deliberate exploitation of portfolio-management function for benefit of Defendant 1**

Defendant 2 exploited his position as portfolio manager for Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz in order to execute transactions in their names that benefitted Defendant 1 at the expense of Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz. For instance, Defendant 2 deliberately followed through on a previously-hatched plan to cause approx. CHF 50 million in losses by placing sales and purchase orders directly with the two custodian banks on 16 October 2007.

Defendant 2 communicated the following orders:

Sell the following warrants:

| Number | Designation | Call/put | Strike CHF | Term | Valor | Price CHF | Total value CHF | Sec. Acct. |
|---|---|---|---|---|---|---|---|---|
| 30,000,000 | OERDK | C | 650 | 2007 - 3/7/2008 | 3066051 | 0.12 | 3,600,000 | 156429 |
| 56,600,000 | OERDT | C | 700 | 2006 - 12/21/2007 | 2796327 | 0.157 | 8,886,200 | 1001362.649-09 |
| 73,300,000 | OERDD | C | 650 | 2006 - 3/21/2008 | 2796329 | 0.258 | 18,911,400 | 1001362.649-09 |
| 10,900,000 | OERDG | C | 750 | 2007 - 3/20/2008 | 2865662 | 0.13 | 1,417,000 | 1001362.649-09 |
| 145,000,000 | OERDK | C | 650 | 2007 - 3/20/2008 | 3066051 | 0.12 | 17,400,000 | 1001362.649-09 |
| 42,000,000 | OERDD | C | 650 | 2006 - 3/21/2008 | 2796329 | 0.258 | 10,836,000 | 15.7363 (S.A.) |

**TOTAL: CHF 61,050,600**

**Evidence:**     Rumen Hranov, already identified, **as witness**

These sales generated proceeds in the amount of CHF 61,050,000.00.

**Evidence:**     Rumen Hranov, already identified, **as witness**

At the same time, Defendant 2 placed the following purchase orders:

| Number | Designation | Call/put | Strike CHF | Term | Valor | Price CHF | Total value CHF | Sec. Acct. |
|---|---|---|---|---|---|---|---|---|
| 62,500,000 | OERIS | C | 600 | 2007 - 8/15/2008 | 3481921 | 0.46188 | 28,867,500 | 156426 |
| 60,000,000 | OERIR | C | 500 | 2007 - 3/20/2007 | 3481920 | 0.65785 | 39,471,000 | 156426 |
| 75,500,000 | OERIQ | C | 450 | 2007 - 2/15/2008 | 3481919 | 0.56524 | 42,393,000 | 1001362.649-09 |

**TOTAL: CHF 110,731,500**

**Evidence:**     Rumen Hranov, already identified, **as witness**

CHF 110,731,500 was paid for the purchases of these warrants.

**Evidence:**     Rumen Hranov, already identified, **as witness**

All of the warrants purchased on 16 October 2007 expired worthless because the price of OC Oerlikon AG stock fell so dramatically as a result of Defendant 1 knowingly selling large numbers of shares of OC Oerlikon AG stock that it was lower in each instance than the warrants' strike price.

**Evidence:**      Rumen Hranov, already identified, **as witness**

Driven by the massive sell-off of Defendant 1, the price of OC Oerlikon AG stock fell 30% during the period from 1 January until 29 February 2008 alone.

| Date | Price in CHF | % Change versus 1 January 2008 |
|------|------|------|
| 01/01/2008 | 473.25 | |
| 01/07/2008 | 386.25 | −18.39 |
| 01/29/2008 | 374.50 | −20.87 |
| 02/29/2008 | 339.74 | −28.21 |

**Evidence:**      Obtaining an expert opinion

What is especially conspicuous is the performance of OC Oerlikon AG stock as contrasted with the overall market (the upper green line traces the performance of the Swiss Performance Index, the lower blue one that of OC Oerlikon AG stock):



**Evidence:**     Obtaining an expert opinion

At the end of the warrants' term, the price of OC Oerlikon AG stock was as follows:

| Designation | Strike CHF | End of term | Stock price CHF |
|---|---|---|---|
| OERIS | 400.00 | 02/15/2008 | 377.50 |
| OERIR | 500.00 | 03/20/2008 | 315.50 |
| OERIQ | 600.00 | 08/15/2008 | 268.25 |

**Evidence:**     Obtaining an expert opinion

Defendant 2 brought about the drop in the price of OC Oerlikon AG stock by taking advantage of the position of Defendant 1 as market maker when selling off its massive stock holdings.

**Evidence:**     Excerpt from account books of Defendant 1, which list the purchases and sales of OC Oerlikon AG stock by Defendant 1 during period from 1 until 29 February 2008, to be produced by Defendant 1

Testimony of Defendant 2, **as party**

According to the legal definition of Art. 4 (1) no. 8 of Directive 2004/39/EC, "market maker"

> "means a person who holds himself out on the financial markets on a continuous basis as being willing to deal on own account by buying and selling financial instruments against his proprietary capital at prices defined by him."

Market making is present whenever credit institutions act as principals for a traded financial instrument and themselves set fixed purchase and/or sales prices and/or enter into such fixed-price transaction. If a credit institution acts as a market maker, it is exempted from the limitations imposed on uncovered short sales of stock, among other things, pursuant to Art. 17 (1) of Regulation (EU) 236/2012 (Short-Selling Regulation).

In this manner, the market maker ensures market liquidity **and influences the price**.

