E<small>XHIBIT</small> 4

**Deloitte Report**

# Deloitte.

**Deloitte GmbH**
Wirtschaftsprüfungsgesellschaft

**Deutsche Bank AG**

**Frankfurt am Main**

Bericht über die Authentifizierung von E-Mails im
Rechtsstreit Hranov gegen die Deutsche Bank AG

# Deloitte.

**Deloitte GmbH**
Wirtschaftsprüfungsgesellschaft

Franklinstraße 50
60486 Frankfurt am Main

Postfach 15 03 62
60063 Frankfurt am Main
Deutschland

Tel:  +49 (0)69 75695 01
Fax: +49 (0)69 75695 6333
www.deloitte.com/de

**Deutsche Bank AG**

**Frankfurt am Main**

Bericht über die Authentifizierung von E-Mails im
Rechtsstreit Hranov gegen die Deutsche Bank AG

Deloitte bezieht sich auf Deloitte Touche Tohmatsu Limited („DTTL"), eine „private company limited by guarantee"
(Gesellschaft mit beschränkter Haftung nach britischem Recht), ihr Netzwerk von Mitgliedsunternehmen und ihre
verbundenen Unternehmen. DTTL und jedes ihrer Mitgliedsunternehmen sind rechtlich selbstständig und unabhän-
gig. DTTL (auch „Deloitte Global" genannt) erbringt selbst keine Leistungen gegenüber Mandanten. Eine detaillier-
tere Beschreibung von DTTL und ihren Mitgliedsunternehmen finden Sie auf www.deloitte.com/de/UeberUns.

# Deloitte.

**Deloitte GmbH**
Wirtschaftsprüfungsgesellschaft

**Inhaltsübersicht**                                                                                   Seite

| | | |
|---|---|---:|
| **1** | **Auftrag und Auftragsdurchführung** | **1** |
| | | |
| **2** | **Zusammenfassung** | **4** |
| 2.1 | Ausgangssituation | 4 |
| 2.2 | Beurteilung der wesentlichen Untersuchungsergebnisse | 4 |
| 2.2.1 | Beurteilung angewandter Archivierungs- und eDiscovery-Prozesse | 4 |
| 2.2.2 | Beurteilung der Authentizität sachverhaltsrelevanter E-Mails | 6 |
| 2.2.3 | Schlussfolgerung | 7 |
| | | |
| **3** | **Vorgehensweise und Methodik** | **9** |
| 3.1 | Beurteilung angewandter Archivierungs- und eDiscovery-Prozesse | 10 |
| 3.2 | Beurteilung der Authentizität sachverhaltsrelevanter E-Mails | 14 |
| 3.2.1 | Bereitstellung von Daten durch Consilio | 15 |
| 3.2.2 | Bereitstellung von Daten durch die Deutsche Bank | 16 |
| 3.2.3 | Identifikation und Analyse sachverhaltsrelevanter E-Mails | 19 |
| | | |
| **4** | **Analysen und Feststellungen** | **22** |
| 4.1 | Analyse angewandter Archivierungs- und eDiscovery-Prozesse | 22 |
| 4.1.1 | Archivierung | 22 |
| 4.1.2 | Identifikation | 23 |
| 4.1.3 | Aufbewahrung und Sicherung | 24 |
| 4.1.4 | Prozessierung und Sichtung | 27 |
| 4.2 | Beurteilung der Authentizität sachverhaltsrelevanter E-Mails | 29 |
| 4.2.1 | Validierung früherer Bereitstellungen an Consilio | 29 |
| 4.2.2 | Validierung der von der Deutschen Bank bereitgestellten Daten | 30 |
| 4.2.3 | Identifikation relevanter E-Mails innerhalb der Datenbereitstellung der Deutschen Bank | 31 |
| 4.2.4 | Analyse sachverhaltsrelevanter E-Mails | 35 |
| | | |
| **5** | **Schlussbemerkung** | **48** |

**Deloitte.**

**Deloitte GmbH**
Wirtschaftsprüfungsgesellschaft

**Anlagen**[*]

**1**      **E-Mails aus relevanten Kommunikationssträngen**

**2**      **Allgemeine Auftragsbedingungen für Wirtschaftsprüfer und**
         **Wirtschaftsprüfungsgesellschaften**

---

Wir weisen darauf hin, dass bei der Verwendung von gerundeten Beträgen und Prozentangaben aufgrund kauf-
männischer Rundung Differenzen auftreten können. Aufgrund der umfangreichen Seitenanzahl bei den Anlagen,
werden diese nur in elektronischer Form durch einen separaten Datenträger mitgeliefert.

II

**Deloitte.**

**Deloitte GmbH**
Wirtschaftsprüfungsgesellschaft

# Deloitte.

**Deloitte GmbH**
Wirtschaftsprüfungsgesellschaft

## 1        Auftrag und Auftragsdurchführung

Wir, die Deloitte GmbH Wirtschaftsprüfungsgesellschaft („Deloitte"), wurden durch die

**Deutsche Bank AG,**
**Frankfurt am Main**

– nachfolgend auch kurz „Deutsche Bank" genannt –

mit Auftragsbestätigung vom 9. Dezember 2020 beauftragt, die Authentizität der vorgelegten E-Mails im Rechtsstreit Hranov gegen die Deutsche Bank u. a. zu untersuchen.

Anlass der Untersuchung ist der  beim Landgericht Frankfurt am Main anhängige Prozess gegen die Deutsche Bank. Der Deutschen Bank wird vorgeworfen, dass der ehemals bei dieser beschäftigte Händler Simon Biner das Vermögen des Ehegatten der Klägerin Rumen Hranov vorsätzlich geschädigt habe. Die Klägerpartei trägt vor, Simon Biner habe verbriefte Optionen an Rumen Hranov verkauft und dabei gezielt zum Nachteil von Hranov gehandelt. Die Klägerin hat ausgedruckte bzw. abfotografierte E-Mails als Beweismittel in das Verfahren eingebracht, welche  inhaltliche Unterscheidungen zu den entsprechenden von der Deutschen Bank vorgelegten E-Mails aufweisen.

Gegenstand der Untersuchung war es, die Authentizität der vorgelegten und weiterer fallrelevanter E-Mails zu untersuchen. In diesem Kontext waren auch die relevanten Prozesse der Deutschen Bank auf Einhaltung entsprechender Standards zu prüfen. Die Arbeitsschritte wurden dokumentiert und werden in diesem Bericht entsprechend beschrieben.

Angestrebtes Ziel der Untersuchung war es, die Authentizität der fallrelevanten E-Mails der Deutschen Bank und der Klägerin zu beurteilen.

Im Rahmen der Untersuchung wurden folgende Vorbereitungshandlungen durchgeführt:

- **Fachliche Interviews:** Durchführung mehrerer Interviews zur Feststellung des Sachverhaltes, Bestimmung relevanter Dokumentationen, Klärung prozessbezogener Fragen und Identifikation relevanter Datenquellen.
- **Forensische Datensicherung:** Durchführung von digitalforensischen Sicherungen potentiell relevanter Datenquellen. Die Bereitstellung von Backups erfolgte durch die Fachabteilung „eDiscovery Services" der Deutschen Bank. Zusätzlich wurde eine frühere Datenbereitstellung der Deutschen Bank, welche an den eDiscovery-Dienstleister Consilio Legal Technology

**Deloitte.**

Deloitte GmbH
Wirtschaftsprüfungsgesellschaft

GmbH (im Folgenden „Consilio") erfolgte, nach Absprache mit dieser durch Consilio an Deloitte übergeben. Die digitalforensische Sicherung erfolgte in der Deloitte-Niederlassung in Frankfurt am Main durch Deloitte-Mitarbeiter.

Zur Durchführung der Untersuchung wurden folgende Untersuchungshandlungen unternommen:

- **Beurteilung der angewandten Archivierungs-Prozesse:** Beurteilung mandantenseitiger Prozesse, welche zur Archivierung relevanter E-Mails eingesetzt wurden in Anlehnung an ISO 14641:2018 „Electronic document management — Design and operation of an information system for the preservation of electronic documents — Specifications".
- **Beurteilung der eDiscovery-Prozesse:** Überprüfen der Einhaltung von Standards, in Anlehnung an das Electronic Discovery Reference Model (EDRM) und der DIN EN ISO/IEC 27037:2016 „Information technology -- Security techniques -- Guidelines for identification, collection, acquisition and preservation of digital evidence", bei der Identifikation und dem Export der potentiell relevanten Daten durch die Deutsche Bank.
- **Beurteilung der Authentizität sachverhaltsrelevanter E-Mails:** Beurteilung der Authentizität, der durch die Klägerin dargelegten E-Mail-Varianten (vgl. Abschnitt 4.2.4.1), sowie die Beurteilung gleichartiger E-Mails aus dem Datenbestand der Deutschen Bank.

Die Untersuchung wurde im Zeitraum vom 9. Dezember 2020 bis 21. Januar 2021 von den folgenden Sachverständigen durchgeführt:

- Thomas Fritzsche
- Sven Bursch-Osewold
- Christian Forst
- Anna Pause

Der vorliegende Bericht stellt den Untersuchungsstand zum 21. Januar 2021 dar.

# Deloitte.

Deloitte GmbH
Wirtschaftsprüfungsgesellschaft

Als wesentliche Ansprechpartner standen uns zur Verfügung:

- Jörg Mucke, Head of Litigation (Germany) – Deutsche Bank AG
- Margaret Dolson, Global Head of Discovery – Deutsche Bank AG
- Timothy Chan, Vice President – eDiscovery Services Deutsche Bank AG
- Christian Schmitt, Partner – Linklaters LLP
- Saurabh Shrivastava, Senior Director – Data Operations – Consilio Legal Technology GmbH

Für die Durchführung des Auftrages und unsere Verantwortlichkeit, auch im Verhältnis zu Dritten, gelten die Inhalte unserer Auftragsvereinbarung sowie ergänzend die als Anlage beigefügten „Allgemeinen Auftragsbedingungen für Wirtschaftsprüfer und Wirtschaftsprüfungsgesellschaften" in der Fassung vom 1. Januar 2017.

Die Art unserer Tätigkeit unterscheidet sich sowohl in ihrem Umfang als auch in ihren Zielen wesentlich von einer Jahresabschlussprüfung oder ähnlichen Tätigkeiten. Demzufolge erteilen wir keinen Bestätigungsvermerk und geben keine andere Form der Bescheinigung oder Zusicherung hinsichtlich der von uns für unsere Arbeit gegebenenfalls herangezogenen Jahresabschlüsse und sonstigen Rechnungslegungsunterlagen oder des internen Kontrollsystems der Deutschen Bank.

Wir weisen an dieser Stelle ausdrücklich darauf hin, dass eine rechtliche oder steuerrechtliche Beurteilung des dargestellten Sachverhalts nicht Gegenstand unseres Auftrages ist.

Die vorliegenden Ergebnisse unserer Sonderuntersuchung, im Zusammenhang mit der oben genannten Beauftragung, sind ausschließlich für unsere Auftraggeber bestimmt und dürfen nicht an Dritte weitergegeben werden. Eine Weitergabe ist nur mit unserer vorherigen schriftlichen Zustimmung bzw. unter den im Auftragsschreiben festgelegten Bedingungen zulässig. Die Strafverfolgungs- und Aufsichtsbehörden zählen nicht zu Dritten im Sinne dieser Vereinbarung, sofern die Weitergabe zu reinen Informationszwecken mit der Maßgabe erfolgt, dass wir den Strafverfolgungs- und Aufsichtsbehörden gegenüber keine Haftung übernehmen und sie die Unterlagen nicht weiteren Dritten offenlegen. Eine Weitergabe der vorliegenden Ergebnisse an die von der Deutschen Bank beauftragten Rechtsanwaltskanzlei Linklaters LLP, Frankfurt im Zusammenhang mit der hier dargestellten Untersuchung ist zulässig.

Wir weisen weiter darauf hin, dass das Ergebnis unserer Untersuchung von der Qualität und dem Umfang der vorgefundenen Unterlagen, erhaltenen Aussagen und Informationen abhängt, und bei Vorliegen neuer Informationen unter Umständen andere bzw. darüber hinausgehende Schlussfolgerungen gezogen werden könnten.

3

# Deloitte.

Deloitte GmbH
Wirtschaftsprüfungsgesellschaft

## 2        Zusammenfassung

### 2.1        Ausgangssituation

**Anlass der Untersuchung** ist der beim Landgericht Frankfurt am Main anhängige Prozess gegen die Deutsche Bank. Der Deutschen Bank wird vorgeworfen, dass der ehemals bei dieser beschäftigte Händler Simon Biner das Vermögen des Ehegatten der Klägerin Rumen Hranov vorsätzlich geschädigt habe. Die Klägerpartei trägt vor, Simon Biner habe verbriefte Optionen an Rumen Hranov verkauft und dabei gezielt zum Nachteil von Hranov gehandelt. Die Klägerin hat ausgedruckte bzw. abfotografierte E-Mails als Beweismittel in das Verfahren eingebracht, welche inhaltliche Unterscheidungen zu den entsprechenden von der Deutschen Bank vorgelegten E-Mails aufweisen.

**Gegenstand der Untersuchung** war es, die Authentizität der vorgelegten und weiteren fallrelevanten E-Mails zu untersuchen. In diesem Kontext waren auch die relevanten Prozesse der Deutschen Bank auf Einhaltung entsprechender Standards zu prüfen. Die Arbeitsschritte wurden dokumentiert und werden in diesem Bericht entsprechend beschrieben.

**Angestrebtes Ziel der Untersuchung** ist es, die Authentizität der fallrelevanten E-Mails der Deutschen Bank und der Klägerin zu analysieren.

Im Rahmen der Untersuchung wurden die folgenden **wesentlichen Untersuchungshandlungen** durchgeführt:

- Beurteilung der angewandten Archivierungs- und eDiscovery-Prozesse durch die Sichtung potentiell relevanter Prozessdokumentationen und durch die Durchführung prozessbezogener Interviews.
- Beurteilung der Authentizität sachverhaltsrelevanter E-Mails durch inhaltliche Analyse sowie die Analyse hiermit verbundener Metadaten.

Für eine detaillierte Übersicht der Vorgehensweise und Untersuchungshandlungen verweisen wir auf Kapitel 3 „Vorgehensweise und Methodik".

### 2.2        Beurteilung der wesentlichen Untersuchungsergebnisse

Im Folgenden stellen wir die Ergebnisse strukturiert nach Untersuchungshandlungen dar.

### 2.2.1        Beurteilung angewandter Archivierungs- und eDiscovery-Prozesse

Zur Beurteilung der durch die Deutsche Bank angewandten digitalforensischen Sicherungs- und Bereitstellungsprozesse sowie der vorangehenden Archivierung von Kommunikationsdaten, erfolgte

**Deloitte.**                                            Deloitte GmbH
                                                         Wirtschaftsprüfungsgesellschaft

die Anfrage und Sichtung der relevanten Dokumentationen durch Deloitte und die Durchführung von Interviews mit Verantwortlichen der Deutschen Bank und des eDiscovery-Dienstleisters Consilio.

Die von der Deutschen Bank eingesetzten Vorgehensweisen im Hinblick auf Archivierungs- und eDiscovery-Prozesse entsprechen den Marktstandards. Die von uns geprüften Prozesse sind geeignet, die Datenintegrität und Authentizität von E-Mails während der Archivierung und im Rahmen von eDiscovery-Maßnahmen zu gewährleisten. Dies wurde durch die Beurteilung der Archivierungs- und eDiscovery-Prozesse verifiziert. Für die eDiscovery-Prozesse stand insbesondere die Beurteilung der Identifikation, Aufbewahrung von potentiell relevanten Daten, Sicherung, Aufbereitung und Sichtung der Daten im Hinblick auf die Einhaltung forensischer Prinzipien (Dokumentation, Vertraulichkeit, Wiederholbarkeit, Datenintegrität und Authentizität) im Vordergrund. Die Beurteilung erfolgte zum einen auf Basis der dokumentierten Prozesse. Zum anderen wurde die Einhaltung der Prozesse im Kontext der Datenbereitstellungen anhand von Log-Dateien und Checklisten beurteilt. Hierzu wurden für die Identifikation, Aufbewahrung von potentiell relevanten Daten, Sicherung, Prozessierung und Sichtung das EDRM Model sowie der Standard DIN EN ISO/IEC 27037:2016 „Information technology - Security techniques - Guidelines for identification, collection, acquisition and preservation of digital evidence" herangezogen. Die geprüften Prozessen der Deutschen Bank werden in Hinblick auf die Dokumentation, Vertraulichkeit, Wiederholbarkeit, Datenintegrität und Authentizität den Anforderungen gerecht. So sind die genannten Prozessschritte intern im Rahmen einer Standardvorgehensweise[1] dokumentiert, welche neben dem Standardvorgehen auch die Behandlung auftretender Fehler, etwa bei Datensicherungen, darstellt. Die durchgeführten Prozesse werden bei der Deutschen Bank anhand von Checklisten dokumentiert, wodurch die Einhaltung von Prozessschritten nachvollziehbar dokumentiert wird. Die Vertraulichkeit bei der Weitergabe von Daten wird mit Hilfe von verpflichtenden Verschlüsselungen unterstützt. Die Integrität der Daten wurde über die Prozesskette hinweg an mehreren Stellen auf Grundlage von Prüfsummen geprüft. Zusätzlich erfolgte eine Kontrolle von Prozesslog-Dateien und Metadaten wie die übertragenen Datengrößen zur zusätzlichen Wahrung der Integrität.

Für die Archivierung der Daten, die den eDiscovery-Prozessen vorangestellt ist, wurde der Standard ISO 14641:2018 „Electronic document management — Design and operation of an information system for the preservation of electronic documents — Specifications" als Referenzgrundlage genutzt. Die geprüften Prozesse der Deutschen Bank werden in Hinblick auf die Dokumentation, Nachvollziehbarkeit, Vertraulichkeit, Wiederholbarkeit, Datenintegrität, Sicherheit, Authentizität und Eignung für Langzeit-Archivierung den Anforderungen gerecht. So wird die Nachvollziehbarkeit auch hier durch eine durchgängige Dokumentation der angewandten Prozess-Schritte sowie der automatischen Erstellung von Log-Dateien zur Aufzeichnung durchgeführter Aktivitäten unterstützt. Die Nutzung spezialisierter Archiv-Systeme z. B. auf Basis spezialisierter Software wie Digital Safe

---

[1] Eine Auflistung einzelner Dokumente und Inhalte findet sich in Abschnitt 3.1

**Deloitte.**

<div align="right">

**Deloitte GmbH**
Wirtschaftsprüfungsgesellschaft

</div>

oder Hardware wie Backup-Bändern unterstützt die Eignung der Verfahren auch bei langfristiger Archivierung. Um die Sicherheit und Integrität der Daten zu fördern, finden unter anderem Rechte-Einschränkungen auf Basis eines „Need to Know"-Prinzips statt aber auch die Berechnung sowie Prüfung von Prüfsummen zur Identifikation von Veränderungen der Daten.

Auch das Überprüfen der an Deloitte übermittelten Datenlieferung sowie anhängiger Log-Dateien und Checklisten ergab keine Hinweise darauf, dass Grundprinzipien aus der eDiscovery nicht eingehalten wurden oder eine Abweichung zu den dokumentierten Standardprozessen erkennbar war. Ebenso konnten bei einer durch Deloitte durchgeführten Analyse der vorangegangenen Datenlieferung der Deutschen Bank an Consilio keine Abweichungen zu den Standardprozessen identifiziert werden.

### 2.2.2    Beurteilung der Authentizität sachverhaltsrelevanter E-Mails

Für die Beurteilung der Authentizität standen folgende E-Mails bzw. Datenquellen zur Verfügung:

- Die beiden von der Klägerin in den Dokumenten S&P03, S&P09 und S&P11 als Scans bzw. Fotografien eingereichten E-Mail-Varianten, die den Satz „no matter what, we can adjust the pricing in our favour. Client is not aware at all." enthalten und auf den 28. März 2008 datieren.
- Der Datenbestand von sechs Custodians, die entweder Sender oder Empfänger der zu betrachtenden E-Mail waren. Hierbei standen Daten aus neun unterschiedlichen Datenquellen, welche Sicherungen aus AXSOne, Digital Safe und E-Mail-Server-Backups aus insgesamt vier verschiedenen Ländern (UK, USA, Singapur und China/Hongkong) umfassten, zur Verfügung.
- Eine Datenbereitstellung von Consilio, die Daten des Custodians Simon Biner umfasst. Die Daten des Custodian wurden im Vorfeld der Untersuchung von der Deutschen Bank an Consilio übermittelt.

Es zeigte sich, dass die beiden von der Klägerin eingereichten E-Mail-Varianten[2] der prozessrelevanten E-Mail Unterschiede im Text und in der Formatierung aufweisen, obwohl es sich bei beiden E-Mail-Varianten gemäß Stellungnahme[3] des durch die Klägerin beauftragten Rechtsanwalts Dr. Kern um dieselbe E-Mail handeln soll. So findet sich von der Grußformel „regards" in einer Variante die richtige Schreibweise, während es in der anderen Variante „regrds" heißt. Außerdem sind einzelne Abschnitte der E-Mail in den beiden Varianten unterschiedlich formatiert. Diese Abweichungen zwischen den beiden von der Klägerin vorgelegten E-Mail-Varianten lassen sich technisch nicht erklären. Es handelt sich daher aus technischer Sicht nicht um dieselbe E-Mail.

