UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
                                                        :
IN THE MATTER OF THE APPLICATION                        :
OF ISABELLA HRANOV FOR AN ORDER                         :
TO TAKE DISCOVERY PURSUANT TO 28                        :      Misc. Case No. 21-MC-751
U.S.C. §1782                                            :
                                                        :
                                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

## MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO QUASH SUBPOENA ISSUED PURSUANT TO 28 U.S.C. § 1782

November 24, 2021

**WILK AUSLANDER LLP**
825 Eighth Avenue – Suite 2900
New York, New York 10019
Tel.: (212) 981-2300

Of Counsel:

*Attorneys for Applicant Dr. Isabela Hranov*

    Stuart M. Riback
     *sriback@wilkauslander.com*
    Scott Watnik
     *swatnik@wilkauslander.com*

# TABLE OF CONTENTS

Facts ...........................................................................................................................5

Argument ....................................................................................................................6

    Point I

    HRANOV HAS MET THE STATUTORY § 1782 REQUIREMENTS ..............................................6

        A.    Statutory requirements under § 1782; meaning of "found in the district" .........................6

        B.    DB's contacts with New York caused the evidence to be available .....................................8

        C.    DB's Reliance On the Second Circuit's Liability-Related Specific Jurisdiction Test Is Wrong and Is Fatal To DB's Argument .................................................12

        D.    DB's Remaining Arguments on Specific Jurisdiction Are Unavailing.............................13

    Point II

    THE COURT PROPERLY EXERCISED ITS DISCRETION
    IN FAVOR OF GRANTING THE APPLICATION........................................................................15

        A.    First *Intel* factor .................................................................................................15

        B.    Second *Intel* factor ..............................................................................................16

        C.    Third *Intel* factor ................................................................................................17

        D.    Fourth *Intel* factor .............................................................................................19

Conclusion ................................................................................................................20

i

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Accent Delight Int'l Ltd.*,
  869 F.3d 121 (2d Cir. 2017) ..............................................................................................4, 18

*Al-Ghanim v. IAP Worldwide, Servs., Inc.*,
  2012 WL 13102517 (M.D. Fl. Jan. 8, 2012 ..................................................................18

*In re Application of Kreke Immobilien KG*,
  2013 WL 5966916 (S.D.N.Y. Nov. 8, 2013) ................................................................16

*Brandi–Dohrn v. IKB Deutsche Industriebank AG*,
  673 F.3d 76 (2d Cir. 2012) ...............................................................................6, 15, 18, 19

*Burger King v. Rudzewicz*,
  471 U.S. 462 (1985) ...............................................................................................6, 14

*In re California Teachers Retirement System*,
  2017 WL 1246349, at * 2 (D.N.J. Apr. 3, 2017) .........................................................15

*In re del Valle Ruiz*,
  939 F.3d 520 (2d Cir. 2019) ........................................................................................*passim*

*In re Edelman*,
  295 F.3d 171, 180 (2d Cir. 2002) .......................................................................... 13, 15

*Euromepa S.A. v. R. Esmerian, Inc.*,
  51 F.3d 1095 (2d Cir. 1995) ......................................................................................4, 17

*In re Evenstar Master Fund SPC For and on behalf of Evenstar Master Sub-Fund I Segregated
  Portfolio*, 2021 WL 3828881 (S.D.N.Y. Aug. 28, 2021) .............................................18

*Fund for the Protection of Investor Rights in Foreign States v. Alix Partners*,
  5 F.4th 216 (2d Cir. 2021) ....................................................................................6, 17, 18

*In re Furstenberg Finance SAS*,
  2018 WL 3392882 (S.D.N.Y. Jul. 12, 2018) ...............................................................17

*In re Godfrey*,
  526 F.Supp.2d 417 (S.D.N.Y. 2007) ...........................................................................17

*Gorsoan Ltd. v. Bullock*,
  652 Fed.Appx. 7 (2d Cir. 2016) .....................................................................................7

*In re Hansainvest Hanseatische Investment-GmbH,*
    364 F.Supp.3d 243 (S.D.N.Y. 2018) ................................................................. 17

*Intel Corp. v. Advanced Micro Devices, Inc.,*
    542 U.S. 241 (2004) ................................................................................. *passim*

*In re Malev Hungarian Airlines,*
    964 F.2d 97 (2d Cir. 1992) .............................................................................. 16

*Matter of Degens,*
    2020 WL 4252725 (S.D.N.Y. Jul. 24, 2020) .................................................. 18

*Mees v. Buiter,*
    793 F.3d 291 (2d Cir. 2015) ..................................................................... *passim*

*Metallgesellschaft AG v. Hodapp,*
    121 F.3d 77 (2d Cir., 1997) ................................................................... 4, 7, 17

*Waldman v. Palestine Liberation Org.,*
    835 F.3d 317 (2d Cir. 2016) .................................................................. 6, 12, 13

**Statutes**

28 U.S.C. § 1782 ................................................................................................. *passim*

**Other Authorities**

Rule 26 ........................................................................................................................ 16

Rule 30(b)(6) ............................................................................................................ 5, 20

Rule 45 ........................................................................................................................ 20

Applicant Isabella Hranov respectfully submits this memorandum of law in opposition to the motion by Deutsche Bank AG ("DB") to quash the subpoena ("Subpoena") served on DB pursuant to this Court's September 8, 2021 Order (Dkt. No. 8).[1]

