UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

IN THE MATTER OF THE APPLICATION OF
ISABELLA HRANOV FOR AN ORDER TO
TAKE DISCOVERY PURSUANT TO 28
U.S.C. § 1782
------------------------------------------------------------x

21-mc-751 (PKC)

OPINION AND ORDER

CASTEL, U.S.D.J.

On September 22, 2021, this Court granted an ex parte application brought by

Isabella Hranov to take discovery in aid of a foreign proceeding.  See 28 U.S.C. § 1782.  Hranov

seeks a wide range of documents from Deutsche Bank AG ("Deutsche Bank"), or, alternatively,

from Deutsche Bank Trust Corporation, in connection with a civil proceeding in the courts of

Germany, where she has sued Deutsche Bank.

Deutsche Bank moves to quash the subpoena.  It urges that because it is not

"found" this District, Hranov's application does not satisfy the mandatory criteria of section

1782(a).  It further urges that if the mandatory criteria is satisfied, the discretionary factors set

forth in Intel Corp. v. Advanced Micro Devices, Inc., 542 U.S. 241, 264-65 (2004), weigh

against the application.

As will be explained, Hranov has not pointed to a causal relationship between

Deutsche Bank's forum contacts and the discovery that she seeks in this application.  The Court

therefore concludes that, for the purposes of Hranov's application, Deutsche Bank is not "found"

in this district, and Hranov has not satisfied the mandatory factors of section 1782(a).  See In re

del Valle Ruiz, 939 F.3d 520, 527 (2d Cir. 2019).  Alternatively, if the Court were to reach the

discretionary Intel factors, these factors weigh strongly against Hranov's application, and the

motion to quash would be granted.

Accordingly, Deutsche Bank's motion to quash will be granted.

BACKGROUND.

On or about October 31, 2016, applicant Isabella Hranov commenced a civil proceeding in the Main Regional Court of Frankfurt, Germany, asserting claims against Deutsche Bank and one of its employees, Simon Biner (the "Complaint"). (Kern Dec. Ex. 2.) The Complaint describes Hranov's husband, Rumen Hranov, as "an extremely wealthy Swiss citizen" who was damaged when Biner carried out a scheme that rendered worthless his short-term call options on shares of OC Oerlikon AG ("Oerlikon"). (Id. at 9.) As described in the Complaint, Rumen Hranov assigned his claims to Isabella Hranov, who then brought claims on behalf of Rumen, his mother, and his deceased sister. (Id. at 10, 15-16.)

Broadly summarized, the Complaint alleges that Biner approached Rumen Hranov and proposed to invest his money in high-volume options trading, a field in which Rumen lacked knowledge and experience, and that, after a series of profitable transactions, Biner advised Rumen to acquire options in Oerlikon shares "at a massive scale." (Id. at 11.) As described in the Complaint, Deutsche Bank was the counterparty to Rumen's options, and set prices on the options that exceeded their fair market value by 18%. (Id. at 10, 12.) The Complaint alleges that the investments were "geared toward total loss" to Hranov, with the intent of maximizing gains to Deutsche Bank. (Id. at 12.) According to the Complaint, due to Biner's scheme, Hranov suffered a total loss on the options when the Oerlikon share price was lower than the options' strike price on their exercise date. (Id. at 32.) The Complaint alleges losses totaling 316,011,961 Swiss francs, or approximately €326.8 million. (Id.; Schmitt Dec. ¶ 4.) The Complaint brings claims against Deutsche Bank and Biner under German law that appear similar to fraud, breach of fiduciary duty and/or securities fraud. (Id. at 94-108.)

Hranov's section 1782 application seeks a wide range of documents relating to Biner's advice to Rumen Hranov and his Oerlikon transactions.  Hranov asserts that for the purpose of this application, Deutsche Bank "is found" in this District based on an email that Biner sent to others within Deutsche Bank on March 28, 2008, which copied a New York-based employee.  He also points to a declaration filed in an ongoing dispute in the German litigation about conflicting versions of this email (the "Disputed Email") and Deutsche Bank's process for archiving and retrieving electronic data.  In the Disputed Email, Biner appears to make observations about the options holdings of Rumen Hranov and another Deutsche Bank client. The email was copied to Noreddine Sebti, the former Global Head of Equity Trading at Deutsche Bank, who was located in New York at the time the email was sent.  (Kern Dec. ¶ 16.)  In a version of the email that Hranov purportedly obtained as a "printout" from "an unknown third party," the email states in regard to Rumen Hranov: "no matter what, we can adjust the pricing in our favour.  client is not aware at all." (the "Disputed Language")[1]  (Kern Dec. ¶ 11.)

