UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

IN THE MATTER OF THE APPLICATION OF
ISABELLA HRANOV FOR AN ORDER TO
TAKE DISCOVERY PURSUANT TO 28
U.S.C. § 1782
-------------------------------------------------------------x

21-mc-751 (PKC)

OPINION AND ORDER

CASTEL, U.S.D.J.

        Deutsche Bank Trust Corporation ("DBTC") moves for an Order quashing a subpoena in aid of foreign discovery served upon it by Isabella Hranov pursuant to 28 U.S.C. § 1782.  (ECF 39.)  A prior Opinion and Order granted a motion to quash filed by Deutsche Bank AG ("DBAG"), concluding that DBAG is not "found" in this District.  Matter of Hranov, 2022 WL 1261827 (S.D.N.Y. Apr. 28, 2022) ("Hranov I").  The Court held that, alternatively, the discretionary factors of Intel Corp. v. Advanced Micro Devices, Inc., 542 U.S. 241 (2004), weighed in favor of quashing the subpoena to DBAG.  Hranov I, 2022 WL 1261827, at *7-8.

        At the outset of this proceeding, the Court observed that Hranov "appears to be at sea as to the proper party to serve but that is Applicant's responsibility to determine and not the Court's, especially in the ex parte context."  (ECF 8 at 1 n.1.)  After the Court granted DBAG's motion to quash, it noted that no restrictions had been placed on Hranov's ability to serve a subpoena on DBTC.  (ECF 36.)  Hranov then served her subpoena upon DBTC.[1]

        As will be explained, the Court concludes that the first Intel factor weighs heavily against Hranov's application.  The subpoena is nominally made upon DBTC but seeks no documents or information related to DBTC, and requests only documents and information related to DBAG, which is Hranov's adversary in the underlying foreign litigation.  The Second

---

[1] Hranov filed a Notice of Appeal to the Second Circuit as to the Opinion and Order in Hranov I.  (ECF 28.)  That appeal has been held in abeyance, pending a decision on this motion to quash.  (ECF 47.)

Circuit and courts of this District have explained that the first <u>Intel</u> factor weighs against an applicant "when the real party from whom documents are sought . . . is involved in foreign proceedings . . . ."  <u>Kiobel by Samkalden v. Cravath, Swaine & Moore LLP</u>, 895 F.3d 238, 245 (2d Cir. 2018); <u>see also</u> <u>In re Saul Klein</u>, 2023 WL 8827847, at *10 (S.D.N.Y. Dec. 21, 2023) (Engelmayer, J).  Because there is no pretense that Hranov seeks documents pertaining to the operations of DBTC, and seeks solely information relating to her foreign adversary, the motion to quash will be granted.

BACKGROUND.

        A.   <u>The Underlying Litigation and the Parties.</u>

Hranov seeks discovery in aid of a German proceeding in the Frankfurt am Main District Court.  (Schmitt Dec. ¶ 3 (ECF 42-1).)  In that proceeding, Hranov sued DBAG and former DBAG employee Simon Biner, asserting that they breached fiduciary duties owed to her husband by convincing him to purchase stock options for a Swiss company called OC Oerlikon, and then manipulating Oerlikon's stock price, causing losses of EUR 326.8 million.  (Schmitt Dec. ¶ 4.)  Hranov was assigned the claims by her husband.[2]  (Schmitt Dec. ¶ 5.)

DBTC is a New York corporation and does not have any employees.  (Mucke Dec. ¶¶ 6-7 (ECF 41).)  Jörg Mucke, who is DBAG's "Head of Litigation Germany," describes DBTC as "a holding company whose only business is to wholly own" Deutsche Bank USA Core Corporation ("DBUCC") and other affiliates.  (Mucke Dec. ¶ 6.)  DBAG is the ultimate parent corporation of DBTC and DBUCC.  (Mucke Dec. ¶ 3.)