**Evidence:**     Obtaining an expert opinion

That Defendant 1 was the market maker for OC Oerlikon AG stock is already evident in the fact that it issued the warrants in dispute, sold them to Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz as part of an OTC transaction prior to listing them on the exchange and saw to such listing only afterward.

**Evidence:**     See above

Accordingly, Defendant 1 incorporated into the offering circulars for the warrants in dispute the following identical phrases regarding its function as market maker under Section II, sub-section "General Risk Factors," item 5 (under the heading "The Securities May Be Illiquid"):

> "The Issuer may, but is not obliged to, at any time purchase Securities at any price in the open market or by tender or private agreement. Any Securities so purchased may be held or resold or surrendered for cancellation. Since the issuer may be the only market maker in the Securities, the secondary market may be limited. The more limited the secondary market is, the more difficult it may be for holders of the Securities to realise value for the Securities prior to the exercise, expiration, redemption or maturity date."

**Evidence:**     Offering Circular, already submitted as **Exhibit K [●]**

The German translation reads as follows:

> „Der Emittent darf, ist dazu aber nicht verpflichtet, jederzeit Wertpapiere [gemäß Definition unter Ziffer 1. Definitions sind damit die streitgegenständlichen Warrants gemeint, Anm. der Unterzeichner]

> zu einem beliebigen Preis im offenen Markt oder wenn sie ihm an-
> geboten werden oder durch eine Vereinbarung mit einem Dritten
> kaufen. Alle Wertpapiere, die so gekauft werden, dürfen gehalten
> oder verkauft oder zur Einziehung aufgegeben werden. Da der
> Emittent der einzige Market Maker für das Wertpapier sein kann, ist
> der Zweitmarkt möglicherweise limitiert. Je limitierter der Zweitmarkt
> ist, umso schwieriger kann es für den Inhaber von Wertpapieren
> sein, den Wert der Wertpapiere vor deren Ausübung, Ablauf des
> Ausübungszeitraums, Rückkauf oder Fälligkeitszeitpunkt zu reali-
> sieren."

**Evidence:**     Obtaining an expert opinion

The investment recommendations of Defendant 2 served the exclusive goal of inflicting damages on Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz. An investment strategy that consists of substituting warrants for warrants with a short term and a lower strike price only benefits the issuer, not the investor – especially if and to the extent that it becomes apparent that the stock price will go down.

**Evidence:**     Obtaining an expert opinion

Defendant 2 knew that the price of OC Oerlikon AG stock would drop as he intended – and by virtue of the position of Defendant 2 as market maker disposed of the means necessary – to bring about such price drop.

On 16 October 2007, the price of OC Oerlikon AG stock was CHF 524.00, and on 15 August 2008 CHF 268.25.

**Evidence:**     See above

Within ten months, the price practically lost half of its value. This was due to the fact that, starting in early January of 2008, Defendant 1 sold large positions in OC Oerlikon AG stock on the exchange with a view to pushing the price lower.

**Evidence:**     Excerpt from account books of Defendant 1, which list the purchases and sales of OC Oerlikon AG stock by Defendant 1 during period from 1 until 29 February 2008, to be produced by Defendant 1

Testimony of Defendant 2, as party

A stock trader with Bank Vontobel AG in Zurich on 5 February 2008 alerted Mr. Rumen Hranov's to the fact that Defendant 1 was "selling Oerlikon on a massive scale."

**Evidence:**     Rumen Hranov, already identified, **as witness**

Mr. Rumen Hranov confronted Defendant 2 with this information a few days later. Defendant 2 responded by asserting that:

*"I'm selling only as long as the price is above CHF 400.00."*

**Evidence:**     See above

He was doing so, he said, because his superiors at Defendant 1 had so instructed him.

**Evidence:**     See above

The fact that Defendant 2 had instead hatched this plan long before was already revealed in conversation with Mr. Ronny Pecik on 12 October 2007. Mr. Pecik and his co- shareholders had assumed majority control of OC Oerlikon AG in the year 2005 via their holding company VICTORY Industriebeteiligung AG. On 12 October 2007, Defendant 2 told Mr. Ronny Pecik during a meeting in Vienna that he intended to sell Mr. Rumen Hranov new options on OC Oerlikon AG stock that had a short term and a very low strike price ("deep in the money"). This was how he would generate a sizeable inflow of capital for Defendant 1. The approach relied on the fact that warrants that are "deep in the money" command a higher price since they offer a greater potential reward as a result.

Thereafter, Defendant 2 intended to cause the price of OC Oerlikon AG stock to plummet, so that the options sold to Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz would expire worthless. This required that the price of OC Oerlikon AG stock sink below the strike price of the options. In response, Mr. Pecik told Defendant 2 that he could not possibly inflict this kind of damage on Mr. Rumen Hranov. To which Defendant 2 offered Mr. Pecik the following reply:

*"What do you care? It's not your money, it's Hranov's."*

**Evidence:**    Copy of Ronny Pecik's statement dated 9 April 2013 – **Exhibit K 49**

Ronny Pecik, to be summoned via VICTORY Industriebeteiligung AG, Wipplinger Str. 35, 1010 Wien, Austria, **as witness**

On 16 October 2007, Mr. Rumen Hranov and his family were on vacation in Turkey.

**Evidence:**    Rumen Hranov, already identified, **as witness**

Defendant 2 arranged for the transactions represented above without giving Mr. Rumen Hranov prior notice.