---

[2] S&P03 und S&P09 zeigen dieselbe E-Mail-Variante
[3] Stellungnahme der Sonntag & Partner Partnerschaftsgesellschaft mbB vom 3. Dezember 2020

**Deloitte.**

**Deloitte GmbH**
Wirtschaftsprüfungsgesellschaft

Eine Suche nach gemeinsamen Bestandteilen der E-Mail-Versionen in dem übergebenen Datenbe-
stand der Deutschen Bank lieferte insgesamt 88 Treffer-E-Mails, verteilt über alle fünf Datenquellen.
Hierbei sind 19 E-Mails direkte Treffer (die analysierte E-Mail) und 69 indirekte Treffer (Antwort auf
die analysierte E-Mail bzw. eine Weiterleitung der analysierten E-Mail). Die 88 E-Mails sind inhaltlich
konsistent und weisen lediglich vereinzelte Unterschiede auf, die allesamt technisch begründet sind.
Zum einen fehlt in einigen Fällen die Formatierung (z. B. Fettdruck). Dies ist durch die Archivierung
im Digital Safe begründet, alle dort archivierten E-Mails enthalten keine Formatierung. Zum anderen
enthalten einige E-Mails nur eine gekürzte Vorschauversion. E-Mails mit gekürzten Vorschauversio-
nen stammten aus Sicherungen von E-Mail Servern, bei denen die E-Mails bereits über AXSOne
archiviert wurden. Somit wurde die im Postfach des jeweiligen Nutzers vorliegende E-Mail system-
bedingt im Rahmen des Archivierungsprozesses durch AXSOne dauerhaft in das Archive transferiert
und im Postfach des Nutzers durch eine gekürzte Vorschauversion ersetzt. Die Beurteilung der Me-
tadaten der E-Mails der Deutschen Bank ergab keine Anhaltspunkte für Manipulationen.

Alle 88 E-Mails sind inhaltlich, sofern es sich nicht um eine gekürzte Vorschauversion handelt, kon-
sistent und enthalten den vorgenannten Satz „no matter what, we can adjust the pricing in our
favour. Client is not aware at all." nicht. Wir haben keine Anhaltspunkt dafür gefunden, dass dieser
Satz im Original der E-Mail von Simon Biner enthalten war. Das Wort „regards" war in allen 88 E-
Mails in der falschen Schreibweise „regrds" geschrieben. Alle durchgeführten Analysen belegen, dass
dieser Schreibfehler ursprünglich in der E-Mail von Simon Biner enthalten war und die von der Klä-
gerin vorgelegte E-Mail-Variante, die diesen Fehler nicht enthält (S&P11), nicht das Original wieder-
gibt.

### 2.2.3    Schlussfolgerung

Die Prozesse der Deutschen Bank für die Archivierung, Identifikation, Aufbewahrung und Sicherung
von potentiell relevanten Daten sind durchgehend dokumentiert und nachvollziehbar. Sie befolgen
IT-forensische Grundprinzipien und entsprechen dem Marktstandard. Selbiges gilt für die angewand-
ten Prozesse des eDiscovery-Dienstleisters Consilio, welcher im Rahmen eines Interviews Einblicke
in die Prozessierung und den Review der Daten gegeben hat. Dementsprechend werden die Grund-
pinzipien der eDiscovery eingehalten. Für die Analyse wurden E-Mails von sechs ehemaligen Mitar-
beitern aus insgesamt neun verschiedenen Datenquellen (AXSone (UK), AXSone (Singapur), Digital
Safe, sowie sechs Backups von E-Mail-Servern) aus insgesamt vier verschiedenen Ländern (UK, USA,
Singapur und China/Hongkong) genutzt. Bei der Bereitstellung von E-Mail-Daten durch die Deutsche
Bank an Deloitte konnten keine Abweichungen von dem Prozess festgestellt werden. Ebenso konnte
nicht festgestellt werden, dass bei der früheren Prozessierung und Sichtung von Daten von den durch
die Deutsche Bank sowie Consilio beschriebenen Standardprozessen abgewichen wurde. Es fanden
sich keine Anzeichen möglicher Manipulationen oder inhaltliche sowie visuelle Inkonsistenzen inner-
halb der identifizierten E-Mails aus dem Datenbestand der Deutschen Bank. Die identifizierte E-Mail

**Deloitte.**                                                    **Deloitte GmbH**
                                                                Wirtschaftsprüfungsgesellschaft

entspricht der Version, die im Vorfeld von Consilio prozessiert wurde und im Rahmen dieses Gerichts-
prozesses von der Deutschen Bank vorgelegt wurde.

Eine erfolgreiche Manipulation aller 88 betrachteter E-Mails sowie aller Datenquellen wäre mit einem
erheblichen Aufwand verbunden. Die Komplexität von Manipulations- und Angriffsbemühungen ist
durch die Diversität der Datenquellen, durch die Einbettung der E-Mail in einer Vielzahl von E-Mail
Kommunikationen und durch das Systemdesign der verschiedenen Archivierungssysteme bestimmt.
Auch ggf. bis zu ihrer Korrektur in einzelnen Applikationen vorhandene Sicherheitslücken wären,
sofern durch Angreifer ausnutzbar, nicht geeignet alle Datenquellen zu manipulieren. Der notwendige
Aufwand zur Durchführung vermeintlicher Manipulationen würde gleichzeitig die Wahrscheinlichkeit
für die Erkennung eines solchen Vorganges signifikant erhöhen. Unsere Untersuchung ergab durch-
gehend keine Anhaltspunkte für eine solche Manipulation.

Dem gegenüber stehen zwei unterschiedliche Varianten der E-Mail, die von der Klägerin vorgelegt
wurden. Die Abweichungen in den beiden Varianten sind technisch nicht erklärbar. Die von der Klä-
gerin vorgelegten E-Mails sind – obschon es sich um ein und dieselbe E-Mail handeln soll – bereits
nicht in sich konsistent.

Nachdem der Satz „no matter what, we can adjust the pricing in our favour. Client is not aware at
all." in allen 88 Treffer-E-Mails aus den Archiven der Deutschen Bank fehlte und Manipulationen
dieser E-Mails nicht erkennbar waren, ist aus technischer Sicht davon auszugehen, dass dieser Satz
nicht in der Ursprungs-E-Mail von Simon Biner enthalten war. Die Ergebnisse der Überprüfung der
beschriebenen Prozesse und der übergebenen E-Mails zeigen einheitlich, dass die durch Deloitte
identifizierten relevanten E-Mails authentisch sind.

# Deloitte.

**Deloitte GmbH**
Wirtschaftsprüfungsgesellschaft

## 3        Vorgehensweise und Methodik

In diesem Kapitel wird die im Rahmen der Untersuchung angewandte Methodik beschrieben und die hiermit verbundenen Untersuchungshandlungen, welche die Grundlage für die Beurteilungen darstellen. Die hierbei getätigten Feststellungen werden in Kapitel 0 abgehandelt.

Es wurden nachfolgende Vorbereitungs- und Untersuchungshandlungen ausgeführt:

- **Fachliche Interviews:** Durchführung mehrerer Informationsgespräche zur Feststellung des Sachverhaltes, Bestimmung potentiell relevanter Dokumentationen, Klärung prozessbezogener Fragen und Identifikation potentiell relevanter Datenquellen.

- **Forensische Datensicherung:** Durchführung von forensischen Sicherungen relevanter Datenquellen, die uns durch die Deutsche Bank und Consilio übergeben wurden.

- **Beurteilung angewandter Archivierungs- und eDiscovery-Prozesse:** Nachvollzug und Beurteilung mandantenseitiger Prozesse, welche zur Archivierung, Identifikation und Export relevanter E-Mails eingesetzt wurden.

- **Beurteilung der Authentizität sachverhaltsrelevanter E-Mails:** Beurteilung der Authentizität der durch die Klägerin vorgelegten E-Mails sowie die Beurteilung ähnlich lautender E-Mails aus dem Datenbestand der Deutschen Bank.

Die Untersuchung bezog sich auf den Zeitraum vom 28. März 2008 bis zum 31. März 2008. Der Zeitraum ist auf das Erstelldatum der für die Untersuchung als relevant deklarierten E-Mail, den 28. März 2008, zurückzuführen. Ebenso, wie auf die Möglichkeit einer Weiterleitung oder anderen Beinhaltung besagter E-Mail in nachfolgenden Kommunikationsketten.

Die für die Untersuchung als relevant identifizierten Mitarbeiter wurden anhand des Sender- und Empfängerkreises, der durch die Klägerin und der Deutschen Bank eingebrachten E-Mails, bestimmt. Sender oder Empfänger besagter E-Mail und damit Custodians im Sinne unserer Untersuchung waren:

- Simon Biner
- Noreddine Sebti
- Garth Ritchie
- Nino Kjellman
- Richard Carson
- Luigi Vignola

**Deloitte.**

Deloitte GmbH
Wirtschaftsprüfungsgesellschaft

**Anmerkung:** Werden im Folgenden zu Vorgängen konkrete Uhrzeiten angegeben, so erfolgt die Zeitangabe in UTC (Universal Time Coordinated – Koordinierte Weltzeit), um eine zeitzonenunabhängige Betrachtung zu ermöglichen. Die deutsche Sommerzeit besitzt hierbei, verglichen mit UTC, einen Zeitunterschied von zwei Stunden (UTC+2) und die deutsche Winterzeit einen Zeitunterschied von einer Stunde (UTC+1).

## 3.1 Beurteilung angewandter Archivierungs- und eDiscovery-Prozesse

Zur Beurteilung der durch die Deutsche Bank angewandten forensischen Sicherungs- und Bereitstellungsprozesse, erfolgte die Anfrage der prozessrelevanten Dokumentationen. Darüber hinaus wurden Interviews mit Verantwortlichen der Deutschen Bank und des eDiscovery-Dienstleisters Consilio geführt.

Die Schritte dieser Sicherungs- und Bereitstellungsprozesse können thematisch in folgende sechs Bereiche gegliedert werden:

- Bevor Daten einem eDiscovery-Prozess zugeführt werden, greifen standardmäßige IT-Prozesse zur Verarbeitung von Daten (Vergleiche ISO 14641:2018). Als Grundlage für die Untersuchung dienen Daten, welche im Rahmen eines gängigen **Archivierung**sprozesses gespeichert werden.
- Der **Identifikation**sprozess umfasst gemäß DIN EN ISO/IEC 27037:2016 und EDRM Model die Suche, Erfassung und Dokumentation potentiell relevanter digitaler Beweismittel. Dies umfasst auch eine Priorisierung der Datensicherung der jeweiligen Beweismittel, entsprechend ihrer Volatilität, um Datenverlust z. B. aufgrund von Löschfristen gemäß der Datenschutz-Grundverordnung oder begrenzter Verfügbarkeit zu vermeiden. Entsprechende Identifikationsprozesse sollten strukturiert sein, da ansonsten die Gefahr besteht, Beweismittel zu übersehen.
- Die **Aufbewahrung** und die **Sicherung** der potentiell relevanten Daten soll gemäß EDRM Model zum einen das Verändern von Beweismittel unterbinden, zum anderen sollen die Datenquellen einschließlich der existierenden Metadaten gerichtsfest gesichert werden. Letzteres ermöglicht eine digitalforensische Untersuchung mit verschiedensten Fragestellungen.
- Die **Aufbereitung** und **Identifikation** der Daten nach forensischen Standards und die Speicherung der Daten auf Serversystemen stellt sicher, dass alle verfahrensrelevanten Dokumente identifiziert und für eine weitere Analyse und Bereitstellung für weitere Untersuchungshandlungen zur Verfügung stehen. Zur Evaluation des Prozesses kann ebenfalls das EDRM Model als Grundlage herangezogen werden.

Die geprüften Prozessschritte sowie der zeitliche Verlauf in welchem die einzelnen Prozessschritte in der Regel durchschritten werden sind in Abbildung 1 visuell dargestellt.

# Deloitte.

**Deloitte GmbH**
Wirtschaftsprüfungsgesellschaft

**Abbildung 1: Geprüfte Prozessschritte**



Die bei der Deutschen Bank angeforderte technische Dokumentation umfasste beschreibende Standarddokumente zu

- Archivierungsprozessen,
- Identifikation von Datenquellen und Daten,
- Export- und Sicherungsvorgängen und
- Prozessen zur Übermittlung fallrelevanter Daten sowie

hierfür unterstützende Dokumentationen wie Checklisten und weitere Dokumentation, die den Umgang mit fallrelevanten Datenquellen beschreiben, wurden ebenfalls beigefügt. Uns wurden am 15. Dezember 2020 und 4. Januar 2021 durch die Deutsche Bank nachfolgende Dokumente bereitgestellt:

**Tabelle 1: Übersicht technischer Dokumente, die Deloitte zur Verfügung gestellt wurden**

| Dokument | Beschreibung | Betroffene Prozessschritte | Version |
|---|---|---|---|
| Identification and Refinement Process Map.pdf | Ablaufdiagramm – Ablauf zur Erstellung einer Anfrage zur Durchführung von Datensicherungen | Identifikation | n.a. |
| SP 2.1-Identify data sources for Messaging data request - Workflow V1.5.pdf | Ablaufdiagramm – Identifikation von Kommunikationsdaten innerhalb der IT-Infrastruktur | Identifikation | 1.5 |

**Deloitte.**

**Deloitte GmbH**
Wirtschaftsprüfungsgesellschaft

| Dokument | Beschreibung | Betroffene Prozessschritte | Version |
|---|---|---|---|
| AXSOne Collection Process.pdf | Standardvorgehensweise – Sicherung und Bereitstellung von Daten aus AXSOne | Archivierung, Identifikation, Sicherung | 1.1 |
| Delivery Process.pdf | Standardvorgehensweise – Bereitstellung von Daten zur weiteren Verarbeitung | Sicherung | 6.0 |
| Digital Safe Collection Process.pdf | Standardvorgehensweise – Sicherung und Bereitstellung von Daten aus Digital Safe | Archivierung, Identifikation, Sicherung | 4.0 |
| Domino Restore Collection Process.pdf | Standardvorgehensweise – Sicherung und Bereitstellung von Daten aus E-Mail-Server-Backups | Archivierung, Identifikation, Sicherung | 2.1 |
| Messaging Identification Process.pdf | Standardvorgehensweise – Identifikation von Kommunikationsdaten | Identifikation | 17.0 |
| Process Checklist_Collection_AXSOne.xlsm | Checkliste – Sicherung und Bereitstellung von Daten aus AXSOne inklusive der Qualitätssicherung | Identifikation, Sicherung | 8.0 |
| Process Checklist_Collection_Digital Safe.xlsm | Checkliste – Sicherung und Bereitstellung von Daten aus Digital Safe inklusive der Qualitätssicherung | Identifikation, Sicherung | 12.0 |
| Process Checklist_Collection_HDGS.xlsm | Checkliste – Sicherung und Bereitstellung von Daten aus E-Mail-Server-Backups inklusive der Qualitätssicherung | Identifikation, Sicherung | 2.0 |
| Process Checklist_Identification_Messaging.xlsm | Checkliste – Identifikation von Kommunikationsdaten | Identifikation | 17.0 |

**Deloitte.**

**Deloitte GmbH**
Wirtschaftsprüfungsgesellschaft

| Dokument | Beschreibung | Betroffene Pro-zessschritte | Version |
|---|---|---|---|
| 200428_Witness state-ment_Document cus-tody_eDiscovery V1.0 (004).pdf | Zeugenaussage von Margaret Dolson und Beschreibung der technischen Prozesse der Deutschen Bank | Archivierung, Iden-tifikation, Aufbe-wahrung, Sicherung | 1.0 |

Neben einer Sichtung der technischen Standarddokumentation erfolgten ergänzende Interviews mit ausgewähltem Fachpersonal der Deutschen Bank und des eDiscovery-Dienstleisters Consilio, um weitere prozessbezogene Fragen zu klären. Folgende Interviews wurden hierzu durchgeführt:

**Tabelle 2: Übersicht der von Deloitte durchgeführten Interviews**

| Thema | Teilnehmer | Durchführung |
|---|---|---|
| Beschreibung der Klage und der bislang vorgebrachten Beweismittel | Christian Schmitt (Linklaters), Jörg Mucke (Deutsche Bank), Sven Bursch-Osewold (Deloitte), Nico Vahlpahl (Deloitte) | 10. Dezember 2020 |
| Standardvorgehensweise im Rahmen der Datenaufbereitung und Sichtung durch Consilio | Saurabh Shrivastava (Consilio), Pasha Moshirian (Consilio), Christian Schmitt (Linklaters), Matthew Moses (Deutsche Bank), Sven Bursch-Osewold (Deloitte), Christian Forst (Deloitte), Nico Vahlpahl (Deloitte) | 07. Januar 2021 |

Die bereitgestellten Dokumente wurden, ergänzt durch die in den Interviews und durch Fragelisten gewonnen Informationen, durch Fachexperten von Deloitte analysiert und auf die Einhaltung von grundlegenden Standards geprüft.

13

**Deloitte.**

Deloitte GmbH
Wirtschaftsprüfungsgesellschaft

Zur Beurteilung des Archivierungsvorgangs bei der Deutschen Bank wurden insbesondere nachfolgende Kriterien der ISO 14641:2018 als relevant im Kontext der Untersuchung geprüft:

- **Datenintegrität:** Die Daten werden in einer Umgebung aufbewahrt, in der Veränderungen vermieden werden.
- **Nachvollziehbarkeit:** Archivierungsvorgänge sind aufgrund der Dokumentation nachvollziehbar und verständlich.
- **Sicherheit:** Der Zugriff auf die Daten ist eingeschränkt, protokolliert und die Daten werden ausfallsicher gelagert.
- **Eignung für Langzeit-Archivierung:** Die Systeme sind auf die Archivierung von Daten insbesondere unter Berücksichtigung zeitlicher Aspekte ausgelegt

Hierbei wurden insbesondere folgende forensischen Grundprinzipien für die Identifikation, Aufbewahrung, Sicherung, Aufbereitung und Sichtung der Daten berücksichtigt:

- **Dokumentation:** Jeder Schritt des Untersuchungsprozesses muss angemessen dokumentiert sein.
- **Vertraulichkeit:** Sicherstellung, dass die untersuchten Daten nicht durch Unbefugte eingesehen werden können. Dazu dienen u. a. der Zugriffsschutz durch Einschränken von Nutzerrechten und Verschlüsselungen der Dateien.
- **Wiederholbarkeit:** Die im gesamten Untersuchungszeitraum verwendeten Methoden und Hilfsmittel müssen bei Anwendung durch Dritte wiederholbar sein, um eine Reproduktion der Untersuchungsergebnisse zu gewährleisten.
- **Datenintegrität:** Bei der Verarbeitung muss sichergestellt werden, dass Daten nicht verändert werden. Dies wird unter anderem durch die erstellten Prüfsummen sichergestellt, die eine Änderung der Daten kenntlich machen würden. Mögliche Ausnahmen der Unveränderlichkeit müssen nachvollziehbar dokumentiert werden.
- **Authentizität:** Für jede Datei muss es möglich sein, den Ursprungsort festzustellen. Daher wird eine lückenlose Beweiskette, analog zu einem Sicherstellungsprotokoll, dokumentiert. Zudem ermöglicht eine lückenlose Beweismittelkette (sogenannte „Chain of Custody"), sämtliche Übergaben von Beweismitteln retrograd nachzuvollziehen.

## 3.2 Beurteilung der Authentizität sachverhaltsrelevanter E-Mails

Zur Beurteilung der Authentizität fallrelevanter E-Mails, wurden Datenquellen für folgende Empfänger und Sender relevanter E-Mails angefragt:

- Simon Biner
- Noreddine Sebti
- Garth Ritchie

**Deloitte.**

- Nino Kjellman
- Richard Carson
- Luigi Vignola

Zusätzlich wurden uns durch die Deutsche Bank für einen weitergehenden Vergleich nachfolgende Unterlagen der Klägerin bereitgestellt:

**Tabelle 3: Übersicht von Dokumenten der Klägerin, die Deloitte zur Verfügung gestellt wurden**

| Dokument | Beschreibung |
|---|---|
| S&P 03.pdf | Anlage S&P 03 der Klägerin; Abbildung einer fallrelevanten E-Mail |
| S&P 09.pdf | Anlage S&P 09 der Klägerin; Untersuchungsbericht der Klägerin |
| S&P 11.pdf | Anlage S&P 11 der Klägerin; Abbildung einer fallrelevanten E-Mail mit Stellungnahme durch die International Investigation Agency |
| 201029_SS Gegenseite.pdf | Schreiben der Sonntag & Partner Partnergesellschaft mbB vom 29. Oktober 2020 |
| 201203_SS Gegenseite_ergänzender Vortrag.pdf | Schreiben der Sonntag & Partner Partnergesellschaft mbB vom 3. Dezember 2020 |
| Anlage L 82_Beglaubigte Übersetzung der schriftlichen Zeugenaussage der Margaret Dolson.pdf | Beglaubigte Übersetzung der Zeugenaussage von Margaret Dolson |

### 3.2.1   Bereitstellung von Daten durch Consilio

Im Rahmen des laufenden Verfahrens wurden bereits E-Mail-Daten analysiert, welche Unterscheidungen zu den durch die Klägerin eingereichte E-Mail-Versionen besitzen. Die ursprünglich für das Verfahren durch die Deutsche Bank an Consilio übermittelten Daten wurden von Deloitte zu einer näheren Analyse angefragt. Die Daten wurden nach schriftlicher Freigabe durch die Deutsche Bank am 14. Januar 2021 von Consilio an Deloitte  übermittelt und die Integrität der erhaltenen Daten anhand der bereitgestellten Prüfsummen überprüft.