## PRELIMINARY STATEMENT

A strawman thoroughly flogged is nevertheless a straw man.  A mere glance at the document requests annexed to the Subpoena served on DB shows that they focus primarily on Simon Biner's ("Biner") communications with others in DB concerning Hranov's derivatives trades and Oerlikon stock. (Declaration of Scott Watnik dated November 24, 2021 ("Watnik Decl.") Ex. A).[2]  That, and **not** the so-called "Disputed Email," is at the core of the discovery Hranov is seeking.  The one request Hranov did make that related to the so-called "Disputed Email" was a request for a forensic examination of DB's system which the Court did not grant (*see* Sept. 8, 2021 order (Dkt. No. 8), at 1), and was not contained in the Subpoena as served (Watnik Decl., Ex. A). So DB's brief attacks a phantasm.  Whatever may be the case regarding the Disputed Email, the documents Hranov is seeking are plainly pertinent to the litigation in Germany.  So DB's entire argument that the so-called

---

[1]     As used herein, "Riback Decl." refers to the Declaration of Stuart Riback dated September 20, 2021 (Dkt. No. 3) filed in support of Dr. Hranov's application in this proceeding. "Dolson Decl." refers to the Declaration of Margaret Dolson attached as Exhibit 3 to the Declaration of Konrad Kern (Dkt. No. 2) filed in support of Dr. Hranov's application in this proceeding.  "App. Br." refers to Dr. Hranov's memorandum of law in support of the application (Dkt. No. 4).  "DB Mov. Br." refers to DB's memorandum of law in support of its Motion To Quash (Dkt. No. 11).

[2]     *See* Watnik Decl., at Ex. A (Request No. 1 – "All communications between (a) Biner and (b) anyone employed by DB concerning the Accounts, including without limitation any and all trading activity in Oerlikon stock or stock options concerning the Accounts"; Request No. 2 – "All documents and communications concerning any investment advice or strategy provided by Biner to Hranov concerning Oerlikon stock or stock options"; Request No. 3 – "All communications sent or received by supervisory or compliance personnel at DB concerning Biner's conduct, role or involvement in connection with any transactions in Oerlinkon stock and derivatives"; Request No. 4 – "All communications sent or received by Biner concerning any trading strategy (actual or contemplated) of DB or customer of DB in Oerlikon stock or derivatives"; Request No. 5 – "All documents and communications concerning the termination of Biner's employment by DB in 2008 or 2009.").

Disputed Email is at the heart of this application is simply not true and nothing more than a giant distraction – a complete straw man.

The main issue here, and the one on which DB spends the most time in its moving brief, is whether serving a subpoena on DB in this district under § 1782 offends due process. It clearly does not. Under the Second Circuit's decision in *In re del Valle Ruiz*, 939 F.3d 520 (2d Cir. 2019), the issue is whether the evidence sought has a case-related connection to New York, ***not*** whether the facts of the underlying lawsuit took place in New York. The latter would be relevant if Dr. Hranov were seeking to sue DB here, but Dr. Hranov is not. That is why DB's extensive discussion of personal jurisdiction law is entirely beside the point: Hranov is not asking this Court to impose liability on DB, only to require DB to respond to a subpoena. The Second Circuit in *del Valle Ruiz* held specifically that the personal jurisdiction standards had to be "translated" to the discovery process, and enunciated a standard for that translation: "we think it enough for purposes of due process in these circumstances that the [respondent]'s contacts with the forum go to the actual discovery sought rather than the underlying cause of action," *id*, 939 F.3d at 530 – a standard clearly met here.

It is clearly met because the case-related evidence sought here is obviously connected to DB's activities in New York. For one thing, Norredine Sebti -- DB's Global Head of Equity Trading who had input on the hundreds of millions of Euros' worth of Hranov options trades, affecting billions of Euros of underlying shares of stock -- was located in New York by DB's own admission, Mücke Decl. ¶ 5 (Dkt. No. 13). In fact, Sebti was in that position in New York since 2005. (Watnik Decl. Ex. B, C) In that position, Sebti had ultimate authority over DB's securities derivatives risk (Watnik Decl. Ex. B, C), which would certainly include the Oerlikon option trades Biner was doing for Hranov. Whether he ***had to be*** located in New York or not is irrelevant; the fact is that DB stationed him here during the period of Biner's misconduct from 2006 to 2008, and he was in contact with Biner about the Hranov trades in that capacity.

2

The Disputed Email thus is relevant here **not** because of its content but because, **no matter which version of it is genuine**, it shows that Biner was keeping Sebti (in New York) informed about the hundreds of millions of Euros' worth of Oerlikon derivatives trades Biner was doing for Hranov -- which is perfectly natural and to be expected because Sebti was the person in charge of derivatives risk.  (Watnik Decl., Ex. B, C)  That email confirms the connection between the case-related evidence and New York under § 1782 and *del Valle Ruiz*: DB's head of Global Equity Trading, who was in charge of securities derivatives risk, (*see* Watnik Decl., Ex. B, C) was in New York and **Biner communicated with him about the Hranov trades**.  DB all but ignores this connection between the case and the evidence sought – obviously, the Hranov trades were the proximate cause for the emails with and to Sebti to have been created at all.

DB also chose to use personnel in New York to extract and restore documents out of archives as part of its investigation for purposes of the German litigation.  Again: this is relevant because it shows DB's activity in New York which resulted in the evidence being available.  Whether DB's head of eDiscovery **had to be** located in New York is beside the point.  The fact is that she *is* located in New York, and that she supervised the gathering of documents that would otherwise not be available (*i.e.* they would be still be unextracted from archives scattered in other places).  In other words, DB chose to connect those documents with New York for purposes of the underlying case.  As a result, DB is "found" in New York for purposes of § 1782.[3]

DB's remaining arguments are a hash of non sequiturs and misleading statements.  For example: this Court (as well as other courts) has repeatedly noted the very limited tools that German civil procedure affords to obtain documents, *see* App. Br. 15-16, Point II.B, *infra*.  DB wants this

---

[3]      Hranov accepts DB's representation that the "Digital Safe" is not in New York, but elsewhere in the US.  Ms. Dolson's declaration was less than clear on the point, which led Hranov astray.