After being presented with this email by Hranov during the German litigation, Deutsche Bank then located a version of this email in its own electronic archives that was near-identical, except that it did not contain the Disputed Language.

Hranov's application asserts that under German law, parties do not exchange documents in a formal discovery process, and that each party is responsible for obtaining and developing its own evidence independently.  (Kern Dec. ¶ 14.)  In support of the authenticity of its own archived version of the Disputed Email, Deutsche Bank submitted to the German Court a

---

[1] Deutsche Bank's attorney in the German proceedings states that the email proffered by Hranov "was a paper printout; it was not a .pst email file or any other electronic file."  (Schmitt Dec. ¶ 10.)  In the German proceedings, Hranov has attempted to confirm the authenticity of the email by submitting a "'Picture' from the 'Dark Web' that purportedly confirms the authenticity of the Disputed Document" and was taken by a detective agency.  (Schmitt Dec. ¶ 17 & Ex. 3.)

declaration from Margaret Dolson, who has the title Global Head of eDiscovery Services at Deutsche Bank and is located in New York.  (Kern Dec. ¶ 12 & Ex. 3.)  Dolson described how Deutsche Bank's electronic data is archived and retrieved, including historical employee emails. (Kern Dec. ¶ 12 & Ex. 3.)  As described by Dolson, Deutsche Bank produced the email after a search of archived emails belonging to Sebti, and Dolson stated that the data retrieved from Sebti "was not altered or amended."  (Dolson Dec. ¶ 31.)  Deutsche Bank has described the email proffered by Hranov as "a possible forgery."  (Deutsche Bank Mem. at 1.)

Hranov asserts that for the purposes of this application, Deutsche Bank "is found" in this District through the forum contacts reflected in Sebti's receipt of the Disputed Email, as well as through the New York presence of Dolson.  (Kern Dec. ¶¶ 19-20.)

Hranov's application seeks broad categories of documents related to Biner's trading activities and his communications within Deutsche Bank.  Her application is not directed toward Biner's communications with the New York-based Sebti, who is not mentioned in the document requests, nor is it directed toward Dolson's process for retrieving materials from Deutsche Bank's electronic archives.  Rather, Hranov cites to the New York presence of Sebti and Dolson to access a wide range of materials without temporal or geographic limitations.

Request 1 seeks "[a]ll communications" between Biner and "anyone employed by Deutsche Bank" concerning Rumen Hranov's accounts.  Request 2 seeks "[a]ll documents and communications concerning any investment advice or strategy provided by Biner to Hranov concerning Oerlikon stock or stock options."  Request 3 seeks "[a]ll communications" sent or received by Deutsche Bank supervisory or compliance personal about Biner's involvement with any Oerlikon transactions.  Request 4 weeks "[a]ll communications" sent or received by Biner as to Oerlikon trading strategies.  Request 5 seeks Deutsche Bank's ethics and conflict-of-interest

guidelines.  Request 6 seeks "[a]ll documents and communications" concerning the termination of Biner's employment at Deutsche Bank.  Request 7 seeks "[a]ll documents and communications" about the inspection of the security systems concerning Deutsche Bank's electronic documents.  Hranov also seeks an order that would direct Deutsche Bank to permit a forensic expert to enter Deutsche Bank's premises and examine its systems for storing and retrieving electronic data, and to take the Rule 30(b)(6), Fed. R. Civ. P., deposition of a witness designated by Deutsche Bank.

The Court granted Hranov's <u>ex parte</u> application for the issuance of a subpoena directed to documents covered by requests 1-4 and 6, and for the testimony of a Rule 30(b)(6) witness as to the same topics.  (Docket # 1-1, 8.)  It denied the remainder of the application.

DISCUSSION.

I.      <u>The Mandatory and Discretionary Factors of 28 U.S.C. § 1782.</u>

A district court may, "upon the application of any interested person," order a person within its jurisdiction to "give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal . . . ."  28 U.S.C. § 1782(a).  To grant a section 1782 application, the Court must be satisfied that three mandatory factors are satisfied: "'(1) the person from whom discovery is sought resides (or is found) in the district of the district court to which the application is made, (2) the discovery is for use in a foreign proceeding before a foreign [or international] tribunal, and (3) the application is made by a foreign or international tribunal or any interested person.'"  <u>Mees v. Buiter</u>, 793 F.3d 291, 297 (2d Cir. 2015) (quoting <u>Brandi-Dohrn v. IKB Deutsche Industriebank AG</u>, 673 F.3d 76, 80 (2d Cir. 2012)); <u>accord</u> <u>In re Accent Delight Int'l Ltd.</u>, 869 F.3d 121, 128 (2d Cir. 2017).