---

[2] DBAG's attorney in the German proceedings speculates that the claim was assigned to Isabel Hranov "to evade" a German rule prohibiting a plaintiff from testifying as a witness.  (Schmitt Dec. ¶ 5.)  The Court takes no position and implies no view on why the claim may have been assigned to Isabel Hranov.

The Regulation, Compliance and Anti-Financial Crime Technology division of DBUCC includes a "CIO eDiscovery Services" department.  (Dolson Witness Statement ¶¶ 2, 4 (ECF 40-1).)  eDiscovery "is the department responsible for the extraction and delivery of electronic data."  (Id. ¶ 4.)  It has standard protocols that govern technical tasks for account and data identification, data extraction and data delivery.  (Id. ¶ 4.)  It undertakes tasks pursuant to written contracts executed by a Deutsche Bank entity as the requesting party.  (Dolson Dec. ¶ 4 (ECF 40).)  According to Mucke, DBTC is not a party to eDiscovery work orders carried out by DBUCC and has no role in eDiscovery work.  (Mucke Dec. ¶ 8.)  Mucke further states that neither DBTC nor DBUCC possesses or maintains custody of DBAG documents, including those requested by Hranov, nor do they have open access to those documents due to bank secrecy laws.  (Mucke Dec. ¶¶ 9-13.)

B.  The "Disputed Document."

Much of DBTC's motion is devoted to what it calls the "Disputed Document," which is an email purportedly sent by Biner to others at Deutsche Bank, dated March 28, 2008. That email states in part:

> the two big players VICTORY and HRANOV are not active at all at the moment
> . . .
> value portfolio HRANOV approx. – 13 mil CHF at 350 (he is short puts) at 450 it would be + 24 mio CHF and would have a delta of 500 / shares
> . . .
> loss out of April is a total 93 mio CHF for this [sic] two clients. I would say in a bullish environment they would prefer to sell it back because a delta neutral roll over would cost to [sic] much money.
>
> as soon as this [sic] 2 clients see that we are under pressure they will be hard with us as well. (remember last autumn)
>
> on a verbal basis HRANOV tells me that he would be willing to sell if his portfolio gets a value. at what level is difficult to say. no matter

<u>what, we can adjust the pricing in our favour. client is not aware at
all.</u>

(Schmitt Dec. Ex. 1; emphasis added.)

In April 2020, Hranov filed the Disputed Document in the record of the German

action.  (Schmitt Dec. ¶ 9.)  According to Schmitt, Hranov has not disclosed who gave her the

document or where she obtained it, but she has characterized it as proof of Biner's intent to

defraud her husband, Mr. Hranov.  (Schmitt Dec. ¶¶ 7-8, 18.)

After reviewing the Disputed Document, DBAG "commenced a thorough search"

of Biner's emails, with the search overseen by Margaret Dolson, but "the actual searching" was

performed by eDiscovery personnel in Europe.  (Schmitt Dec. ¶¶ 11-12.)  Dolson is employed by

DBUCC as the Global Head of eDiscovery Services for DBAG and its affiliates.  (Dolson Dec. ¶

2 (ECF 40).)  Dolson submitted to the German court a document styled as a "Witness

Statement," explaining search protocols and results.  (Schmitt Dec. ¶ 13.)  In its archival search,

DBAG discovered several copies of an email that largely resembled the Disputed Document.

(Schmitt Dec. ¶¶ 15-16 & Ex. 2.)  However, the emails found by DBAG did not include the

lines: "no matter what, we can adjust the pricing in our favour. client is not aware at all."  (See

Schmitt Dec. Ex. 2.)  DBAG also retained Deloitte GmbH to conduct further investigation, and it

concluded that the Disputed Document was not authentic.  (Schmitt Dec. ¶¶ 19-20 & Ex. 3.)