## 2.6   When Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz' heirs learned of claims against defendants

Over an extended period of time, Mr. Rumen Hranov tried to shed light on the causes underlying the immense losses that he, Ms. Hranova and Ms. Schulz had suffered in connection with the option transactions with Defendant 1. On 20 October 2015, he had a preliminary conversation with the undersigned to determine whether claims against Defendant 1 in connection with the option transactions in dispute had any chance of succeeding.

**Evidence:**     *Rechtsanwalt* Prof. Dr. Wolf-Rüdiger Bub, Promenadeplatz 9, 80333
München, Germany, **as witness**

*Rechtsanwalt* Dr. Henning Krauss, Promenadeplatz 9, 80333
München, Germany, **as witness**

After perusing and reviewing the documents supplied by Mr. Rumen Hranov, the
undersigned recommended that, in light of the complexity of stock-option
transactions, the high volume of transactions executed and the complex strategy
recommended by the defendants, an expert be consulted about the option
transactions.

**Evidence:**     See above

Mr. Rumen Hranov then hired Prof. Dr. Christoph Kaserer to prepare an expert
opinion.

**Evidence:**     See above

After multiple meetings between the undersigned and Prof. Dr. Christoph Kaserer as
well as further inquiries into the facts of the case made by the latter, Prof. Dr.
Christoph Kaserer arrived at the conclusion that the service fees charged by
Defendant 1 were inflated at a rate of 600% and the defendants' investment strategy
was geared toward the total loss of the capital wagered by Mr. Rumen Hranov, Ms.
Maria Hranova and Ms. Elissaveta Schulz. The undersigned then advised Mr. Rumen
Hranov for the very first time that such findings may expose Defendant 2 to liability as
well. This, Mr. Rumen Hranov had not known before.

**Evidence:**     See above

The expert opinion prepared by Prof. Dr. Christoph Kaserer dates from 5 October
2016. And only since it was made available has it been apparent that the drastically
inflated service fees charged by Defendant 1 essentially rendered the stock-option
transactions null and void, which is why a reversal thereof is indicated under the law
on unjust enrichment.

**Evidence:**    See above

**3.      Legal analysis**

**3.1      Suit is admissible**

The suit is admissible and in particular, the Frankfurt am Main Regional Court has
jurisdiction.

**3.1.1   International jurisdiction for suit against Defendant 1**

**a)      International jurisdiction pursuant to Art. 4 (1) of Council Regulation
(EC) No 44/2001**

With respect to the suit against Defendant 1, the Frankfurt am Main Regional
Court has international jurisdiction pursuant to Art. 4 (1) in conjunction with
Art. 63 (1) lit. (a) of the regulation of the European Parliament and of the
Council of 12 December 2012 on jurisdiction and the recognition and
enforcement of judgments in civil and commercial matters (Regulation (EU)
No 1215/2012, published in the Official Journal of the European Communities
L 351/01 p. 1) ("Brussels Ia Regulation").

Pursuant to Art. 4 (1) of the Brussels Ia Regulation, persons domiciled within
the sovereign territory of a member state are to be sued in the courts of that
member state. Pursuant to Art. 63 (1) lit. (a) of the Brussels Ia Regulation,
legal entities for purposes of the Brussels Ia Regulation are domiciled at the
place where they have their statutory seat.

**b)      International jurisdiction pursuant to Art. 2 (1) of Lugano Convention II**

The Frankfurt am Main Regional court also has international jurisdiction for
the suit against Defendant 1 under Art. 2 (1) in conjunction with Art. 60 (1) lit.
(a) of the Lugano Convention II.

aa)    Pursuant to Art. 73 (1) of the Brussels Ia Regulation, the Brussels Ia Regulation does not affect the applicability of the convention on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters of 30 October 2007 – OJ EU No. L 339 p. 3 – hereinafter "**Lugano Convention II**."

bb)    Pursuant to Art. 63 (1) of the Lugano Convention II, the Lugano Convention II is applicable temporally because it went into force for Germany on 1 January 2010 (OLG [higher regional court of] Munich, BeckRS 2012, 14153; Musielak/Stadler, ZPO [code of civil procedure]. 13th edition, Europäisches Zivilprozessrecht [European code of civil procedure], item 13). For Switzerland, it went into force on 1 January 2011 (https://www.bj.admin.ch/bj/de/home/wirtschaft/privatrecht/lugue-2007.html).

cc)    The Lugano Convention II is materially applicable because the present case represents a civil matter within the meaning of Art. 1 (1) sentence 1 of the Lugano Convention II. The Lugano Convention applies in relations between Brussels Ia Regulation members states and countries solely governed by the Lugano Convention II. In this constellation, Brussels Ia Regulation members states are obliged to apply the Lugano Convention II. Any substantive link pointing to a member state solely governed by the Lugano Convention II suffices for the Lugano Convention II to be declared applicable vis-à-vis any Brussels Ia Regulation member state (Rauscher/Peter Mankowski, EuZPR (2016), Art. 74 Brussels Ia Regulation, item 4 [Note: EuGVVO is referred to in this comment as "Brussels Ia Regulation."]).

dd)    Pursuant to Art. 2 (1) of the Lugano Convention II, the Frankfurt am Main Regional Court has jurisdiction. Persons domiciled in a state bound by the Lugano Convention II are to be sued in the courts of that state pursuant to Art. 2 (1) of the Lugano Convention II.