**Deloitte.**

Deloitte GmbH
Wirtschaftsprüfungsgesellschaft

Es erfolgte zunächst eine gesonderte Identifikation der fallrelevanten E-Mail im durch Consilio bereitgestellten Datenbestand. Dies geschah mit der Software Nuix Workstation (Version: 8.6.2.414) des Herstellers Nuix. Als Suchterm kam der Satzbestandteil *„loss out of APRIL is a total of 93 mio CHF for this two clients"* zum Einsatz. Zusätzlich erfolgte eine Sichtung bereitgestellter Log-Dateien und prozessbezogener Dokumente auf Anzeichen zu den dokumentierten Standardprozessen oder den allgemeinen forensischen Standards abweichenden Prozeduren.

Hierbei wurde durch Deloitte folgendes gesichtet:

- Log-Dateien zu Kopier- und Bereitstellungsprozessen sowie
- Ausgefüllte Checklisten zur Identifikation und Bereitstellung von Daten.

### 3.2.2    Bereitstellung von Daten durch die Deutsche Bank

Als Grundlage zur Durchführung der Untersuchungshandlungen wurden E-Mails aus verschiedenen Datenquellen angefragt. Die untersuchten Datenquellen wurden zuvor anhand mehrerer Gespräche mit Vertretern der Deutschen Bank und durch Sichtung zur Verfügung gestellter technischer Dokumente, welche die Archivierung von Kommunikationsdaten (insbesondere E-Mails) beschreiben, identifiziert. Nach Sichtung der verfügbaren Dokumentation und Durchführung von Interviews liegen keine Anhaltspunkte für weitere Datenquellen vor. Die nachfolgenden Kapitel geben Detailinformationen zu den jeweiligen verfügbaren Datenquellen wieder.

Da die Mitarbeiter aus unterschiedlichen Ländern stammen, und die unterschiedlichen Länder unterschiedliche Archivierungssysteme nutzen, erfolgte eine Anfrage an die Deutsche Bank, die jeweils dafür relevante Datenquellen der betroffenen Mitarbeiter zur Verfügung zu stellen. Darauffolgend wurden Deloitte Daten aus dem AXSOne Archivierungssystem, Digital Safe und Daten aus den Sicherungen des E-Mail-Servers von der Deutschen Bank am 7. Januar 2021 zur Verfügung gestellt. Die Übergabe der externen Festplatte, die besagte Daten enthielt, geschah persönlich am Standort der Deutschen Bank AG in der Theodor-Heuss-Allee 72, 60486 Frankfurt am Main.

Sämtliche übergebene Daten lagen verschlüsselt auf der Festplatte vor. Die Übermittlung von Passwörtern und Prüfsummen (SHA256) erfolgte unabhängig von der Datenübergabe auf einem gesonderten Kommunikationsweg. Die Prüfsumme (Hashwert) dient dazu, die Integrität der Daten bei einem Transfer zu verifizieren und damit eine mögliche Veränderung der Daten auf dem Transportweg zu erkennen. Somit werden Manipulationen und ungewollte Veränderungen ausgeschlossen. Bei einer Prüfsumme handelt es sich um einen mathematisch berechneten Wert, der sich bei Veränderungen der Daten ebenfalls ändert. Die Übereinstimmung der übermittelten Prüfsummen mit denen der erhaltenen Daten wurde nach Empfang der Daten erfolgreich verifiziert. Dies bedeutet, dass eine Veränderung der Daten seit der ursprünglichen Generierung der Prüfsummen nicht stattgefunden hat.

**Deloitte.**

Deloitte GmbH
Wirtschaftsprüfungsgesellschaft

Die logische Sicherung der übergebenen Daten wurde am 14. Januar 2021 mit der Software FTK Imager (Version 4.2.0.13) des Herstellers Access Data in der Niederlassung von Deloitte in Frankfurt am Main durchgeführt. Während der Erstellung der forensischen Kopie wurde ein digitaler Fingerabdruck (MD5/SHA1) errechnet, um die Integrität der Daten im Vergleich von Original und Kopie verifizieren zu können. Hiermit kann sichergestellt werden, dass die Untersuchung an unveränderten Daten durchgeführt wird. Eine Prüfung der Integrität wurde innerhalb der Untersuchung vorgenommen und bestätigt. Zusätzlich erfolgte eine Sichtung und ein erfolgreicher Vergleich der durch die Deutschen Bank übergebenen Log-Dateien, welche ebenfalls die Hash-Werte der übergebenen Daten dokumentieren. Unterschiedliche Dateigrößen bei den gelieferten Daten der einzelnen Datenquellen, resultieren aus der Nutzung unterschiedlicher Sicherungsstrategien der Software, unterschiedlichen Arten der Datenablage und unterschiedlichen Sicherungszeiträumen bzw. Zeitpunkten.

### 3.2.2.1    AXSOne

Bei AXSOne handelt es sich um eine Archivierungslösung des Herstellers OpenText welche bei der Archivierung von strukturierten sowie unstrukturierten Daten unterstützt. Hierbei können verschiedene E-Mail-Daten, Dateien von Dateisystemen, wie etwa Netzwerklaufwerke oder etwa Microsoft Produkten wie Office 365, archiviert und verwaltet werden.

Die nachfolgende Tabelle beschreibt die am 7. Januar 2021 durch die Deutsche Bank an Deloitte übergebenen AXSOne Sicherungen. Sind mehrere Prüfsummen für einzelne Datenquellen enthalten, so bedeutet dies, dass die Bereitstellung einer Datenquelle mehrere ZIP-Archive umfasste. Ist eine Prüfsummer für mehrere Datenquellen angegeben, so bedeutet dies, dass mehrere Datenquellen gebündelt bereitgestellt wurden.

**Tabelle 4: Metadaten übergebener AXSOne Backups**

| Nach-name | Vor-name | Quelle | Größe | Prüfsumme (SHA256) |
|---|---|---|---|---|
| Kjell-man | Nino | AXSOne - SG | 467.456 KB | F3FA26C1302FBBD2E1733DC940388D206E64FCA189F7F6CA92B58D792B737315 |
| Sebti | Nored-dine | AXSOne - SG | 2.729.472 KB | 26D1BC73423215DF39B608889917781073197611CD173602AB355DB7735F1E99 |
| Ritchie | Garth | AXSOne - UK | 3.410.176 KB | 0A0F531E6ED9D71C996B5A2CDE47BAE104437332279793AAE6B30538CB43539C |
| Vignola | Luigi | AXSOne - UK | 590.336 KB | 693F738EBA7FDD329E1D6662A4CE74D5E3CF979746D99BBBBBEE1285BA7947E0 |
| Kjell-man | Nino | AXSOne - UK | 1.543.168 KB | B682A0BF1AF446822EA3F3CF2577FE442125E3C16B660D9547A6F711E88A8B37 |
| Biner | Simon | AXSOne - UK | 475.904 KB | 11CF4B49CB6AAD8CE8F90EBCA77F5080221C5A7268647970D050743BFBB2B747 |
| Carson | Richard Mal-colm | AXSOne - UK | 5.814.528 KB | 14C76073D79A32118F70567B1E9146AC77E83452BD50E938F8EFA96BEF16F94D |

**Deloitte.**

Deloitte GmbH
Wirtschaftsprüfungsgesellschaft

### 3.2.2.2    Digital Safe

Bei Digital Safe des Herstellers Micro Focus handelt es sich um eine cloudbasierte Archivierungslösung für Kommunikationsdaten.

Die nachfolgende Tabelle beschreibt die am 7. Januar 2021 durch die Deutsche Bank an Deloitte übergebenen Digital Safe Sicherungen. Sind mehrere Prüfsummen für einzelne Datenquellen enthalten, so bedeutet dies, dass die Bereitstellung einer Datenquelle mehrere ZIP-Archive umfasste. Ist eine Prüfsummer für mehrere Datenquellen angegeben, so bedeutet dies, dass mehrere Datenquellen gebündelt bereitgestellt wurden.

**Tabelle 5: Metadaten übergebener Digital Safe Backups**

| Nachname | Vorname | Quelle | Größe | Prüfsumme (SHA256) |
|---|---|---|---|---|
| Sebti | Noreddine | Digital Safe - US | 677.134 KB | B431A749D7A8E05D965367D2965F8112A131C FC09828FB0FDFFBE061C6BB0708<br><br>96B53CBF3381EEF50E4565AB4344B402A2F56B FBB441420C8B20DCF7316EEA66<br><br>1B18259A5239D75FCF2CA30EEBB7F71C34B1FB CBD26705FAC580D4049538BBB7<br><br>5D4173394FE3796A472C876C863D02D33B240B 4D805594A7DF6A0F061F019CDC |

### 3.2.2.3    E-Mail-Server-Backups

Um den Ausgangszustand nach Systemausfällen und Datenverlusten wiederherzustellen, werden bei der Deutschen Bank standardmäßig Datensicherungen des E-Mail-Servers durchgeführt, sogenannte E-Mail-Server-Backups. E-Mails, welche zum Zeitpunkt der Sicherung des E-Mail-Servers existieren, sind somit innerhalb der Backups des E-Mail-Servers enthalten. Deswegen sind diese E-Mails, sofern sie Bezug zu dem Prozess aufweisen, ebenfalls von Relevanz.

Die nachfolgende Tabelle beschreibt die am 7. Januar 2021 durch die Deutsche Bank an Deloitte übergebenen Daten der E-Mail-Server-Backups. Sind mehrere Prüfsummen für einzelne Datenquellen enthalten, so bedeutet dies, dass die Bereitstellung einer Datenquelle mehrere ZIP-Archive umfasste. Ist eine Prüfsumme für mehrere Datenquellen angegeben, so bedeutet dies, dass mehrere Datenquellen gebündelt bereitgestellt wurden.

# Deloitte.

**Deloitte GmbH**
Wirtschaftsprüfungsgesellschaft

**Tabelle 6: Metadaten übergebener E-Mail-Server-Backups**

| Nach-name | Vorname | Quelle | Größe | Prüfsumme (SHA256) |
|---|---|---|---|---|
| Kjell-man | Nino | E-Mail-Server-Backup - HK | 1.961.984 KB | B2A2FC8C99FFB13E1DE18A945C2BDCB5CB7 D2CD0622684929835762 5009B8BDF |
| Sebti | Noreddine | E-Mail-Server-Backup - HK | 11.323.136 KB | B2A2FC8C99FFB13E1DE18A945C2BDCB5CB7 D2CD0622684929835762 5009B8BDF |
| Carson | Richard Malcolm | E-Mail-Server-Backup - UK | 2.419.712 KB | 833EA2AA637573300C984CA8B0B2FD1C65C 2E7FFAF1A2C5083E6727026E7421E |
| Ritchie | Garth | E-Mail-Server-Backup - UK | 756.224 KB | 959ABC9FBE8ECC279D220945376FF92C8474 D7525081DA7B69658E7210287F19 |
| Kjell-man | Nino | E-Mail-Server-Backup - UK | 793.600 KB | 3887576A52587F28CC763B25E1C4AA04203A 7AFC341978F444CB4E257FD8E08B |
| Biner | Simon | E-Mail-Server-Backup - UK | 675.840 KB | 3887576A52587F28CC763B25E1C4AA04203A 7AFC341978F444CB4E257FD8E08B |
| Vignola | Luigi | E-Mail-Server-Backup - UK | 0 KB | 3887576A52587F28CC763B25E1C4AA04203A 7AFC341978F444CB4E257FD8E08B |

Entsprechend Tabelle 6 konnten für Luigi Vignola keine Daten basierend auf den Sicherungen des E-Mail-Servers durch die Deutsche Bank bereitgestellt werden. Für Luigi Vignola war jedoch entsprechend des Ergebnisses des „eDiscovery Delivery Tools" im relevanten Zeitraum ein E-Mail-Konto eingerichtet. Zur Überprüfung, ob dieser Unterschied technisch begründbar ist, wurde bei der Deutschen Bank zur Ursache des Fehlens der Daten nachgefragt. Entsprechend der Deutschen Bank wurde bei der Erstellung einer Liste aller verfügbaren Backups festgestellt, dass das erste verfügbare Backup vom 1. Februar 2009 stammt. Folglich lagen Sicherungen des E-Mail-Servers des Custodians für den relevanten Zeitraum nicht mehr vor.

Für die Datenbereitstellungen der Deutschen Bank erfolgte nach Erhalt der Daten die Analyse der Datenlieferung anhand der beigelegten Prozesschecklisten und Log-Dateien, um zu prüfen, ob es Anzeichen für eine Abweichung von den Standardprozeduren gab.

## 3.2.3   Identifikation und Analyse sachverhaltsrelevanter E-Mails

In einem weiteren Schritt fand die Identifikation potentiell relevanter E-Mails innerhalb des übergebenen Datenbestands der Deutschen Bank statt. Hierzu wurden die erhaltenen Daten zunächst entschlüsselt und mit der Software Nuix Workstation (Version: 8.6.2.414) des Herstellers Nuix prozessiert. Anschließend erfolgte die Identifikation der relevanten E-Mail-Dateien im Vergleich zu den E-Mail-Versionen, welche durch die Klägerin eingebracht wurden. Hierzu wurden Textbestandteile extrahiert, und innerhalb des Datenbestandes gesucht. Als Suchterm kam der Satzbestandteil *„loss out of APRIL is a total of 93 mio CHF for this two clients"* zum Einsatz, welcher gleichermaßen in den eingereichten E-Mail-Versionen der Klägerin wie auch in der eingereichten Version der Deutschen Bank enthalten ist. Die Suche schließt, neben den bei dem Landgericht eingereichten E-Mail-

**Deloitte**

Darstellungen, auch etwaige Antworten auf die entsprechende E-Mail mit ein, da die Textbestandteile im Regelfall bei Antworten und Weiterleitungen Teil der anhängigen E-Mail-Ketten sind. Zusätzlich erfolgte eine Suche nach dem Textbaustein *„client is not aware at all"*, welcher im Rahmen des Verfahrens als Hauptunterscheidungsmerkmal zwischen den Versionen der Klägerin und der Version der Deutschen Bank angebracht wurde.

Es erfolgte eine Analyse auf mögliche Datenlücken („Gap-Analyse"), im Rahmen derer geprüft wurde, ob die Plausibilität der Verteilung der identifizierten E-Mails über die einzelnen Datenquellen gegeben ist.

### 3.2.3.1    Analyse von E-Mails der Klägerin

Abbildungen der durch die Klägerin bei Gericht eingereichten E-Mail-Versionen wurden Deloitte zur Verfügung gestellt. Diese wurden gegenübergestellt, um inhaltliche sowie visuelle Unterscheidungen zu untersuchen. Wurden Unterscheidungen festgestellt, so wurde die Relevanz des jeweiligen Unterscheidungsmerkmals bewertet. Weiter wurde aus technischer Sicht argumentiert, inwieweit Unterschiede erklärt werden können.

### 3.2.3.2    Analyse von E-Mails der Deutschen Bank

Es erfolgte ein Vergleich der im Datenbestand der Deutschen Bank identifizierten E-Mails. Hierzu wurden in einem ersten Schritt die mit Nuix Workstation (Version: 8.6.2.414) des Herstellers Nuix prozessierten und exportierten E-Mails einer sogenannten Gap-Analyse unterzogen. Ziel hierbei ist es, die Verteilung der E-Mails auf einzelne Datenquellen zu prüfen und ggf. auftretende Lücken zu identifizieren. Wurden hierbei Lücken identifiziert, so wurde aus technischer Sicht argumentiert, inwieweit die jeweilige Lücke begründet werden kann.

Im Anschluss erfolgte ein  Vergleich der identifizierten E-Mails auf inhaltlicher und Darstellungsebene. Traten Unterschiede auf, so erfolgte eine Kategorisierung der E-Mails nach Kategorien in inhaltlichen und darstellenden Unterscheidungsmerkmalen. Es wurde geprüft, ob sich die jeweiligen Unterschiede zwischen den einzelnen Kategorien technisch begründen lassen und nachvollziehbar sind.

Des Weiteren wurden die Metadaten der digital verfügbaren E-Mails analysiert, um zu prüfen, ob Hinweise auf etwaige Veränderungen und Manipulationen gefunden werden können. Hierbei wurden geprüft:

- Zeitstempel auf Abweichungen zum erwarteten Versandzeitpunkt. Große Abstände erfordern eine tiefergehende Analyse, um die Abläufe nachzuvollziehen, und eine nachträgliche Anpassung der Zeitstempel auszuschließen. Letzteres kann z. B. bei der

**Deloitte.**

Verwendung einer zeitlich anders gelegenen E-Mail als Grundlage für die neue (manipulierte) E-Mail der Fall sein.

- Analyse bekannter Inhalte (Sender, Empfänger, E-Mail-Adressen) auf Tippfehler und andere Auffälligkeiten.
- Eindeutige Nachrichten-IDs (Eigenschaft: MessageID) und referenzierende Nachrichten-IDs (Eigenschaft: In_Reply_To) zur Prüfung von Unstimmigkeiten im Kommunikationsverlauf. Hierbei muss die referenzierende Nachrichten-ID mit jener Nachrichten-ID der vorausgehenden Nachricht übereinstimmen. Andernfalls ist eine weitere Analyse notwendig.

Zur Analyse der Metadaten kam ebenfalls Nuix Workstation in genannter Version zum Einsatz.

### 3.2.3.3 Gegenüberstellung der E-Mails der Klägerin und der Deutschen Bank

Zum Abschluss der Untersuchung wurden die als relevant identifizierten E-Mail-Stränge der Deutschen Bank sowie die E-Mail-Versionen der Klägerin gegenübergestellt. Hierbei erfolgte eine Analyse des Inhaltes sowie der Darstellung der jeweiligen E-Mail-Varianten. Wurden Unterscheidungsmerkmale festgestellt, so wurde geprüft, inwieweit technische Begründungen herangezogen werden können, um die jeweiligen Unterschiede zu erklären. Ein Vergleich der E-Mails basierend auf Metadaten und anderen elektronischen Merkmalen fand nicht statt, da die E-Mail-Versionen der Gegenseite nicht in digitaler Ausführung vorliegen.

**Deloitte.**

Deloitte GmbH
Wirtschaftsprüfungsgesellschaft

# 4        Analysen und Feststellungen

Die nachfolgenden Ausführungen stellen die im Verlauf der Untersuchungen getroffenen Feststellungen nach Themen sortiert dar. Eine Übersicht der jeweils angewandten Methodik und Vorgehensweise findet sich in Kapitel 3.

## 4.1        Analyse angewandter Archivierungs- und eDiscovery-Prozesse

Die Deutsche Bank verfügt über eine Reihe an dokumentierten Standardverfahren zur Archivierung, Identifikation und Extraktion verschiedener Datenquellen. Die nachfolgenden Ausführungen beschränken sich auf relevante Prozessbestandteile, welche zur Beurteilung der Vorgehensweise gemäß Abschnitt 3.1 nötig sind. Dies umfasst insbesondere jene Prozessbestandteile, die eine Auswirkung auf forensische Grundprinzipien wie die nötige Dokumentation, Vertraulichkeit, Wiederholbarkeit, Datenintegrität und Authentizität haben. Organisatorische und technische Details, welche keine Relevanz für die forensische Eignung aufweisen, werden nicht gesondert aufgeführt und zum Schutz interner Prozesse der Deutschen Bank nicht näher erläutert.

Entsprechend der Angaben der Deutschen Bank wurden die nachfolgend beschriebenen Standardprozeduren zur Durchführung der Archivierung, Identifikation, Aufbewahrung, Sicherung, Prozessierung und Sichtung relevanter Daten bei dieser Untersuchung befolgt. Die Analyse der vorliegenden Dateien und übermittelten Log-Dateien durch Deloitte stützen die Aussage, dass die beschriebenen Prozesse und hiermit auch die vorgenannten Grundprinzipien und Marktstandards eingehalten wurden.

### 4.1.1        Archivierung

**AXSOne:** AXSOne von OpenText wird von der Deutschen Bank als Archivierungssystem für Lotus Notes Postfächer verwendet. Lotus Notes wiederum ist eine Software von IBM, die laut Margaret Dolson die hauptsächlich genutzte E-Mail-Anwendung der Deutschen Bank im relevanten Zeitraum war. Eine Archivierung von E-Mails ist laut der Deutschen Bank in der Regel nach 41 Tagen vorgesehen. Die Sicherungen werden gemäß Aussagen der Deutschen Bank nächtlich vollzogen. Das System ist so konfiguriert, dass keine Datenlöschungen durchgeführt werden können. Dies wird zusätzlich durch technische Systeme wie CyberArk überwacht. Eine zeitliche Beschränkung der aufbewahrten Daten ist nicht implementiert. Die in AXSOne vorliegenden Daten reichen aussagegemäß bis in das Jahr 1996 zurück. Sofern Nutzer jedoch ihre E-Mails vor der Ausführung des Archivierungsvorgangs gelöscht hätten, seien diese nur sieben Tage im Papierkorb aufbewahrt worden und somit nicht Teil der Archivierung.