Court to ignore this Court's rulings on precisely this question.  As Hranov showed in its initial papers (App. Br., 15,16), these very narrow and limited tools require that the requesting party specifically identify the documents it seeks (which means the party can only request items it already knows about), and only if the other side has placed them in issue by reference in case proceedings. (Declaration of Konrad Kern in Opposition to DB Motion to Quash dated November 24, 2021 ("Kern Opp. Decl.").  The Court will note that DB submitted only a chart (Schmitt Dec. Ex. 5, Dkt. No. 12), which divorces the requests from the underlying proceedings, including DB's own statements that led to the requests.  In fact, the requests are very narrow and specific.  (Kern Opp. Dec. ¶ 6-9.  Mr. Schmitt's conclusory assertion in ¶ 23 of his declaration that most of the documents sought by § 1782 were requested in Germany is unsupportable and should be rejected.  (Of course, DB wants it both ways; it says *both* that the documents were already requested in Germany (Schmitt Dec. ¶ 23) *and* that they are not discoverable in Germany (DB Mov. Br. 19).  Both can't be true.

DB even asks the Court, in effect, to ignore the Supreme Court's direct holding in *Intel* that there is no foreign discoverability requirement, *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 260 (2004),[4] by taking Hranov to task for seeking documents that are not producible in Germany. DB Mov. Br. 19.  But that is the entire point of § 1782: not merely to assist foreign tribunals but also to set an example for other countries.  *See, e.g., del Valle Ruiz*, 939 F.3d at 528; *In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 134 (2d Cir. 2017); *Mees v. Buiter*, 793 F.3d 291, 297-98 (2d Cir. 2015).

It is understandable that DB does not much like § 1782, but that is not something the Court need concern itself with.  DB has one of its largest installations in New York and about 10% of its

---

[4]    *Accord Metallgesellschaft AG v. Hodapp*, 121 F.3d 77, 79 (2d Cir., 1997) ("We have rejected any requirement that evidence sought in the United States pursuant to § 1782(a) be discoverable under the laws of the foreign country"); *Euromepa S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1099 (2d Cir. 1995) ("We do not believe that an extensive examination of foreign law regarding the existence and extent of discovery in the forum country is desirable in order to ascertain the attitudes of foreign nations to outside discovery assistance").

personnel here.  If DB wants the benefits of being in the American financial center, it must be willing to bear the burdens as well, including the burden of producing § 1782 evidence in cases where New York touches issues in a foreign litigation.

Finally (for now), DB also grossly misrepresents the document requests as seeking information about all DB-related Oerlikon trades for 16 years (DB Mov. Br., 20).  They do nothing of the sort.  Hranov's requests in the Subpoena are quoted *supra*, at fn. 2, and they focus only on Biner and his trading activities.  Biner was gone from DB as of late 2008 or early 2009, so the only mentions of him after his departure would relate to DB's efforts to clean up his mess.  There is nothing unreasonable or overbroad about that.  Nor does it matter that there is no one at DB in New York who can testify with personal knowledge of the events.  That is what Rule 30(b)(6) is for.

In sum, this motion appears to have been brought for the sake of obstruction.  From the mischaracterization of German law, to the mischaracterization of the basis for this application, to the mischaracterization of Hranov's document requests, to the mischaracterization of Second Circuit law, DB's motion relies almost entirely on misstating the law and the facts.  The motion should be denied.

## Facts

The facts are adequately set forth in Hranov's application (*see* App. Br., 1-6) and will not be repeated here.  To the extent additional factual matter is needed to refute DB's arguments, it is discussed in the responsive argument sections below and supported by the additional declarations of Konrad Kern and Scott Watnik, both dated November 24, 2021.

# Argument

## POINT I

### HRANOV HAS MET THE STATUTORY § 1782 REQUIREMENTS

A.     **Statutory requirements under § 1782; meaning of "found in the district"**

The Court may grant a § 1782 application only if the statutory requirements are met:

> (1) the person from whom discovery is sought resides (or is found) in the district of the district court to which the application is made, (2) the discovery is for use in a foreign proceeding before a foreign [or international] tribunal, and (3) the application is made by a foreign or international tribunal or any interested person.

*Fund for the Protection of Investor Rights in Foreign States v. Alix Partners*, 5 F.4th 216, 223 (2d Cir. 2021); *Brandi–Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 80 (2d Cir. 2012).  DB does not contest that the evidence sought here is for use in a foreign proceeding, nor that the application is made by an interested person.  The only element DB disputes is the first one: that the person from whom discovery is sought is "found" in this district.

The main flaw in DB's argument is its assumption that DB is "found" in this district for purposes of § 1782 only if DB also could be sued here – *i.e.*, if it were subject to personal jurisdiction such that this Court could impose liability.  DB spends many pages discussing *Burger King v. Rudzewicz*, 471 U.S. 462 (1985), *Waldman v. Palestine Liberation Org.*, 835 F.3d 317 (2d Cir. 2016) and similar cases (DB Mov. Br., 15-17).  But those cases deal with the standard for exercising personal jurisdiction over a defendant in a lawsuit.  That is precisely ***not*** what the law is in the Second Circuit for § 1782.  *del Valle Ruiz* held that the due process test had to be "translated" to the situation where the applicant asks the district court only for discovery from the respondent and not to impose liability as

a party. *del Valle Ruiz*, 939 F.3d at 530.  In a § 1782 proceeding, the foreign court is the one that

decides on imposing liability, not this Court.[5]

DB's diversion effort begins with its first argument, *i.e.*, that it is not subject to general juris-

diction in this district (DB Mov. Br. 14).  Hranov never argued that the parent company DB is sub-

ject to general jurisdiction here; Hranov argued only that DB is subject to specific jurisdiction be-

cause of its case-related contacts, App. Br. 8-10.[6]  And there can be no question that DB is subject

to specific jurisdiction here for purposes of § 1782.  The Second Circuit explained how the due pro-

cess test for specific jurisdiction should be "translated" to the § 1782 situation, where the respon-

dent is not made party to a case in this district and thus subject to liability, but is required only to re-

spond to a subpoena.   In the words of the Second Circuit, "we think it enough for purposes of due

process in these circumstances that the nonparty's contacts with the forum go to the actual disco-

very sought rather than the underlying cause of action." *del Valle Ruiz*, 939 F.3d at 530.  "Nonparty"

in this context means that this Court is not deciding its rights and liabilities; that is the job of the

foreign court.  This Court only authorizes discovery.