If the applicant satisfies the mandatory factors, the district court then weighs four discretionary factors listed in Intel, 542 U.S. at 264-65.  "These are: (1) whether 'the person from whom discovery is sought is a participant in the foreign proceeding,' in which case 'the need for § 1782(a) aid generally is not as apparent'; (2) 'the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance'; (3) 'whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States'; and (4) whether the request is 'unduly intrusive or burdensome.'"  Mees, 793 F.3d at 298 (quoting Intel, 542 U.S. at 264-65).  The Court's exercise of discretion "'is not boundless,'" and must be guided by the goals of "'providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts.'" Mees, 793 F.3d at 297-98 (quoting Schmitz v. Bernstein Liebhard & Lifshitz, LLP, 376 F.3d 79, 83-84 (2d Cir. 2004)).

II.     Hranov Has Not Demonstrated that Deutsche Bank "Is Found" in This District.

Deutsche Bank does not dispute that the discovery sought is for use in a foreign proceeding and that the application is brought by an interested person.  See Mees, 793 F.3d at 297.  However, Deutsche Bank urges that the subpoena should be quashed because Hranov cannot demonstrate that "the person from whom discovery is sought resides (or is found) in the district of the district court to which the application is made . . . ."  Id.

In applying section 1782(a), "the statutory scope of 'found' extends to the limits of personal jurisdiction consistent with due process."  del Valle Ruiz, 939 F.3d at 527.  Hranov does not urge that Deutsche Bank is subject to general jurisdiction in this district, and asserts that

that based on its forum contacts through Sebti and Dolson, Deutsche Bank "is found" in this

District under the reasoning of del Valle Ruiz.

    To exercise specific jurisdiction over a foreign person, "'there must be an

affiliation between the forum and the underlying controversy, principally, [an] activity or an

occurrence that takes place in the forum State.'" Id. at 529 (quoting Bristol-Myers Squibb Co. v.

Superior Ct. of Cal., 137 S. Ct. 1773, 1780 (2017)).  "In the liability context, '[t]he exercise of

specific jurisdiction depends on in-state activity that gave rise to the episode-in-suit.'" Id. at 530

(quoting Waldman v. Palestine Liberation Org., 835 F.3d 317, 331 (2d Cir. 2016) (emphasis in

original)).  In the context of a section 1782 application, the due process analysis looks to the

relationship between the respondent's forum contacts and the discovery sought:

> Translated to account for a § 1782 respondent's nonparty status, we
> thus hold that, where the discovery material sought proximately
> resulted from the respondent's forum contacts, that would be
> sufficient to establish specific jurisdiction for ordering discovery.
> That is, the respondent's having purposefully availed itself of the
> forum must be the primary or proximate reason that the evidence
> sought is available at all.  On the other hand, where the respondent's
> contacts are broader and more significant, a petitioner need
> demonstrate only that the evidence sought would not be available
> but for the respondent's forum contacts.

Id.  Although "the use of terminology relating to causation is a somewhat awkward fit for

discovery . . . the focus on the relationship between a § 1782 respondent's forum contacts and the

resulting availability of the evidence is a workable translation of the normal personal-jurisdiction

framework.  For instance, an applicant could target its discovery to all documents relating to *x*

created during the course of respondent's engagement with forum entity *y*.  That our holding will

generally require a § 1782 applicant to provide additional specificity concerning the discovery it

seeks is a feature, not a flaw."  Id. at 530 n.12.  "[I]t [is] enough for purposes of due process in

these circumstances that the nonparty's contacts with the forum go to the actual discovery sought

rather than the underlying cause of action." Id. at 530.