Hranov's submissions to the German court have maintained that the Disputed

Document is authentic, stating that a version of the document was also found on the so-called

"Dark Web" and providing a picture of the document.  (Schmitt Dec. ¶ 17.)  The "Dark Web"

version of the Disputed Document contains spacing and formatting discrepancies that vary from

the Disputed Document as it was submitted to the German court.  (DBTC Mem. at 8 & n. 2.)

DBTC advises that as of April 19, 2024, the German court has not issued any ruling on the parties' dispute over the authenticity of the Disputed Document.  (ECF 53.)

DBTC states that it "does not ask this Court to decide which of these documents is authentic.  DBTC only asks this Court to observe that there is a substantial likelihood that the Disputed Document (like the Dark Web Document) is a forgery."  (DBTC Mem. at 10.)  The Court declines to do so, though it notes the respective contentions of DBTC and Hranov.

        C.   <u>Dolson's eDiscovery Work Pertaining to the Disputed Document.</u>

Hranov's subpoena to DBTC seeks only those documents that Dolson gathered in connection with the German action relating to the Disputed Document.  There is no dispute that Dolson is employed in New York by DBUCC, that DBUCC is, in turn, a wholly-owned subsidiary of DBTC, and that DBAG is the ultimate parent of both DBUCC and DBTC.

Dolson has been employed by DBUCC since July 2017 and is familiar with the protocols of Deutsche Bank's eDiscovery services.  (Dolson Dec. ¶¶ 2-3.)  She states that as a general matter, neither she nor her staff has possession of DBAG's archived electronic data.  (Dolson Dec. ¶ 5.)  She states that eDiscovery personnel are generally prohibited from accessing archived electronic data without specific authorization from Deutsche Bank's legal department, in part because of the bank secrecy laws of Germany and other countries.  (Dolson Dec. ¶¶ 6-7.)  Dolson states that she has never shared information related to a document request for a Deutsche Bank entity with DBTC, and that documents "do not flow freely between DBTC and DBUCC."  (Dolson Dec. ¶ 10.)

In her witness statement submitted to the German Court, which was originally written in English and submitted in a certified German translation, Dolson states that on January 31, 2020, Mucke requested retrieval of Biner's emails, Bloomberg messages and instant

messages.  (Witness Statement ¶ 3 (ECF 40-1).)  She explains the data-archiving system in detail and describes the process used to locate Biner's emails.  (Witness Statement ¶¶ 4-12.)  She also details the processes for extracting archived electronic records and confirming their accuracy and completeness.  (Witness Statement ¶¶ 13-20, 24-29.)

                D.  <u>The Subpoena to DBTC.</u>

Hranov's subpoena to DBTC includes the instruction that in responding to the subpoena, "you are required to search only the data files retrieved as set forth in the Dolson declaration [e.g., the German witness statement], specifically, the data files containing communications of Simon Biner and Norredine Sebti."  (Subpoena Instructions ¶ BB (ECF 41-1).)  The subpoena contains five document demands, four of which are focused on communications concerning Biner's relationship to Hranov and Oerlikon stock, and a separate demand for documents and communications concerning the termination of Biner's employment at DBAG in 2008 or 2009.  (Subpoena at p. 6.)

Schmitt states that "[m]ost of the subpoenaed documents have also been requested in the German Action" and that Hranov's requests for further documents are pending before the German court.  (Schmitt Dec. ¶¶ 23-24.)  The parties advise that as of April 19, 2024, these requests remain pending.  (ECF 52, 53.)  Schmitt states that all of the subpoenaed documents are accessible to DBAG in Germany.  (Schmitt Dec. ¶ 26.)

LEGAL STANDARD.

"The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal . . . ."  28 U.S.C. § 1782(a); <u>see also</u> <u>Kiobel</u>, 895 F.3d at 243 ("A district court possesses jurisdiction to grant a Section 1782 petition if: (1) the

person from whom discovery is sought resides (or is found) in the district of the district court to which the application is made, (2) the discovery is for use in a proceeding before a foreign tribunal, and (3) the application is made by a foreign or international tribunal or any interested person.") (quotation marks, ellipsis and brackets omitted). DBTC agrees that Hranov's subpoena satisfies these mandatory section 1782 factors. (DBTC Mem. at 12.)