Under Art. 60 (1) lit. (a) of the Lugano Convention II, Defendant 1, as a legal entity for purposes of the Lugano Convention II, is domiciled at the place where it has its statutory seat – i.e., Frankfurt am Main

**c)      Legal venue pursuant to item 5 (pp. 1-15) of Offering Circular**

In addition, Defendant 1 submitted to the jurisdiction of the Frankfurt am Main Regional Court in connection with the warrants in dispute, of which it is the issuer.

In item 5 on pages 1-15 of the Offering Circular submitted as **Exhibit K 38**, Defendant 1 declared that Frankfurt am Main is the legal venue for all proceedings with regard to matters regulated in the terms and conditions for securities governing the warrants in dispute. This, too, places jurisdiction with the Frankfurt am Main Regional Court (Geimer/Schütze, l.c., A 1 Art. 2, item 78).

**3.1.2   International jurisdiction for suit against Defendant 2**

The Frankfurt am Main Regional Court has international jurisdiction with respect to the suit against Defendant 2 under Art. 6 no. 1 of the Lugano Convention II.

Pursuant to Art. 6 no. 1 of the Lugano Convention II, the courts of a state bound by this convention also have jurisdiction over suits against a defendant domiciled in another member state if such defendant is sued alongside one who is domiciled in the same state as the court, provided the claims are so closely connected that it is expedient to hear and determine them together to avoid the risk of irreconcilable judgments resulting from separate proceedings. These requirements are satisfied with respect to Defendant 1 and Defendant 2.

a)      Defendant 2 resides in Rüschlikon, Switzerland.

b)      The joinder of defendants gives rise to international jurisdiction in the direction against the other defendant(s) as well. Art. 6 no. 1 of the Lugano Convention II assigns jurisdiction to the Frankfurt am Main Regional Court since Defendant 1 has its registered offices in Frankfurt (Geimer/Schütze, l.c., A 1 Art. 2 item 171).

c)      In accordance with the case law of the Federal Court of Justice (*Bundesgerichtshof - BGH*), consideration should be given to the parallel provision of Art. 8 no. of the Brussels Ia Regulation, along with any pertinent case law of the Court of Justice of the European Union (CJEU) when interpreting Art. 6 no. 1 of the Lugano Convention II (BGH ruling dated 7 June 2016 – KZR 6/15, NJW 2016, 2266 = SchiedsVZ 2016, 218; BGH judgment dated 30 November 2009 – II ZR 55/09, NJW-RR 2010, 644 = WM 2010, 378). Accordingly, the requisite link between suits is present whenever there is a risk of conflicting decisions in one and the same set of legal and factual circumstances CJEU ruling dated 11 April 2013 – C-645/11, NJW 2013, 1661, item 43 – Sapir; ruling dated 11 October 2007 – C-98/06, Sig 2007, I-8340, item 40 – Freeport; Geimer in Geimer/Schütze, Europäisches Zivilverfahrensrecht [European rules of civil procedure], 3rd edition, Art. 6 of the Brussels Ia Regulation, item 19; Thomas/Putzo/Hüßtege, ZPO, 37th edition, Art. 8 of the Brussels Ia Regulation, item 4).

The link is present in that the suit against Defendant 1 and Defendant 2 is based on the same factual circumstances and cause of action of § 826 of the Civil Code (*Bürgerliches Gesetzbuch - BGB*) (Thomas/Putzo/Hüßtege, l.c.). They are sued as joint and several debtors (BGH ruling dated 7 June 2016 – KZR 6/15, NJW 2016, 2266 = SchiedsVZ 2016, 218; BGH advisory opinion dated 30 November 2009 – II ZR 55/09, NJW-RR 2010, 644). Accordingly, the claims against Defendant 1 and Defendant 2 are so closely connected that it is expedient to hear and determine them together to avoid the risk of irreconcilable judgments resulting from separate proceedings (Geimer/Schütze, l.c., A 1 Art. 6 item 16 u. Hw. a. CJEU ruling dated 13 July 2006 – Rs C-103/05 – Reisch Montage AG v. Kiesel Baumaschinen Handels GmbH, NJW-RR 2006, 1568).

### 3.1.3   Geographic jurisdiction

The geographic jurisdiction of the Frankfurt am Main Regional Court flows from Art. (1) of the Lugano Convention II and §§ 12, 17 (1) sentence 1 of the Code of Civil Procedure.

### 3.2   Suit has merit

The suit has merit because Defendant 1 and Defendant 2 must pay damages to the Plaintiff in the amount of CHF 318,177,048.15.

### 3.2.1   Plaintiff has standing

The Plaintiff has standing to sue because she has acquired the claims in dispute from Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz: The Plaintiff acquired the claims in dispute against Defendant 1 from Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz under the assignment agreement dated 12 October 2016 (**Exhibit K 1**). She acquired the claims in dispute that Mr. Rumen Hranov held against Defendant 2 under the assignment agreement dated 12 October 2016 (**Exhibit K 1**). She acquired the claims in dispute that Mr. Maria Hranova held against Defendant 2 under the assignment agreement dated 29 July 2016 (**Exhibit K 4**). And she acquired the claims in dispute that Mr. Elissaveta Schulz held against Defendant 2 under the assignment agreement dated 29 July 2016 (**Exhibit K 5**).

As a result, the Plaintiff is the holder of all claims in dispute against Defendant 1 and Defendant 2 and thus has standing to sue.