**Digital Safe:** Bei Digital Safe von Micro Focus handelt es sich um eine Compliance-Archivierungslösung zur Speicherung von Kommunikationsdaten (E-Mails und Instant-Messaging). Es werden Daten von Mitarbeitern archiviert, die aufgrund ihres Arbeitsortes oder ihrer Rolle bei der Deutschen Bank

**Deloitte.**                                                    Deloitte GmbH
                                                                Wirtschaftsprüfungsgesellschaft

innerhalb der technischen Systeme zur Aufbewahrung gekennzeichnet wurden. Es gibt hierbei drei separate Speicherorte für die Mitarbeiter der entsprechenden Regionen: die USA, Deutschland für die Region EMEA und Singapur für die Region APAC. Bei der Übermittlung von Daten wird ein digitaler Fingerabdruck (SHA256) erstellt, um Veränderungen von übermittelten Daten zu erkennen. Die Vollständigkeit der Übermittlung wird auch dahingehend überprüft, ob die Anzahl der Nachrichten im Postfach eines Nutzers mit der Anzahl der übermittelten Nachrichten an Digital Safe übereinstimmt. Darüber hinaus werden täglich Statistiken zur Qualitätskontrolle der übermittelten Daten durch den Anbieter Micro Focus an die Deutsche Bank geliefert. Einer Veränderung wird aufgrund des eingesetzten „Write Once – Read Many Times" Prinzips entgegengewirkt. Dieses System ist per Design revisionssicher konzipiert. Nach einem initialen Schreibzugriff (in diesem Fall: Der Archivierungsvorgang) ist das Löschen von Daten nur nach Freigabe im Rahmen eines Freigabeprozesses ermöglicht und hierbei auch eine Aufzeichnung der Löschoperationen in den Digital Safe Audit Logs. Zusätzlich werden Zugriffe auf Digital Safe aufgezeichnet. Diese sind auf wenige dedizierte Mitarbeiter beschränkt und basieren auf einem „Need-To-Know" Prinzip. Die Aufbewahrungszeit wurde im Regelfall auf zehn Jahre gesetzt. Es wurden bisher keine archivierten Daten aus dem Digital Safe der Deutschen Bank gelöscht, daher liegen – insofern zuvor archiviert – auch ältere Daten vor. Daten werden ausfallsicher gespeichert. Es existieren zwei Kopien der archivierten Nachrichten im Hauptrechenzentrum von Micro Focus. Zusätzlich werden zwei weitere Kopien in einem sekundären Rechenzentrum von Micro Focus aufbewahrt.

**E-Mail-Server-Backups:** Aus Gründen der Ausfallsicherung und zur Wiederherstellung des Betriebszustandes nach einem Funktionsausfall, wurden im relevanten Zeitraum Backups des Lotus Domino-Servers erstellt. Dies geschieht in unterschiedlichen Zyklen (z. B. täglich, wöchentlich, monatlich). Die zur Langzeitaufbewahrung verwendeten und für die Untersuchung relevanten Backups wurden monatlich durchgeführt. Diese werden auf für die Archivierung von Daten spezialisierten Backup-Bändern gespeichert. Eine Löschung der auf den Backup-Bändern abgelegten Daten nach Speicherung bis zum Ende von Aufbewahrungsfristen ist nicht vorgesehen und wird auch hier über das WORM-Prinzip („Write Once – Read Many Times") unterstützt. Aufgrund lokaler Aufbewahrungserfordernisse oder beispielsweise gerichtlicher Anfragen, werden Backup-Bänder auch über die gesetzliche Aufbewahrungsfrist hinaus aufbewahrt.

### 4.1.2      Identifikation

Der Identifikationsprozess startet mit einer Anfrage über das Fall-Management-System Atlas das zur Verfolgung und Organisation der einzelnen Prozess-Schritte von der Identifikation bis hin zur Bereitstellung von Daten dient. Im Rahmen von Datenanfragen werden Details wie der Betrachtungszeitraum, für die Untersuchung als relevant erscheinende Datenarten (z. B. E-Mail-Kommunikation) sowie Details zu den Custodians angegeben. Zur Durchführung des Identifikationsvorganges existiert ein automatisierter Prozess in dem die eingehenden Datenanfragen regelmäßig geprüft und in das sogenannten eDiscovery Identification Tool „eDIT" überführt werden, welches zur Verwaltung von

**Deloitte.**

Identifikationsaufgaben dient. Hierauf folgend wird der Identifikationsprozess durchgeführt, der neben einer Prüfung von Standard-Informationen wie etwa der Beschäftigungszeit des Custodian bei der Deutschen Bank auch die Prüfung der dem Custodian zugeordneten relevanten Datenquellen umfasst. Der hierbei generierte Report umfasst neben einer Übersicht der Zeiträume in der der jeweilige Custodian einen zur Datenquelle bezogenes Benutzerkonto aktiv hatte auch Beschreibungen zu auftretenden Ausnahmen und zusätzliche Informationen wie etwa alternative Benutzerkonten- und E-Mail-Adressen eines Custodians die für die Identifikation berücksichtigt wurden.

Die Identifikation von potentiell relevanten Daten wird mit Hilfe von Checklisten unterstützt, welche etwa auf das Prüfen möglicher Zweit-Accounts und relevanter digitaler Datenquellen hinweisen und die Vollständigkeit und Einhaltung der Prozesse unterstützt. Hierbei werden für einzelne Datenquellen auch Qualitätssicherungsschritte genannt, welche die Vollständigkeit der identifizierten Daten nochmals unterstützen.

### 4.1.3    Aufbewahrung und Sicherung

**AXSOne:** Um im Rahmen einer eDiscovery-Untersuchung Daten (z. B. E-Mails) aus AXSOne zu sichern, wird zum einen die „Directory ID" (DBDirID) sowie zum anderen der bereitzustellende Zeitraum in das AXSOne Webportal eingegeben. Um den späteren Download der Daten nach abgeschlossener Suche zu ermöglichen, wird eine „Offline Suche" durchgeführt. Für abgeschlossene Suchen ist ersichtlich, ob diese erfolgreich durchgeführt wurden oder ob es bei der Durchführung der Suche zu Warnungen oder Fehlern gekommen ist. Details zu aufgetretenen Fehlern und Warnungen sind innerhalb des Such-Managers ersichtlich. Die Deutsche Bank besitzt hierfür gesonderte Prozeduren und Vorgehensweisen zur Fehlerbehandlung, einschließlich einer Neu-Iteration des Suchdurchlaufes. Eine Fehlerdiagnose ist gemäß der Prozessbeschreibung bei Auftreten von Fehlern und Warnungen zwingend erforderlich und zu dokumentieren.

Identifizierte E-Mail-Daten werden im Rahmen einer durchgeführten „Offline Suche" im Datei-Format NSF (Dateiformat für „Lotus Notes" E-Mails) automatisch auf einen festgelegten Netzwerkshare heruntergeladen. Dieser ist regionsspezifisch vordefiniert. Die E-Mail-Daten werden mit dem internen Tool „eDiscovery Data Delivery Tool" mit einem 23-stelligen Passwort vor unbefugten Zugriffen geschützt. Um eine ausreichende Komplexität des Passwortes und damit die Robustheit gegenüber passwortbasierten Angriffen auf die Verschlüsselung zu gewährleisten, werden Anforderungen an die Verwendung von Groß- und Kleinschreibung sowie Sonderzeichen gestellt. Zusätzlich erlaubt die Berechnung eines digitalen Fingerabdrucks (SHA256) die Verifizierung der Integrität der bereitgestellten Dateien im Rahmen des Verfahrens, um beabsichtigte, aber auch unbeabsichtigte Veränderungen der Daten zu erkennen z. B. bei fehlerhaften Dateitransfers.

**Deloitte.**                                                    Deloitte GmbH
                                                                 Wirtschaftsprüfungsgesellschaft

Erstelle Log-Dateien werden archiviert und innerhalb des Tools Atlas hochgeladen und gespeichert. Anschließend wird die Datenlieferung einer Qualitätskontrolle unterzogen. Dies umfasst unter anderem die Analyse auf Vollständigkeit, z. B. anhand des gesicherten Datenvolumens, und die erfolgreiche Verschlüsselung der Daten. Hierbei wird auch das Ergebnis der Integritätsprüfung kontrolliert. Für die Durchführung sämtlicher Prozessschritte sowie die Qualitätskontrolle existieren Checklisten. Diese erlauben die Zuordenbarkeit der Prozessschritte auf einzelne Verantwortliche. Ebenso unterstützen sie die prozedurale Vollständigkeit des Prozesses. Zusätzlich existieren weitere Kontrollschritte bei Eintreten von Grenzfällen wie etwa einer Suche ohne Treffer, die das Wiederholen der Prozessschritte durch einen weiteren Analysten nach sich zieht.

Nach erfolgreicher Datenlieferung erfolgt die Benachrichtigung des Empfängers gleichzeitig mit der Übermittlung einer Übersicht der transferierten Daten sowie die zur Entschlüsselung der Daten benötigten Passwörter.

Da das AXSOne System der Deutschen Bank so ausgelegt ist, dass durch Nutzer keine Daten gelöscht oder verändert werden können, wird hierdurch der Möglichkeit von Manipulationen entgegengewirkt. Die jeweiligen Prozess-Schritte integrieren Vorgänge zum Schutz gegen Manipulationen wie die Verifikation von Prüfsummen sowie Logging-Mechanismen. Eine Verifikation von Prüfsummen sowie erhaltener Log-Dateien ergab keine Anhaltspunkte für Manipulationen.

**Digital Safe:** Zur Durchführung von Daten-Exporten aus Digital Safe ist zum einen die manuelle Durchführung einer Suche und eines Daten-Exportes über das Digital Safe Webportal dokumentiert sowie die automatische Suche mit Unterstützung eines „eDiscovery Bots". Innerhalb des Case-Management-Systems Atlas wird durch einen „eDiscovery Bot" geprüft, ob offene nicht bereits zugeordnete Sicherungsaufgaben bezüglich Digital Safe ausstehen. Liegen offene Sicherungsaufgaben vor, so führt der Bot die Suchanfrage basierend auf den in Atlas hinterlegten Suchkriterien durch. Es erfolgt eine E-Mail-Benachrichtigung, die den Status der jeweiligen Suche (im Kontext von Digital Safe mit „Audit" bezeichnet) mitteilt. Suchen können abgeschlossen, teilweise abgeschlossen oder fehlgeschlagen sein. Hierauf folgend wird eine manuelle Qualitätskontrolle durchgeführt, um Fehlermeldungen zu identifizieren und ggf. eine manuelle Iteration des Suchlaufes durchzuführen. Auch bei einer erfolgreich abgeschlossenen Suche erfolgen explizit dokumentierte Qualitätssicherungsmaßnahmen, um die Korrektheit der Suchparameter und die Vollständigkeit der Suche (z. B. Abdeckung des relevanten Betrachtungszeitraumes) zu bestätigen.

Zusätzlich ist es möglich über das Digital Safe Webportal manuelle Suchen durchzuführen, z. B. um fehlgeschlagene automatische Suchen zu wiederholen. Um Daten aus Digital Safe zu identifizieren, werden innerhalb der Kommunikation die E-Mail-Adresse des angeforderten Nutzers, die „Directory ID" sowie der bereitzustellende Zeitraum in das Digital Safe Portal eingegeben. Zudem werden die regionsspezifischen Datenablagen ausgewählt, in denen gesucht werden soll (Regionen: APAC, EMEA oder US).

**Deloitte.**

Deloitte GmbH
Wirtschaftsprüfungsgesellschaft

Das Ergebnis der Suchen wird standardmäßig im Format PST exportiert und automatisch über SFTP durch Micro Focus an die Deutsche Bank bereitgestellt. Teil der Datenbereitstellung ist auch eine Übersicht von Prüfsummen (SHA1), mit Hilfe derer Veränderungen an Daten im Laufe weiterer Bereitstellungs- und Arbeitsschritte erkannt werden können. Die Daten werden anschließend gemäß dokumentiertem Standard mit Hilfe des „eDiscovery Delivery Tools" als Archiv-Datei des Formates ZIP komprimiert, verschlüsselt und mit einem 23-stelligen Passwort versehen, um vor unbefugten Zugriffen zu schützen. Um eine ausreichende Komplexität des Passwortes zu gewährleisten und somit die verschlüsselten Daten vor passwortbasierten Angriffen zu schützen, werden Anforderungen an die Verwendung von Groß- und Kleinschreibung sowie Sonderzeichen gestellt.

Erstellte Logs werden archiviert und innerhalb des Tools Atlas hochgeladen und gespeichert. Anschließend wird die Datenlieferung einer dokumentierten Qualitätskontrolle unterzogen. Hierbei wird auch das Ergebnis der Integritätsprüfung kontrolliert. Für die Durchführung sämtlicher Prozessschritte sowie die Qualitätskontrolle existieren Checklisten, welche die Zurechenbarkeit der Prozessschritte auf einzelne Verantwortliche erlauben, sowie die prozedurale Vollständigkeit des Prozesses unterstützen.

Nach erfolgreicher Datenlieferung erfolgt die Benachrichtigung des Empfängers zusammen mit der Übermittlung einer Übersicht der transferierten Daten sowie die zur Entschlüsselung der Daten benötigten Passwörter.

Das System Digital Safe ist ein Compliance-Archivsystem und somit so ausgelegt, dass keine Daten verändert werden können. Eine Löschung durch Berechtigte würde protokolliert werden. Das Systemdesign wirkt der Möglichkeit von Manipulationen entgegen. Die jeweiligen Prozess-Schritte integrieren Vorgänge zum Schutz gegen Manipulationen wie die Verifikation von Prüfsummen sowie Logging-Mechanismen. Eine Verifikation von Prüfsummen sowie erhaltener Log-Dateien ergab keine Anhaltspunkte für Manipulationen.

**E-Mail-Server-Backups:** Zur Sicherung von Daten innerhalb des Sicherungsbestands der E-Mail-Server müssen folgende Informationen vorliegen:

- Nutzername,
- E-Mail-Adresse des Nutzers,
- Lotus Domino Server-Name, Ablageort und Bezeichnung des Backups sowie
- Relevanter Zeitraum – Abbilder können i. d. R. monatlich, vierteljährlich oder jährlich bereitgestellt werden.

Zur Datensicherung von E-Mails aus dem Backup wird zunächst eine Anfrage mittels Atlas erstellt. Anschließend werden entsprechend der Dokumentation interne Checks durchgeführt, welche unter

**Deloitte.**                                                    **Deloitte GmbH**
                                                                 Wirtschaftsprüfungsgesellschaft

anderem eine Analyse des angefragten Zeitraumes umfassen. So ist gemäß Dokumentation zwingend vorgeschrieben, mindestens eine Sicherung bereitzustellen, die nach dem angefragten Zeitpunkt liegt. Dies ist darauf zurückzuführen, dass Sicherungen in regelmäßigen Abständen durchgeführt werden, und bei einer Zurverfügungstellung von Sicherungen ausschließlich innerhalb des angefragten Zeitraumes ggf. Zeitbereiche nicht abgedeckt sein können.

Die Daten werden über die Kommandokonsole mit Hilfe eines TSM[4]-Clients auf das lokale Laufwerk des Backup-Servers exportiert. Um auf den Sicherungsserver zur Durchführung des Exportes zuzugreifen, ist ein Login mittels CyberArk nötig. Die jeweiligen Logins werden aufgezeichnet. Die Datenexporte erfolgen hierbei einzeln pro verfügbarer Sicherung (z. B. jeweils pro Monatssicherung). Zugriffe auf die Sicherungen über den TSM-Client werden hierbei über die Kommandokonsole im Rahmen von Log-Dateien aufgezeichnet und sind somit auch nachträglich nachvollziehbar. Die Prüfsummen der Daten werden anschließend mit dem „eDiscovery Delivery Tool" bestimmt und auf den eDiscovery Share transferiert. Dies umfasst neben den Kommunikationsdaten auch Log-Dateien welche die Berechnung der Prüfsumme bestätigen sowie Log-Dateien zum Kopierprozess, um die Integrität der Daten sicherzustellen. Die wiederhergestellten Daten werden im Anschluss verschlüsselt in ZIP-Dateien aufbewahrt. Das hierfür verwendete Passwort weist 23 Stellen auf und es werden Anforderungen an die Verwendung von Groß- und Kleinschreibung sowie Sonderzeichen gestellt. Hiermit soll eine ausreichende Komplexität des Passwortes sichergestellt werden, um vor passwortbasierten Angriffen auf die verschlüsselten Daten zu schützen. Sobald sämtliche Kopiervorgänge abgeschlossen sind, erfolgt eine erneute Analyse aller vorliegender Log-Dateien auf Vollständigkeit wie auch die Verifikation der Datenintegrität.

Für die Durchführung sämtlicher Prozessschritte sowie die Qualitätskontrolle existieren Checklisten, welche die Zurechenbarkeit der Prozessschritte auf einzelne Verantwortliche erlauben, sowie die prozedurale Vollständigkeit des Prozesses unterstützen.

Eine Verifikation von Prüfsummen sowie erhaltener Log-Dateien ergab keine Anhaltspunkte für Manipulationen.

### 4.1.4     Prozessierung und Sichtung

Das Prozessieren und Sichten digitaler Daten, einschließlich Kommunikationsdaten wie etwa E-Mails, wurde durch den externen eDiscovery-Dienstleister Consilio übernommen. Zur Erläuterung und Be-

---

[4] TSM steht für „Trivoli Storage Manager" und ist eine Archivierungsanwendung von IBM die eine Sicherung von Daten unterstützen und somit Datenverlusten vorbeugen soll.

**Deloitte.**

Deloitte GmbH
Wirtschaftsprüfungsgesellschaft

urteilung des standardmäßigen Prozesses erfolgte am 7. Januar 2021 ein Interview zwischen Vertretern von Deloitte und  Consilio, bei denen der von Consilio angewandte Standardprozess erläutert wurde. Hierbei wurde Consilio vertreten durch:

- Saurabh Shrivastava
- Pasha Moshirian

Im Rahmen der Standardvorgehensweise werden Daten an Consilio durch die Deutsche Bank via SFTP bereitgestellt. Die Daten sind standardmäßig vorab durch die Deutsche Bank verschlüsselt. Für empfangene Daten werden durch Consilio digitale Fingerabdrücke erstellt und  eine Integritätsprüfung vorgenommen, um sicherzustellen, dass Daten während des Datentransfers unverändert empfangen wurden. Es wird von Seiten Consilios ein „need to know"-Prinzip der Datenzugriffe angewendet. Im Rahmen der nachfolgenden Prozessierungs- und Hosting-Schritte erhält nur jener Personenkreis auf die Daten Zugriff, der diesen aufgrund der jeweiligen Zuordnung zum Projekt benötigt. Darüber hinaus wird auf die ursprünglich erhaltenen Originaldaten zu keinem Zeitpunkt schreibend zugegriffen. Zugriffe auf relevante Daten erfolgten, soweit technisch möglich, mit forensischer und hierfür ausgelegter Software, die eine Veränderung der Daten unterbindet. Die empfangenen Daten werden nach einer Integritätsprüfung in der Software Nuix prozessiert und anschließend nach erfolgreicher Prozessierung für weitere Analysen und Review in die Review-Plattform Relativity geladen. Das Ermöglichen eines Zugriffes auf die in der Review-Plattform Relativity gespeicherten Informationen durch einen externen Personenkreis (z. B. die Deutsche Bank oder durch die Deutsche Bank beauftragte Anwälte) erfolgt nur nach expliziter Absprache mit der Deutschen Bank. Das Kopieren von Informationen oder Dateien ist hierbei standardmäßig unterbunden. Ein Austausch der Daten erfolgt ausschließlich verschlüsselt über SFTP oder auf physischen Datenträgern.

Gemäß Aussage der genannten Gesprächspartner von Consilio, werden für sämtliche durchgeführten Schritte automatisiert Audit-Logs erstellt, welche die jeweiligen auf die Daten angewandten Operationen und Aktivitäten aufzeichnen. Die im Rahmen der Prozesse erstellten Logs werden archiviert und sind weiterhin verfügbar.

In dem Gerichtsprozess vorgelegte E-Mails wurden durch die Deutsche Bank an Consilio übermittelt und sind weiterhin verfügbar und archiviert. Sie wurden durch Deloitte im Rahmen des Gespräches angefragt und nach schriftlicher Freigabe durch die Deutsche Bank direkt und verschlüsselt von Consilio an Deloitte übermittelt. Weiter werden sie im Rahmen der Analysen aus Abschnitt 4.2.1 berücksichtigt.

Für den vorliegenden relevanten Zeitraum wurden bei der Analyse der übermittelten Log-Dateien (z. B. zu Kopiervorgängen) sowie einer Prüfung der übermittelten Prüfsummen keine Unregelmäßigkeiten oder Hinweise für Manipulationen festgestellt.