The test to be applied is as follows:

---

[5]     The discussion in *del Valle Ruiz* uses the word "non-party" to refer to the person from
whom discovery is sought under § 1782.  It is clear from the discussion that the Second Cir-
cuit used that term to mean that the person subject to § 1782 is not a party to **an action in
this district**.  It obviously did not mean that a party to the overseas litigation from whom
§ 1782 evidence is sought is subject to a different due process standard than someone who is
not a party to the overseas litigation.  Nothing in § 1782 or the case law suggests that the
meaning of "found" in § 1782 changes depending on whether the target of the subpoena is a
party in the foreign case.  Numerous Second Circuit decisions uphold § 1782 subpoenas to
the applicant's foreign adversary.  *See, e.g., Mees, supra; Gorsoan Ltd. v. Bullock*, 652 Fed.Appx. 7
(2d Cir. 2016); *Metallgesellschaft GMbH v. Hodapp*, 121 F.3d 77 (2d Cir. 1997).

[6]     At the same time, Hranov also pointed out that Deutsche Bank Trust Corporation, the
immediate parent of Ms. Dolson's employer, is a New York corporation headquartered in
New York and would be clearly subject to a document subpoena under this Court's general
jurisdiction; Hranov is prepared to issue a subpoena to DBTC if necessary.  App. Br., 10-11.
The Court authorized Hranov to do so.  (Dkt. No. 8).

> Translated to account for a § 1782 respondent's nonparty status, we thus hold that, where the discovery material sought proximately resulted from the respondent's forum contacts, that would be sufficient to establish specific jurisdiction for ordering discovery. That is, the respondent's having purposefully availed itself of the forum must be the primary or proximate reason that the evidence sought is available at all. On the other hand, where the respondent's contacts are broader and more significant, a petitioner need demonstrate only that the evidence sought would not be available but for the respondent's forum contacts.

*Id.*, 939 F.3d at 530.

Here, the test is unquestionably met. DB's contacts with New York are both "broad[]" and "significant." After all, though DB is headquartered in Germany, (a) it has five business units in Manhattan, (b) it employs approximately ten percent of its work force here, and (c) it conducts a huge amount of its business at its Manhattan branch, its only branch in the United States. *See* DB's 2020 Annual Report filed with the SEC (available at https://investor-relations.db.com/files/documents/annualreports/Annual_Report_2020.pdf?language_id=1). But no matter which prong of the test governs here, DB is subject to subpoena in this district for the requested documents.

**B.  DB's contacts with New York caused the evidence to be available**

There are two material connections between the documents sought and DB's activities in New York: through Norredine Sebti and through Margaret Dolson.[7]

**1.  Chief of Global Equity Trading and Global Derivatives Risk, Norredine Sebti**

During the time Hranov was dealing with Biner (2006-2008), Sebti was not some transient in this district. Sebti was DB's head of Global Equity Trading, operating from DB's Manhattan offi-

---

[7]     Based on the Dolson Decl., Hranov believed, apparently mistakenly, that the Digital Safe was located in New York. Assuming that DB's statements otherwise are true, it appears the Digital Safe's location is not a basis for concluding that DB "is found" here. However, the overall case remains that DB is subject to jurisdiction here for § 1782 purposes.

ces. DB Mov. Br., 11.  Per a November 2005 article (Watnik Decl., Ex. B), the "Cash Equities Trading and Equity Derivative Trading divisions of Deutsche Bank will be merged to form the new Global Markets Equity division[.]"  Following the merger of these platforms:

> Norredine Sebti will be responsible for the securities derivatives platform from New York.  This area includes derivatives on indices, single values and OTC securities as well as Correlation, Flow Exotics and Client Executive Services.  Sebti, who has been with Deutsche Bank since 1998, **_will also be responsible for Global Derivatives Risk_**.

(Watnik Decl., Ex. B) (emphasis supplied).  Another article the following month describes Sebti's job functions in similar terms:

> Jon Hitchon and Noreddine Sebti will co-run synthetic equity, which will include all equity products such as certificates, swaps and exchange traded funds. Hitchon, who is London-based, will also manage the prime services group as a joint venture between global markets equity and global finance. Sebti will head the equity derivatives platform. Products in this business area will include index, single stock listed and over-the-counter equity derivatives, as well as correlation, flow exotics and client execution services. **_Sebti will also run global derivatives risk from New York_**.

(Watnik Decl., Ex. C) (emphasis supplied).

This explains why Biner was informing Sebti about the Hranov trades, which accounted for hundreds of millions (or, based on the value of underlying stock, **_billions_**) of Euros' worth of global derivatives risk:  Sebti was the person ultimately responsible for that risk.  Remember that DB was the counterparty on Hranov's options, so the Hranov trades very much affected DB's risk.  These trades were truly massive, and obviously significant enough to DB that it was **_necessary_** for Biner to keep Sebti informed.  Thus, **_DB's purposeful contact with this district_** in the form of having Sebti here as its head of Global Equity Trading is the direct and proximate reason why communications between Biner and Sebti (and between and among Biner, Sebti and other DB personnel) concerning the trades in Oerlikon stock at issue in the German Action exist.  This easily satisfies both ends of the standard for specific jurisdiction under _del Valle Ruiz_, 929 F.3d at 531.