        In del Valle Ruiz, the Second Circuit concluded that the respondent's forum

contacts were insufficient to exercise jurisdiction consistent with due process. Id. at 531.  The

respondent, Banco Santander S.A. ("Santander"), had used two New York City firms, UBS and

Citibank, to conduct due diligence on the potential acquisition of a Spanish bank, BPE.  Id. at

524.  Before Santander made an offer, BPE "suffered an all-out run on deposits" and conducted a

government-forced sale.  Id.  Santander then acquired BPE for €1, and its CEO stated that it had

been able to do so only because it previously conducted due diligence.  Id. at 524-25.  A group of

investors in BPE brought legal proceedings in the European Union and Spain directed to the

forced sale and filed a section 1782 application in New York seeking discovery of Santander.  Id.

at 525.  The Second Circuit concluded that Santander's pre-acquisition due diligence was

insufficient to exercise specific jurisdiction over the application because the diligence "only"

related to the acquisition of BPE prior to the forced sale.  Id. at 531.  The applicants' legal claims

"and likewise the bulk of discovery sight" arose from the forced sale of BPE, which was a

separate transaction.  Id.  Thus, because Santander's in-forum retention of UBS and Citibank

were not connected to BPE's forced sale, they were not "the primary or proximate reason that the

evidence sought is available at all."  Id. at 531.  Similarly, Santander's forum contacts that

postdated the BPE acquisition could not constitute "even but-for 'causes' of the availability of

the evidence sough in discovery."  Id.

        Hranov urges that Deutsche Bank's forum contacts should be scrutinized under

del Valle Ruiz because its status in this proceeding is that of a respondent to a section 1782

application and not that of a defendant facing civil liability in this District.  Deutsche Bank

points out that del Valle Ruiz was expressly tailored to a section 1782 respondent who was a non-party to the foreign proceeding.  See 939 F.3d at 530 n.11 ("Although [respondents] are technically 'parties' to this § 1782 proceeding, they are functionally nonparties in the sense that they are not subject to liability in the underlying foreign proceedings.").  Deutsche Bank urges that because it is a defendant in the German litigation, there is no specific jurisdiction over Hranov's application because she has not pointed to forum "activity that gave rise to the episode-in-suit."  Waldman, 835 F.3d at 331 (emphasis in original).

The Court assumes, without deciding, that the reasoning of del Valle Ruiz applies to Hranov's application, rather than the "episode-in-suit" requirement of Waldman.  del Valle Ruiz considered an application made against a non-party to the underlying foreign proceeding, but it was premised on established principles about the exercise of specific jurisdiction.  See 939 F.3d at 529.  That is, there must be "an 'affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State'" and "'[s]pecific jurisdiction . . . permits adjudicatory authority only over issues that 'aris[e] out of or relat[e] to the [entity's] contacts with the forum.'"  Id. (quoting Bristol-Myers Squibb, 137 S. Ct. at 1780, and Gucci Am., Inc. v. Weixing Li, 768 F.3d 122, 134 (2d Cir. 2014) (alterations in original)).[2]  del Valle Ruiz tailored these general principles to a discovery application under section 1782.

In this case, the "underlying controversy" before the Court is Hranov's discovery application and not Deutsche Bank's liability to Hranov.  The Court will therefore apply del

---

[2] Contrary to Deutsche Bank's characterization, del Valle Ruiz rejected the notion that the exercise of jurisdiction over a nonparty affords weaker due process protections than the exercise of jurisdiction over a defendant.  939 F.3d at 530 ("We decline to hold that there is a categorically lower showing of due process needed to obtain discovery from a nonparty.  Instead, we think it enough for purposes of due process in these circumstances that the nonparty's contacts with the forum go to the actual discovery sought rather than the underlying cause of action.").

Valle Ruiz to Hranov's application.  Hranov has not demonstrated that Deutsche Bank's forum contacts are either the proximate or but-for cause of the materials that she seeks in discovery.  del Valle Ruiz, 939 F.3d at 530.

Sebti held the job title of Global Head of Equities Trading at Deutsche Bank from 2008 to 2010.  (Mucke Dec. ¶ 5.)  The Disputed Email of March 28, 2008 was sent by Biner to a recipient named Richard Carson, and copied to four recipients within Deutsche Bank, including Sebti.  (See Schmitt Dec. Exs. 1-3.)  There is no dispute that at the time he was copied on this email, Sebti was located in New York, although he moved to Hong Kong a few weeks later, on May 1, 2008.  (Mucke Dec. ¶ 5.)  In a memorandum, Hranov states that "it was necessary" for Biner to keep Sebti updated about Hranov's options holdings, given their size and Sebti's authority over Deutsche Bank's derivatives risks.  (Opp. Mem. at 9.)  Hranov asserts that Deutsche Bank's "purposeful contact with this district in the form of having Sebti here . . . is the direct and proximate reason why communications between Biner and Sebti . . . concerning the trades in Oerlikon stock at issue in the German Action exist," therefore satisfying the standard set forth in del Valle Ruiz.  (Id.)