If an applicant satisfies the mandatory factors, the court then weighs the four discretionary factors listed in Intel, 542 U.S. at 264-65. "These are: (1) whether 'the person from whom discovery is sought is a participant in the foreign proceeding,' in which case 'the need for § 1782(a) aid generally is not as apparent'; (2) 'the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance'; (3) 'whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States'; and (4) whether the request is 'unduly intrusive or burdensome.'" Mees v. Buiter, 793 F.3d 291, 298 (2d Cir. 2015) (quoting Intel, 542 U.S. at 264-65). The Court's exercise of discretion "'is not boundless,'" and must be guided by the goals of "'providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts.'" Mees, 793 F.3d at 297-98 (quoting Schmitz v. Bernstein Liebhard & Lifshitz, LLP, 376 F.3d 79, 83-84 (2d Cir. 2004)).

DISCUSSION.

       I.       <u>Hranov's Application Satisfies the Mandatory Section 1782 Factors.</u>

As noted, DBTC has stated that it "does not dispute" that Hranov satisfies that mandatory section 1782 factors.  (DBTC Mem. at 12.)  The Court concludes that the mandatory section 1782 factors are met.

       II.      <u>Application of the Discretionary <i>Intel</i> Factors.</u>

          A.  <u>Factor One: Hranov Seeks Documents from DBAG.</u>

The first factor <u>Intel</u> factor looks to whether the person from whom discovery is sought is a participant in the foreign proceeding.  <u>Mees</u>, 793 F.3d at 298.  "[W]hen the person from whom discovery is sought is a participant in the foreign proceeding . . . the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad.  A foreign tribunal has jurisdiction over those appearing before it, and can itself order them to produce evidence."  <u>Intel</u>, 542 U.S. at 264.  "In contrast, nonparticipants in the foreign proceeding may be outside the foreign tribunal's jurisdictional reach; hence, their evidence, available in the United States, may be unobtainable absent § 1782(a) aid."  <u>Id.</u>  DBTC is not a party to the German proceeding, which is brought against DBAG and Biner.

DBTC urges that this factor weighs heavily against Hranov because she is attempting to use DBTC's presence in the United States as a way to obtain discovery from her adversary in Germany, DBAG.  The Second Circuit and the courts of this District have held that the first <u>Intel</u> factor weighs against an applicant who seeks discovery from its foreign adversary through a section 1782 subpoena served upon its United States agent or affiliate.

In <u>Kiobel</u>, 895 F.3d at 244-45, the Second Circuit concluded that the district court abused its discretion by issuing a section 1782 subpoena to the United States legal counsel of a potential foreign adversary, who possessed documents potentially relevant to the applicant's anticipated litigation against Royal Dutch Shell, a Netherlands company.  "[U]nder existing precedent in this Circuit, when the real party from whom documents are sought (here, Shell) is involved in foreign proceedings, the first Intel factor counsels against granting a Section 1782 petition seeking documents from U.S. counsel for the foreign company."  <u>Id.</u> at 245 (citing <u>Schmitz v. Bernstein Liebhard & Lifshitz, LLP.</u>, 376 F.3d 79, 85 (2d Cir. 2004) (first <u>Intel</u> factor weighed against applicant when "for all intents and purposes petitioners are seeking discovery from DT, their opponent in the German litigation.").)  <u>Kiobel</u>'s analysis also afforded significant weight to a preexisting protective order governing the materials sought by the applicant, as well as harms attendant to compelling the production of documents obtained by United States legal counsel during the course of representing a foreign client.  <u>Id.</u> at 246-48.  The Second Circuit's <u>Schmitz</u> decision noted the express statements of German authorities, who stated that granting discovery threatened an ongoing governmental investigation and "German sovereign rights."  376 F.3d at 84-85.  Courts have thus cautioned against reading <u>Kiobel</u> as creating a fixed rule against granting a subpoena to a foreign adversary's United States affiliate.  <u>In re Batbold</u>, 2023 WL 2088524, at *5 (S.D.N.Y. Feb. 17, 2023) ("the Court does not read <u>Kiobel</u> to impose a rigid requirement on district courts to weigh the first factor against 'agents' of foreign parties.") (Abrams, J.).