### 3.2.2   Liability of Defendant 1

### a)      Liability under § 826 BGB

Defendant 1 bears liability under § 826 of the Civil Code because it deliberately inflicted damages on Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz in an immoral manner.

**aa)**      **Immoral infliction of damages**

Defendant 1 immorally visited damages on the injured parties in three ways by

- not educating the injured parties about the warrants;

- collecting immorally inflated service fees that exceeded the standard service fees of 2-3% by 300% on average; and

- recommending an investment strategy that had to culminate in total loss.

**(1)      Failure to disclose relevant facts**

(a)      Defendant 1 immorally inflicted damages on Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz by not educating them about the risks inherent in the stock-option transactions in dispute. According to settled Federal Court of Justice case law, commercial brokers of futures options –which naturally include banks such as Defendant 1 that issue and themselves distribute futures options – must, prior to the closing, convey to interested parties such knowledge as may enable them to accurately assess the scope of their loss of risk as well as the adjustment of their potential reward as a result of the mark-up on the option premium (BGH NJW 2002, 2777; NJW-RR 1999, 843; NJW 1998, 2882; NJW 1994, 512; NJW-RR 1988, 544; WM 1988, 291; NJW-RR 1991, 1243; NJW 1993, 257; NJW 1994, 997).

Aside from the disclosure of the amount of the option premium, this includes explanations of the economic aspects of the stock-option transaction as well as the significance of the option premium and its impact on the risk associated with the transaction (BGH NJW 2002, 2777). It must be stressed that the premium marks the range of an area of risk that the market still deems acceptable, and that its amount reflects the expectations as to performance of exchange traders that, while viewed as somewhat realistic, are understood to be largely speculative in nature (BGH, l.c.). It must further be explained whether and in what amount a mark-up is added to the premium, and that such mark-up adversely affects the potential reward since now a price movement greater than what exchange traders view as realistic is needed to reach the profit zone (BGH, l.c.). In this context, it must be communicated in plain language that greater premiums practically rob the investors of their entire potential reward in all likelihood (BGH, l.c.).

(b)  Had Defendant 1 properly educated and advised Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz, the damages would not have been incurred since the latter would have distanced themselves from the stock-option transactions. According to settled Federal Court of Justice case law, a presumption as to proper conduct with respect to such disclosure favors the injured investor (BGH NJW 1984, 512, 513, along with extensive references to its settled case law under item 2a).

(c)  Defendant 1 deliberately and purposely did not educate Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz about the risks associated with stock-option transactions.

This much is already evident in the fact that it furnished Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz with issue prospectuses or any other written documents for none of the warrants in dispute. Defendant 2 did not even provide verbal instructions.

(2)     **Overpricing**

Defendant 1 immorally inflicted damages on Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz by charging them amounts for the purchase and sales prices invoiced for the warrants that exceeded the fair market price on average by 12.38% with respect to all transactions executed, by 16.64% with respect to transactions with a transaction value greater than CHF 10 million and by 17.30% with respect to transactions with a transaction value greater than CHF 20 million. Expressed as a weighted average, overpricing versus the fair market price amounted to 17.30%. As a result, the injured parties incurred damages in the amount of CHF 107,264,931.00 on the basis of implicit volatility and CHF 208,795,094.00 on the basis of historical volatility. Standard market rates were exceeded in this manner because Defendant 1 did not mark up the fair market price of the warrants as consideration for the issue thereof by the standard 2-3% but by 9-18%.

(a)     The standard market valuation premium and the valuation premium charged by Defendant 1 diverge by a weighted average of 600%.

This is a conspicuous disparity that gives rise to immoral conduct according to settled Federal Court of Justice case law on credit fees (BGHZ 110, 338). The Federal Court of Justice affirms the immoral nature of interest on credit if the contractual interest rate exceeds the effective standard market interest rate by 100%, relatively speaking, or by twelve percentage points in the absolute (BGH, l.c.). And it has even done so where the 100% or 12% threshold was not reached – namely, in cases of relative divergencies between 90% and 100% (BGHZ 104,105), of 91% (BGH NJW 1982, 2433) and of 96% (BGH NJW 1987, 183).

(b)    In setting the amount of the valuation premium, Defendant 1 took advantage of its superior position in relation to the injured parties, who lacked any experience with stock options. Not only did it not disclose to the injured parties that it was charging a valuation premium above and beyond the fair market price of the warrants in dispute, which the injured parties would not have incurred if they had purchased such warrants on the EUREX. It also concealed from the injured parties that the valuation premium exceeded the standard market valuation premium charged by other market participants for the issue of warrants by a factor of 6, or 600%. Defendant 1 consciously exploited its superior position to the detriment of Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz and for its own benefit. Given their weaker position relative to Defendant 1, the injured parties were unable to ascertain for themselves whether Defendant 1 added a valuation premium to the fair market price and, if applicable, whether such premium reflected standard market terms;

such conduct on the part of Defendant 1 violates prevailing moral standards. Specialized knowledge is required to determine the fair market price of warrants or assess whether the issuer charges service fees in line with common market practice, and only professional market participants or experts, such as university professors, possess such knowledge.