**Deloitte.**

Deloitte GmbH
Wirtschaftsprüfungsgesellschaft

**4.2      Beurteilung der Authentizität sachverhaltsrelevanter E-Mails**

Neben einer Verifizierung der Plausibilität früherer Datenbereitstellungen erfolgte eine gezielte Analyse der für Deloitte bereitgestellten Daten. Zusätzlich erfolgte eine Identifikation relevanter E-Mail-Ketten und eine inhaltliche und visuelle Analyse der hierbei gefundenen E-Mails.

**4.2.1      Validierung früherer Bereitstellungen an Consilio**

Eine Sichtung der bereitgestellten Log-Dateien und Checklisten lieferte keine Hinweise auf eine Abweichung zu den in 4.1 genannten Standardprozessen, wodurch die Einhaltung der ebenfalls in 4.1 aufgeführten forensischen Grundprinzipien nachvollzogen werden konnte. Die angewandten Vorgehensweisen und unternommenen Schritte wurden durch die Deutsche Bank dokumentiert. Hieraus geht hervor, durch welche Analysten welche Prozess- und Iterationsschritte unternommen wurden. Insbesondere sind Kernaktivitäten wie die Berechnung von Prüfsummen, die Verifikation der hierauf fußenden Datenintegrität und die Verschlüsselung bereitzustellender Daten zur Wahrung der Vertraulichkeit und dem Schutz vor unbefugten Zugriffen dokumentiert.

Ebenso fand eine Analyse vorliegender Log-Dateien in Bezug auf fehlerhafte Dateitransfers statt. Dabei konnten keine fehlerhaften Transfers festgestellt werden. Zur weiteren Bestätigung der Vorgehensweise wurde der eDiscovery-Dienstleister Consilio um die Bereitstellung der durch die Deutsche Bank übermittelten E-Mail-Daten gebeten. Diese dienten als Grundlage zur Verifikation erstellter Prüfsummen, um entsprechende Werte innerhalb der vorliegenden Log-Dateien zu prüfen. Zum einen konnte hierbei verifiziert werden, dass die Daten in unverändertem Zustand  an Deloitte übermittelt wurden, in dem Consilio sie erhalten hatte. Zum anderen ergab eine inhaltliche Analyse der E-Mails keine Abweichungen zum bisher bekannten Sachverhalt und der durch die Deutsche Bank dargestellten E-Mail. Auf Basis der abgeglichenen Hashwerte kann eine Manipulation der Daten während oder aufgrund der Übertragung an Deloitte ausgeschlossen werden.

Die im Datenbestand von Consilio enthaltene sachverhaltsrelevante E-Mail ist in Abbildung 2 dargestellt.

**Deloitte.**

<div align="right">

**Deloitte GmbH**
Wirtschaftsprüfungsgesellschaft

</div>

**Abbildung 2: Im von Consilio übergebenen Datenbestand identifizierte relevante E-Mail**

we sell warrants only over the market with our normal market making activity.
the volume we sell is always small and short term

the two big players VICTORY and HRANOV are not active at all at the moment.

value portfolio VICTORY approx. 18 mio CHF at 350, at 450 it would be 70 mio CHF and would have a delta of 750 / shares

value portfolio HRANOV approx. - 13 mio CHF at 350 (he is short puts), at 450 it would be + 24 mio CHF and would have a delta of 500 / shares

on the upside, delta will be generated with this 2 portfolios. at a certain level they would roll or sell it back to us.

loss out of APRIL is a total of 93 mio CHF for this two clients. I would say in a bullish environment they would prefer to sell it back because a delta neutral roll over would cost to much money.

as soon as this 2 clients see that we are under pressure they will be hard with us as well. (remember last autumn)

on a verbal basis HRANOV tells me that he would be willing to sell if his portfolio gets a value. at what level is difficult to say.

DWS I will meet in the afternoon as paul is in this building and out for lunch

call you in 1 hour

regrds

Simon Biner
Managing Director
Head of GME Switzerland

+41 44 227 33 40
+41 79 833 21 42

Neben der inhaltlichen Sichtung der übergebenen Daten fand eine Analyse der durch die Deutsche Bank bereitgestellten Log-Dateien (z. B. bezüglich Kopiervorgängen) und Checklisten statt. Diese umfassen sowohl das Vorgehen im Rahmen der Identifikation sowie die Bereitstellung an Consilio. Hier konnten anhand der bereitgestellten Dokumente und einer Analyse der übermittelten Dateien mittels Prüfsummen und Dateigrößen keine Abweichungen zum in Abschnitt 4.1 beschriebenen Standardprozess gefunden werden.

### 4.2.2      Validierung der von der Deutschen Bank bereitgestellten Daten

Zur Einschätzung der Datenqualität und zur Untersuchung auf Anzeichen, welche gegen eine Einhaltung der in Abschnitt 4.1 beschriebenen Prozesse sprechen könnten, wurden die von Deloitte erhaltenen Daten sowie die zur Datenlieferung bereitgestellten Log-Dateien und Prüfsummen verglichen. Die übermittelten Prüfsummen und innerhalb der Log-Dateien benannten Dateigrößen konnten verifiziert werden. Darüber hinaus waren übermittelte Checklisten vollständig und gemachte Angaben in Übereinstimmung mit den im Rahmen des Berichtes dargestellten Standardprozessen.

**Deloitte.**

Deloitte GmbH
Wirtschaftsprüfungsgesellschaft

### 4.2.3     Identifikation relevanter E-Mails innerhalb der Datenbereitstellung der Deutschen Bank

Um eine Beurteilung der E-Mails zu ermöglichen erfolgte in einem ersten Schritt die Identifikation von sachverhaltsrelevanten E-Mails innerhalb des durch die Deutsche Bank übergebenen Datenbestandes. Als Grundlage für die Identifikation sachverhaltsrelevanter E-Mails erfolgte die Suche nach Textbausteinen der durch die Klägerin eingereichten E-Mail-Varianten. Als Basis hierfür dienen zwei von der Klägerin eingereichte E-Mail-Varianten, welche nachfolgend als „Variante G1" und „Variante G2" bezeichnet werden. Diese sind jeweils in Abbildung 3 und Abbildung 4 dargestellt.

**Abbildung 3: E-Mail der International Investigation Agency als Teil der durch die Klägerin eingereichten Anlage S&P 11 vom 20. November 2020 (Variante G1)**

# Deloitte.

**Deloitte GmbH**
Wirtschaftsprüfungsgesellschaft

**Abbildung 4: Eingereichte E-Mail der Klägerin als Teil des Untersuchungsberichtes S&P 09 (Variante G2)**



Zusätzlich zu der in Abbildung 4 abgebildeten Darstellung der E-Mail-Variante G2 existiert eine wei-
tere, durch die Klägerin eingereichte Abbildung der selbigen E-Mail-Variante G2, welche aufgrund
der Darstellungsqualität in der weiteren Ausführung als repräsentatives Vergleichsmuster für weitere

# Deloitte.

Deloitte GmbH
Wirtschaftsprüfungsgesellschaft

Analysen dient. Eine inhaltliche Analyse der jeweiligen Varianten sowie eine Gegenüberstellung mit den aus dem Datenbestand der Deutschen Bank identifizierten E-Mails erfolgt in Abschnitt 4.2.4.

**Abbildung 5: Alternative Darstellung der E-Mail-Variante G2, welche ebenfalls durch die Klägerin eingereicht wurde**

we sell warrants only over the market with our normal market making activity
the volume we sell is always small and short term

the two big players VICTORY and HRANOV are not active at all at the moment.

**value portfolio VICTORY approx. 18 mio CHF at 350, at 450 it would be 70 mio CHF and would have a delta of 750 / shares**

**value portfolio HRANOV approx. - 13 mio CHF at 350 (he is short puts), at 450 it would be + 24 mio CHF and would  have a delta of 500 / shares**

on the upside, delta will be generated with this 2 portfolios. at a certain level they would roll or sell it back to us.

loss out of **APRIL is a total 93 mio CHF** for this two clients. I would say in a bullish environment they would prefer to sell it back because a delta neutral roll over would cost to much money.

as soon as this 2 clients see that we are under pressure they will be hard with us as well. (remember last autumn).

on a verbal basis HRANOV tells me that he would be willing to sell if his portfolio gets a value. at what level is difficult to say. no matter what, we can adjust the pricing in our favour. client is not aware at all.

DWS I will meet in the afternoon as paul is in this building and out for lunch

call you in 1 hour

regrds

Simon Biner
Managing Director
Head of GME Switzerland

Zur Identifikation relevanter E-Mails erfolgte mit der Forensik-Software Nuix eine Suche nach dem in beiden Versionen der Klägerin vorgefundenen Suchstring „*loss out of APRIL is a total of 93 mio CHF for this two clients*". Dies führte zu 88 Treffern innerhalb des bereitgestellten Datenbestandes der Deutschen Bank. Die identifizierten Treffer schließen neben der jeweiligen Ursprungs-E-Mail auch weiterführende Kommunikationen mit ein, welche die relevante E-Mail als Bestandteil der Kommunikationshistorie aufweisen.

Die entsprechenden Hierarchieebenen innerhalb der Kommunikation sind nachfolgender Abbildung zu entnehmen:

**Deloitte.**

**Deloitte GmbH**
Wirtschaftsprüfungsgesellschaft

**Abbildung 6: Darstellung des Kommunikationsverlaufs der Nachrichten innerhalb des Datenbestands**



„0" steht hierbei für die Ursprungs-E-Mail, die vom Custodian Simon Biner am 28. März 2008 um 12:01 Uhr verfasst wurde. „1" ist eine unmittelbare Antwort auf Simon Biners E-Mail, womit diese E-Mail Bestandteil der E-Mail-Kette ist. „4" steht exemplarisch für die vierte E-Mail. Werden Nachrichtenverläufe unabhängig fortgeführt, so wird dies mit einem Buchstaben ergänzt. Die Unterscheidung ist insofern relevant, als dass weiterführende Kommunikationen die ursprüngliche E-Mail vom 28. März 2008 als Teil des Kommunikationsverlaufs beinhalten können. Zusätzlich müssten bei etwaigen Manipulationsversuchen auch die verschiedenen Kommunikationsstränge Berücksichtigung finden. Die entsprechenden E-Mails sind dem Bericht als Anhang angehängt.

Eine gezielte Analyse der Datenquellen und eine Analyse der Verteilung der E-Mails auf bestimmte Datenquellen findet im Rahmen des Abschnittes 4.2.4 statt.

Zusätzlich zur beschriebenen Suche wurde nach dem Textbaustein „client is not aware at all" über den kompletten, Deloitte verfügbaren Datenbestand gesucht. Dies lieferte innerhalb des übergebenen Datenbestands keine Treffer. Dies bedeutet, dass es keine Hinweise auf eine E-Mail mit dem entsprechenden Inhalt auf Basis der untersuchten Daten gibt.

**Deloitte.**

Deloitte GmbH
Wirtschaftsprüfungsgesellschaft

**4.2.4        Analyse sachverhaltsrelevanter E-Mails**

**4.2.4.1        Analyse von durch die Klägerin eingereichten E-Mail-Varianten**

In einem ersten Schritt wurde ein inhaltlicher und visueller Vergleich der von der Klägerin einge-
reichten E-Mail-Varianten vorgenommen. Hierbei wird zwischen zwei Varianten der E-Mail der Klä-
gerin unterschieden:

- **Variante G1:** E-Mail-Variante der Klägerin, eingebracht im Dokument „S&P 11“.
- **Variante G2:** E-Mail-Variante der Klägerin, eingebracht in den Dokumenten „S&P 03“ und
  „S&P 09“.

Durch einen Vergleich beider vorliegender Varianten konnten folgende Unterscheidungsmerkmale
identifiziert werden:

- **Merkmal A:** Unterschiedliche Formatierung und Schreibweise des Wortes „regards“ zum Ab-
  schluss der Nachricht. Das Wort „regards“ ist in Variante G1 korrekt geschrieben, in Variante
  G2 allerdings als „regrds“ mit einem Tippfehler versehen.
- **Merkmal B:** Doppeltes Leerzeichen zwischen „would“ und „have“ im Abschnitt „[…]be + 24
  mio CHF and would have[…]“. Das doppelte Leerzeichen tritt in Variante G2 auf, während es
  in Variante G1 fehlt.
- **Merkmal C:** Unterschiedliche Formatierung des Textbereiches „APRIL is a total 93 mio CHF“.
  Der Textbereich ist in Variante G2 fett formatiert, in Variante G1 fehlt diese Formatierung.
- **Merkmal D:** Die Signatur ist um eine zusätzliche Leerzeile verschoben. In Variante G2 ist
  die Signatur des Absender verschoben, während es in Variante G1 keinen Abstand zwischen
  Schlusswort und Signatur gibt.

**Merkmal A und B** weisen hierbei eine besonders hohe Relevanz auf, da inhaltliche Änderungen in
Mitten eines E-Mail-Körpers im Regelfall weder bei Konvertierungen noch bei Archivierungsvorgängen
auftreten. Der geschriebene Text einschließlich der enthaltenen Rechtschreibfehler bleibt im Rahmen
solcher Prozesse erhalten. Insbesondere für textuell sichtbare Änderungen wie die unterschiedliche
Schreibweise des Wortes „regards“ sind daher keine technischen Erklärungen bekannt.

**Merkmal C und D** sind Änderungen, welche bei E-Mail-Konvertierungen in andere Datei-Formate
und ähnlichen Transformationsoperationen prinzipiell erfolgen können. Dies wäre auf den Verlust von
Formatierungseigenschaften oder auf die Umkodierung des dargestellten Textes zurückzuführen. So
würden bei einer Umwandlung von E-Mails in einer reinen Textversion beispielsweise Fettdruck sowie
Kursivdruck verloren gehen, da sich diese Information bei der Umwandlung textuell nicht im neuen
Format darstellen lassen würde. Derartige Veränderungen umfassen hierbei aber in der Regel den

**Deloitte.**

**Deloitte GmbH**
Wirtschaftsprüfungsgesellschaft

kompletten E-Mail-Körper. Dies ist jedoch bei den E-Mail-Varianten G1 und G2 nicht der Fall, da der Fettdruck (Merkmal A) in weiteren Teilbereichen der E-Mail intakt ist.

Nachfolgende Abbildung verdeutlicht die jeweiligen Unterscheidungsmerkmale anhand der einge-reichten E-Mail-Varianten der Klägerin:

# Deloitte.

Deloitte GmbH
Wirtschaftsprüfungsgesellschaft

Abbildung 7: Inhaltlicher und visueller Vergleich des E-Mail-Inhalts der durch die Klägerin eingereichten E-Mail-Varianten G1 und G2



In den Dokumenten S&P03, S&P09 und S&P11 bestätigt der von der Klägerin benannte Sachverständige, Moshe Buller, trotz dieser erkennbaren Unterschiede die Authentizität dieser E-Mail, und dass es sich in beiden Fällen um die gleiche E-Mail handelt. Für diese Einschätzung gibt es auf Basis der durchgeführten Untersuchung keine technische Grundlage. Auch das Gutachten Herrn Bullers trägt diese Feststellung nicht.

**Deloitte.**

Deloitte GmbH
Wirtschaftsprüfungsgesellschaft

#### 4.2.4.2    Analyse der im Datenbestand der Deutschen Bank sachverhaltsrelevanten E-Mails

Zusätzlich zu den E-Mail-Varianten der Klägerin fanden die im Datenbestand der Deutschen Bank als relevant identifizierten E-Mails für einen inhaltlichen Vergleich Berücksichtigung. Alle 88 identifizierten E-Mails aus dem Datenbestand der Deutschen Bank wurden mit Hilfe der Forensik-Software Nuix für eine inhaltliche Analyse exportiert. Der Export erfolgte für einen inhaltlichen Vergleich im Datei-Format EML. Da unabhängig vom exportierten E-Mail-Format (z. B. auch bei E-Mails im Datei-Format HTML) Veränderungen der E-Mails mit einem Texteditor möglich sind, wurden für sämtliche exportierten E-Mails Prüfsummen berechnet, um die Integrität der Einzeldateien im Rahmen der Untersuchung, aber auch bei Zurverfügungstellung der E-Mails, zu gewährleisten.

**Gap-Analyse:** Zur Analyse der im Datenbestand der Deutschen Bank identifizierten E-Mails erfolgte zunächst die Durchführung einer Gap-Analyse. Hierdurch sollte festgestellt werden, ob Lücken oder auffällige Verteilungen der identifizierten E-Mails innerhalb des Datenbestandes vorliegen. Hierbei wurde die Verteilung der E-Mails auf die jeweiligen Datenquellen auf Plausibilität untersucht. Eine Zusammenfassung ist Tabelle 77 zu entnehmen.

Zu den erhaltenen Datenquellen ist gelistet, ob E-Mails aus relevanten E-Mail-Ketten enthalten sind (grün markiert), mit Hilfe der Suchen nicht identifiziert werden konnten (rot markiert) oder zu denen aufgrund von Archivierungsvorgängen ausschließlich Auszüge enthalten sind (gelb markiert). Diesbezüglich ist anzumerken, dass es sich bei mehrfach gelisteten Quellen um Daten aus verschiedenen Monatssicherungen des E-Mail-Servers handelt.

Das Vorkommen der E-Mail „4C" in einer einzigen Datenquelle ist insofern plausibel, als dass es sich hierbei um eine E-Mail-Weiterleitung handelt an der einzig der Custodian, Luigi Vignola beteiligt ist.

Das Fehlen der E-Mail „4B" innerhalb der Datenquellen des Custodians Simon Biner ist insofern konsistent, als dass diese E-Mail in sämtlichen dem Custodian zugeordneten Datenquellen fehlt. Hierbei ist anzumerken, dass einzig die Archivierungslösung Digital Safe eine Journal-Funktion aufweist, d. h. sämtliche erstellte und erhaltene E-Mails vorhanden sein sollten. Eine Archivierung von E-Mails in AXSOne und das Erstellen von Backups des E-Mail-Servers erfolgt zeitversetzt. Das heißt zum Sicherungszeitpunkt besteht die Möglichkeit, dass besagte E-Mail „4B" bei diesem einen Custodian bereits gelöscht wurde. Aufgrund des konsistenten Fehlens innerhalb der Datenquellen eines einzelnen Custodians und des Vorhandenseins in anderen bereitgestellten Datenquellen der alternativen Custodians, erscheint dies plausibel. Dies gilt ebenso für das Fehlen einzelner E-Mails des Custodians Luigi Vignola.

**Deloitte.**

Deloitte GmbH
Wirtschaftsprüfungsgesellschaft

Tabelle 7: Identifikation einzelner E-Mail-Varianten innerhalb der bereitgestellten Datenquellen.

| Quelle | 0 | 1 | 2 | 3A | 3B | 4B | 4C |
|---|---|---|---|---|---|---|---|
| Garth Ritchie – AXSOne – UK | 1 | 1 | 1 | 1 | 1 | 1 | 0 |
| Garth Ritchie - E-Mail-Server-Backup – UK | A | 1 | A | A | A | A | 0 |
| Luigi Vignola - AXSOne – UK | 0 | 0 | 1 | 1 | 1 | 1 | 1 |
| Nino Kjellman - AXSOne – UK | 1 | 1 | 1 | 1 | 1 | 1 | 0 |
| Nino Kjellman - E-Mail-Server-Backup - Hong Kong | A | A | A | A | A | A | 0 |
| Nino Kjellman - E-Mail-Server-Backup - Hong Kong | A | A | A | A | A | A | 0 |
| Nino Kjellman - E-Mail-Server-Backup – UK | A | A | A | A | A | A | 0 |
| Noreddine Sebti - Digital Safe – US | 1 | 1 | 1 | 1 | 1 | 1 | 0 |
| Noreddine Sebti - E-Mail-Server-Backup - Hong Kong | 1 | 1 | 1 | 1 | 1 | 1 | 0 |
| Noreddine Sebti - E-Mail-Server-Backup - Hong Kong | 1 | 1 | 1 | 1 | 1 | 1 | 0 |
| Noreddine Sebti - E-Mail-Server-Backup - Hong Kong | 1 | 1 | 1 | 1 | 1 | 1 | 0 |
| Noreddine Sebti - E-Mail-Server-Backup - Hong Kong | 1 | 1 | 1 | 1 | 1 | 1 | 0 |
| Noreddine Sebti - E-Mail-Server-Backup - Hong Kong | 1 | 1 | 1 | 1 | 1 | 1 | 0 |
| Noreddine Sebti - E-Mail-Server-Backup - Hong Kong | 1 | 1 | 1 | 1 | 1 | 1 | 0 |
| Noreddine Sebti - E-Mail-Server-Backup - Hong Kong | 1 | 1 | 1 | 1 | 1 | 1 | 0 |
| Richard Malcolm Carson - AXSOne – UK | 1 | 1 | 1 | 1 | 1 | 1 | 0 |
| Richard Malcolm Carson - E-Mail-Server-Backup – UK | A | A | A | A | A | A | 0 |
| Simon Biner - AXSOne – UK | 1 | 1 | 1 | 1 | 1 | 0 | 0 |
| Simon Biner - E-Mail-Server-Backup – UK | A | A | A | A | A | 0 | 0 |

| | |
|---|---|
| A | Archivierte E-Mail |
| 0 | E-Mail nicht vorhanden |
| 1 | E-Mail vorhanden |

Darüber hinaus ist eine weitere Besonderheit der E-Mail-Archivierung betreffend der E-Mail-Server-Backups zu berücksichtigen. E-Mails, welche im Rahmen einer Sicherung des E-Mail-Servers gesichert werden, können zum Zeitpunkt der Erstellung der Sicherung bereits in anderen Archiv-Systemen wie AXSOne gesichert worden sein. Im Rahmen des Verschiebungsvorganges, wird die ursprüngliche E-Mail in das entsprechende Archiv verschoben und innerhalb der Mailbox des Nutzers mit einer E-Mail-Vorschau ersetzt, wie Abbildung 8 beispielhaft aufzeigt.