It matters not that (in DB's words) "[t]he subject negotiations and transactions and stock trading" that were the subject of Biner's contacts with Sebti "all took place in Switzerland." DB Mov. Br., 16.   What matters under *del Valle Ruiz* is not whether DB's traders placed the trades from Geneva or Timbuktu.  What matters is that DB stationed Sebti in this district when Biner needed to contact him.  Accordingly, DB's contacts with this district are the direct and proximate reason why the evidence sought exists, regardless of where the trades in Oerlikon stock occurred.

### 2.  Chief of eDiscovery Margaret Dolson.

As Dolson tells us, the Investigation arose in March 2020 when DB's legal department asked eDiscovery Services to retrieve data for the custodian Biner from 2006-2009.  (Dolson Decl., ¶¶ 4, 9).  DB launched the Investigation to investigate the Biner Email which had taken on some importance in the German Action.  It was not done to provide discovery to Hranov in Germany, but rather to develop evidence internally for DB's use.  DB characterizes this as a "defensive reaction" to the Biner Email. DB Mov. Br., 1.

DB concedes that Dolson, as DB's "Global Head of eDiscovery Services" oversaw the Investigation from DB's Manhattan offices.  DB Mov. Br., 14.  (*See also* Dolson Decl. at ¶¶ 1, 2).  Additionally – and critically -- Ms. Dolson tells us that **before the Investigation, the documents sought by the Subpoena were not available**.  To make the documents available, DB had to follow a "documented set of standard procedures that cover the technical tasks associated with user account and data identification, the extraction of data from various data sources and the data delivery process."  (Riback Decl., Ex. A (Dolson Decl.) at ¶ 4).  Ms. Dolson explained the process:

> Simon Biner's IT account was identified and mapped to systems which potentially still stored the messaging data.  During the relevant period it was confirmed that Simon Biner's email account was created in IBM Lotus Notes, which was the primary email application the Bank used at the time. Searches were then carried out for the email data of this account and data was found available in below two locations and the time period.

      i.       In OpenText AXSOne (Email Archive) (UK), time period 30-Oct-2007 to 01 -Feb-2009.

      ii.      Lotus Notes email server backup tape – UK, time period 30-Oct-2007 to 01 -Feb-2009

(Dolson Decl., ¶ 4). Dolson goes on to describe the various technical procedures DB employed as part of the Investigation to revive and extract Mr. Biner's emails from "AXSOne" and the Lotus Notes "backup tape." (*See* Riback Decl., Ex. A (Dolson Decl.) at ¶¶ 5-20).

The technical details are not important here. What is important is that no email, spreadsheet or other document existed before Ms. Dolson commenced the Investigation. **It is only because of the Investigation that the emails and other documents of Biner and Sebti were extracted, reconstructed and made available.**

Accordingly, the Court has specific jurisdiction over DB under the Second Circuit's test set forth in *del Valle Ruiz* : (1) absent DB's conduct in reconstituting Biner's and Sebti's communications from its electronic archives in the Investigation, the documents called for by the Subpoena would not be available today; and (2) Dolson, as DB's Global Head of eDiscovery Services, spearheaded from her office in Manhattan the Investigation that made the documents available. Ergo, either test under *del Valle Ruiz* is met: (a) DB "purposefully avail[ing] itself of the forum [is] the primary or proximate reason that the evidence sought is available at all," and more broadly, (b) "the evidence sought would not be available but for [DB]'s forum contacts." *del Valle Ruiz*, 939 F.3d at 520.

DB argues that "the Investigation was worldwide; the U.S. Digital Safe is not in New York, it was only one of several electronic archives that were searched, and [DB] personnel need not be in the US to access the US Digital Safe." DB Mov. Br., 15. But none of this changes the outcome. What could have been done, or the fact that tasks could be done elsewhere is not relevant; what is relevant is that DB chose to make a New Yorker its global head of eDiscovery Services, and as-signed to her the task of making the documents available, which she did from this district. The *del*

*Valle Ruiz* test is satisfied regardless of where the Digital Safe or other electronic archive was located or where it was accessed.

**C.     DB's Reliance On the Second Circuit's Liability-Related Specific Jurisdiction Test Is Wrong and Is Fatal To DB's Argument**

Instead of applying the *del Valle Ruiz* test for specific jurisdiction in § 1782 proceedings, DB wrongly applies the "episode-in-suit" test for specific jurisdiction under *Waldman v. Palestine Liberation Org.,* 835 F.3d 317 (2d Cir. 2016). This fundamental mistake misreads *del Valle Ruiz* and is fatal to DB's entire analysis.

DB argues, "The Second Circuit 'has always required some causal relationship between an entity's in-forum contacts and the proceeding at issue." DB Mov. Br., 15 (quoting *del Valle Ruiz,* 929 F.3d at 530). That is not by itself controversial. The problem is in DB's next leap of logical fancy:

> And where, as here, the respondent is a party potentially liable in the foreign proceeding, "[t]he exercise of specific jurisdiction depends on in-state activity that gave rise to the episode-in-suit." *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 331 (2d Cir. 2016) (emphasis in original)(quoted in *del Valle Ruiz,* 919 F.3d at 530).

DB Mov. Br., 15. DB thus misreads *del Valle Ruiz* to hold that whenever a § 1782 respondent faces liability ***in the underlying foreign proceeding,*** the *Waldman* test for specific jurisdiction applies. But *del Valle Ruiz* says nothing of the sort. Just the opposite: the crux of *del Valle Ruiz* is that because a § 1782 respondent ***never faces liability in the § 1782 proceeding,*** the "episode-in-suit" standard for specific jurisdiction under *Waldman* ***never*** applies in a § 1782 proceeding. That is why the personal jurisdiction test has to be "translated." Nothing in *del Valle Ruiz* suggests that the meaning of "found" as used in § 1782 changes depending on whether the subpoena respondent is a party in the foreign litigation.