But Hranov seeks discovery that goes far beyond Deutsche Bank's forum ties through Sebti, who is not mentioned in the discovery requests.  Hranov seeks materials like "[a]ll communications" between Biner and "anyone employed by Deutsche Bank" concerning Rumen Hranov's accounts, among other things.  The requests are not focused on Biner's communications with Sebti and contain no geographic or temporal limitations.  Hranov does not explain how Deutsche Bank's forum contacts, through Sebti, could be either a primary or but-for reason "that the evidence sought is available at all."  del Valle Ruiz, 939 F.3d at 530.  Hranov speculates that Sebti bore ultimate responsibility for Biner's trading activities, and, as support,

cites to articles published in 2005 to the website Risk.net and a German-language site called "eFinancialCareers," both of which broadly described Sebti's workplace responsibilities. (Watnik Dec. Exs. B, C.)  These two posts have no bearing on the Disputed Email, Sebti's authority over Biner, or any materials sought in this application.

Hranov's attempt to identify a forum contact based on the Dolson Declaration is even more strained.  As discussed, Dolson submitted a declaration in the German litigation that described the process for retrieving Deutsche Bank's archived electronic data.  (Kern Dec. Ex. 3.)  Her declaration is dated July 10, 2020, and identifies her as Deutsche Bank's Global Head of eDiscovery Services based in New York.  (Dolson Dec. ¶¶ 1-2.)  Dolson's declaration states that archives of Biner's emails were found in the United Kingdom, as was a backup tape.  (Dolson Dec. ¶ 4.)  Archives of Sebti's emails were found in Deutsche Bank's "compliance messaging archive called 'the Digital Safe' located in the US."  (Dolson Dec. ¶ 22.)  Dolson described the "Digital Safe" as a "compliance archive" that a vendor hosts externally in the United States, United Kingdom, Germany and Singapore.  (Dolson Dec. ¶ 24.)  Much of Dolson's declaration describes technical details about Deutsche Bank's data archives and endeavors to explain why the archived data could not be altered or amended.

Hranov urges that Dolson's presence in New York is a forum contact sufficient to confer specific jurisdiction over its application.  She explains:

> The technical details are not important here.  What is important is that no email, spreadsheet or other document existed before Ms. Dolson commenced the Investigation.  **It is only because of the Investigation that the emails and other documents of Biner and Sebti were extracted, reconstructed and made available.**

(Opp. Mem. at 11; emphasis in original.)

Hranov conflates Dolson's role in supervising the mere extraction of archived data with the creation of the underlying documents and emails.  In essence, Hranov urges that a company should be "found" in any forum where an information technology professional can access and retrieve archived electronic data.  Given the ubiquity of electronic data and communications, this approach could allow for a presence similar to general jurisdiction in any forum where the respondent maintains an information-technology team.  Moreover, Hranov's application is not limited to evidence about Dolson's supervision of document extraction, the maintenance of Deutsche Bank's electronic archives or the process used to locate Deutsche Bank's version of the Disputed Email.  It instead relies on the relatively discrete issues surrounding the Disputed Email as the entry point to seek a trove of information that goes well beyond the underlying email.

Neither Sebti's receipt of the Disputed Email nor Dolson's supervision of data extraction demonstrates causation between Deutsche Bank's forum contacts and the documents that Hranov's seeks.  Given the breadth and generality of Hranov's discovery requests, the Court need not consider whether any narrower, hypothetical request might demonstrate causation between Deutsche Bank's forum contacts and the discovery sought.  See In re del Valle Ruiz, 939 F.3d at 530 n.12 ("That our holding will generally require a § 1782 applicant to provide additional specificity concerning the discovery it seeks is a feature, not a flaw.").

Because the application does not demonstrate that Deutsche Bank "is found" in this district, the Court concludes that Hranov has not satisfied the mandatory criteria of section 1782(a).  Deutsche Bank's motion to quash will therefore be granted.

III.    The *Intel* Factors Weigh in Favor of Deutsche Bank's Motion to Quash.

Hranov has not satisfied the mandatory factors of section 1782.  If she had, the Court would conclude that the <u>Intel</u> factors weigh against the application and that the subpoena should be quashed.  The Court affords particular weight to the first and fourth <u>Intel</u> factors.