Guided by <u>Kiobel</u> and district court authority, the Court concludes that a focus of the inquiry should be whether the discovery sough seeks information concerning the activities of

the person or entity that is the subject of the section 1782 application, or, instead, the activities of the foreign affiliate that is party to the foreign litigation.

DBTC points to Judge Caproni's decision in <u>In re Application of CBRE Global Invs. (NL) B.V.</u>, 2021 WL 2894721, at *9 (S.D.N.Y. July 9, 2021), which observed that "Second Circuit precedent makes clear that a petitioner may not use section 1782 to require an affiliate or related third party to obtain documents from its opponent in the foreign litigation."  However, Judge Caproni then noted that "'[p]arent companies who are 'participants' to foreign proceedings are considered separate legal entities from their subsidiaries and affiliates for the purpose of Section 1782 motions.'  Accordingly, there is no question that, considering only the entities themselves, [respondent] is not a party to the foreign litigations."  <u>Id.</u> at *10 (quoting <u>In re Top Matrix Holdings, Ltd.</u>, 2020 WL 248716, at *5 (S.D.N.Y. Jan. 16, 2020) (Ramos, J.)).  <u>CBRE</u> ultimately concluded that the first <u>Intel</u> factor weighed in favor of the subpoena applicant because it sought information about the activities of the subpoenaed United States-based affiliate and not the parent company that was the applicant's adversary in the foreign proceeding.  <u>See id.</u>

Other judges in the District have similarly concluded that the applicant satisfies the first <u>Intel</u> factor when the applicant seeks information about the activities of the United States subsidiary of the applicant's foreign adversary.  <u>See, e.g.</u>, <u>In re Evenstar Master Fund SPC</u>, 2021 WL 5498283, at *4 (S.D.N.Y. Nov. 23, 2021) (adopting Report and Recommendation that "correctly evaluated the subpoenas as seeking information from U.S.-based Respondents about Respondents' U.S.-based activities, for use in Applicants' foreign litigation against [the foreign adversary], not as an end-run to obtain documents solely pertaining to [the foreign adversary]. Applicants are not trying to obtain [the foreign adversary's] documents from Respondents; they are trying to obtain Respondents' documents from Respondents.") (Seibel, J.); <u>In re Application</u>

of Johannes Roessner, 2021 WL 5042861, at *2 (S.D.N.Y. Oct. 29, 2021) (first Intel factor

weighed in applicant's favor when applicant sought documents from the United States subsidiary

of a German parent, "particularly because the requested information relates to the Respondent's

transactions and thus does not seem to be information that an affiliate or subsidiary would have

solely by virtue of its relationship to the real party to the foreign proceedings and is pertinent

only to the party to the foreign proceedings.") (Wang, M.J.) (quotation marks omitted).