(c)     According to settled Federal Court of Justice case law, commercial brokers of futures options plying their trade outside of the securities trade common among banks, which broker transactions stripped of any potential reward by design and do so exclusively for their own gain, bear liability not only on account of *culpa in contrahendo* for inadequate disclosure regarding the transactions' lack of any potential reward, but also for intentionally inflicting damages in an immoral manner within the meaning of § 826 of the Civil Code if their business model is geared toward brokering transactions stripped of any potential reward for the investor exclusively for their own gain (BGH NJW-RR 2011, 1193 item 21).

In this regard, the Federal Court of Justice argued as follows in its ruling dated 25 January 2011 – XI ZR 195/08, NJW-RR 2011, 1193 item 21:

> *"Such a broker is solely concerned with generating profits in a significant amount by executing as many transactions as possible that offer no potential reward to the investor for reasons of excessive fees and premiums. Right from the start, its business model is deliberately geared toward signing up trusting men and women in uniform as business partners while immorally exploiting their pursuit of profit and carelessness, and profiting at their expense (cf. Senate, BGHZ 184,365 = NZG 2010, 550 = MMR 2010, 582 items 25 et seq.; NJW-RR 2011, 548 = WM 2010, 2025 item 41; NJOZ*

*2010, 227 = ZIP 2010, 2004 item 37 and NJW-*
*RR 2011, 97 = WM 2010, 1590 item 39 and*
*NJW-RR 2011, 551 = 2010, 2214 item 40;*
*additional sources available)"*

These principles apply *mutatis mutandis* to Defendant
1, which itself issued and sold the warrants as a bank.
Defendant 1 profited from the transactions with the
injured parties in two ways: It collected as profit the
option premiums for the warrants insofar as they
expired worthless – which was ultimately the case for
all warrants – and it collected the excessive service fee.
By way of the investment strategy it recommended, it
steered the fate of the warrants with a view to having all
of them either sold, with the proceeds being
immediately applied toward the purchase of new
warrants, or expire worthless.

**(3)    Investment strategy**

The warrants in dispute were devoid of chances not just on
account of overpricing; Defendant 1 deliberately stripped them
of any potential reward through the investment strategy it
recommended. As was explained under item 2.3.2 above, such
investment strategy was geared toward the total loss of the
capital wagered by the injured parties as any CHF loss meant
a CHF gain for Defendant 1. That such conduct on the part of
Defendant 1 amounted to deliberate immoral damage inflicted
on the injured parties is self-evident.

**(4)    Transactions dated 16 October 2007**

By recommending the sales and purchase transactions of 16
October 2007 (see item 2.5.3 lit. c) above) and personally
phoning in the orders with Mr. Rumen Hranov's custodian bank
with a view to causing the options to expire worthless by
bringing about a drop in the price of OC Oerlikon AG stock,

Defendant 2 for his part deliberately inflicted damages in an immoral manner. And pursuant to § 31 of the Civil Code, the actions of Defendant 2 may be attributed to Defendant 1.

**bb)**   **Willful intent**

Defendant 1 intentionally inflicted damages on the injured parties.

Based on settled Federal Court of Justice case law, § 826 of the Civil Code holds that liability is not limited to those who have positive knowledge of the circumstances rendering their actions immoral but extends to parties who would possess such knowledge if not for their willful ignorance (BGHZ 176, 281 item 46; 129, 175 et seq.; ZIP 1994, 789, 792; WM 1989, 1047, 1048 et seq.) and, for instance, breach their professional duties in such a cavalier fashion that their conduct may aptly be described as unconscionable or unscrupulous (BGHZ 176, 281 item 46; WM 1992, 1184, 1187; WM 1991, 2034, 2035; WM 1975, 559, 560). The manner of immoral conduct may support the conclusion that there was intent to inflict damage (BGH 129, 136, 177; 176, 281 item 46).

Since Defendant 1, a market maker and global bank, was aware of the fair market price of the warrants in dispute and the amount of standard service fees, it acted with intent to inflict damage when it hid a service fee exceeding market rates by an average of 317.5% in the option premium without the knowledge of the injured parties.

The same is true for the investment strategy recommended by Defendant 1, which exclusively served the objective of causing the injured parties to suffer a total loss in order to collect the entire capital wagered by them as profit.

**b)**      **Liability pursuant to § 823 (2) sentence 1 of Civil Code in conjunction with § 263 (1) of Criminal Code**

aa)      Defendant 2 misled Mr. Rumen Hranov by encouraging him to believe that he was being told of an investment opportunity at market rates that was free of risk. In addition, he concealed from Mr. Rumen Hranov that Defendant 1 and he himself had an economic interest in the recommended transactions, which mired them in a massive conflict of interest. Finally, Defendant 2 led Mr. Rumen Hranov to believe that he was being given preferential treatment as compared to other potentially interested parties by asserting that the warrants were made available to Mr. Rumen Hranov at a time when they were not yet on the market. From Mr. Rumen Hranov's viewpoint, it looked like an especially advantageous investment opportunity at a fair price. In fact, the defendants had issued the warrants specially for Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz in order to systematically fleece them. Other market participants generated no or only minor sales with the warrants in dispute, as **Exhibit K 47** demonstrates.