## Deloitte.

**Deloitte GmbH**
Wirtschaftsprüfungsgesellschaft

**Abbildung 8: Beispiel einer bereits archivierten E-Mail aus einem E-Mail-Server-Backup**



Aufgrund der Kürzung der E-Mails, führen die innerhalb von Abschnitt 4.2.3 dargestellten Suchan-
fragen für E-Mail-Server-Backups, nur eingeschränkt zu Treffern. Lediglich die Ursprungsemail „0"
konnte hierbei für alle Sicherungen des E-Mail-Servers identifiziert werden. Aus diesem Grund er-
folgte eine manuelle zeitbasierte Analyse der E-Mail-Inhalte der einzelnen E-Mail-Server-Backups.
Hierbei konnten zu den relevanten Zeitpunkten der jeweiligen Antworten und Weiterleitungen, ent-
sprechend gemäß Abbildung 8, gekürzte und archivierte E-Mail-Versionen vorgefunden werden.
Diese wurden in Tabelle 77 zur Kenntlichmachung mit einem „A" versehen.

Innerhalb von drei custodianbasierten Datenquellen konnten keine relevanten E-Mails identifiziert
werden. Dies begründet sich für die betroffenen Datenquellen wie folgt:

- **Nino Kjellman - AXSOne – SG:** Die früheste in den Datenquellen enthaltene Kommunika-
  tion stammt vom 14. Oktober 2008. Daher ist eine zeitliche Abdeckung der relevanten E-
  Mails nicht gegeben.
- **Noreddine Sebti - AXSOne – SG:** Die früheste in den Datenquellen enthaltene Kommuni-
  kation stammt vom 8. Mai 2008. Daher ist eine zeitliche Abdeckung der relevanten E-Mails
  nicht gegeben.
- **Luigi Vignola - E-Mail-Server-Backup – UK:** Diese Datenquelle war, wie in Abschnitt
  3.2.2.3 dargestellt, kein Bestandteil der Datenlieferung.

Zusammengefasst erscheint die Verteilung der E-Mails über die erhaltenen Datenquellen konsistent
und das Fehlen von Treffern bezüglich einzelner E-Mails ist erklärbar.

**Deloitte.**

Deloitte GmbH
Wirtschaftsprüfungsgesellschaft

**Textuelle und visuelle Analyse:**

Inhaltlich und visuell lassen sich die im Datenbestand der Deutschen Bank identifizierten E-Mails in drei Kategorien gliedern:

- **Kategorie DB1:** E-Mails mit technisch bedingt fehlender Formatierung. Entfällt auf relevante E-Mails, welche aus dem Archivierungssystem Digital Safe stammen.
- **Kategorie DB2:** E-Mails mit im Rahmen von Archivierungsvorgängen reduzierten Vorschau-texten. Dies beschränkt sich in den als relevant identifizierten E-Mails auf jene E-Mails, die im Rahmen von Archivierungsvorgängen in das Archivierungssystem AXSOne verschoben wurden, womit innerhalb der Sicherungen des E-Mail-Servers gekürzte Vorschau E-Mails ent-halten sind.
- **Kategorie DB3:** E-Mails mit intakter Formatierung.

Für E-Mails der Kategorie DB2 erfolgte im Rahmen der Gap-Analyse eine Analyse auf inhaltliche Übereinstimmung zwischen den E-Mails in der Vorschau-Version der Kategorie DB2 mit den vollstän-dig enthaltenen E-Mails der Kategorien DB1 und DB3. Eine Übereinstimmung war gegeben, weshalb der Fokus in diesem Abschnitt auf einen Vergleich der E-Mails aus Kategorie DB1 und DB3 liegt.

Innerhalb der Kategorien DB1 und DB3 sind die jeweiligen E-Mails textuell und visuell identisch. Daher erfolgte zunächst ein Vergleich repräsentativer E-Mails aus der jeweiligen Kategorie, bezogen auf die von Simon Biner am 28. März 2008 um 12:01 verfasste E-Mail.

Über einen direkten Vergleich der jeweiligen Kategorien konnten keine textuellen Unterscheidungs-merkmale identifiziert werden. Textuell sind die innerhalb des Bestands der Deutschen Bank identi-fizierten E-Mails deckungsgleich. Visuell können zwei Unterscheidungsmerkmale zwischen den E-Mails aus Kategorie DB1 und DB3 identifiziert werden:

- **Merkmal A**: Unterschiedlicher Fettdruck des Textbereiches „value Portfolio VICTORY[...]" bis „have a delta of 500 / shares"
- **Merkmal B:** Unterschiedlicher Fettdruck des Textbereiches „APRIL is a total 93 mio CHF"

Dies ist in Abbildung 9 visuell hervorgehoben.

# Deloitte.

**Deloitte GmbH**
Wirtschaftsprüfungsgesellschaft

**Abbildung 9: Vergleich der E-Mail-Varianten DB1 und DB3**

**Variante DB1**

value portfolio VICTORY approx. 18 mio CHF at 350, at 450 it would be 70 mio CHF and would have a delta of 750 / shares  (A)

value portfolio HRANOV approx. - 13 mio CHF at 350 (he is short puts), at 450 it would be + 24 mio CHF and would  have a delta of 500 / shares

on the upside, delta will be generated with this 2 portfolios. at a certain level they would roll or sell it back to us.

loss  (B) f APRIL is a total of 93 mio CHF for this two clients. I would say in a bullish environment they would prefer to sell it back because a delta

as soon as this 2 clients see that we are under pressure they will be hard with us as well. (remember last autumn)

on a verbal basis HRANOV tells me that he would be willing to sell if his portfolio gets a value. at what level is difficult to say.

DWS I will meet in the afternoon as paul is in this building and out for lunch

call you in 1 hour

regrds

Simon Biner
Managing Director
Head of GME Switzerland

**Variante DB3**

value portfolio VICTORY approx. 18 mio CHF at 350, at 450 it would be 70 mio CHF and would have a delta of 750 / shares  (A)

value portfolio HRANOV approx. - 13 mio CHF at 350 (he is short puts), at 450 it would be + 24 mio CHF and would  have a delta of 500 / shares

on the upside, delta will be generated with this 2 portfolios. at a certain level they would roll or sell it back to us.

loss  (B) t APRIL is a total of 93 mio CHF for this two clients. I would say in a bullish environment they would prefer to sell it back because a delta n

as soon as this 2 clients see that we are under pressure they will be hard with us as well. (remember last autumn)

on a verbal basis HRANOV tells me that he would be willing to sell if his portfolio gets a value. at what level is difficult to say.

DWS I will meet in the afternoon as paul is in this building and out for lunch

call you in 1 hour

regrds

Simon Biner
Managing Director
Head of GME Switzerland

Die fehlende Formatierung ist innerhalb der identifizierten E-Mails einheitlich auf Bereitstellungen aus der Archivierungslösung Digital Safe beschränkt und daher technisch begründet. Dies wird dadurch unterstützt, dass die Formatierungen über die jeweilige E-Mail hinaus konsistent verloren gingen und auch in weiteren E-Mails der entsprechenden E-Mail-Kommunikation fehlen.

**Deloitte.**

Deloitte GmbH
Wirtschaftsprüfungsgesellschaft

**Analyse von Metadaten:**

Neben einer inhaltlichen Analyse führten wir eine Analyse der Metadaten der E-Mails durch. Hierzu wurde für alle identifizierten E-Mails geprüft, ob Hinweise für Manipulationen gefunden werden können. Diente beispielsweise eine bereits bestehende E-Mail als Grundlage einer manipulierten Nachricht, so müssten die Metadaten und Dokumenteninhalte manuell angepasst werden. Betrachtet wurden:

- Metadaten zu **Sendern** und **Empfängern**, z. B. Rechtschreibfehler bei der Anpassung von Sendern und Empfängern.
- In den Metadaten aufgezeichnete **Zeitstempel**. Große Abstände erfordern eine tiefergehende Analyse, um die Abläufe nachzuvollziehen, und eine nachträgliche Anpassung der Zeitstempel, z. B. bei der Verwendung einer zeitlich anders gelegenen E-Mail als Grundlage, auszuschließen.
- Referenzen auf vorausgehende Nachrichten welche den **Kommunikationsverlauf** widerspiegeln.

Hierbei konnten bei den 88 identifizierten E-Mails keine Unstimmigkeit innerhalb des Sender- und Empfängerkreises festgestellt werden. Ebenso existierten keine signifikanten Abweichungen innerhalb der betrachteten zeitstempelbezogenen Metadaten. Geringe Abweichungen können mit der Erstellung der E-Mail (Zeitpunkt der Verfassung bis zum Versenden) oder geringe Abweichungen im Sekundenbereich im Kontext des Versands der Nachricht erklärt werden. Darüber hinaus wurde der Kommunikationsverlauf innerhalb der für einen Nutzer nicht ersichtlichen Metadaten korrekt dargestellt. Auf Vorgängernachrichten referenzierende Nachrichten-IDs stimmen mit den Nachrichten-IDs vorausgehender Nachrichten überein.

Die Abweichungen der E-Mails im Datenbestand der Deutschen Bank sind damit technisch erklärbar. Insgesamt bestätigt unsere Untersuchung die Authentizität der untersuchten E-Mails.

### 4.2.4.3   Vergleich der E-Mails aus dem Datenbestand der Deutschen Bank und der Klägerin

Für einen weiteren Vergleich der E-Mail-Varianten der Klägerin und der E-Mail-Varianten der Deutschen Bank erfolgte zunächst ein visueller und textueller Vergleich der beiden durch die Klägerin eingereichten Varianten G1 und G2 sowie der Variante DB3 der Deutschen Bank, da diese textuell repräsentativ für etwaige andere E-Mails aus den Kategorien DB1 und DB2 ist, wie in Abschnitt 0 aufgezeigt wurde.

**Deloitte.**

Deloitte GmbH
Wirtschaftsprüfungsgesellschaft

Durch einen textuellen sowie visuellen Vergleich der E-Mail-Variante G1 der Klägerin und der E-Mail-Variante DB3 aus dem Datenbestand der Deutschen Bank werden nachfolgende visuelle sowie textuelle Unterschiede offensichtlich:

- **Merkmal A:** Die Textpassage „No matter what. We can adjust the pricing in our favour. Client is not aware at all." ist in beiden Versionen der Deutschen Bank nicht enthalten.
- **Merkmal B:** Unterschiedliche Formatierung und Schreibweise des Wortes „regards" zum Abschluss der Nachricht. In der Version G1 der Klägerin, ist das Abschlusswort als „regards" geschrieben, während die Version der Deutschen Bank einen Tippfehler („regrds") aufweist. Hier stimmt die Version der Deutschen Bank mit der Version G2 der Klägerin überein.
- **Merkmal C:** Doppeltes Leerzeichen zwischen „would" und „have" im Abschnitt „[…]be + 24 mio CHF and would have[…]". Die Version G1 der Klägerin weist kein doppeltes Leerzeichen auf, während es in den E-Mails aus dem Datenbestand der Deutschen Bank enthalten ist. Ebenso enthalten ist es in der Version G2 der Klägerin.
- **Merkmal D**: Unterschiedliche Formatierung des Textbereiches „APRIL is a total 93 mio CHF". Dieser Abschnitt ist in Version G1 der Klägerin nicht formatiert, in der E-Mail-Variante DB3 der Deutschen Bank und der Version G2 der Klägerin schon. Abweichungen hiervon waren in Abschnitt 4.2.4.2 für die E-Mails der Deutschen Bank einheitlich technisch begründbar.
- **Merkmal E:** Die Signatur ist um eine zusätzliche Leerzeile verschoben. In der Version G1 der Klägerin existiert kein Abstand zwischen dem Schlusswort und der Signatur des Absenders. In der E-Mail aus dem Bestand der Deutschen Bank ist dies jedoch der Fall. Ebenso in der Version G2 der Klägerin.

Jene Merkmale, welche auf eine textuelle Änderung des E-Mail-Inhaltes hinweisen (**A, B und C**), weisen eine besondere Relevanz auf. Jene Unterschiede sind technisch nicht mit Konvertierungen in unterschiedliche E-Mail-Formate oder mit dem Kürzen von Nachrichten im Rahmen der Generierung von Vorschau-Versionen zu erklären, da diese im aufgezeigten Fall nur Stellenweise und weder zu Beginn noch gegen Ende der E-Mail vorzufinden sind. Es handelt sich damit aus technischer Sicht nicht um dieselbe E-Mail. Im Gegensatz hierzu stammen textuell und visuell identische E-Mails aus verschiedenen Datenquellen der Deutschen Bank, welche zusätzlich weitere Kommunikationsebenen wie etwa Antworten und Weiterleitungen umfassen.

Die **Unterscheidungsmerkmale D und E** wären insofern mit technischen Argumentationsmitteln erklärbar, dass diese konsistent über den E-Mail-Inhalt hinweg erkennbar sind, d. h. konsistent vergrößerte Zeilenabstände oder Satzteilunabhängiger Wegfall der Formatierung wie sie ebenfalls im Datenbestand der Deutschen Bank erkennbar waren.

Abbildung 10 zeigt die E-Mail-Variante G1 sowie die E-Mail-Variante DB3 im visuellen Vergleich.

# Deloitte.

**Deloitte GmbH**
Wirtschaftsprüfungsgesellschaft

**Abbildung 10: Visueller Vergleich der E-Mail-Varianten G1 und DB3**



Aufgrund der vorausgehenden Argumentation gibt es auf Basis der durchgeführten Untersuchung keine technische Erklärung für die textuellen sowie visuellen Unterschiede zwischen den E-Mail-Versionen der Klägerin und der E-Mail-Version DB3 der Deutschen Bank. Dagegen stützen die durchgeführten Analysen sowie die Berücksichtigung verschiedener Kommunikationsstränge und Datenquellen die Authentizität der untersuchten E-Mails der Deutschen Bank.

**Deloitte.**

Deloitte GmbH
Wirtschaftsprüfungsgesellschaft

Ein Vergleich der durch die Klägerin eingereichten E-Mail-Version G2 und der im Datenbestand der Deutschen Bank vorgefundenen E-Mail-Variante DB3 weist dagegen nur die zuvor genannten Unterscheidungsmerkmale A und E auf:

- **Merkmal A:** Die Textpassage „No matter what. We can adjust the pricing in our favour. Client is not aware at all." Ist in der Variante G2 der Klägerin enthalten, jedoch nicht in den E-Mails aus dem Datenbestand der deutschen Bank.
- **Merkmal E:** Die Signatur ist um eine zusätzliche Leerzeile verschoben. In der Version G2 der Klägerin existiert ein verringerter Abstand zwischen dem Schlusswort und der Signatur des Absenders. In der E-Mail aus dem Bestand der Deutschen Bank ist der Abstand größer.

# Deloitte.

Deloitte GmbH
Wirtschaftsprüfungsgesellschaft

**Abbildung 11: Visueller Vergleich der E-Mail-Varianten G2 und DB3**



**Variante G2**

value portfolio VICTORY approx. 18 mio CHF at 350, at 450 it would be 70 mio CHF and would have a delta of 750 / shares

value portfolio HRANOV approx. - 13 mio CHF at 350 (he is short puts), at 450 it would be + 24 mio CHF and would have a delta of 500 / shares

on the upside, delta will be generated with this 2 portfolios. at a certain level they would roll or sell it back to us.

loss out of APRIL is a total 93 mio CHF for these two clients. I would say in a bullish environment they would prefer to sell it back because a delta neutral roll over would cost to much money.

as soon as this 2 clients see that we are under pressure they will be hard with us as well. (remember last autumn)

on a verbal basis HRANOV tells me that he would be willing to sell if his portfolio gets a value. at what level is difficult to say. no matter what, we can adjust the pricing in our favour. client is not aware at all. **A**

DWS I will meet in the afternoon as paul is in this building and out for lunch.

call you in 1 hour

regrds **E**

Simon Biner
Managing Director
Head of GME Switzerland

**Variante DB3**

value portfolio VICTORY approx. 18 mio CHF at 350. at 450 it would be 70 mio CHF and would have a delta of 750 / shares

value portfolio HRANOV approx. - 13 mio CHF at 350 (he is short puts). at 450 it would be + 24 mio CHF and would have a delta of 500 / shares

on the upside. delta will be generated with this 2 portfolios. at a certain level they would roll or sell it back to us.

loss out of APRIL is a total of 93 mio CHF for this two clients. I would say in a bullish environment they would prefer to sell it back because a delta n

as soon as this 2 clients see that we are under pressure they will be hard with us as well. (remember last autumn)

on a verbal basis HRANOV tells me that he would be willing to sell if his portfolio gets a value. at what level is difficult to say. **A**

DWS I will meet in the afternoon as paul is in this building and out for lunch

call you in 1 hour

regrds

**E**

Simon Biner
Managing Director
Head of GME Switzerland

# Deloitte.

Deloitte GmbH
Wirtschaftsprüfungsgesellschaft

**5        Schlussbemerkung**

Wir haben unsere Tätigkeit unter Zugrundelegung der uns zur Verfügung gestellten Unterlagen, der erhaltenen Informationen und der uns erteilten Auskünfte durchgeführt und erstatten vorliegenden Bericht nach bestem Wissen und Gewissen.

Düsseldorf, den 25. Februar 2021

**Deloitte GmbH**
Wirtschaftsprüfungsgesellschaft

(Thomas Fritzsche)                                     (Maximilian Wevers)
Partner                                                     Director

# Deloitte.

**Deloitte GmbH**
Wirtschaftsprüfungsgesellschaft

## Anlage 1: E-Mails aus relevanten Kommunikationssträngen

Die in Abschnitt 4.2.3 identifizierten Treffer schließen neben der jeweiligen Ursprungs-E-Mail „0" auch weiterführende Kommunikationen mit ein, welche die relevante E-Mail als Bestandteil der Kommunikationshistorie aufweisen. Die entsprechenden Hierarchieebenen innerhalb der Kommunikation sind nachfolgender Abbildung zu entnehmen:

**Abbildung 12: Darstellung des Kommunikationsverlaufs der Nachrichten innerhalb des Datenbestands**



Zur Veranschaulichung des jeweiligen Kommunikationsverlaufes werden die in Abbildung 12 dargestellten Kommunikationsstränge auf den nächsten Seiten gesondert abgebildet. Die ausgewählten Abbildungen sind hierbei repräsentativ für die E-Mails aus den verschiedenen analysierten Datenquellen der einzelnen Custodians wie in Abschnitt 4.2.4.2 dargestellt. Die Darstellungen erfolgen hierbei ausgehend von der jüngsten E-Mail bis hin zur Ursprungs-E-Mail „0", welche darüber hinaus nochmals gesondert anhand eines repräsentativen Beispiels abgebildet wird.

49

**Deloitte.**

Deloitte GmbH
Wirtschaftsprüfungsgesellschaft

**Darstellung eines ausgewählten Beispiels der Ursprungs-E-Mail „0" von Simon Biner:**

**Abbildung 13: Ausgewähltes repräsentatives Beispiel der E-Mail "0" von Simon Biner**

| Simon Biner | To | Richard Carson/DMGEQ/DMG UK/DeuBa@DBEMEA |
|---|---|---|
| 28.03.2008 12:01 | cc | Garth Ritchie/DMGEQ/DMG UK/Deuba@DBEMEA, luigi.vigndla@db.com, nino.kjellman@db.com, Noreddine Sebti/NewYork/DBNA/DeuBa@DBAmericas |
| | Subject | Re: OERLIKON ****pls read **** |

we sell warrants only over the market with our normal market making activity.
the volume we sell is always small and short term

the two big players VICTORY and HRANOV are not active at all at the moment.

value portfolio VICTORY approx. 18 mio CHF at 350, at 450 it would be 70 mio CHF and would have a delta of 750 / shares

value portfolio HRANOV approx. – 13 mio CHF at 350 (he is short puts), at 450 it would be + 24 mio CHF and would have a delta of 500 / shares

on the upside. delta will be generated with this 2 portfolios. at a certain level they would roll or sell it back to us.

loss out of **APRIL is a total of 93 mio CHF** for this two clients. i would say in a bullish environment they would prefer to sell it back because a delta neutral roll over would cost to much money.

as soon as this 2 clients see that we are under pressure they will be hard with us as well. (remember last autumn)

on a verbal basis HRANOV tells me that he would be willing to sell if his portfolio gets a value. at what level is difficult to say.