In fact, the Second Circuit in *del Valle Ruiz* specifically precluded DB's current argument. It explicitly stated that its prior holding in *Waldman* -- "[t]he exercise of specific jurisdiction depends

on in-state activity that gave rise to the episode-in-suit" -- applies "*in the liability context.*" *del Valle Ruiz*, 929 F.3d at 530 (quoting *Waldman*, 835 F.3d at 331) (emphasis in original).  In stark contrast, the Second Circuit stressed, § 1782 is "*simply a discovery mechanism and does not subject a person to liability*[.]*" del Valle Ruiz*, 929 F.3d at 526 (quoting *In re Edelman*, 295 F.3d 171, 179 (2d Cir. 2002) (emphasis added).

Had Hranov sued DB in this district instead of in Germany, DB would face liability here, and the *Waldman* standard for specific jurisdiction would apply.  **But Dr. Hranov did not do so**.  Instead, Dr. Hranov sued DB in Germany, and brought a § 1782 proceeding here, which seeks only ***discovery*** (not liability) from DB.  These are the precise circumstances upon which the Second Circuit in *del Valle Ruiz* rejected the *Waldman* test for specific jurisdiction in § 1782 proceedings, and instead adopted the more flexible approach for serving discovery orders on nonparties.

Thus, DB's argument fails because it rests upon *Waldman*.  DB contends that (a) "The Investigation cannot have 'given rise to the episode-in-suit' that occurred in 2006-2008 (DB Mov. Br., 2 (quoting *Waldman*, 835 F.3d at 331)); and (b) "The Investigation plainly did not give rise to the German Action."  Similarly, DB argues that "Mr. Biner ccing Mr. Sebti in New York plainly did not 'give rise' to the German Action" DB Mov. Br., 16 (quoting *del Valle Ruiz*, 939 F.3d at 529).  This all misses the mark and is of zero legal import: The *Waldman* "episode-in-suit" test for specific jurisdiction simply does not apply here.

## D.   DB's Remaining Arguments on Specific Jurisdiction Are Unavailing

The question of which version of the Disputed Email is authentic is for the German court to decide.  This Court has before it only a § 1782 application.  But DB devotes a large portion of its moving brief to trying to convince the Court that the Biner Email is a forgery and the DB Version is legitimate.  DB Mov. Br.,4-9.  But DB even admits it "does not ask this Court to decide which of these documents is authentic."  DB Mov. Br., 9.  This has zero to do with the Court's jurisdiction;

the obvious reason DB raised the issue is to try to poison the Court's view of Hranov. Hranov could respond in kind but will not; the German Court will arrive at its own conclusions. The Court should disregard DB's entire discussion on this topic.

DB cites *Burger King* for the proposition that the "'purposeful availment' requirement ensures that a defendant will not be hailed into a jurisdiction 'solely as a result of random, fortuitous, or attenuated contacts," and argues, "there is no indication that Mr. Biner had any 'purposeful' interest in Mr. Sebti's geographic location." DB Mov. Br., 16 (quoting *Burger King*, 417 U.S. at 475). This is unavailing, for two reasons. **First,** *Burger King* has nothing to do with 28 U.S.C. § 1782. It is a long-arm jurisdiction case. *Burger King*, 471 U.S. at 464. Hranov does ***not*** seek long-arm jurisdiction over DB here. Hranov seeks only to obtain discovery under § 1782.

**Second,** DB's contacts with New York were not "random, fortuitous or attenuated." DB contends that Ms. Dolson "worked in New York, but she was not required to work in New York in order to serve in that capacity." DB Mov. Br., 15. This is a complete non sequitur. It cannot be that any time a § 1782 respondent's contact with New York could have theoretically worked elsewhere, the contact with New York is insufficient. Such a rule not only has zero support in *del Valle Ruiz*, but would make it virtually impossible for specific jurisdiction to ever be satisfied since most desk jobs in today's electronic age can be performed remotely.

Equally fatuous (for similar reasons) is DB's contention that if Hranov had "introduced the [Biner Email]" at an earlier point in time, "the author of the witness statement would have been Ms. Mueller [Ms. Dolson's predecessor]" who "worked in Frankfurt," and thus "there would have been no activity in New York whatsoever on which Applicant could purport to base a Section 1782 Application." DB Mov. Br. 16. This is completely hypothetical and would similarly result in a paradigm where it would be virtually impossible for a Section 1782 applicant to ever show specific jurisdiction. This is absurd.

## POINT II

## THE COURT PROPERLY EXERCISED ITS DISCRETION
## IN FAVOR OF GRANTING THE APPLICATION

As we show in more detail below, DB's main arguments relating to discretion consist of complaints about the scope of § 1782 as the Supreme Court and Second Circuit have construed it. Of course, § 1782 should be "interpreted broadly", *In re Edelman*, 295 F.3d 171, 180 (2d Cir. 2002), to provide an "efficient means" for aiding parties in international litigation, *Mees*, 793 F.3d at 297-298. *See also Brandi-Dohrn*, 673 F.3d 81 ("the statute has, over the years, been given "increasingly broad applicability") (internal quotations and citations omitted). As shown below, the *Intel* factors all counsel in favor of upholding the Subpoena as served.