On the first <u>Intel</u> factor, Hranov and Deutsche Bank are both parties to the German proceeding.  "<u>Intel</u> suggests that because [respondent] is a participant in the German litigation subject to German court jurisdiction, petitioner's need for § 1782 help 'is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad.'"  <u>Schmitz v. Bernstein Liebhard & Lifshitz, LLP.</u>, 376 F.3d 79, 85 (2d Cir. 2004) (quoting <u>Intel</u>, 542 U.S. at 264); <u>see also</u> <u>Kiobel by Samkalden v. Cravath, Swaine & Moore LLP</u>, 895 F.3d 238, 245 (2d Cir. 2018) (district court erred by not giving sufficient weight to the fact that the real party in interest to the response was a party to the underlying foreign proceedings).  This is because "[a] foreign tribunal has jurisdiction over those appearing before it, and can itself order them to produce evidence."  <u>Intel</u>, 542 U.S. at 264.  Deutsche Bank states that all of the documents Hranov seeks are accessible in Germany, that some of the documents covered by Hranov's application have been produced in Germany, and that Hranov already has pending applications before the German court that requests access to many of the documents sought in this application.  (Schmitt Dec. ¶¶ 22-27 & Ex. 5.)  The first <u>Intel</u> factor weighs strongly against the application.

The fourth <u>Intel</u> factor, which considers whether a request is unduly intrusive or burdensome, also weighs against the application.  The requests include "[a]ll communications" between Biner and "anyone employed by DB" concerning the Hranov accounts, "[a]ll communications sent or received by supervisory or compliance personnel at DB concerning

- 13 -

Biner's conduct, role or involvement in connection with any transactions in Oerlinkon stock and derivatives" and "[a]ll documents and communications concerning the termination of Biner's employment by DB in 2008 or 2009." (Docket # 1-1.) There is no geographic or temporal limitation on these requests, and it appears that the bulk of the requests would involve materials located outside the United States, as indicated by the United Kingdom location of Biner's data archives. See In re del Valle Ruiz, 939 F.3d at 533 ("[A] court may properly, and in fact should, consider the location of documents and other evidence when deciding whether to exercise its discretion to authorize such discovery.").

The third Intel factor looks to whether the section 1782 request conceals an attempt to circumvent foreign proof-gathering restrictions. "In the context of § 1782 and the third Intel factor, circumvention occurs where the applicant uses a § 1782 application to avoid measures that are intended to restrict certain means of gathering or using evidence." Fed. Republic of Nigeria v. VR Advisory Servs., Ltd., 27 F.4th 136, 153 (2d Cir. 2022). Deutsche Bank points to Hranov's express acknowledgement that Germany's discovery process is more restrictive than that of the United States. (Hranov Mem. 17; Deutsche Bank Mem. 18-19.) It also appears that Hranov has brought various applications to the German court to access certain documents. (Schmitt Dec. Ex. 5.) While a section 1782 application should not be a vehicle "to circumvent the [forum country's] more restrictive discovery practices," Kiobel, 895 F.3d at 245, "courts [also] should not give undue weight to the mere absence in foreign jurisdictions of proof-gathering mechanisms available in the United States . . . ." Fed. Republic of Nigeria, 27 F.4th at 153. Here, the statements of Hranov's counsel and the apparent existence of her discovery applications in Germany implicate the concerns noted by Kiobel, but Deutsche Bank also has not urged that Germany's procedures amount to "a proof-gathering restriction, or at least a policy

preference for use of its processes over other means by which [applicant] can gather evidence in the United States . . . ." Fed. Republic of Nigeria, 27 F.4th at 153.  Because there is no indication that Germany has a policy preference for its own proof-gathering processes, this factor weighs in favor of the application.

        The second Intel factor similarly tips in favor of the application.  The underlying litigation is a civil dispute in Germany that has been pending since 2016.  There is no suggestion that Germany's courts are not generally receptive to the assistance of the United States federal courts.

        On balance, the Court concludes that even if Hranov had satisfied the mandatory criteria of section 1782(a), the Court would grant Deutsche Bank's motion to quash based on the discretionary Intel factors, affording particular weight to the first and fourth factors.

CONCLUSION.

        For the reasons explained, Deutsche Bank's motion to quash the subpoena is GRANTED.  The Clerk is directed to terminate the motion, the related letter-motions and to close the case.  (Docket # 10, 14, 23.)

        SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
      April 28, 2022