      Judge Engelmayer recently emphasized that in applying the first Intel factor, "a

district court must focus on the 'real party from whom documents are sought,' rather than the

nominal party to whom a subpoena is addressed." In re Saul Klein, 2023 WL 8827847, at *10

(S.D.N.Y. Dec. 21, 2023) (quoting Kiobel, 895 F.3d at 245). In Klein, the applicant subpoenaed

the bank records of his adversary in a Brazil proceeding, which were held by United States

financial institutions. See id. Judge Engelmayer concluded that the first Intel factor weighed

against the applicant:

> The respondents do not have any independent records germane to
> the Brazilian courts. And [applicant] does not dispute that, to the
> extent the parties have accounts at the U.S. financial institutions he
> has subpoenaed, they, as account holders, have access to and could
> access them were such materials sought of them in a Brazilian
> proceeding. For § 1782 purposes, [applicant's] subpoena is thus
> unlike a subpoena to a non-party percipient witness, or even a
> subpoena to a U.S.-based employee of a foreign party. In substance,
> the real party from whom documents are sought are [applicant's]
> opponents (the heirs), all of whom are involved in the foreign
> proceedings. The first Intel factor thus counsels against granting
> [applicant's] petition.

Id. (internal citations, quotation marks and brackets omitted). "A ruling otherwise would

undermine the first Intel factor. It would invite foreign parties to end-run directly seeking

discovery from their adversaries in the foreign proceeding by serving § 1782 subpoenas on the

adversaries' U.S.-based agents or archivists." Id. See also In re Application of Elvis Presley

Enterprises LLC, 2016 WL 843380, at *3 (S.D.N.Y. Mar. 1, 2016) (first Intel factor weighed

against applicant when it sought information from the American parent company of its adversary

in Germany, and materials sought had largely been produced by the adversary already) (Cote, J.).

   The subpoena broadly defines the terms "You," "Your" and "DB" as including

DBTC and "any corporate parent, direct or indirect subsidiary or affiliate thereof," including

DBUCC.  (Subp. Instr. ¶ H.)  It seeks communications by or with Biner concerning the Hranovs,

documents and communications concerning investment advice or strategy from Biner to the

Hranovs concerning Oerlikon, communications sent or received by supervisory and compliance

personnel at "DB" concerning Biner's role in Oerlikon investments, Biner's communications

concerning Oerlikon trading strategy, and documents and communications concerning the

termination of Biner's employment at DB in 2008 or 2009.  (Subp. at p. 6.)  While the

subpoena's definitions incorporate DBTC and DBUCC, Hranov does not suggest that these two

United States entities have played any role in Biner's activities or the Hranovs' investments.

   Hranov's subpoena to DBTC parallels the subpoena before Judge Engelmayer in

Klein.  There is no suggestion that Hranov seeks information about the operations or activities of

DBTC or DBUCC.  Instead, she seeks documents possessed by and related to the actions of its

German adversary, DBAG, specifically as they pertain to Biner, her other adversary in the

German proceeding.  Hranov seeks to use DBUCC's role in providing eDiscovery services to

DBAG as a predicate to subpoenaing DBTC based on DBTC's status as DBUCC's parent.  None

of the requested documents pertain to DBTC or its operations.  DBTC has stated that the

documents are obtainable only if DBUCC acquires them from DBAG and that the documents are

not in DBTC's possession.  Hranov has not plausibly alleged otherwise.  DBAG states "that all

of the subpoenaed documents are accessible to DB[AG] in Germany," subject to applicable laws,

and that some of the subpoenaed documents have already been produced.  (Schmitt Dec. ¶¶ 24, 26.)  Unlike the applicants in CBRE and Evenstar, there is no pretense that Hranov seeks information about the activities of DBTC or even DBUCC.  Rather, "the real party from whom documents are sought are [the applicant's] opponents . . . all of whom are involved in the foreign proceedings."  Klein, 2023 WL 8827847, at *10 (quotation marks omitted).

Though the subpoena is nominally directed to DBTC, the Court concludes that DBAG is the real party from whom documents are sought.  Hranov makes no claim that DBAG, her foreign adversary, is unable to obtain the documents that she seeks.  Though Hranov states that German courts provide for narrower discovery than United States courts, she does not suggest that DBAG has taken the position that the documents are beyond its power to obtain because DBAG uses eDiscovery services in the United States.  The Court concludes that the first Intel factor weighs heavily against Hranov.