Regarding the transactions of 16 October 2007, Defendant 2 naturally opted not to tell Mr. Rumen Hranov that his recommendations were based on a plan to cause the warrants to expire worthless by bringing about a drop in the price of OC Oerlikon AG stock.

bb)      As a result of the false impressions fed to Mr. Rumen Hranov, Mr. Rumen Hranov himself, Ms. Maria Hranova and Ms. Elissaveta Schulz bought the warrants in dispute and suffered the damages as detailed.

cc)     Such conduct of Defendant 2 may be attributed to Defendant 1 pursuant to § 31 of the Civil Code. Since Defendant 2 was placed in charge and given full responsibility for the derivatives division of the branch office of Defendant 1, and because he acted as Head of Global Markets Equity, Switzerland, in relations with Mr. Rumen Hranov, the requirements of § 31 of the Civil Code have been satisfied.

dd)     Defendant 1 is liable to Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz pursuant to §§ 823 (2) sentence 1, 31 of the Civil Code and § 263 (1) of the Criminal Code for the damages caused by the fraudulent actions of Defendant 2.

**c)     Liability pursuant to §§ 280 (1), 311 (2) of Civil Code**

Pursuant to § 280 (1) in conjunction with § 311 (2) of the Civil Code, Defendant 1 is liable for indemnifying Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz against the damages in dispute for lack of disclosure (BGB NJW-RR 2011, 1193, along with further references to settled case law).

aa)     Between Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz on the one hand and Defendant 1, an investment advisory agreement existed as a function of the execution of the stock-option transactions in dispute. In the event that investors avail themselves of the help of a credit institution with a specific investment decision, and if such institution consents to providing advice, a contract is concluded even without an express arrangement to that effect or a fee being agreed (BGHZ 123, 126; NJW 2013, 3293). In this context, the tacit conclusion of a contract is to be affirmed as soon as the advisor – here: Defendant 2 – realizes that a client wishes to base his/her investment decision on the outcome of the consultation (BGH, l.c.), Palandt-Grüneberg, Komm. z. [commentary on] BGB, 75th edition, § 280 item 47). Pursuant to § 166 (1) of the Civil Code, the knowledge of Defendant 2 that Mr. Rumen Hranov acted in his own name as well as in the names of Ms. Maria Hranova and Ms. Elissaveta Schulz may be attributed to Defendant 1.

bb)     Under the investment advisory agreements so concluded in each instance between Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz on the one hand and Defendant 1 on the other, Defendant 1 was bound by the duty to educate Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz about the risks, the functioning and the economic significance of stock-option transactions. Defendant 1 breached such duty. It did not advise Mr. Rumen Hranov of the fact that stock options are associated with a risk of total loss. Moreover, it did not disclose to Mr. Rumen Hranov that the prices it charged for the recommended warrants by far exceeded their fair market equivalent. Finally, it also failed to alert Mr. Rumen Hranov to the fact that the recommended investment strategy could only culminate in a total loss.

cc)     What's more, it would have been incumbent upon Defendant 1 and Defendant 2 to advise Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz that the recommended warrants had been issued by Defendant 1, which is why it was Defendant 1 who collected the option premium – i.e., a sort of rebate. In its ruling dated 19 December 2006, the Federal Court of Justice observed as follows on such duty:

> "Transparency about the rebate is necessary so that the client is made aware of any conflict of interest that exists to such extent (§ 31 I no. 2 of the Securities Trading Act). Not until clients are so advised are they capable of making their own assessment of the bank's interest in generating sales (cf. Assmann/Schneider/Koller, § 31 item 74; disagreeing: Schwarz, § 31 WpHG item 27) and determine whether the bank is recommending a certain title for the sole reason that it profits from doing so itself. Based on Senate case law (BGHZ 146, 235 [239] = NJW 2001, 962), a bank that pays commissions and custodian fees to an asset manager must advise its clients prior to entering into the securities transactions initiated by the asset manager that it thus created a risk to the client's interests in the person of the asset manager.

Such case law is applicable to the present case. If a bank advises a client, provides investment recommendations and profits from the funds recommended in the form of rebates without an asset manager in the middle, such rebates collected by the bank compromise the client's interests. Specifically, there is a risk of the bank dispensing investment advice not solely in the client's interest following the criteria of a consultation appropriate for both the investor and the investment object, but also, at least to some extent, in its own interest in generating the maximum amount of rebates. By contrast to the defendants' view, it is of no consequence whether the rebates are attributed to a certain transaction directly or paid in certain intervals. What matters is only that the rebate is not a function of sales."

- BGH ruling dated 19 December 2006 – XI ZR 56/05, NJW 2007, 1876 -

In its judgment dated 20 January 2009, the Federal Court of Justice argued as follows:

"(1) It is argued correctly in the grounds for appeal that the Senate decision referenced (BGHZ 170,226 [234 et seq.] = NJW 2007, 1876 item 23) is also applicable to the distribution of media funds by a bank. In the context of disclosures about rebates, the pivotal question is whether the client is placed at risk. For this reason, it is indicated that the client be educated about any rebate, and that this be done irrespective of the rebate amount. Here, it makes no difference whether the advisor distributes equity or media funds. The conflict of interest subject to disclosure is the same in both cases. And while the Senate cited § 31 I no. 2 of the Securities Trading Act (old version) in connection with the duty to avoid conflicts of interest (BGHZ 170, 226 [234] = NJW 2007, 1876 item 23), it did not confine its observations on conflicts of interest to the area of application of the Securities Trading Act. § 31 no. 2 of the Securities Trading Act (old version) merely standardized the principle of avoiding conflicts of interest in breach of contract, which is generally recognized in civil law as well, for the securities trade under regulatory law (cf. Möllers, in: KK – WpHG, § 31 item 23; additional sources available; also: Palandt/Spandau, BGB, 68th edition, § 654 item 4).