DWS I will meet in the afternoon as paul is in this building and out for lunch

call you in 1 hour

regrds


Simon Biner
Managing Director
Head of GME Switzerland

+41 44 227 33 40
+41 79 833 21 42

50

# Deloitte.

**Deloitte GmbH**
Wirtschaftsprüfungsgesellschaft

**Darstellung des Kommunikationsstranges der E-Mails „0" bis „3A".** Der nachfolgend abgebildete repräsentative Kommunikationsverlauf enthält die E-Mails „3A", „2", „1" und „0". Zur Verdeutlichung der Zusammengehörigkeit wurden die jeweiligen Screenshots mit einer entsprechenden textuellen Überlappung erstellt.

**Abbildung 14: Auszug aus dem Kommunikationsverlauf der E-Mails „0" bis „3A" - Teil 1**

| Luigi Vignola@DBEMEA 28.03.2008 17:20 | To: | Simon Biner/db/dbcom@DBEMEA@DEUBAINT, |
|---|---|---|
| | cc: | Garth Ritchie/DMGEQ/DMG UK/DeuBa@DBEMEA, Nino Kjellman/DMGEQ/DMG UK/DeuBa@DBEMEA, Noreddine Sebti/NewYork/DBNA/DeuBa@DBAmericas, |
| | Subject: | Re: OERLIKON  ****pls read **** |

re the possibility to cash compensate instead of physical settlement

The way I read this is that we indeed have the possibility to pay a cash compensation.
I will go through the prospectus in detail and try to identify the exact application, but here are the relevant clauses in the prospectus:

"**Settlement Disruption Event**" means, in the opinion of the Issuer, an event beyond the control of the Issuer as a result of which the Issuer cannot make delivery of a Physical Settlement Unit in accordance with such market method as it elects at the relevant time for delivery of the relevant Physical Settlement Unit;

"**Disruption Cash Settlement Price**" means, in respect of each Series, the fair market value of such Security on such day as shall be selected by the Issuer taking into account such factors as it deems relevant, including without limitation the value of any Physical Settlement Units delivered less the cost to the Issuer and/or any Affiliate of unwinding any underlying related hedging arrangements, all as determined by the Issuer acting in a reasonable manner;

**Settlement Disruption**
If and to the extent Physical Settlement applies and prior to delivery of a Physical Settlement Unit in respect thereof, in the opinion of the Calculation Agent, a Settlement Disruption Event is subsisting, then the Settlement Date for such Physical Settlement Unit shall be postponed to the first following Business Day on which no Settlement Disruption Event is subsisting.

For so long as delivery of all or any of the Physical Settlement Units is not practicable by reason of a Settlement Disruption Event, then in lieu of physical settlement and notwithstanding any other provision hereof the Issuer *may elect in its sole discretion to satisfy its obligations in respect of the relevant Security by payment of the Disruption Cash Settlement Price* not later than on the third Business Day following the date that notice of such election is given to the Securityholders in accordance with General Condition 4. Payment of the Disruption Cash Settlement Price will be made in such manner as shall be notified to the Securityholders in accordance with General Condition 4. The Calculation Agent shall give notice as soon as practicable to the Securityholders in accordance with

# Deloitte.

**Deloitte GmbH**
Wirtschaftsprüfungsgesellschaft

**Abbildung 15: Auszug aus dem Kommunikationsverlauf der E-Mails „0" bis „3A" - Teil 2**

Agent shall give notice as soon as practicable to the Securityholders in accordance with
General Condition 4 that a Settlement Disruption Event has occurred.

No Securityholder or any other person shall be entitled to any payment in respect of a
Security in the event of any delay in the delivery of any Physical Settlement Unit due to the
occurrence of a Settlement Disruption Event and no liability in respect thereof shall attach to
the Issuer.

▼ Simon Biner/db/dbcom@DBEMEA

| | | |
|---|---|---|
| **Simon Biner/db/dbcom@DBEMEA**<br>28/03/2008 15:13 | To | DeuBa@DBEMEA@DEUBAINT |
| | cc | Garth Ritchie/DMGEQ/DMG UK/DeuBa@DBEMEA, |
| | Subject | Re: OERLIKON  ****pls read **** |

update :

- DWS still not back
- we are market 10 - 15 % above the market. if we mark down the vols now, we get an additional delta of
80'000on the book
- if we keep the vol at this level and we would mark the vol down if the stock goes up we would have an
additonal puffer. short vol at spot 400 is 1 mio CHF vega. if we mark down at spot 400 CHF 10 % we
would generate 10 mio CHF and we would get more then 200  delta on the book (delta difficult to

# Deloitte.

**Deloitte GmbH**
Wirtschaftsprüfungsgesellschaft

**Abbildung 16: Auszug aus dem Kommunikationsverlauf der E-Mails „0" bis „3A" - Teil 3**

would generate 10 mio CHF and we would get more then 200  delta on the book (delta difficult to simulate)

**our short at 400 CHF with a remark of 10 % vol would be then 277 / instead of 477 /**

I assume that we can buy 200 / shares up to 400.

so if we buy 200 / shares and we remark by 10 % vol we would be **short 77 /** delta (massiv gamma)

PL compared to yesterday Trading Price 380 assuming stock at 400

+ 59 mio  (333.75 – 380)
+ 10 mio (vola change)
- 5 mio estimated loss of short position

**estimated profit 64 mio CHF**

**delta flat**

I agree with the remaining gamma risk. if I see the PL and the delta I fell myself more comfortable then now !
even if we go to 500 and would get 850 / shares short we would still be positive.

the 500 strikes will not be excercised from them, they have to roll ! (no money)
if we dont make a rollover price, they will have problem to find an counterparty to do this. this is an additional aspect where I think they can not squeeze us out to any level.
they have to roll or sell the stake over the market - roll over in this size DB is the only counterparty.

# Deloitte.

Deloitte GmbH
Wirtschaftsprüfungsgesellschaft

**Abbildung 17: Auszug aus dem Kommunikationsverlauf der E-Mails „0" bis „3A" - Teil 4**

they have to roll or sell the stake over the market - roll over in this size DB is the only counterparty.

**In my view I would show an offer of 1.5 mio shares at 380**

regards


Simon Biner
Managing Director
Head of GME Switzerland

+41 44 227 33 40
+41 79 833 21 42



**Nino
Kjellman/DMGEQ/DMG
UK/DeuBa@DBEMEA**

28/03/2008 14:06

| | |
|---|---|
| To | Simon Biner/db/dbcom@DBEMEA@DEUBAINT |
| cc | Garth Ritchie/DMGEQ/DMG UK/DeuBa@DBEMEA, luigi.vignola@db.com, Noreddine Sebti/NewYork/DBNA/DeuBa@DBAmericas, Richard Carson/DMGEQ/DMG UK/DeuBa@DBEMEA |
| Subject | Re: OERLIKON ****pls read ****Link |

We can forget Blackrock as Rene found out unofficially that it effectively Merrill Lynch the holder of the

54

# Deloitte.

**Deloitte GmbH**
Wirtschaftsprüfungsgesellschaft

**Abbildung 18: Auszug aus dem Kommunikationsverlauf der E-Mails „0" bis „3A" - Teil 5**

We can forget Blackrock as Rene found out unofficially that it effectively Merrill Lynch the holder of the stocks

Nino

**Simon
Biner/db/dbcom@DBE
MEA**

28/03/2008 12:01

To Richard Carson/DMGEQ/DMG UK/DeuBa@DBEMEA

cc Garth Ritchie/DMGEQ/DMG UK/DeuBa@DBEMEA, luigi.vignola@db.com, nino.kjellman@db.com, Noreddine Sebti/NewYork/DBNA/DeuBa@DBAmericas

Subject Re: OERLIKON ****pls read ****Link

we sell warrants only over the market with our normal market making activity.
the volume we sell is always small and  short term

the two big players VICTORY and HRANOV are not active at all at the moment.

**value portfolio VICTORY approx. 18 mio CHF at 350, at 450 it would be 70 mio CHF and
would have a delta of 750 / shares**

# Deloitte.

**Deloitte GmbH**
Wirtschaftsprüfungsgesellschaft

**Abbildung 19: Auszug aus dem Kommunikationsverlauf der E-Mails „0" bis „3A" - Teil 6**

would have a delta of 750 / shares

value portfolio HRANOV approx. – 13 mio CHF at 350 (he is short puts), at 450 it would be + 24 mio CHF and would  have a delta of 500 / shares

on the upside, delta will be generated with this 2 portfolios. at a certain level they would roll or sell it back to us.

loss out of APRIL is a total of 93 mio CHF for this two clients. I would say in a bullish environment they would prefer to sell it back because a delta neutral roll over would cost to much money.

as soon as this 2 clients see that we are under pressure they will be hard with us as well. (remember last autumn)

on a verbal basis HRANOV tells me that he would be willing to sell if his portfolio gets a value. at what level is difficult to say.

DWS I will meet in the afternoon as paul is in this building and out for lunch

call you in 1 hour

regrds



Simon Biner
Managing Director
Head of GME Switzerland

+41 44 227 33 40
+41 79 833 21 42

**Deloitte.**

**Deloitte GmbH**
Wirtschaftsprüfungsgesellschaft

**Darstellung des Kommunikationsstranges der E-Mails „0" bis „4B".** Der nachfolgend abgebildete repräsentative Kommunikationsverlauf enthält die E-Mails „4B", „3B", „2", „1" und „0". Zur Verdeutlichung der Zusammengehörigkeit wurden die jeweiligen Screenshots mit einer entsprechenden textuellen Überlappung erstellt. Aufgrund des schweizerischen Bankkundengeheimnis sind entsprechende Kundenangaben geschwärzt.

**Abbildung 20: Auszug aus dem Kommunikationsverlauf der E-Mails „0" bis „4B" - Teil 1**



# Deloitte.

**Deloitte GmbH**
Wirtschaftsprüfungsgesellschaft

**Abbildung 21: Auszug aus dem Kommunikationsverlauf der E-Mails „0" bis „4B" - Teil 2**



+41 79 833 21 44 Mobile
▼ Simon Biner/db/dbcom@DBEMEA

| | **Simon Biner/db/dbcom@DBEMEA** | To | Nino Kjellman/DMGEQ/DMG UK/ |
|---|---|---|---|
| | 28/03/2008 15:13 | cc | DeuBa@DBAmericas, Richard Carson/DMGEQ/DMG |
| | | Subject | Re: OERLIKON ****pls read **** |

update :

- DWS still not back
- we are market 10 - 15 % above the market. if we mark down the vols now, we get an additional delta of 80'000on the book
- if we keep the vol at this level and we would mark the vol down if the stock goes up we would have an additonal puffer. short vol at spot 400 is 1 mio CHF vega. if we mark down at spot 400 CHF 10 % we would generate 10 mio CHF and we would get more then 200  delta on the book (delta difficult to simulate)

**our short at 400 CHF with a remark of 10 % vol would be then 277 / instead of 477 /**

I assume that we can buy 200 / shares up to 400.

so if we buy 200 / shares and we remark by 10 % vol we would be **short 77 /** delta (massiv gamma)

PL compared to yesterday Trading Price 380 assuming stock at 400

# Deloitte.

**Deloitte GmbH**
Wirtschaftsprüfungsgesellschaft

**Abbildung 22: : Auszug aus dem Kommunikationsverlauf der E-Mails „0" bis „4B" - Teil 3**

PL compared to yesterday Trading Price 380 assuming stock at 400

+ 59 mio  (333.75 - 380)
+ 10 mio (vola change)
- 5 mio estimated loss of short position

**estimated profit 64 mio CHF**

**delta flat**

I agree with the remaining gamma risk. if I see the PL and the delta I fell myself more comfortable then now !
even if we go to 500 and would get 850 / shares short we would still be positive.

the 500 strikes will not be excercised from them, they have to roll ! (no money)
if we dont make a rollover price, they will have problem to find an counterparty to do this. this is an additional aspect where I think they can not squeeze us out to any level.
they have to roll or sell the stake over the market - roll over in this size DB is the only counterparty.

**In my view I would show an offer of 1.5 mio shares at 380**

regards


Simon Biner
Managing Director
Head of GME Switzerland

+41 44 227 33 40
+41 79 833 21 42

# Deloitte.

**Deloitte GmbH**
Wirtschaftsprüfungsgesellschaft

**Abbildung 23: Auszug aus dem Kommunikationsverlauf der E-Mails „0" bis „4B" - Teil 4**

+41 79 833 21 42

**Nino
Kjellman/DMGEQ/DMG
UK/DeuBa@DBEMEA**

28/03/2008 14:06

To  Simon Biner/db/dbcom@DBEMEA@DEUBAINT

cc  Garth Ritchie/DMGEQ/DMG UK/DeuBa@DBEMEA, luigi.vignola@db.com, Noreddine
    Sebti/NewYork/DBNA/DeuBa@DBAmericas, Richard Carson/DMGEQ/DMG
    UK/DeuBa@DBEMEA

Su  Re: OERLIKON ****pls read ****Link
bje
ct

We can forget Blackrock as Rene found out unofficially that it effectively Merrill Lynch the holder of the
stocks

Nino

**Simon
Biner/db/dbcom@DBE
MEA**

28/03/2008 12:01

To  Richard Carson/DMGEQ/DMG UK/DeuBa@DBEMEA

cc  Garth Ritchie/DMGEQ/DMG UK/DeuBa@DBEMEA, luigi.vignola@db.com, nino.kjellman@db.com,
    Noreddine Sebti/NewYork/DBNA/DeuBa@DBAmericas

**Deloitte.**

**Deloitte GmbH**
Wirtschaftsprüfungsgesellschaft

**Abbildung 24: Auszug aus dem Kommunikationsverlauf der E-Mails „0" bis „4B" - Teil 5**

Simon
Biner/db/dbcom@DBE
MEA

28/03/2008 12:01

T o  Richard Carson/DMGEQ/DMG UK/DeuBa@DBEMEA

cc  Garth Ritchie/DMGEQ/DMG UK/DeuBa@DBEMEA, luigi.vignola@db.com, nino.kjellman@db.com,
Noreddine Sebti/NewYork/DBNA/DeuBa@DBAmericas

Subj  Re: OERLIKON ****pls read ****Link
ect

we sell warrants only over the market with our normal market making activity.
the volume we sell is always small and  short term

the two big players VICTORY and HRANOV are not active at all at the moment.

**value portfolio VICTORY approx. 18 mio CHF at 350, at 450 it would be 70 mio CHF and
would have a delta of 750 / shares**

**value portfolio HRANOV approx. – 13 mio CHF at 350 (he is short puts), at 450 it would be
+ 24 mio CHF and would  have a delta of 500 / shares**

on the upside, delta will be generated with this 2 portfolios. at a certain level they would roll or sell it
back to us.

loss out of **APRIL is a total of 93 mio CHF** for this two clients. I would say in a bullish environment
they would prefer to sell it back because a delta neutral roll over would cost to much money.

# Deloitte.

**Deloitte GmbH**
Wirtschaftsprüfungsgesellschaft

**Abbildung 25: Auszug aus dem Kommunikationsverlauf der E-Mails „0" bis „4B" - Teil 6**

loss out of **APRIL is a total of 93 mio CHF** for this two clients. I would say in a bullish environment they would prefer to sell it back because a delta neutral roll over would cost to much money.

as soon as this 2 clients see that we are under pressure they will be hard with us as well. (remember last autumn)

on a verbal basis HRANOV tells me that he would be willing to sell if his portfolio gets a value. at what level is difficult to say.

DWS I will meet in the afternoon as paul is in this building and out for lunch

call you in 1 hour

regrds

Simon Biner
Managing Director
Head of GME Switzerland

+41 44 227 33 40
+41 79 833 21 42

**Deloitte**

Deloitte GmbH
Wirtschaftsprüfungsgesellschaft

**Darstellung des Kommunikationsstranges der E-Mails „0" bis „4C".** Der nachfolgend abgebil-
dete repräsentative Kommunikationsverlauf enthält die E-Mails „4C", „3B", „2", „1" und „0". Zur
Verdeutlichung der Zusammengehörigkeit wurden die jeweiligen Screenshots mit einer entsprechen-
den textuellen Überlappung erstellt. Aufgrund des schweizerischen Bankkundengeheimnis sind ent-
sprechende Kundenangaben geschwärzt.

**Abbildung 26: Auszug aus dem Kommunikationsverlauf der E-Mails „0" bis „4C" - Teil 1**

---

**Fw: OERLIKON ****pls read ****

**Luigi Vignola**  to: Ian Holt                                          31.03.2008 09:49

Show Details

fyi

Luigi Vignola
Deutsche Bank AG, Zurich Branch
Global Markets
Strategic Transactions Switzerland

+41 44 227 33 51 Office
+41 44 227 30 77 Fax
+41 79 833 21 44 Mobile
----- Forwarded by Luigi Vignola/db/dbcom on 31/03/2008 11:47 -----

       **Luigi Vignola/db/dbcom**

       31/03/2008 11:34

| | |
|---|---|
| To | Simon Biner/db/dbcom@DBEMEA@DEUBAINT |
| cc | Garth Ritchie/DMGEQ/DMG UK/DeuBa@DBEMEA, |
| Subject | Re: OERLIKON ****pls read **** |

update, just spoke with ▮▮▮▮▮

- they acknowledged the fact that we have turned down their bid on Friday but felt uncomfortable with the
fact that we did not come with a firm offer in the vicinity of the current market price
- in the discussion I highlighted again our potential risk on the upside and they seem now to be open to
discuss possible solutions. E.g. selling of cash settled call options. We are meeting with ▮▮▮▮▮▮
this afternoon to discuss this

**FYI:** In the call, ▮▮▮▮▮▮ mentioned that ▮▮▮▮▮▮ might call ▮▮▮▮▮▮ directly

will keep you updated

---

**Abbildung 27: Auszug aus dem Kommunikationsverlauf der E-Mails „0“ bis „4C“ - Teil 2**

will keep you updated

Luigi Vignola
Deutsche Bank AG, Zurich Branch
Global Markets
Strategic Transactions Switzerland

+41 44 227 33 51 Office
+41 44 227 30 77 Fax
+41 79 833 21 44 Mobile

Simon Biner/db/dbcom@DBEMEA

**Simon Biner/db/dbcom@DBEMEA**
28/03/2008 15:13

To: DeuBa@DBEMEA@DEUBAINT
cc: Garth Ritchie/DMGEQ/DMG UK/DeuBa@DBEMEA,
Subject: Re: OERLIKON ****pls read ****

update :

- DWS still not back
- we are market 10 - 15 % above the market. if we mark down the vols now, we get an additional delta of 80'000on the book
- if we keep the vol at this level and we would mark the vol down if the stock goes up we would have an additonal puffer. short vol at spot 400 is 1 mio CHF vega. if we mark down at spot 400 CHF 10 % we would generate 10 mio CHF and we would get more then 200 delta on the book (delta difficult to

# Deloitte.

**Deloitte GmbH**
Wirtschaftsprüfungsgesellschaft

**Abbildung 28: Auszug aus dem Kommunikationsverlauf der E-Mails „0" bis „4C" - Teil 3**

would generate 10 mio CHF and we would get more then 200 delta on the book (delta difficult to simulate)

**our short at 400 CHF with a remark of 10 % vol would be then 277 / instead of 477 /**

I assume that we can buy 200 / shares up to 400.

so if we buy 200 / shares and we remark by 10 % vol we would be **short 77 /** delta (massiv gamma)

PL compared to yesterday Trading Price 380 assuming stock at 400

+ 59 mio  (333.75 - 380)
+ 10 mio (vola change)
- 5 mio estimated loss of short position

**estimated profit 64 mio CHF**

**delta flat**

I agree with the remaining gamma risk. if I see the PL and the delta I fell myself more comfortable then now !
even if we go to 500 and would get 850 / shares short we would still be positive.

the 500 strikes will not be excercised from them, they have to roll ! (no money)
if we dont make a rollover price, they will have problem to find an counterparty to do this. this is an additional aspect where I think they can not squeeze us out to any level.
they have to roll or sell the stake over the market - roll over in this size DB is the only counterparty.

# Deloitte.

**Deloitte GmbH**
Wirtschaftsprüfungsgesellschaft

**Abbildung 29: Auszug aus dem Kommunikationsverlauf der E-Mails „0" bis „4C" - Teil 4**

they have to roll or sell the stake over the market - roll over in this size DB is the only counterparty.

**In my view I would show an offer of 1.5 mio shares at 380**

regards


Simon Biner
Managing Director
Head of GME Switzerland

+41 44 227 33 40
+41 79 833 21 42



**Nino
Kjellman/DMGEQ/DMG
UK/DeuBa@DBEMEA**

28/03/2008 14:06

To Simon Biner/db/dbcom@DBEMEA@DEUBAINT

cc Garth Ritchie/DMGEQ/DMG UK/DeuBa@DBEMEA, luigi.vignola@db.com, Noreddine Sebti/NewYork/DBNA/DeuBa@DBAmericas, Richard Carson/DMGEQ/DMG UK/DeuBa@DBEMEA

Su Re: OERLIKON ****pls read ****Link
bje
ct

We can forget Blackrock as Rene found out unofficially that it effectively Merrill Lynch the holder of the

**Deloitte.**

Deloitte GmbH
Wirtschaftsprüfungsgesellschaft

**Abbildung 30: Auszug aus dem Kommunikationsverlauf der E-Mails „0" bis „4C" - Teil 5**

We can forget Blackrock as Rene found out unofficially that it effectively Merrill Lynch the holder of the stocks

Nino

**Simon
Biner/db/dbcom@DBE
MEA**

28/03/2008 12:01

To Richard Carson/DMGEQ/DMG UK/DeuBa@DBEMEA

cc Garth Ritchie/DMGEQ/DMG UK/DeuBa@DBEMEA, luigi.vignola@db.com, nino.kjellman@db.com, Noreddine Sebti/NewYork/DBNA/DeuBa@DBAmericas

Subject Re: OERLIKON ****pls read ****Link

we sell warrants only over the market with our normal market making activity.
the volume we sell is always small and  short term

the two big players VICTORY and HRANOV are not active at all at the moment.