### A.    First *Intel* factor

Contrary to DB's argument, the fact that DB is a party to the German litigation is not a barrier to obtaining § 1782 discovery here. As noted in Dr. Hranov's brief supporting the Application (App. Br. 13-14), abundant authority shows that the relevant inquiry is whether the evidence sought can be compelled in the home forum, not whether the person to be subpoenaed is a party in the foreign case. The case law on this is unmistakable: German (and French, and other civil law countries') procedures do not permit requests for categories of documents, but only for specifically identified documents that the adversary has referred to. *See* cases cited at App. Br., 15-16; *Heraeus Kulzer, GmbH v. Biomet, Inc.*, 633 F.3d 591, 597 (7th Cir. 2011) ("Heraeus cannot obtain even remotely comparable discovery by utilizing German procedures"); *In re California Teachers Retirement System*, 2017 WL 1246349, at * 2 (D.N.J. Apr. 3, 2017) ("German civil procedure does not allow general pretrial discovery"). Mr. Schmitt's misleading statements to the contrary (Schmitt Dec. ¶ 22)

should be rejected.  In fact, the Second Circuit has repeatedly upheld § 1782 subpoenas issued to parties in the foreign litigation.[8]  *See* cases cited in fn. 5, *supra*.

**B.      Second *Intel* factor**

DB makes no attempt to show that the German Court would be hostile or unreceptive to evidence gathered under § 1782.  It can't -- this district has granted many § 1782 applications for use in Germany, *see* App. Br. 17.  There is no evidence, much less "authoritative proof," that the German Court would reject § 1782 evidence.  *See* cases cited at App. Br., 17-18.

Faced with this, DB invents a new requirement, that Hranov should have first informed the German Court (and thus, obviously, DB) ahead of time (DB Mov. Br., 18).  No such requirement exists.  The scores, perhaps hundreds, of § 1782 cases in this district make no mention of any such thing.  The Second Circuit has rejected any "foreign exhaustion" rule that would require the appli-cant to seek discovery in the foreign case first.  *See, e.g., In re Malev Hungarian Airlines*, 964 F.2d 97, 100 (2d Cir. 1992) (district courts may "not impose extra-statutory barriers to obtaining discovery such as an exhaustion requirement").

The one case DB does cite, *In re Application of Kreke Immobilien KG*, 2013 WL 5966916 (S.D.N.Y. Nov. 8, 2013) is not to the contrary.  That case held that the second *Intel* factor was "'neutral or slightly favor[ing]' the petitioner" precisely because the movant could not show any objection by Germany.  *Kreke*, 2013 WL 5966916, at * 5 (internal citation and quotation omitted).

---

[8]      The charge that Hranov conceded this is a fishing expedition (DB Mov. Br., 17) is silly.  The document requests in the subpoena are utterly unremarkable from a Rule 26 point of view.  As is clear from the brief on the Application, when Hranov said she did not know what DB has, that meant she did not have sufficient detailed knowledge of the contents of DB's files to be able to formulate a detailed request for each document (remember, in Germany the ad-versary has to refer to the document first for it be subject to a turnover request, *see* Kern Opp. Decl., ¶ 4.

## C.   Third *Intel* factor

The third *Intel* factor looks at whether the application seeks to "circumvent foreign proof-gathering limits or other policies of a foreign country or the United States." *Intel*, 542 U.S. at 244-245; *accord Alix Partners*, 5 F.4th at 230 (same).  DB complains that the discovery Hranov seeks would not be available in Germany (DB Mov. Br., 18-19) – but this is precisely what "circumvent[ing] foreign proof-gathering restrictions" does **not** mean.  The Supreme Court directly so held in *Intel*, which rejected any "foreign discoverability" requirement.  The Second Circuit and this Court have likewise repeatedly rejected any such attempt to sneak a "foreign discoverability" requirement back into the analysis through the third *Intel* factor.[9]

The case law DB cites is not only distinguishable, but also contrary to later case law.  DB erroneously relies on *In re Godfrey*, 526 F.Supp.2d 417 (S.D.N.Y. 2007) for its argument that the third *Intel* factor favors DB "because the connection to the United States is slight at best."  DB Mov. Br., 18.  In *Godfrey*, a 2007 case, the Court denied a § 1782 application primarily on the grounds that (1) because the corporate respondent was "neither incorporated nor headquartered" in this district and there was "no allegation that it "engaged in systematic and continuous activities in this district" and (2) "the documents petitioners seek are located in Russia".  *Godfrey*, 526 F.2d at 422,423.  This case predates *del Valle Ruiz* by twelve years, so it cannot be applying the now-correct standard.  In

---

[9]   *See, e.g., Mees*, 793 F.3d at 302 (""[i]f district courts were free to refuse discovery based upon its unavailability in a foreign court … § 1782 would be irrelevant to much international litigation, frustrating its underlying purposes.'"  (quoting *Metallgesellschaft*, 121 F.3d at 80); *Brandi-Dohrn*, 673 F.3d at 82 ("a district court should not consider the *discoverability* of the evidence in the foreign proceeding") (emphasis in original); *Euromepa S.A.*, 51 F.3d at 1098 (rejecting "any implicit requirement that any evidence sough in the United States be discoverable under the laws of the foreign country") (quoting *Application of Gianoli Aldunate*, 3 F.3d 54, 59 (2d Cir. 1993)); *In re Hansainvest Hanseatische Investment-GmbH*, 364 F.Supp.3d 243, 251 (S.D.N.Y. 2018) ("Section 1782 contains neither a foreign-discoverability nor an exhaustion requirement, and such requirements would seem to undermine the statute's very purpose"); *In re Furstenberg Finance SAS*, 2018 WL 3392882, at *7 (S.D.N.Y. Jul. 12, 2018) ("§ 1782 contains no foreign-discoverability requirement").

any event, DB *clearly does* "engage[] in systematic and continuous activities in this district" – and did so in this very case by supervising derivatives risk and making relevant data newly available here, *see* pp. 1-3, 8-10.[10] And because of Dolson's efforts, the documents are (or were) in New York.