B.   Factor Two: The Nature of the Foreign Tribunal.

The second Intel factor considers the nature of the foreign tribunal, the character of the foreign proceeding, and the receptivity of the foreign tribunal to United States judicial assistance.  542 U.S. at 264-65.  There is no suggestion that the German court would not be receptive to United States judicial assistance or that the character of the proceeding weighs against allowing foreign discovery.  This factor weighs in favor of the applicant.

C.   Factor Three: Whether the Request Seeks to Circumvent Germany's Proof-Gathering Restrictions.

The third Intel factor considers whether the request "conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States."  542 U.S. at 265.  There is no suggestion that Hranov's subpoena is an attempt to circumvent such restrictions.  This factor weighs in favor of the application.

- 13 -

D.  <u>Factor Four: The Burden of the Request.</u>

The Fourth <u>Intel</u> factor considers whether the subpoena is "unduly intrusive or burdensome."  542 U.S. at 265.  In contrast to the subpoena in <u>Hranov I</u>, the documents requested involve a confined universe of documents.  DBTC does not urge that the request is unduly intrusive or burdensome.  This factor weighs in favor of the application.

E.   <u>The Additional Issues Raised by DBTC.</u>

"The <u>Intel</u> factors are not to be applied mechanically.  A district court should also take into account any other pertinent issues arising from the facts of the particular dispute." <u>Kiobel</u>, 895 F.3d at 245.  DBTC points to additional considerations that it urges weigh in favor of quashing the subpoena.  The Court addresses each one in turn.

First, DBTC has gone on at length about the origins and reliability of the Disputed Document, deeming it "highly suspicious" and a likely forgery.  (<u>See</u>, <u>e.g.</u>, DBTC Mem. at 13-14.)  DBTC states that this Court "need not decide" whether the document is actually a forgery, but instead should find "that there is a material possibility" that it is a forgery, meaning that Hranov has committed "possibly a fraud upon the German court, not to mention this Court . . . ." (<u>Id.</u> at 14.)  The origins of the document and the effect of its contents are being litigated before the German court in the underlying proceeding.  (<u>See</u>, <u>e.g.</u>, ECF 53.)  Questions about how Hranov came to obtain this document, why it varies from the version of the email archived by DBAG, and any differences between the Disputed Document and the version found on the so-called "Dark Web" are far afield from the considerations before the Court on this section 1782 dispute.  Issues of comity with the German court and the relatively discrete nature of a section 1782 application weigh against making any finding or observation as to the provenance of the Disputed Document.

- 14 -

Second, DBTC urges that that the Court "should not compel Deutsche Bank to oppose two duplicative subpoenas concurrently," and that Deutsche Bank "now faces double the burden" after its previous, successful motion to quash the subpoena against DBAG in Hranov I. (Id. at 14.)  DBTC does not identify an onerous burden caused by Hranov's second subpoena. DBTC's motion to quash is premised in significant part on the separate legal identities of DBTC and DBAG.  It is true that Hranov has proceeded inefficiently by first seeking to serve a subpoena upon DBAG alone while apparently viewing any later subpoena upon DBTC as a back-up plan.  See ECF 1 at 1 (moving for an Order authorizing a subpoena upon DBAG "or, alternatively," DBTC); ECF 8 at 1 n.1 (Order observing that "[a]pplicant does not seek to issue a subpoena to both entities.").  But DBTC does not identify how this has created an unfair prejudice that weighs in favor of quashing the subpoena.