(2) As a result of such advisory agreement, the Defendant was obligated to educate the Plaintiff about the fact that it received the full premium from C for brokering the sale of the fund shares.

Accordingly, a significant incentive was in place for the Defendant to recommend an investment in C's fund in particular. Of this and the conflict of interest related thereto, the Defendant had to inform the Plaintiff as part of the consultation, the better for the Plaintiff to assess the Defendant's interest in generating sales and determine whether the Defendant and its advisor recommended the fund investment for the sole reasons that they themselves profited from doing so (cf. Senate ruling BGHZ 170, 226 [234 et seq.] = NJW 2007, 1876 item 23). This is all the more true in the present case, because the conflict of interest was further heightened by the fact that the Defendant additionally collected a fee of 3% of the limited partnership capital for assuming a placement guarantee, and C paid an added commission in the amount of EUR 100,000 for any regional branch that met the placement quotas set for them at 100%. Due to such enhanced incentive system, there was an elevated risk that the consultation to be conducted in the client's interest, one that is appropriate for both the investor and the investment object, was not conducted properly or skipped altogether."

- BGH judgment dated 20 October 2009 – XI ZR 510/07, NJW 2009, 1416 -

In its advisory opinion of 9 March 2011, the Federal Court of Justice observed as follows with respect to the mandatory disclosure of rebates:

"The appellate court was correct in assuming that the Defendant bore an obligation under the advisory agreement to educate the assignor about any rebates flowing to it from sales commissions (cf. Senate, BGHZ 170, 226 = NJW 2007,1876 items 22 et seqq.; NJW 2009, 2298 = NZG 2009, 828 = WM 2009, 1274 item 11 and WM 2009, 2306 = ZIP 200 9,2380 = BeckRS 2009, 86793 item 31; Senate, NJW 2009 1416 = NZG 2009, 828 = WM 2009, 405 item 13 and NJW 2010, 2339 = NZG 2010, 873 = WM 2010, 1694 item 5). […]

As the Senate argued most recently, on the other hand, rebates subject to disclosure are present only in the event that portions of the issue premiums or administrative fees that the client pays to the company via the bank flow back to the advising bank irrespective of sales behind the client's back, to the effect that the bank has a special interest in recommending such investment in particular, which the client has no way of discerning (Senate, WM 200 9,2306 = BeckRS 2009, 86796 item 31). […]

What matters in the context of mandatory disclosure, by contrast, is that the investor is unable, in the absence of such disclosure, to discern the bank's special interest in recommending such investment in particular. The misconception that the bank dispenses impartial investment advice, which the mandatory disclosure of rebates is to do away with, owes solely to the fact that the advising bank is not identified as the rebate's recipient. However, such disclosure arises irrespective of the openly stated source from which the rebate flows to the advising bank.

The defendants concealed from Mr. Rumen Hranov that Defendant 1 was the issuer of the warrants. Since the defendants also withheld the issue prospectuses from Mr. Rumen Hranov, he could not have known this. For these reasons, he was unable to discern the defendants' special interest in recommending the warrants in dispute in particular. This is why Mr. Rumen Hranov mistakenly believed that Defendant 2 would provide him with impartial advice and protect his interests as an investor rather than promoting the profit motive of Defendant 1 or his own interests with respect to the performance-based remuneration he received from Defendant 1.

cc)    The legal consequence of such breaches of duty is that Defendant 1 must pay damages pursuant to §§ 280 (1), 249 of the Civil Code. The claim for damages aims at repayment of sums expended as well as indemnification against consequential damage (BGHZ 115, 213, 221; NJW 2006, 2042 item 32).

### 3.2.3   Liability of Defendant 2

**a.**    **Liability pursuant to § 823 (2) of Civil Code in conjunction with § 263 (1) of Criminal Code**

Pursuant to § 823 (2) of the Civil Code in conjunction with § 263 (1) of the Criminal Code, Defendant 2 liable for indemnifying Mr. Rumen Hranov, Ms. Maria Hranova and Ms. Elissaveta Schulz against the damages that they incurred from the stock options in dispute.

Defendant 2 misled Mr. Rumen Hranov. The false impression so created in Mr. Rumen Hranov's mind led to the purchase of the warrants in dispute.

In the interest of avoiding redundancy, reference is made to our pleadings under item 3.2.2 lit. b) above.

**b)**     **Liability pursuant to § 830 (1) of Civil Code**

Pursuant to §§ 830 (1), 826 of the Civil Code, Defendant 2 bears liability for the damages in dispute as an accessory.

In the interest of avoiding redundancy, reference is made to our pleadings under item 3.2.2 lit. a) above.

The willful intent of Defendant 2 with respect to his aiding and abetting the immoral damages inflicted upon the injured parties by Defendant 1 is evident in the manner of his immoral conduct. In the interest of avoiding redundancy, reference is made to our pleadings under item 3.2.2 lit. a) bb) above.

**3.3**     **Calculation of damages**

The damages asserted is calculated as follows:

| | | |
|---|---|---|
| Loss from option transactions | CHF | 316,011,961.00 |
| Commissions | CHF | 2,073,843.55 |
| Exchange fees | CHF | 91,243.60 |
| **TOTAL** | **CHF** | **318,177,048.15** |

[signature]                              [signature]

Prof. Dr. Bub                            Dr. Henning Krauss
*Rechtsanwalt*                           *Rechtsanwalt*