**value portfolio VICTORY approx. 18 mio CHF at 350, at 450 it would be 70 mio CHF and would have a delta of 750 / shares**

**value portfolio HRANOV approx. - 13 mio CHF at 350 (he is short puts), at 450 it would be + 24 mio CHF and would  have a delta of 500 / shares**

67

# Deloitte.

**Deloitte GmbH**
Wirtschaftsprüfungsgesellschaft

**Abbildung 31: Auszug aus dem Kommunikationsverlauf der E-Mails „0" bis „4C" - Teil 6**

**value portfolio HRANOV approx. – 13 mio CHF at 350 (he is short puts), at 450 it would be + 24 mio CHF and would have a delta of 500 / shares**

on the upside, delta will be generated with this 2 portfolios. at a certain level they would roll or sell it back to us.

loss out of **APRIL is a total of 93 mio CHF** for this two clients. I would say in a bullish environment they would prefer to sell it back because a delta neutral roll over would cost to much money.

as soon as this 2 clients see that we are under pressure they will be hard with us as well. (remember last autumn)

on a verbal basis HRANOV tells me that he would be willing to sell if his portfolio gets a value. at what level is difficult to say.

DWS I will meet in the afternoon as paul is in this building and out for lunch

call you in 1 hour

regrds

Simon Biner
Managing Director
Head of GME Switzerland

+41 44 227 33 40
+41 79 833 21 42

[aus technischen Gründen muss diese Seite in der Berichtsvorlage verbleiben]

# Allgemeine Auftragsbedingungen
### für
## Wirtschaftsprüfer und Wirtschaftsprüfungsgesellschaften
### vom 1. Januar 2017

DokID: 712258   MWFVW20

Alle Rechte vorbehalten. Ohne Genehmigung des Verlages ist es nicht gestattet, die Vordrucke ganz oder teilweise nachzudrucken bzw. auf fotomechanischem oder elektronischem Wege zu vervielfältigen und/oder zu verbreiten.
© IDW Verlag GmbH · Tersteegenstraße 14 · 40474 Düsseldorf

### 1. Geltungsbereich

(1) Die Auftragsbedingungen gelten für Verträge zwischen Wirtschaftsprüfern oder Wirtschaftsprüfungsgesellschaften (im Nachstehenden zusammenfassend „Wirtschaftsprüfer" genannt) und ihren Auftraggebern über Prüfungen, Steuerberatung, Beratungen in wirtschaftlichen Angelegenheiten und sonstige Aufträge, soweit nicht etwas anderes ausdrücklich schriftlich vereinbart oder gesetzlich zwingend vorgeschrieben ist.

(2) Dritte können nur dann Ansprüche aus dem Vertrag zwischen Wirtschaftsprüfer und Auftraggeber herleiten, wenn dies ausdrücklich vereinbart ist oder sich aus zwingenden gesetzlichen Regelungen ergibt. Im Hinblick auf solche Ansprüche gelten diese Auftragsbedingungen auch diesen Dritten gegenüber.

### 2. Umfang und Ausführung des Auftrags

(1) Gegenstand des Auftrags ist die vereinbarte Leistung, nicht ein bestimmter wirtschaftlicher Erfolg. Der Auftrag wird nach den Grundsätzen ordnungsmäßiger Berufsausübung ausgeführt. Der Wirtschaftsprüfer übernimmt im Zusammenhang mit seinen Leistungen keine Aufgaben der Geschäftsführung. Der Wirtschaftsprüfer ist für die Nutzung oder Umsetzung der Ergebnisse seiner Leistungen nicht verantwortlich. Der Wirtschaftsprüfer ist berechtigt, sich zur Durchführung des Auftrags sachverständiger Personen zu bedienen.

(2) Die Berücksichtigung ausländischen Rechts bedarf – außer bei betriebswirtschaftlichen Prüfungen – der ausdrücklichen schriftlichen Vereinbarung.

(3) Ändert sich die Sach- oder Rechtslage nach Abgabe der abschließenden beruflichen Äußerung, so ist der Wirtschaftsprüfer nicht verpflichtet, den Auftraggeber auf Änderungen oder sich daraus ergebende Folgerungen hinzuweisen.

### 3. Mitwirkungspflichten des Auftraggebers

(1) Der Auftraggeber hat dafür zu sorgen, dass dem Wirtschaftsprüfer alle für die Ausführung des Auftrags notwendigen Unterlagen und weiteren Informationen rechtzeitig übermittelt werden und ihm von allen Vorgängen und Umständen Kenntnis gegeben wird, die für die Ausführung des Auftrags von Bedeutung sein können. Dies gilt auch für die Unterlagen und weiteren Informationen, Vorgänge und Umstände, die erst während der Tätigkeit des Wirtschaftsprüfers bekannt werden. Der Auftraggeber wird dem Wirtschaftsprüfer geeignete Auskunftspersonen benennen.

(2) Auf Verlangen des Wirtschaftsprüfers hat der Auftraggeber die Vollständigkeit der vorgelegten Unterlagen und der weiteren Informationen sowie der gegebenen Auskünfte und Erklärungen in einer vom Wirtschaftsprüfer formulierten schriftlichen Erklärung zu bestätigen.

### 4. Sicherung der Unabhängigkeit

(1) Der Auftraggeber hat alles zu unterlassen, was die Unabhängigkeit der Mitarbeiter des Wirtschaftsprüfers gefährdet. Dies gilt für die Dauer des Auftragsverhältnisses insbesondere für Angebote auf Anstellung oder Übernahme von Organfunktionen und für Angebote, Aufträge auf eigene Rechnung zu übernehmen.

(2) Sollte die Durchführung des Auftrags die Unabhängigkeit des Wirtschaftsprüfers, die der mit ihm verbundenen Unternehmen, seiner Netzwerkunternehmen oder solcher mit ihm assoziierten Unternehmen, auf die die Unabhängigkeitsvorschriften in gleicher Weise Anwendung finden wie auf den Wirtschaftsprüfer, in anderen Auftragsverhältnissen beeinträchtigen, ist der Wirtschaftsprüfer zur außerordentlichen Kündigung des Auftrags berechtigt.

### 5. Berichterstattung und mündliche Auskünfte

Soweit der Wirtschaftsprüfer Ergebnisse im Rahmen der Bearbeitung des Auftrags schriftlich darzustellen hat, ist alleine diese schriftliche Darstellung maßgebend. Entwürfe schriftlicher Darstellungen sind unverbindlich. Sofern nicht anders vereinbart, sind mündliche Erklärungen und Auskünfte des Wirtschaftsprüfers nur dann verbindlich, wenn sie schriftlich bestätigt werden. Erklärungen und Auskünfte des Wirtschaftsprüfers außerhalb des erteilten Auftrags sind stets unverbindlich.

### 6. Weitergabe einer beruflichen Äußerung des Wirtschaftsprüfers

(1) Die Weitergabe beruflicher Äußerungen des Wirtschaftsprüfers (Arbeitsergebnisse oder Auszüge von Arbeitsergebnissen – sei es im Entwurf oder in der Endfassung) oder die Information über das Tätigwerden des Wirtschaftsprüfers für den Auftraggeber an einen Dritten bedarf der schriftlichen Zustimmung des Wirtschaftsprüfers, es sei denn, der Auftraggeber ist zur Weitergabe oder Information aufgrund eines Gesetzes oder einer behördlichen Anordnung verpflichtet.

(2) Die Verwendung beruflicher Äußerungen des Wirtschaftsprüfers und die Information über das Tätigwerden des Wirtschaftsprüfers für den Auftraggeber zu Werbezwecken durch den Auftraggeber sind unzulässig.

### 7. Mängelbeseitigung

(1) Bei etwaigen Mängeln hat der Auftraggeber Anspruch auf Nacherfüllung durch den Wirtschaftsprüfer. Nur bei Fehlschlagen, Unterlassen bzw. unberechtigter Verweigerung, Unzumutbarkeit oder Unmöglichkeit der Nacherfüllung kann er die Vergütung mindern oder vom Vertrag zurücktreten; ist der Auftrag nicht von einem Verbraucher erteilt worden, so kann der Auftraggeber wegen eines Mangels nur dann vom Vertrag zurücktreten, wenn die erbrachte Leistung wegen Fehlschlagens, Unterlassung, Unzumutbarkeit oder Unmöglichkeit der Nacherfüllung für ihn ohne Interesse ist. Soweit darüber hinaus Schadensersatzansprüche bestehen, gilt Nr. 9.

(2) Der Anspruch auf Beseitigung von Mängeln muss vom Auftraggeber unverzüglich in Textform geltend gemacht werden. Ansprüche nach Abs. 1, die nicht auf einer vorsätzlichen Handlung beruhen, verjähren nach Ablauf eines Jahres ab dem gesetzlichen Verjährungsbeginn.

(3) Offenbare Unrichtigkeiten, wie z.B. Schreibfehler, Rechenfehler und formelle Mängel, die in einer beruflichen Äußerung (Bericht, Gutachten und dgl.) des Wirtschaftsprüfers enthalten sind, können jederzeit vom Wirtschaftsprüfer auch Dritten gegenüber berichtigt werden. Unrichtigkeiten, die geeignet sind, in der beruflichen Äußerung des Wirtschaftsprüfers enthaltene Ergebnisse infrage zu stellen, berechtigen diesen, die Äußerung auch Dritten gegenüber zurückzunehmen. In den vorgenannten Fällen ist der Auftraggeber vom Wirtschaftsprüfer tunlichst vorher zu hören.

### 8. Schweigepflicht gegenüber Dritten, Datenschutz

(1) Der Wirtschaftsprüfer ist nach Maßgabe der Gesetze (§ 323 Abs. 1 HGB, § 43 WPO, § 203 StGB) verpflichtet, über Tatsachen und Umstände, die ihm bei seiner Berufstätigkeit anvertraut oder bekannt werden, Stillschweigen zu bewahren, es sei denn, dass der Auftraggeber ihn von dieser Schweigepflicht entbindet.

(2) Der Wirtschaftsprüfer wird bei der Verarbeitung von personenbezogenen Daten die nationalen und europarechtlichen Regelungen zum Datenschutz beachten.

### 9. Haftung

(1) Für gesetzlich vorgeschriebene Leistungen des Wirtschaftsprüfers, insbesondere Prüfungen, gelten die jeweils anzuwendenden gesetzlichen Haftungsbeschränkungen, insbesondere die Haftungsbeschränkung des § 323 Abs. 2 HGB.

(2) Sofern weder eine gesetzliche Haftungsbeschränkung Anwendung findet noch eine einzelvertragliche Haftungsbeschränkung besteht, ist die Haftung des Wirtschaftsprüfers für Schadensersatzansprüche jeder Art, mit Ausnahme von Schäden aus der Verletzung von Leben, Körper und Gesundheit, sowie von Schäden, die eine Ersatzpflicht des Herstellers nach § 1 ProdHaftG begründen, bei einem fahrlässig verursachten einzelnen Schadensfall gemäß § 54a Abs. 1 Nr. 2 WPO auf 4 Mio. € beschränkt.

(3) Einreden und Einwendungen aus dem Vertragsverhältnis mit dem Auftraggeber stehen dem Wirtschaftsprüfer auch gegenüber Dritten zu.

(4) Leiten mehrere Anspruchsteller aus dem mit dem Wirtschaftsprüfer bestehenden Vertragsverhältnis Ansprüche aus einer fahrlässigen Pflichtverletzung des Wirtschaftsprüfers her, gilt der in Abs. 2 genannte Höchstbetrag für die betreffenden Ansprüche aller Anspruchsteller insgesamt.

DokID: 712258   MWFVW20

**(5)** Ein einzelner Schadensfall im Sinne von Abs. 2 ist auch bezüglich eines aus mehreren Pflichtverletzungen stammenden einheitlichen Schadens gegeben. Der einzelne Schadensfall umfasst sämtliche Folgen einer Pflichtverletzung ohne Rücksicht darauf, ob Schäden in einem oder in mehreren aufeinanderfolgenden Jahren entstanden sind. Dabei gilt mehrfaches auf gleicher oder gleichartiger Fehlerquelle beruhendes Tun oder Unterlassen als einheitliche Pflichtverletzung, wenn die betreffenden Angelegenheiten miteinander in rechtlichem oder wirtschaftlichem Zusammenhang stehen. In diesem Fall kann der Wirtschaftsprüfer nur bis zur Höhe von 5 Mio. € in Anspruch genommen werden. Die Begrenzung auf das Fünffache der Mindestversicherungssumme gilt nicht bei gesetzlich vorgeschriebenen Pflichtprüfungen.

**(6)** Ein Schadensersatzanspruch erlischt, wenn nicht innerhalb von sechs Monaten nach der schriftlichen Ablehnung der Ersatzleistung Klage erhoben wird und der Auftraggeber auf diese Folge hingewiesen wurde. Dies gilt nicht für Schadensersatzansprüche, die auf vorsätzliches Verhalten zurückzuführen sind, sowie bei einer schuldhaften Verletzung von Leben, Körper oder Gesundheit sowie bei Schäden, die eine Ersatzpflicht des Herstellers nach § 1 ProdHaftG begründen. Das Recht, die Einrede der Verjährung geltend zu machen, bleibt unberührt.

### 10. Ergänzende Bestimmungen für Prüfungsaufträge

**(1)** Ändert der Auftraggeber nachträglich den durch den Wirtschaftsprüfer geprüften und mit einem Bestätigungsvermerk versehenen Abschluss oder Lagebericht, darf er diesen Bestätigungsvermerk nicht weiterverwenden.

Hat der Wirtschaftsprüfer einen Bestätigungsvermerk nicht erteilt, so ist ein Hinweis auf die durch den Wirtschaftsprüfer durchgeführte Prüfung im Lagebericht oder an anderer für die Öffentlichkeit bestimmter Stelle nur mit schriftlicher Einwilligung des Wirtschaftsprüfers und mit dem von ihm genehmigten Wortlaut zulässig.

**(2)** Widerruft der Wirtschaftsprüfer den Bestätigungsvermerk, so darf der Bestätigungsvermerk nicht weiterverwendet werden. Hat der Auftraggeber den Bestätigungsvermerk bereits verwendet, so hat er auf Verlangen des Wirtschaftsprüfers den Widerruf bekanntzugeben.

**(3)** Der Auftraggeber hat Anspruch auf fünf Berichtsausfertigungen. Weitere Ausfertigungen werden besonders in Rechnung gestellt.

### 11. Ergänzende Bestimmungen für Hilfeleistung in Steuersachen

**(1)** Der Wirtschaftsprüfer ist berechtigt, sowohl bei der Beratung in steuerlichen Einzelfragen als auch im Falle der Dauerberatung die vom Auftraggeber genannten Tatsachen, insbesondere Zahlenangaben, als richtig und vollständig zugrunde zu legen; dies gilt auch für Buchführungsaufträge. Er hat jedoch den Auftraggeber auf von ihm festgestellte Unrichtigkeiten hinzuweisen.

**(2)** Der Steuerberatungsauftrag umfasst nicht die zur Wahrung von Fristen erforderlichen Handlungen, es sei denn, dass der Wirtschaftsprüfer hierzu ausdrücklich den Auftrag übernommen hat. In diesem Fall hat der Auftraggeber dem Wirtschaftsprüfer alle für die Wahrung von Fristen wesentlichen Unterlagen, insbesondere Steuerbescheide, so rechtzeitig vorzulegen, dass dem Wirtschaftsprüfer eine angemessene Bearbeitungszeit zur Verfügung steht.

**(3)** Mangels einer anderweitigen schriftlichen Vereinbarung umfasst die laufende Steuerberatung folgende, in die Vertragsdauer fallenden Tätigkeiten:

**a)** Ausarbeitung der Jahressteuererklärungen für die Einkommensteuer, Körperschaftsteuer und Gewerbesteuer sowie der Vermögensteuererklärungen, und zwar auf Grund der vom Auftraggeber vorzulegenden Jahresabschlüsse und sonstiger für die Besteuerung erforderlicher Aufstellungen und Nachweise

**b)** Nachprüfung von Steuerbescheiden zu den unter a) genannten Steuern

**c)** Verhandlungen mit den Finanzbehörden im Zusammenhang mit den unter a) und b) genannten Erklärungen und Bescheiden

**d)** Mitwirkung bei Betriebsprüfungen und Auswertung der Ergebnisse von Betriebsprüfungen hinsichtlich der unter a) genannten Steuern

**e)** Mitwirkung in Einspruchs- und Beschwerdeverfahren hinsichtlich der unter a) genannten Steuern.

Der Wirtschaftsprüfer berücksichtigt bei den vorgenannten Aufgaben die wesentliche veröffentlichte Rechtsprechung und Verwaltungsauffassung.

**(4)** Erhält der Wirtschaftsprüfer für die laufende Steuerberatung ein Pauschalhonorar, so sind mangels anderweitiger schriftlicher Vereinbarungen die unter Abs. 3 Buchst. d) und e) genannten Tätigkeiten gesondert zu honorieren.

**(5)** Sofern der Wirtschaftsprüfer auch Steuerberater ist und die Steuerberatervergütungsverordnung für die Bemessung der Vergütung anzuwenden ist, kann eine höhere oder niedrigere als die gesetzliche Vergütung in Textform vereinbart werden.

**(6)** Die Bearbeitung besonderer Einzelfragen der Einkommensteuer, Körperschaftsteuer, Gewerbesteuer, Einheitsbewertung und Vermögensteuer sowie aller Fragen der Umsatzsteuer, Lohnsteuer, sonstigen Steuern und Abgaben erfolgt auf Grund eines besonderen Auftrags. Dies gilt auch für

**a)** die Bearbeitung einmalig anfallender Steuerangelegenheiten, z.B. auf dem Gebiet der Erbschaftsteuer, Kapitalverkehrsteuer, Grunderwerbsteuer,

**b)** die Mitwirkung und Vertretung in Verfahren vor den Gerichten der Finanz- und der Verwaltungsgerichtsbarkeit sowie in Steuerstrafsachen,

**c)** die beratende und gutachtliche Tätigkeit im Zusammenhang mit Umwandlungen, Kapitalerhöhung und -herabsetzung, Sanierung, Eintritt und Ausscheiden eines Gesellschafters, Betriebsveräußerung, Liquidation und dergleichen und

**d)** die Unterstützung bei der Erfüllung von Anzeige- und Dokumentationspflichten.

**(7)** Soweit auch die Ausarbeitung der Umsatzsteuerjahreserklärung als zusätzliche Tätigkeit übernommen wird, gehört dazu nicht die Überprüfung etwaiger besonderer buchmäßiger Voraussetzungen sowie die Frage, ob alle in Betracht kommenden umsatzsteuerrechtlichen Vergünstigungen wahrgenommen worden sind. Eine Gewähr für die vollständige Erfassung der Unterlagen zur Geltendmachung des Vorsteuerabzugs wird nicht übernommen.

### 12. Elektronische Kommunikation

Die Kommunikation zwischen dem Wirtschaftsprüfer und dem Auftraggeber kann auch per E-Mail erfolgen. Soweit der Auftraggeber eine Kommunikation per E-Mail nicht wünscht oder besondere Sicherheitsanforderungen stellt, wie etwa die Verschlüsselung von E-Mails, wird der Auftraggeber den Wirtschaftsprüfer entsprechend in Textform informieren.

### 13. Vergütung

**(1)** Der Wirtschaftsprüfer hat neben seiner Gebühren- oder Honorarforderung Anspruch auf Erstattung seiner Auslagen; die Umsatzsteuer wird zusätzlich berechnet. Er kann angemessene Vorschüsse auf Vergütung und Auslagenersatz verlangen und die Auslieferung seiner Leistung von der vollen Befriedigung seiner Ansprüche abhängig machen. Mehrere Auftraggeber haften als Gesamtschuldner.

**(2)** Ist der Auftraggeber kein Verbraucher, so ist eine Aufrechnung gegen Forderungen des Wirtschaftsprüfers auf Vergütung und Auslagenersatz nur mit unbestrittenen oder rechtskräftig festgestellten Forderungen zulässig.

### 14. Streitschlichtungen

Der Wirtschaftsprüfer ist nicht bereit, an Streitbeilegungsverfahren vor einer Verbraucherschlichtungsstelle im Sinne des § 2 des Verbraucherstreitbeilegungsgesetzes teilzunehmen.

### 15. Anzuwendendes Recht

Für den Auftrag, seine Durchführung und die sich hieraus ergebenden Ansprüche gilt nur deutsches Recht.

Lizenziert für/Licensed to: Deloitte GmbH | 4305936