DB argues that Hranov is barred from using § 1782 because of the forum selection clause in the contract with DB. DB Mov. Br. 19.  But this argument ignores the fact that *every single foreign plaintiff by definition selected a foreign forum*.  This argument would preclude any foreign plaintiff from using § 1782 because she would have elected to use a forum with procedural restrictions.  And yet the Second Circuit and this Court have repeatedly blessed § 1782 applications by plaintiffs.  *See, e.g.*, *Alix Partners, supra; Mees, supra*; *Brandi-Dohrn*, *supra*; *Accent Delight, supra*; *In re Evenstar Master Fund SPC For and on behalf of Evenstar Master Sub-Fund I Segregated Portfolio*, 2021 WL 3828881 (S.D.N.Y. Aug. 28, 2021); *Matter of Degens*, 2020 WL 4252725 (S.D.N.Y. Jul. 24, 2020).

The argument also proves too much.  DB wants the ability to run a transaction entirely out of New York and still insulate itself from § 1782 just by using a forum selection clause.  It is clear DB would like to be relieved of ever having to deal with § 1782, but Congress passed § 1782 for a reason – two reasons, actually: to assist foreign courts *and* to set an example for other countries.  *See Intel, supra,* at 253*; del Valle Ruiz, supra*, at 528; *Accent Delight, supra*, at 133*, Mees, supra,* at 297-298.  According heavy weight to a mere choice-of-forum clause would interfere with both these objectives.

---

[10]    The other cases DB cites (DB Mov. Br. 19-20) are from other jurisdictions and distinguishable.  In *Al-Ghanim v. IAP Worldwide, Servs., Inc.,* 2012 WL 13102517 (M.D. Fla. Jan. 18, 2012) the § 1782 applicant signed an agreement containing a "forum selection provision providing that: 'Kuwait law has to be applied when there is any disputes [sic] that may arise relating to this contract and the Kuwait court only are competent.'" *Id.*, 2012 WL 13102517, at * 1.  In *Application of Gilead Pharmasset LLC,* 2015 WL 1903957 (D. Del. Apr. 14, 2015) the Court determined that the third *Intel* factor weighed in the respondent's favor because the § 1782 applicant "made no attempts to obtain any discovery from [the respondent] in the foreign tribunals."  None of these facts lie here.  And the latter holding is contrary to the "no-foreign-exhaustion" rule.

*Kreke, supra,* is not to the contrary, either.  In that case, the court stressed that the facts were centered in Germany, so the state with primary interest in the dispute was Germany.  That is not true here: DB itself says the facts of this case took place in Switzerland.  The underlying lawsuit is connected to Germany only through the forum selection clause.  Moreover, the forum selection clause in *Kreke* was not a generic choice-of-forum.  As the court noted in *In re California State Teachers' Retirement Sys.,* 2017 WL 1246349 at *4 (D.N.J. Apr. 3, 2017), the clause in *Kreke* "stat[ed] that the forum selection clause applied to procedural rules."  That is not true here.

Nor is it true, despite Dr. Schmitt's assertions, that Hranov previously requested from the German Court the documents the § 1782 Subpoena seeks.  As Hranov's current attorney Dr. Konrad Kern explains, the requests in Germany are very limited and seek only specifically identified documents.  (*See* Kern Opp. Decl., ¶¶ 6-9).  In contrast, the § 1782 Subpoena requests seek carefully delineated ***categories*** of documents and communications, all pertaining to Biner, his dealings with Hranov, and DB's handling of the Hranov trades and Oerlikon.  To the extent the § 1782 requests may be read as broad enough to sweep in among the responsive documents some of the items requested in Germany, Hranov is amenable to excluding those items from the § 1782 requests.  Dr. Kern explains where the overlap might be – an overlap that became clear only because DB's German lawyer, Dr. Schmitt, has so advised the Court.  Dr. Hranov had no way of knowing ahead of time what is in DB's files; only DB knows that, and DB has first now so advised.  (Kern Opp. Decl. ¶ 7).

## D.    Fourth *Intel* factor

DB's main complaint here is that the documents Hranov seeks do not concern activity in New York.  This is merely a rehash of the argument that DB is "found" in this district for purposes of § 1782 only if DB's contacts with New York in connection with this case are enough to subject DB to personal jurisdiction here as a defendant.  We will not rehash that discussion here.  It is legally

erroneous.  *See* pp. 12-13 *supra*.  It is also not antithetical to the Second Circuit's holding in *del Valle Ruiz* that, once the respondent is subject to jurisdiction under § 1782, Rule 45 requires the respondent to produce all the documents in its "possession, custody or control" no matter where in the world they are kept.  *del Valle Ruiz*, 939 F.3d at 532 n. 14 (citation and quotation omitted), and 533. DB's argument is a frontal assault on Rule 45.

DB's overbreadth complaints are risible.  All of the Subpoena requests are focused on Biner, with a starting date of 2006.  (*See* Watnik Decl., Ex. A). Biner was gone from DB by late 2008-early 2009.  So the requests are aimed at a two or three year period, and to the extent they extend past that, the only responsive documents will be documents that relate, presumably, to cleaning up the mess Biner left behind.

Finally, DB's complaint that there is no one in New York with personal knowledge of the facts who can testify at a deposition is of no moment.  Rule 30(b)(6) solves that problem.

## Conclusion

The motion to quash must be denied.

Dated: New York, New York
        November 24, 2021

WILK AUSLANDER LLP


By: /s/Stuart M. Riback
    Stuart M. Riback (SMR 2443)
    Scott Watnik (SW 8120)
825 Eighth Avenue – Suite 2900
New York, New York 10019
Tel.: (212) 981-2300
sriback@wilkausalnder.com
swatnik@wilkauslander.com
*Attorneys for Applicant Dr. Isabella Hranov*