Third, DBTC asserts that the subpoena should be quashed on grounds of futility. (DBTC Mem. at 15-18.)  It states that neither DBTC or DBUCC has ever had possession or control of the documents subpoenaed by Hranov, and that Dolson only supervised the technical aspects of the eDiscovery process, with the actual archival searches performed by DBAG personnel in Europe with the aid of a European vendor.  (Id. at 16 & Witness Statement ¶¶ 4, 10-11, 15-19.)  It states that due to bank secrecy laws, DBTC has no legal right to DBAG's documents, nor does it have control over DBAG.  (Mucke Dec. ¶¶ 9-11.)  It further states that DBTC is a holding company without employees, and documents do not "flow freely" between DBAG and DBTC or between DBUCC and DBTC.  (Mucke Dec. ¶¶ 6, 7, 14-15.)  In response, Hranov argues that DBTC wholly owns DBUCC, that DBTC has not pointed to any specific bank secrecy laws that would prevent DBAG from disclosing documents to DBUCC, and that

DBAG "cannot unilaterally override" a lawful subpoena issued to its subsidiary.  (Opp. Mem. at 20-25.)

Though framed around the issue of futility, the parties' arguments largely underscore that Hranov's application seeks to use DBTC as a conduit to obtain discovery from DBAG, and not documents or information related to the operations of DBTC itself.  (See, e.g., Opp. Mem. at 23 ("[I]t matters not that the documents sought may be [DBAG's] documents. [DBAG's] documents are under the control of DBUCC.").)  However, on this record, the Court is unable to decide whether it would be futile to enforce the subpoena upon DBTC because of its relationship to DBUCC and DBAG, or because of the effect of any European bank secrecy laws. In CBRE, Judge Caproni concluded after oral argument that an American holding company likely possessed or could obtain at least some responsive documents despite a testimonial declaration asserting otherwise.  2021 WL 2894721, at *5-6.  Focused discovery would likely shed light on DBTC's possession of documents and its ability to obtain the documents of DBAG through DBUCC.  At this stage, DBTC's futility argument does not favor quashing the subpoena.

F.   Weighing the Discretionary Factors under *Intel*.

Hranov acknowledges that she is not seeking documents or information about DBTC and instead seeks information from DBAG about the acts of its former employee, Biner. Both DBAG and Biner are Hranov's adversaries in the underlying proceeding in Germany. DBTC is a respondent to the subpoena solely because it is the parent company of DBUCC, which, in turn, employs Dolin, who has supervisory authority over the eDiscovery system used to obtain electronic information maintained by DBAG.  Thus, Hranov seeks information from

DBTC "solely by virtue of its relationship to the real part[ies] to the foreign proceedings."
Roessner, 2021 WL 5042861, at *2.

   That Hranov is seeking information from DBTC as a conduit to DBUCC, which,
in turn, is a conduit to DBAG, weighs heavily against her subpoena and supports issuing an
Order granting DBTC's motion to quash.  Similar to the circumstances in Klein, "[t]he
respondent[ ] do[es] not have any independent records germane to the [German] courts."  2023
WL 8827847, at *10.  The real party from whom the documents are sought – DBAG – is
Hranov's adversary in the German proceedings.  Enforcing the subpoena upon DBTC "would
invite foreign parties to end-run directly seeking discovery from their adversaries in the foreign
proceeding by serving § 1782 subpoenas on the adversaries' U.S.-based agents or archivists."  Id.

   In its discussion in Hranov I as to whether DBAG is "found" in this District, the
Court noted that "[i]n essence, Hranov urges that a company should be 'found' in any forum
where an information technology professional can access and retrieve archived electronic data.
Given the ubiquity of electronic data and communications, this approach could allow for a
presence similar to general jurisdiction in any forum where the respondent maintains an
information-technology team."  2022 WL 1261827, at *6.  In her current subpoena to DBTC,
Hranov seeks to similarly use section 1782 to extract information from a foreign adversary based
solely on the United States presence of an affiliate capable of extracting electronic data.

   In this instance, the first Intel factor significantly outweighs the other three Intel
factors, and the motion to quash will be granted.

CONCLUSION.

   DBTC's motion to quash is GRANTED.  The Clerk is respectfully directed to
terminate the motion (ECF 39) and close this case.

- 17 -

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
       May 15, 2024